memo in support of msj

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf,<br><br>Plaintiffs,<br><br>v.<br><br>HAWAI‘I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.,<br><br>Defendants.<br>_____ | CIVIL NO. CV04-00596 ACK LEK<br>(Federal and State - Qui Tam)<br><br>MEMORANDUM IN SUPPORT OF MOTION |

_

## MEMORANDUM IN SUPPORT OF MOTION

TABLE OF CONTENTS

Page

I.     Introduction and Summary....................................................................1

II.    FACTS.................................................................................................3

III.   ARGUMENT .......................................................................................9

A.     THE HPH DEFENDANTS DID NOT VIOLATE THE FALSE CLAIMS
       ACT ..................................................................................................12

       1.    Governing Legal Standards ............................................................12

             a.    Rule 56...................................................................................12

             b.    The Federal and Hawaii False Claims Acts ..............................14

       2.    KMC's Chemotherapy Billings Did Not Violate Any Medicare Statutes,
             Rules, or Guidelines .......................................................................15

       a.    The "Incident To" Regulations Require the Use of a Supervising
             Physician's Billing Number Even if the Physician Never Saw the
             Patient...............................................................................................16

       b.    KMC Chemotherapy Billing Was in Compliance with the "Incident to"
             Rules 19

       c.    Relator's Allegations Concerning Untrained Personnel and the
             Suitability of Medical Treatment Do Not Constitute False Claims ......24

       3.    The Undisputed Facts Demonstrate that Relator Lockyer Acted as the
             Supervising Physician For Purposes of "Incident To" Billing............28

B.     Plaintiff Lockyer Cannot Satisfy the Required Elements for a
       Retaliation Claim Under the FCA ................................................................32

IV.    CONCLUSION .........................................................................................36

## TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................13

*British Motor Car Distribs., Ltd. v. San Francisco Auto. Indus. Welfare Fund*,
    882 F.2d 371 (9th Cir. 1989)...................................................................29

*Casumpang v. Int'l Longshore & Warehouse Union, Local
    142*, 361 F. Supp. 2d 1195 (D. Hawaii 2005) ................................. 12, 29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................12

*Lum v. Vision Serv. Plan*,
    104 F. Supp. 2d 1237, 1240 (D. Hawaii 2000)......................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................13

*United States ex rel Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001)....................................................................28

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
    314 F.3d 995 (9th Cir. 2002)...................................................................13

*United States ex rel. Durcholz v. FKW Inc.*,
    189 F.3d 542 (7th Cir. 1999)............................................................ 14, 15

*United States ex rel. Hinden v. UNC/Lear Servs., Inc.*,
    362 F. Supp. 2d 1203, 1209 (D. Hawaii 2005)......................................33

*United States ex rel. Hochman v. Nackman*,
    145 F.3d 1069 (9th Cir. 1998) ................................................................15

*United States ex rel. Hopper v. Anton*,
    91 F.3d 1261 (9th Cir. 1996) ........................................................... 33, 34

i

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
   360 F.3d 220 (1st Cir. 2004) .......................................................... 33, 34

*United States ex rel. Lindenthal v. General Dynamics Corp.*,
   61 F.3d 1402 (9th Cir. 1995) ................................................................. 15

*United States ex rel. Local 234 v. Caputo Co.*,
   321 F.3d 926 (9th Cir. 2003) ................................................................. 15

*United States ex rel. Mathews v. Bank of Farmington*,
   166 F.3d 853 (7th Cir. 1999) ................................................................. 15

*United States ex rel. McCarthy v. Straub Clinic and Hosp., Inc.*,
   140 F. Supp. 2d 1062 (D. Hawaii 2001) ................................................ 33

*United States ex rel. Phillips v. Permian Residential Ctr.*,
   386 F. Supp. 2d 879 (W.D. Tex. 2005) ................................................. 28

*United States ex rel. Rost v. Pfizer Inc.*,
   446 F.  Supp. 2d 6, 12 n.13 (D. Mass. 2006) ....................................... 15

*United States v. Prabhu*,
   442 F. Supp. 2d 1008 (D. Nev. 2006) ............................................ 15, 29

## Statutes

31 U.S.C. § 3729 .......................................................................................14

31 U.S.C. § 3729(a)(1) ...............................................................................14

31 U.S.C. § 3729(a)(2) ...............................................................................14

31 U.S.C. § 3729(a)(3) ...............................................................................14

31 U.S.C. § 3729(b) ...................................................................................14

31 U.S.C. § 3729(b)(3) ...............................................................................14

31 U.S.C. § 3730(b) ...................................................................................15

31 U.S.C. § 3730(d)(1) ...............................................................................15

31 U.S.C. § 3730(d)(2) ...............................................................................15

31 U.S.C. § 3730(h)..............................................................12, 32, 33, 37

Haw. Rev. Stat. § 378-61 ...............................................................32, 37

Haw. Rev. Stat. § 378-62 ....................................................................33

Haw. Rev. Stat. § 661-21 ....................................................................14

Haw. Rev. Stat. §§ 661-21 to 661-29...................................................14

**Other Authorities**

66 Fed. Reg. 55267 (Nov. 1, 2001) .......................................10, 17, 19, 22

**Rules**

42 C.F.R. § 410.26.......................................................... 10, 17, 18

42 C.F.R. § 410.26(a)(5) ....................................................................10

42 C.F.R. § 410.26(b)(5) ....................................................................30

42 C.F.R. § 410.32(b)(3)(ii) ....................................................... 10, 18, 30

42 C.F.R. §§ 410.10...........................................................................17

42 C.F.R. §§ 410.26 (a)(2)..................................................................10

Fed. R. Civ. P. 56(c)..........................................................................13

<u>MEMORANDUM IN SUPPORT OF MOTION</u>

Defendants Hawai'i Pacific Health, Kauai Medical Clinic, Wilcox Memorial Hospital, and Wilcox Health System (the "HPH Defendants") seek summary judgment on all counts in the Complaint in the above-captioned case brought under the False Claims Act, 31 U.S.C. § 3729 et seq.

## I.     Introduction and Summary

This case involves the administration of chemotherapy to patients at the Kauai Medical Clinic ("KMC" or the "Clinic"), a clinic serving a small population that would otherwise have to travel to Honolulu for cancer treatment, particularly administration of chemotherapy.

Cancer patients are examined and evaluated by the resident oncologist at KMC who prescribes a course of treatment, if indicated.  If the treatment involves chemotherapy, the oncologist writes the name and strength of the chemotherapy drug and the range of the red blood cell count, white blood cell count, and platelet count required for chemotherapy to be administered, among other things, in the patient's chart.  Consistent with the standard of care in oncology, trained oncology nurses review the patient's blood test results.  If the blood counts are within the range specified by the oncologist, the nurse administers the chemotherapy prescribed by the oncologist.

The oncologist is present in the Clinic on most days that chemotherapy is

administered.  The standard of care in oncology, however, does not require an

oncologist to be present when chemotherapy is being administered.  On those few

days when the oncologist is not present, an internist from the Clinic is readily

available to assist the nurses should the need arise.  Under these circumstances, the

applicable Medicare billing rules require the Clinic to bill for the chemotherapy

using the internist's Medicare provider number even though the internist probably

never even saw the patient.

James Lockyer, an internist at KMC, was engaged in an employment dispute

with the Clinic over compensation.  The parties engaged in arbitration on the issue

and, in the course of the arbitration, his attorneys discovered that Dr. Lockyer's

Medicare provider number had been used to bill for chemotherapy services.

Dr. Lockyer thereupon abandoned the arbitration and initiated this whistleblower

action alleging that KMC submitted false claims to Medicare when it billed for

chemotherapy using his Medicare provider number.  Dr. Lockyer maintains that the

claims are false because (1) he never saw any of the patients, and (2) he could not

have been providing any services in connection with chemotherapy because the

administration of chemotherapy requires the presence of an oncologist.

Dr. Lockyer also alleges retaliation under the False Claims Act ("FCA") in spite of

the fact that (1) he did not learn of the alleged fraud until after he initiated

arbitration for redress of his compensation complaints, which he now claims were

2

retaliatory acts, and (2) he admits that he conducted no investigation into any alleged fraud at KMC.

## II.  FACTS

KMC is a small outpatient medical clinic, adjacent to Wilcox Memorial Hospital, in Lihue, Kauai.  (*Joseph Decl. ¶ 2*, Exh. 1.)  Because the population of Kauai is approximately 60,000, the Clinic employs one oncologist so that the residents of Kauai do not have to fly to Honolulu for cancer treatment.  (*Id.*)  While the clinic has employed several oncologists over the past several years, there has never been more than one oncologist employed by the Clinic at one time.  (*Id.*)

The oncologist is a member of the Clinic's Internal Medicine Department.  (*Joseph Decl. ¶ 3*, Exh. 1.)  Chemotherapy is administered in a large room that is generally used for infusion therapy, although it is usually referred to as the "chemo suite."  (*Id.*)  The chemo suite is located within the internal medicine suite on the second floor of the Clinic, where the offices of all of the internists are located. (*Id.*)  The internists' offices are all approximately 30 to 50 feet from the chemo suite.  (*Id.*)

Chemotherapy at KMC is prescribed by the oncologist and administered by trained qualified oncology nurses.  (*Joseph Decl. Exh. A*, Exh. 1A; *Diana Decl. ¶¶ 3,5-6*, Exh. 5; *Carter Decl. ¶¶ 3, 5-6*, Exh. 3; *Carlozzi Decl. ¶¶ 2-3*, Exh. 2.)  The oncologist's written prescription contains the name and strength of the drug to

be administered, the blood tests to be administered prior to chemotherapy, and the acceptable range of red and white blood cell count for the patient in order for chemotherapy to be administered.  (*Diana Decl ¶ 3*, Exh. 5; *Carter Decl.¶ 4*, Exh. 3; *Carlozzi Decl. ¶ 2*, Exh. 2.)

The oncology nurses typically draw the patient's blood within 24 hours of treatment and send it for testing.  (*Diana Decl. ¶ 5*, Exh. 5;  *Carter Decl. ¶ 5*, Exh. 3; *Carlozzi Decl. ¶ 3*, Exh. 2.)  When the results come back from the laboratory, the nurses review them to ascertain whether the red and white blood cell count is within the range specified by the oncologist.  (*Id.*)  If the blood count is within the required range, the nurse will proceed with the administration of chemotherapy without consulting a physician.  (*Id.*)  If the blood count, however, is within a gray area, the nurse will consult the oncologist or the covering physician.  (*Id.*)

The oncologist is normally in the office during the hours chemotherapy is being administered at the Clinic.  (*Diana Decl. ¶ 7*, Exh. 5;  *Carter Decl. ¶ 7*, Exh. 3; *Carlozzi Decl. ¶ 4*, Exh. 2.).  When the oncologist is going to be away from the Clinic and chemotherapy is scheduled to be given, an internist is asked to cover. (*Diana Decl. ¶ 8*, Exh. 5;  *Carter Decl. ¶ 7*, Exh. 3;  *Carlozzi Decl. ¶ 5*, Exh. 2; *McKnight Decl. ¶ 2*, Exh. 6.)  This is to ensure that there is a physician available to consult about unusual blood test results, to handle emergencies, or to treat side effects. (*Diana Decl. ¶ 15*, Exh. 5;  *Carlozzi Decl. ¶ 10*, Exh. 2;  *McKnight Decl.*

4

*¶ 4*, Exh. 6.)  The most common side effects during chemotherapy are allergic reactions such as hypersensitivity, hives, shortness of breath or chest tightness, all conditions that can be treated by any physician.  (*Diana Decl. ¶ 14*, Exh. 5; *Carter Decl. ¶ 10*, Exh. 3; *Carlozzi Decl. ¶ 9*, Exh. 2.)  One experienced oncology nurse does not recall ever having to seek the assistance of a physician for any kind of condition resulting from the administration of chemotherapy.  (*Carter Decl. ¶ 10*, Exh. 3.)  Another oncology nurse recalls only three instances in seven years in which she found it necessary for a physician who was immediately available to see a patient receiving chemotherapy.  (*Diana Decl.¶ 14*, Exh. 5.)  This nurse does not recall any patients during her seven years at KMC who needed to be admitted to the hospital or taken to the emergency room because of any reaction to chemotherapy. (*Id.*)

If the oncologist is away from the Clinic and there is no other physician available to cover, chemotherapy is not administered.  (*Diana Decl. ¶ 12*, Exh. 5; *Carlozzi Decl. ¶ 8*, Exh. 2.)  Significantly for this case, if a patient's blood test results are within the range appropriate for chemotherapy, and there are no side effects or emergencies, there is no reason a covering physician would ever see the patient.  (*Carlozzi Decl. ¶ 10*, Exh. 2; *Diana ¶15*, Exh. 5; *Carter Decl. ¶ 10*, Exh. 3.)

Dr. Lockyer was one of the internists who covered chemotherapy when the oncologist was away from the Clinic. (*McKnight Decl. ¶ 5*, Exh. 6; *Carter Decl. ¶ 9*, Exh. 3; *Diana Decl. ¶¶ 9,10, 11*, Exh. 5; *Carlozzi Decl. ¶¶ 5,7*, Exh. 2.) Thus, as Dr. Lockyer testified, he was available to, and did, assist oncology nurses with medical emergencies (*Depo. at 83-84*, Exh. 4; *Depo. at 106-8*, Exh. 4); treat patients having side effects to chemotherapy (*Id.*); and countersign chemotherapy charts that the oncology nurses had completed and signed, as well as other records, indicating that he had been covering that day (*G.P. Medical Record d:6/7/02*, Exh. 12; *H.H. Medical Record d:5/8/02*, Exh. 13; *T.D. Medical Record d: 2/16/01*, Exh. 14; *A. I. Medical Record d: 8/6/01*, Exh. 15; *L. S. Medical Record d: 5/10/02*, Exh. 16; *A. B. Medical Record d: 5/22/03*, Exh. 17; *R. L. Medical Record d: 10/9/01*, Exh. 18; *R. L. Medical Record d: 11/1/01*, Exh. 19; *Depo. at 51*, Exh. 4; *Diana Decl. ¶ 10*, Exh. 5).

Dr. Lockyer complained about having to cover because he believed he should receive extra compensation for doing so. (*Carlozzi Decl. ¶ 7*, Exh. 2.) In the Spring of 2002, when there was a ten day period during which no oncologist would be present at the clinic, each of the internists, including Dr. Lockyer, was assigned a day to cover. Extra compensation was to be provided for coverage. (*Email d: 6/3/02*, Exh. 1B; *Ltr. D:8/23/02*, Exh. 11; *Email d:8/16/02*, Exh. 1C.) Dr. Lockyer was acknowledged to have covered on the day he was assigned and was,

6

therefore, entitled to the additional compensation. (*Email d:8/16/02*, Exh. 1C.)

Compensation was a continual source of contention between Dr. Lockyer and KMC. This dispute over compensation eventually resulted in employment arbitration. (Compl. ¶ 21.) In the course of the arbitration, Dr. Lockyer obtained, among other things, KMC's Medicare billings utilizing his Medicare provider number from December 1999 – September 2003. (Compl. ¶ 21.) The Complaint further alleges that upon reviewing these billings, Dr. Lockyer "discovered" that approximately 378 claims had been submitted using his provider number for "chemotherapy and other injectable drugs" for patients, "many of whom Qui Tam Plaintiff LOCKYER had never seen in his practice." (Compl. ¶ 23.) Believing he had discovered fraud, Dr. Lockyer abandoned the arbitration and initiated this case under the *qui tam* provisions of the FCA.

The fraud allegations centered on the charges for chemotherapy under Dr. Lockyer's Medicare provider number (Compl. ¶ 26) and lab tests that allegedly were not medically necessary because they were not read by the physician ordering the chemotherapy, *i.e.*, the oncologist (Compl. ¶ 28).

An examination of the Written Disclosure Statement ("Disclosure") submitted by Dr. Lockyer with his Complaint, makes his theory of fraud clear.[1] According to

---

[1] When an action is initiated under the *qui tam* provisions of the FCA, the relator is required to file a written disclosure of material evidence and information together with the complaint. 31 U.S.C. §3730(b)(2).

the Disclosure, one of Dr. Lockyer's attorneys compared the charges that had been made using his Medicare provider number with his Daysheets listing the patients Dr. Lockyer had seen in the clinic during the same period. (Disclosure at 2-3.) This analysis "revealed that KMC had charged for chemotherapy and other drugs allegedly administered to patients who were not his patients, and even if they were his patients, in whom he had no role in that aspect of their care." (Disclosure at 3.) The Disclosure also alleges that cancer treatment was delivered by "unsupervised personnel." (Disclosure at 6.) The Disclosure goes on to clarify that, in Dr. Lockyer's opinion, an oncologist was required to be present to "supervise" the delivery of chemotherapy. (*Id*.) Thus, Dr. Lockyer claims that he refused to sign charts documenting that chemotherapy had been administered "because they did not document that the pre-treatment blood work had been reviewed by an oncologist prior to the administration of the chemotherapy." (Disclosure at 11.) According to Dr. Lockyer, the administration of chemotherapy without having had an oncologist first read the lab work constitutes fraud. (Disclosure at 11.) The United States Attorney's Office agreed with this theory of fraud and intervened in this action.

Dr. Lockyer also alleges retaliation under the FCA. The alleged retaliatory action taken by the HPH Defendants was the reduction in his compensation – the same reduction in his compensation that led to the arbitration during which he first

learned of the alleged fraud. Thus, Dr. Lockyer is alleging that he was retaliated against *before* he became aware there was alleged fraud to investigate.

## III.    ARGUMENT

### Summary of Argument

Dr. Lockyer's fraud theory is based on two erroneous premises (1) that it was unlawful for KMC to bill for chemotherapy using Dr. Lockyer's Medicare provider number for patients he allegedly never saw and did not know, and (2) that it was unlawful for KMC to bill for lab work when no oncologist was present to read the results prior to the administration of chemotherapy. As the HPH Defendants fully demonstrate below, Dr. Lockyer's theory of fraud is completely without foundation for the reasons that follow.

Trained oncology nurses review a patient's medical records and laboratory data prior to administering chemotherapy. The nurses monitor the patient while the chemotherapy is being administered. The recognized standard of care in oncology does not require the presence of an oncologist when chemotherapy is being administered. As a result, oncologists do not make it a practice to be present when chemotherapy is being administered. (*Gelmann Decl. ¶ 4*, Exh. 9; *Vanderbilt University Center, Cytotoxic Drug (CHEMOTHERAPY) Administration & Management at 4*, Exh. 10; *Cho Decl. ¶ 3*, Exh. 21.)

The Medicare regulations set forth at 42 C.F.R. § 410.26, govern services and supplies incident to a physician's professional service that are administered by a nonphysician, such as a nurse, under the "direct supervision" of a physician. "Direct supervision" means present in the office suite and immediately available to furnish assistance and direction, but does not mean present in the same room.  42 C.F.R. §§ 410.26 (a)(2),  410.32(b)(3)(ii).  Moreover, if a nurse is giving a flu shot incident to the services of Dr. A, the direct supervision may be provided by Dr. B. 42 C.F.R. § 410.26(a)(5).  Under those circumstances, the regulations require that Dr. B's Medicare provider number be used to bill for the treatment even if he never saw the patient.  66 Fed. Reg. 55267 (Nov. 1, 2001).

To place this in concrete terms, an attorney for the HPH Defendants posed, as a hypothetical, the facts of this case to the individuals within the Centers for Medicare and Medicaid Services ("CMS"), the agency that wrote and administers the "incident to" regulations – the U.S. Attorney's Office's "client" in this case. CMS was asked whether the incident to rules would be satisfied where services are provided by oncology nurses and an internist was in the adjacent suite available to assist.  The response was that the general incident to rules would apply.  (*Rauzi Decl. Exh. B*, Exh. 7B.)  When asked whether the supervising physician must be an oncologist, CMS responded that the supervising physician need not be the same specialty as the ordering physician, but must be available to render assistance.

(*Rauzi Decl. Exh. B*, Exh. 7B.)  Finally, CMS was asked whether the supervising physician (the internist) must review the lab work prior to the nurse initiating chemotherapy.  The response was "no" as long as the nurse is qualified.  (*Rauzi Decl. Exh. B*, Exh. 7B.)

The carrier, Medicare's contractor responsible for reviewing claims for eligibility for payment, reviewed KMC's claims, including its claims for chemotherapy, and determined them to be "entirely consistent" with applicable regulations. (*Fong Decl. ¶ 8*, Exh. 8.)  The Carrier's Medical Director for the 2000-2004 period has stated flatly that, in the case of chemotherapy, the "supervising" physician need not be an oncologist, is unlikely to ever see the patient, and is required to use his Medicare provider number when billing for chemotherapy. (*Fong Decl. ¶¶  6, 7*, Exh. 8.)

In short, this is a case that never should have been brought, and would not have been if Dr. Lockyer and his attorneys had simply read the relevant regulations and the applicable medical standards of care.  This lack of proper diligence has been exacerbated by the United States Attorney's Office which now appears to be taking a position that conflicts with that of its "client" CMS.

Finally, under a strangely dubious theory, Dr. Lockyer alleges retaliation under the FCA.  The form of the alleged retaliation is the reduction in his compensation.  (Compl. ¶ 21; Disclosure at 2, 3, 4, 6-7.)  By his own admission –

indeed, in his Complaint – Dr. Lockyer flatly states that he initiated arbitration "[a]s a result of a dispute over compensation." (Compl. ¶ 21; *see also* Disclosure at 2, 3, 4, 6-7.) As a result of "his analysis" of documents he received in the arbitration proceeding, he discovered alleged fraud. (Compl. ¶ 22.) The retaliation provisions of the FCA do not contemplate an action for adverse consequences that took place prior to the discovery of alleged fraud. The Act requires the relator to have been investigating alleged fraud and to have suffered consequences because the employer became aware of the relator's activities. 31 U.S.C. § 3730(h). Dr. Lockyer has admitted that he did not investigate any alleged fraud, much less that KMC knew about it.

Therefore, as we now demonstrate in detail, the HPH Defendants' motion for summary judgment should be granted.

## A. THE HPH DEFENDANTS DID NOT VIOLATE THE FALSE CLAIMS ACT

### 1. Governing Legal Standards

#### a. Rule 56

The purpose of summary judgment is "to identify and dispose of factually unsupported claims and defenses." *Casumpang v. Int'l Longshore & Warehouse Union, Local 142*, 361 F. Supp. 2d 1195, 1200 (D. Hawaii 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 232 (1986)); *Lum v. Vision Serv. Plan*, 104 F. Supp. 2d 1237, 1240 (D. Hawaii 2000). Summary judgment shall be granted when "the

pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Lum v. Vision Serv. Plan*, 104 F. Supp. 2d at 1240.

While "[t]he evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In order to proceed to trial in an FCA case, a relator is required "to present evidence of actual false claims made by defendants."  *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002).  Failure to do so is a failure to create a triable issue of fact.  *Id.*

In this case, Dr. Lockyer has failed to establish essential elements of the causes of action asserted, presenting only erroneous legal theories and self-serving testimony that is contradicted by the other evidence in the record.

b.    The Federal and Hawaii False Claims Acts

The Complaint alleges that KMC violated the federal and the Hawaii False

Claims Acts.[2]  The FCA imposes liability under these provisions upon any person

who:

> (1) knowingly presents, or causes to be presented, to an officer or
> employee of the United States Government ... a false or fraudulent
> claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or approved
> by the Government;
>
> (3) conspires to defraud the Government by getting a false or
> fraudulent claim allowed or paid . . . .

31 U.S.C. § 3729(a)(1), (a)(2), (a)(3).  The terms "knowing" and "knowingly" do

not require proof of specific intent to defraud the government, 31 U.S.C. §

3729(b)(3), but require that the defendant have "actual knowledge of the

information," or act "in deliberate ignorance of the truth or falsity of the

information," or act "in reckless disregard of the truth or falsity of the information."

31 U.S.C. § 3729(b).  Innocent mistakes, and even negligence, are not actionable

under the FCA.  *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th

Cir. 1999).  Instead, the government or the whistleblower must demonstrate the

---

[2] Hawaii enacted the state false claims act, Haw. Rev. Stat. §§ 661-21 to 661-29, on
May 26, 2000.  Haw. Rev. Stat. § 661-21 is virtually identical to 31 U.S.C. § 3729.
*See United States ex rel. Rost v. Pfizer Inc.*, 446 F.  Supp. 2d 6, 12 n.13 (D. Mass.
2006).  Thus, HPH Defendants' arguments under the federal FCA apply equally to
Plaintiff's claims under the state FCA.

"knowing presentation of a claim that is either fraudulent or simply false." *Id.*

The FCA allows an action to be initiated by a private citizen, (the "relator"). After investigating a relator's claim, the federal and/or state government can decide to intervene and take over the prosecution of the action, or decline to intervene and allow the relator to prosecute the action. In the instant case, the federal government intervened but the State of Hawaii has not. 31 U.S.C. § 3730(b), 31 U.S.C. § 3730(d)(1), (2); *see generally United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 857-58 (7th Cir. 1999).

### 2.    KMC's Chemotherapy Billings Did Not Violate Any Medicare Statutes, Rules, or Guidelines

"Claims are not 'false' under the FCA unless they are furnished in violation of some controlling rule, regulation or standard." *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006); *see also United States ex rel. Local 234 v. Caputo Co.*, 321 F.3d 926, 933 (9th Cir. 2003) ("For a false claim suit to succeed, the plaintiff must show that the claim was false, that is, contrary to an existing state of things."); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073-74 (9th Cir. 1998) (finding no falsity under the FCA when the defendants' acts conformed with the Veteran Administration payment guidelines); *United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1412 (9th Cir. 1995) (finding that "any claims for payment based on work that satisfied GD's [the contractor,

General Dynamics] contractual obligations to the AF [Air Force] could not have been 'false or fraudulent' within the meaning of the FCA").

As we now demonstrate, none of the allegations in the Complaint amount to even a regulatory violation. It follows that KMC's claims to Medicare were not "false," and, as a result, the KMC Defendants could not have submitted *false* claims.

          a.    The "Incident To" Regulations Require the Use of a Supervising Physician's Billing Number Even if the Physician Never Saw the Patient

Relator contends that KMC engaged in fraud because it billed for chemotherapy services, using his Medicare provider number, when he never saw the patients or provided chemotherapy services. This contention is based upon a total misunderstanding of the applicable regulations.

The Medicare Program is administered by the Department of Health and Human Services through CMS. CMS has contracted with insurance companies, called carriers, to administer and pay claims within a designated part of the country. Noridian Administrative Services, LLC ("Noridian") is the carrier serving Hawaii and the carrier that administers KMC's claims. CMS has published the Medicare Carriers Manual that provides regulatory guidance to its carriers.

Certain health services, such as chemotherapy, provided at outpatient clinics are covered under Medicare Part B. As an outpatient clinic, KMC may bill

16

Medicare Part B for the services of auxiliary personnel if those services are "incident to the service of a physician" using the physician's Unique Provider Identification Number ("UPIN") on the bill submitted to the carrier. 42 C.F.R. §§ 410.10 and 410.26. Prior to January 1, 2002, the regulation governing such "incident to" services, 42 C.F.R. § 410.26, stated: (a) Medicare Part B pays for services and supplies incident to a physician's professional services, including drugs and biologicals that cannot be self-administered, if the services or supplies are of the type that are commonly furnished in a physician's office or clinic, and are commonly furnished either without charge, or included in the physician's bill."

On November 1, 2001, CMS promulgated a final rule making changes that affected Medicare Part B payment, including revising the regulation governing services and supplies incident to a physician's professional services, 42 C.F.R. § 410.26. 66 Fed. Reg. 55246 (Nov. 1, 2001). The new rule was intended to codify the then-existing policy set forth in section 2050 of the Medicare Carriers Manual. 66 Fed. Reg. 55267-8 (Nov. 1, 2001). Thus, effective January 1, 2002, 42 C.F.R. § 410.26 stated:

> (b) Medicare Part B pays for services and supplies incident to the service of a physician (or other practitioner).
>
> > (1) Services and supplies must be furnished in a noninstitutional setting to noninstitutional patients.
> > (2) Services and supplies must be an integral, though incidental, part of the service of a physician (or other practitioner) in the course of

diagnosis or treatment of an injury or illness.
(3) Services and supplies must be commonly furnished without charge or included in the bill of a physician (or other practitioner).
(4) Services and supplies must be of a type that are commonly furnished in the office or clinic of a physician (or other practitioner).
(5) Services and supplies must be furnished under the direct supervision of the physician (or other practitioner). <u>The physician (or other practitioner) directly supervising the auxiliary personnel need not be the same physician (or other practitioner) upon whose professional service the incident to service is based.</u>
(6) Services and supplies must be furnished by the physician, practitioner with an incident to benefit, or auxiliary personnel.
(7) A physician (or other practitioner) may be an employee or an independent contractor. (emphasis added).

Because the regulations effective January 1, 2002 incorporated the then-existing policy set forth in the Medicare Carriers Manual, the same "incident to" rules applied during the entire relevant period of this litigation.

The term "direct supervision" as used in 42 C.F.R. § 410.26 is defined by reference to 42 C.F.R. § 410.32(b)(3)(ii), which provides: "Direct supervision in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." This mirrors the definition of "direct personal supervision" contained in the Medicare Carriers Manual § 2050.1B.

CMS has not defined the term "office suite," but has deferred to the carrier for its interpretation. (*Rauzi Decl. Exh. B*, Exh. 1B (informal guidance from CMS

employee Dorothy Shannon).)  Noridian uses the general rule that "immediately

available" means the supervising physician is able to provide assistance and

direction in five minutes or less.  Noridian, Frequently Asked Questions and

Answers/Claims/Incident To, https://www.noridianmedicare.com/p-

medb/news/faq/claims.html#incident.

In the preamble to the 2001 final rule, CMS clarified and distinguished

between the physician ordering the incident to service and the physician supervising

the auxiliary personnel who perform the incident to service.  66 Fed. Reg. 55267

(Nov. 1, 2001).  Specifically, in response to comments about confusion as to whose

Medicare Part B billing number should be used on the claim form, CMS responded:

> When a claim is submitted to Medicare under the billing number of a
> physician (or other practitioner) for an incident to service, the
> physician is stating that he or she either performed the service or
> directly supervised the auxiliary personnel performing the service.
> Accordingly, the Medicare billing number of the ordering physician
> (or other practitioner) should not be used if that person did not directly
> supervise the auxiliary personnel.

*Id.*  Thus, health care providers are required to use the supervising physician's

UPIN when billing Medicare for "incident to" services or supplies.

                    b.    KMC Chemotherapy Billing Was in Compliance with the
                          "Incident to" Rules

It was the normal procedure at KMC's chemo suite for an oncologist to have

an initial consult with the chemotherapy patient.  (*Carlozzi Decl. ¶ 2*, Exh. 2.)  The

oncologist provided a written order for each chemotherapy patient setting forth the

required blood tests, the acceptable parameters for the blood test results, and types and amounts of chemotherapy to be provided. (*Carlozzi Decl. ¶ 2*, Exh. 2; *Diana Decl. ¶¶ 3, 4*, Exh. 5; *Carter Decl. ¶ 4*, Exh. 3.) The nurses working in KMC's chemotherapy suite received on-the-job training, attended courses on chemotherapy treatment, and became certified as oncology nurses, a test for which a nurse becomes eligible only after completing a certain number of hours of on-the-job training. (*Carlozzi Decl. ¶ 1*, Exh. 2; *Carter Decl. ¶¶ 1-3*, Exh. 3; *Diana Decl. ¶¶ 1, 2*, Exh. 5; *Joseph Decl. Exh. A*, Exh. 1A.)

The nurses working in the chemo suite drew blood as ordered and reviewed the results of the blood tests in accordance with the parameters provided by the oncologist. (*Carlozzi Decl. ¶ 3*, Exh. 2; *Diana Decl. ¶ 5*, Exh. 5; *Carter Decl. ¶ 5*, Exh. 3.) The nurses proceeded with chemotherapy if the blood tests were normal and alerted a physician if the tests were abnormal before proceeding with chemotherapy. (*Carlozzi Decl. ¶ 3*, Exh. 2; *Diana Decl. ¶ 5*, Exh. 5; *Carter Decl. ¶ 5*, Exh. 3.) After confirming that the blood test results fell within the acceptable parameters set forth by the oncologist, the nurses prepared chemotherapy drugs in accordance with the oncologist's orders. (*Diana Dec. ¶ 6*, Exh. 5; *Carter Decl. ¶ 6*, Exh. 3.)

An oncologist was normally present in the office at the time a chemotherapy patient received treatment. (*Carlozzi Decl. ¶ 4*, Exh. 2; *Diana Decl. ¶ 7*, Exh. 5;

*Carter Decl. ¶ 7*, Exh. 3.)  If the oncologist was unavailable, another physician

from the Clinic would be assigned to cover for the oncologist.  (*McKnight Decl.*

*¶ 2*, Exh. 6; *Carlozzi Decl. ¶ 4*, Exh. 2; *Diana Decl. ¶ 7*, Exh. 5; *Carter Decl. ¶ 7*,

Exh. 3.)  Physicians in the Internal Medicine Department of the Clinic, including Dr.

Lockyer, covered the chemo suite if the oncologist was not present on a certain day.

(*McKnight Decl. ¶ 2*, Exh. 6; *Carlozzi Decl. ¶¶ 5, 7*, Exh. 2; *Diana Decl. ¶¶ 8, 9,*

*11*, Exh. 5; *Carter Decl. ¶ 7, 9*, Exh. 3.)  The Internal Medicine Department is

located on the same floor as the chemo suite 30-50 feet away.  (*Carlozzi Decl. ¶ 5*,

Exh. 2; *Carter Decl. ¶ 7*, Exh. 3; *Joseph Decl*., Exh. 1.)  In fact, as Dr. Lockyer

explained, the chemo suite could be seen from part of the internal medicine

department.  (*Depo. at 62*, Exh. 4.)  The practice was that the covering physician

would be in the chemotherapy suite or in the Internal Medicine Department down

the hall.  (*McKnight Decl. ¶ 4*, Exh. 6.)

On those occasions when the oncologist was unavailable, the oncology

nurses were aware of which doctor was covering, as this was arranged in advance,

and the nurses would leave the medical charts of those patients seen in the chemo

suite on that day with the physician who was covering.  (*McKnight Decl. ¶ 3*, Exh.

6; *Carlozzi Decl. ¶ 6*, Exh. 2; *Diana Decl. ¶ 9*, Exh. 5.)  If Dr. Lockyer signed a

medical chart on a given day, it meant that he was covering for that day.  (*Diana*

*Decl. ¶ 10*, Exh. 5.)  Either the oncologist or a covering physician was always

21

available for the nurses to consult when the nurses were administering chemotherapy in case of emergencies or side effects from chemotherapy. (*Carlozzi Decl. ¶¶ 8, 9, 10*, Exh. 2; *Diana Decl. ¶¶ 12, 14*, Exh. 5; *Carter Decl. ¶ 8*, Exh. 3.) A new patient was not scheduled for the first day of chemotherapy unless the oncologist was present. (*Diana Decl. ¶ 13*, Exh. 5.)

It was rare that the nurses had to seek a physician's assistance for emergencies while a patient was receiving chemotherapy. (*Carlozzi Decl. ¶ 10*, Exh. 2; *Diana Decl. ¶ 14*, Exh. 5; *Carter Decl. ¶¶ 10, 11*, Exh. 3.) If the blood results were within the prescribed parameters and no emergency occurred, it is likely that a physician would not see a chemotherapy patient even though the physician was supervising for the day. (*Carlozzi Decl. ¶ 10*, Exh. 2; *Diana Decl. ¶ 15*, Exh. 5; *Carter Decl. ¶ 11*, Exh. 3.) Nevertheless, the chemotherapy was billed to Medicare using the billing number of the supervising physician, as required by the regulations. 66 Fed. Reg. 55267 (Nov. 1, 2001).

CMS and Noridian have corroborated KMC's interpretation of the regulations. In informal guidance, CMS confirmed that KMC's practices comport with the regulation governing "incident to" services, specifically with respect to chemotherapy. (*Rauzi Decl. and the attachments thereto*, Exh. 7.) In an email dated May 10, 2006, Dorothy Shannon of CMS was asked whether Medicare requires that the supervising physician for chemotherapy services be an oncologist.

22

She responded:

> The supervising physician must be a member of the group, but does
> not have to be the same specialty as the ordering physician. The
> supervisor must be available and able to render assistance (as
> interpreted by the carrier).

(*Rauzi Decl. Exh. B*, Exh. 7B.)  Ms. Shannon was also asked whether Medicare

requires the supervising physician to review the results of blood tests prior to the

oncology nurses administering chemotherapy.  She responded: "The supervisor

does not have to review the CBC or the nurse's notes, as long as the nurse is

qualified to do that."  (*Id.*)  Further, Ms. Shannon instructed that the Medicare

carrier be consulted for any local coverage determinations that may apply, noting

that the carrier makes the determination of when a physician is considered to be "in

the office suite."  (*Id.*)

KMC submitted Medicare Part B claims, including claims for chemotherapy,

to its carrier Noridian.  The Carrier Medical Director reviewed KMC's Medicare

billings in general and for chemotherapy in particular.  (*Fong Decl. ¶ 8*, Exh. 8.)

The Carrier Medical Director interpreted the regulations governing "incident to"

billing as allowing an oncologist to make an assessment of the patient, establish a

treatment protocol, and advise an oncology nurse on administering appropriate

chemotherapy.  (*Fong Decl. ¶ 6*, Exh. 8; *see also* Medicare Carriers Manual

§ 2050.1B (a service can be considered "incident to" when the nonphysician renders

the service during a course of treatment where the physician renders the initial

service and subsequent services that demonstrate the physician's active participation in and management of the course of treatment).)  If the oncologist was unavailable on the day chemotherapy was administered, another physician had to be available to supervise, meaning immediately available to render assistance to the chemotherapy nurse if needed.  (*Fong Decl. ¶ 6*, Exh. 8.)

In a physician-run clinic, like KMC, where all the physicians and nurses are employed by the Clinic, it was not necessary that the covering physician also be an oncologist.  (*Id.*)  Rather, any licensed physician employed by the Clinic could cover and be deemed the "supervising" physician under the "incident to" rules. Unless the physician was called upon to render assistance, it was unlikely that the "supervising" physician would see the patient.  (*Id.*)  Under these circumstances, the regulations require that the chemotherapy be billed to Medicare under the "supervising" physician's provider number, not the ordering physician's.  (*Fong Decl. ¶ 7*, Exh. 8.)  During the period of 2000-2004, the Carrier Medical Director determined that KMC's Medicare billings were consistent with the rules governing proper "incident to" billing.  (*Fong Decl. ¶ 8*, Exh. 8.)  Thus, KMC's submissions to Medicare were in no way false or fraudulent under the FCA.

        c.    <u>Relator's Allegations Concerning Untrained Personnel and the Suitability of Medical Treatment Do Not Constitute False Claims</u>

Dr. Lockyer contends that KMC submitted false claims because services were

delivered by allegedly unsupervised and/or untrained personnel in violation of the "incident to" rules.  (Disclosure at 5.)

Dr. Lockyer contends that KMC submitted false claims in violation of the "incident to" rules because he was not qualified to supervise chemotherapy as he was not an oncologist.  He further contends that the services were rendered by untrained personnel without the treating physician present.  However, under the Medicare Carriers Manual section 2050.1, a service can be considered "incident to" when the nonphysician renders the service during a course of treatment where the physician renders the initial service and subsequent services that demonstrate the physician's active participation in and management of the course of treatment.  It is undisputed that the practice at KMC was for the oncologist to conduct an initial consultation with the patient, prescribe a course of treatment and set forth acceptable blood results for the administration of chemotherapy, and engage in follow-up appointments to monitor the patient during the course of chemotherapy.  The oncology nurses followed the oncologist's orders and administered chemotherapy accordingly.  Should an emergency arise, the oncology nurses notified the oncologist or covering physician.

KMC's practices comport with the practices of physicians in other medical facilities.  (*Gelmann Decl. ¶ 4*, Exh. 9; *Vanderbilt University Center, Cytotoxic Drug (CHEMOTHERAPY) Administration & Management at 4*, Exh. 10; *Cho Decl.*

*¶ 3*, Exh. 21.) The recognized standard of care in oncology does not require the presence of an oncologist when chemotherapy is administered. (*Id.*) There is no requirement under the "incident to" rules that a supervising physician who is covering for another physician in his group be of the same specialty, as CMS stated in its informal guidance. (*Rauzi Decl. Exh. B*, Exh. 7B; *see also Fong Decl. ¶ 6*, Exh. 8.) Furthermore, when asked if he believes that only an oncologist can treat a patient for side effects from chemotherapy, Dr. Lockyer himself testified: "I suppose anyone could treat them." (*Depo. at 85*, Exh 4.) Therefore, Dr. Lockyer was fully capable of serving as the supervising physician under the "incident to" regulations.

Similarly, Relator's claims that the personnel at KMC's chemo suite were unqualified are unfounded. The oncology nurses at KMC's chemo suite received on-the-job training, attended courses specific to treatment using chemotherapy, and completed the oncology certifications, for which they were eligible only after a certain number of hours of on-the-job training. (*Carlozzi Decl. ¶ 1* (Certified in 1998), Exh. 2; *Carter Decl. ¶ 1-3* (Certified in 2004), Exh. 3; *Diana Decl. ¶ 1, 2*, Exh. 5; *Joseph Decl. Exh. A*, Exh. 1.) It is an accepted practice that oncology nurses review patients' medical records and laboratory date prior to administering chemotherapy. (*Cho Decl. ¶ 2*, Exh. 21; *Gelmann Decl. ¶¶ 4, 5*, Exh. 9.) If the criteria set forth by the oncologist are met, it is normal practice that the oncology

nurses carry out the orders and administer chemotherapy. (*Cho Decl. ¶ 2*, Exh. 21; *Gelmann Decl. ¶ 4*, Exh. 9.) It is routine in chemotherapy infusion centers that a treating oncologist is not present during the time chemotherapy is administered. (*Cho Decl. ¶ 3*, Exh. 21; *Gelmann Decl. ¶ 4*, Exh. 9.) Oncology nurses monitor the patients while they receive chemotherapy and they are trained to take appropriate treatment measures should a medical emergency arise, including calling a physician. (*Cho Decl. ¶ 3*, Exh. 21; *Gelmann Decl. ¶ 5*, Exh. 9.). KMC's practices therefore do not constitute a violation of the "incident to" rules and any claims for such practices are not false under the FCA.

Dr. Lockyer contends that the services were not medically necessary "because the suitability and safety of the treatment had not been established through diagnostic evaluation meeting the standard of care in such cases." (Disclosure at 10; *see also* Compl. ¶ 28). First, if he means that oncology nurses, rather than oncologists, are reading lab tests prior to administering chemotherapy, as we have just demonstrated he is plain wrong. Moreover, it is well established that the evaluation of medical standards have no place in a *qui tam* case brought under the FCA.

In *United States ex rel Mikes v. Straus*, 274 F.3d 687, 693 (2d Cir. 2001), the court recognized that "permitting qui tam plaintiffs to assert that defendants' quality of care failed to meet medical standards would promote federalization of medical

malpractice….” *Id.* at 700.  Further, the Second Circuit observed that “courts are

not the best forum to resolve medial issues concerning the levels of care.  State,

local or private medical agencies, boards or societies are better suited to monitor

quality of care.”  *Id.*  Other courts have similarly held that the FCA “should not be

used to call into question a health care provider’s judgment regarding a specific

course of treatment.”  *United States ex rel. Phillips v. Permian Residential Ctr.*,

386 F. Supp. 2d 879, 884 (W.D. Tex. 2005).

> ### 3.    The Undisputed Facts Demonstrate that Relator Lockyer Acted as the Supervising Physician For Purposes of “Incident To” Billing

Relator Lockyer denies having been the supervising physician for the

administration of chemotherapy or other services for which KMC billed under his

UPIN.  (Disclosure at 6, 8, 9.)  Dr. Lockyer bases such denials in part on his claim

that he did not see the patients in question.  (Compl. ¶ 23; Disclosure at 7-8.)  But

Dr. Lockyer has gone one step further – he has maintained that he does not

understand the meaning of the term “covering” (*Depo. at 34*, Exh. 4.)  At bottom,

this is not a question of medicine or billing, but rather one of semantics.  His own

testimony concedes that he acted as a supervising physician for KMC’s chemo suite

regardless of what term one uses for it.

On summary judgment, the nonmoving party’s uncorroborated allegations

and “self-serving testimony” do not create a genuine issue of fact.  *Casumpang*, 361

F. Supp. 2d at 1201. Additionally, if the factual context renders respondent's claim implausible, then the respondent must produce more persuasive evidence than would otherwise be necessary to support the claim. *British Motor Car Distribs., Ltd. v. San Francisco Auto. Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989); *Prabhu*, 442 F. Supp. 2d at 1025. Dr. Lockyer's claim that he never covered the chemo suite is completely implausible and thoroughly belied by everything else in the record, including Dr. Lockyer's own testimony.

Dr. Lockyer testified that he was available if the chemotherapy nurses needed to consult him about emergencies relating to chemotherapy in instances where the oncologist was not available. (*Depo. at 83-84*, Exh. 4). In one instance, Dr. Lockyer explained that a nurse in the chemo suite called him when a patient passed out as a reaction to the chemotherapy. (*Depo. at 106-8*, Exh. 4). Dr. Lockyer responded to the call, checked the patient's blood pressure, provided fluids through an IV, and sent the patient to the ER. (*Id.*) Accordingly, Dr. Lockyer fulfilled the requirement for "incident to" billing that he be immediately available to render assistance to the auxiliary personnel. *See* 42 C.F.R. § 410.26(b)(5); 42 C.F.R. § 410.32(b)(3)(ii); Medicare Carriers Manual § 2050.1B.

In addition, several oncology nurses and another Internal Medicine physician, Dr. McKnight, attested that Dr. Lockyer did act as the covering physician for the chemotherapy suite on occasions when the oncologist was unavailable.

(*McKnight Decl. ¶ 2*, Exh. 6; *Carlozzi Decl. ¶ 5, 7*, Exh. 2; *Diana Decl. ¶ 8-11*, Exh. 5; *Carter Decl. ¶ 7, 9*, Exh. 3.)  Indeed, Dr. Lockyer even received compensation for covering the chemotherapy suite.  For example, in a June 3, 2002 email from Dr. Mary Pixler to Dr. Evslin with the subject "Schedule for covering Sutherland," Dr. Pixler indicated that Dr. Lockyer was scheduled to cover on June 7, 2002 and was to receive a stipend of $300.  (*Email d: 6/3/02*, Exh. 1B.)  In an email dated August 16, 2002, it was confirmed that Dr. Lockyer did, in fact, cover on June 7 and was entitled to the $300 stipend.  (*Email d:8/16/02*, Exh. 1C.)  Thus, in an August 23, 2002 letter from Dr. Evslin to Dr. Lockyer, Dr. Evslin stated: "you will be receiving compensation for time which you have spent helping with the chemo unit while Dr. Sutherland and Dr. Hayward were not available."  (*Ltr. D:8/23/02*, Exh. 11.)

Furthermore, the medical records themselves contradict Dr. Lockyer's allegations and support that Dr. Lockyer was in fact the supervising physician on occasions in the chemotherapy suite.  According to the Disclosure, Dr. Lockyer's fraud claims are focused on claims submitted for 82 patients on the dates listed in Exhibit 76a.  (Disclosure at 3 and Disclosure Exh. 76a).  However, the actual medical records for those patients are riddled with evidence of Dr. Lockyer having acted as the covering physician, discrediting his self-serving statements that he did not "cover" the chemo suite.  For example, in Plaintiff Lockyer's own exhibit to the

Disclosure, Dr. Lockyer signed a document called "Outpatient Oncology Treatment Administration" reflecting the chemotherapy treatment provided to George P on June 7, 2002.  (*G.P. Medical Record d:6/7/02*, Exh. 12.)  In the Evaluations/Outcomes/ Comments section, the oncology nurse, Debra Dannog, had written that she received an order from Dr. Lockyer to provide Allegra to treat itching and redness.  (*Id.*)   In another document attached to Plaintiff's own Disclosure, the medical record for H.H. on May 8, 2002 shows Dr. Lockyer's signature.  (*H. Medical Record d:5/8/02*, Exh. 13; *Depo. at* 51, Exh. 4 (Dr. Lockyer stated that the signature of Exhibit 6 appears to be his).)  He also signed oncology treatment forms for various other patients (for example, *T.D. Medical Record d: 2/16/01*, Exh. 14; *A.I. Medical Record d: 8/6/01*, Exh. 15; *L.S. Medical Record d: 5/10/02*, Exh. 16; *A.B. Medical Record d: 5/22/03*, Exh. 17).  One of the oncology nurses stated that his signature on these forms meant he was covering. (*Diana Decl. ¶ 10*, Exh. 5.)

Other medical records belie Lockyer's contention that he was not a supervising physician.  For example, for one patient listed on Plaintiff's Exhibit 76a, R.L., the progress records contain notes that indicate that, while Dr. Pixler was on leave, Dr. Lockyer was the physician who were supervising the "incident to" services which were then billed under his UPIN.  For example, the progress record for October 9, 2001 reads: "pt. here for procrit shot only. Dr. Pixler on leave.

31

Dr. Lockyer to authorize (standing order for procrit in 2x week @30,000u)."  (*R.L.*

*Medical Record d: 10/9/01*, Exh. 18.)  A later progress record for November 1,

2001 similarly reads: "pt. here for procrit shot only.  Dr. Pixler on PTO.

Dr. Lockyer to co-sign procrit".  (*R.L. Medical Record d: 11/1/01*, Exh. 19.)  Thus,

there is no doubt that Dr. Lockyer did agree to "cover" for other physicians in the

group who were unavailable, his protestations to the contrary notwithstanding.

### B.    Plaintiff Lockyer Cannot Satisfy the Required Elements for a Retaliation Claim Under the FCA[3]

Dr. Lockyer has asserted a claim for retaliation under 31 U.S.C. § 3730(h)

and Haw. Rev. Stat. § 378-61.[4]  This claim borders on the frivolous and Relator

cannot come close to meeting elements required for a retaliation claim.  The

provision of the FCA governing retaliation provides:

> Any employee who is discharged, demoted, suspended, threatened,
> harassed, or in any other manner <u>discriminated against in the terms
> and conditions of employment by his or her employer because of
> lawful acts done by the employee or others in furtherance of an action
> under this section</u>, including investigation for, initiation of, testimony

---

[3] HPH Defendants incorporate and adopt the arguments set forth in Defendant William A. Evslin, M.D.'s Motion for Summary Judgment on Plaintiff Lockyer's Second, Third and Fourth Claims for Relief and the accompanying memorandum in support thereof.

[4] Courts have noted that "Hawaii's Whistleblowers' Protection Act, Hawaii Revised Statutes §§ 378-61, contains a precise analogy to section 3730(h)."  *United States ex rel. Hinden v. UNC/Lear Servs., Inc.*, 362 F. Supp. 2d 1203, 1209 (D. Hawaii 2005). For the same reasons that Plaintiff cannot succeed on the federal whistleblower statute, Plaintiff cannot succeed as a matter of law under Haw. Rev. Stat. § 378-62.

> for, or assistance in an action filed or to be filed under this section,
> shall be entitled to all relief necessary to make the employee whole....

31 U.S.C. § 3730(h)(emphasis added).

To establish liability under 31 U.S.C. § 3730(h), a relator must prove the following three elements: (1) the employee must have been engaging in conduct protected under the FCA; (2) the employer must have known that the employee was engaging in such conduct; and (3) the employer must have discriminated against the employee because of her protected conduct. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996); *United States ex rel. McCarthy v. Straub Clinic and Hosp., Inc.*, 140 F. Supp. 2d 1062, 1069 (D. Hawaii 2001) (citing the same elements in *Hopper* as necessary to establish a claim for retaliation). Thus, "the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Id.*; *see also United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 237 (1st Cir. 2004) ("[C]onduct protected by the FCA is limited to activities that 'reasonably could lead' to an FCA action; in other words, investigations, inquiries, testimonies, or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government.").

In *Hopper*, the court found that the entire record failed to demonstrate that the plaintiff was engaged "in furtherance of an action" under the FCA. 91 F.3d at 1269. Rather, the record showed that Hopper was attempting to get the School

District to comply with federal and state regulations, not attempting to recover money for the government. *Id.*; *see also Karvelas*, 360 F.3d at 237 (where the plaintiff's allegations related to witnessing and reporting the hospital's alleged failure to comply with patient care standards and the court found that such allegations, without more, do not constitute protected conduct under the FCA).

Also, "unless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)." 91 F.3d at 1269. The court found that Hopper never gave any indication to the School District that she was investigating them for defrauding the federal government. *Id.* at 1270. The court concluded that the district court should have granted summary judgment as a matter of law. *Id.*

Dr. Lockyer has not even attempted to show that he was engaged in activity in furtherance of an action under the FCA. Like the plaintiff in *Hopper*, Lockyer was not investigating fraud. Rather, he was focused on compensation issues which ultimately led to arbitration. In the Complaint, Relator states that he requested an audit of the finances because he was concerned about truthful compensation. (Compl. ¶ 37.) Likewise, in the Disclosure, Relator admits that he sought the billing information "to establish whether pay reductions imposed upon him were accurate and reasonable according to his employment contract," not to establish whether KMC was engaged in fraudulent billing. (Disclosure at 2.) Relator admits that the

initial analysis of the documents provided by KMC were to determine compensation issues. (Disclosure at 3.) Again, Dr. Lockyer admits that KMC produced the documents "[d]uring the course of a dispute over KMC's computation of Dr. Lockyer's earnings." (Disclosure at 4.) Relator affirmatively states that he "never knew that KMC was billing the government and other third party payors under his provider number for the patients in question until he used binding arbitration to force KMC to produce the records of its billings." (Disclosure at 6-7.)

Relator's deposition testimony similarly fails to demonstrate that he was engaged in activity protected under the FCA. When asked if Lockyer saw actual billings provided to Medicare, Dr. Lockyer stated: "I was never privy to the billing information." (*Depo. at 39*, Exh. 4.) Further, Dr. Lockyer did not even know how KMC, as a health care provider, submits claims to Medicare for the services he provided. (*Id.*)

When asked if he conducted any investigation of fraud, Dr. Lockyer responded "I'm not an investigator." (*Depo. at 47*, Exh. 4.) Dr. Lockyer explained that he requested billing information because he was concerned he was being underpaid. (*Depo. at 95*, Exh. 4.) Dr. Lockyer testified that he entered into arbitration because of displeasure with his pay (*Depo. at 97*, Exh. 4) and then, as a result of the arbitration, he discovered that chemotherapy was being billed out under his provider number (*Depo. at 99*, Exh. 4).

Additionally, like in *Hopper*, Lockyer never gave any indication to the administration of KMC that he was investigating KMC for allegedly defrauding the federal government. Dr. Lockyer could not recall ever having even made a formal request to the administration for an audit regarding his salary:

> Q.    …When did you first talk to somebody in the administration, not your colleagues in internal medicine, but with the clinic administration about asking for an audit regarding your salary?
>
> A.    I don't – I'm not sure.
>
> Q.    Did you ever make such a request?
>
> A.    I'm not sure I did. Not formally.

(*Depo. at 277*, Exh. 4.) Thus, the evidentiary record fails to indicate that KMC had any knowledge that Dr. Lockyer was engaged in any protected activity and, indeed, the evidentiary records fails to demonstrate that Dr. Lockyer's activities were connected to the FCA. Because Relator fails to demonstrate that he was investigating fraudulent billing to the government or that KMC was aware of any such investigation, he cannot succeed as a matter of law on his retaliation claim under 31 U.S.C. § 3730(h) or H.R.S. § 378-61.

## IV.    CONCLUSION

For the foregoing reasons, the HPH Defendants respectfully request that this Court grant their Motion for Summary Judgment.

36

DATED:  Honolulu, Hawaii, December 22, 2006.


/s/ Kenneth S. Robbins
KENNETH S. ROBBINS
JOHN-ANDERSON L. MEYER

Attorneys for Defendants
HAWAI`I PACIFIC HEALTH, KAUAI
MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH
SYSTEM


Civil No. CV04-00596 ACK LEK; <u>USA, ex rel. Lockyer, et al. v. Hawaii Pacific Health, et al.</u>; MEMORANDUM IN SUPPORT OF MOTION