concise stmt of facts

Of Counsel:
ROBBINS & ASSOCIATES
Attorneys at Law
A Law Corporation

KENNETH S. ROBBINS          1000-0
JOHN-ANDERSON L. MEYER      8541-0
2200 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 524-2355
Facsimile:  (808) 526-0290
Email:  defend@robbinsandassociates.net

DAVIS WRIGHT TREMAINE LLP          CIVIL NO. CV04-00596 ACK LEK

EDWIN D. RAUZI          4292-0
1501 4th Avenue, Suite 2600
Seattle, Washington  98101
Telephone:  (206) 622-3150
Facsimile:  (206) 628-7699
Email:  edrauzi@dwt.com

PATTON BOGGS LLP

HARRY R. SILVER
2550 M Street NW
Washington, D.C.  20037
Telephone:  (202) 457-6453
Facsimile:  (202) 457-6315
Email:  hsilver@pattonboggs.com

Attorneys for Defendants
HAWAI`I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL and WILCOX HEALTH SYSTEM

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf, | ) ) ) ) ) ) | CIVIL NO. CV04-00596 ACK LEK (Federal and State - Qui Tam) DEFENDANTS HAWAI`I PACIFIC HEALTH, KAUAI MEDICAL CLINIC, WILCOX MEMORIAL |
| Plaintiffs, | ) ) | HOSPITAL AND WILCOX HEALTH SYSTEM'S **CONCISE** |
| v. | ) ) | **STATEMENT OF FACTS**; CERTIFICATE OF COMPLIANCE |
| HAWAI`I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D., | ) ) ) ) ) ) ) | PURSUANT TO LOCAL RULE 7.5; CERTIFICATE OF SERVICE HEARING DATE: TIME: JUDGE:    Alan C. Kay |
| Defendants. | ) ) ) | TRIAL:  3/20/07 |
| _____ | ) | JUDGE:  Alan C. Kay |

DEFENDANTS HAWAI`I PACIFIC HEALTH, KAUAI MEDICAL CLINIC, WILCOX MEMORIAL HOSPITAL AND WILCOX HEALTH SYSTEM'S **CONCISE STATEMENT OF FACTS**

COME NOW Defendants HAWAI`I PACIFIC HEALTH, KAUAI

MEDICAL CLINIC, WILCOX MEMORIAL HOSPITAL AND WILCOX

HEALTH SYSTEM (collectively referred to as "HPH Defendants"), by and

through their attorneys, Robbins & Associates, pursuant to Local Rule 56.1, submit

the following facts pertinent to its summary judgment motion.

2

1.  Kauai Medical Center ("KMC" or the "Clinic") is a small outpatient medical clinic, adjacent to Wilcox Memorial Hospital, in Lihue, Kauai (*Joseph Decl. ¶ 2*, Exh. 1).  While the Clinic has employed several oncologists over the past several years, there has never been more than one oncologist employed by the Clinic at one time. (*Joseph Decl. ¶ 2*, Exh. 1.)  The oncologist is a member of the Clinic's Internal Medicine department. (*Joseph Decl. ¶ 3*, Exh. 1.)

2.  Chemotherapy is administered in a large room that is used for infusion therapy generally, although it is generally referred to as the "chemo suite." (*Joseph Decl. ¶ 3*, Exh. 1.)  The chemo suite is located within the internal medicine suite on the second floor of the Clinic, where the offices of all of the internists are located. (*Joseph Decl. ¶ 3*, Exh. 1; *see also Carlozzi Decl. ¶ 5*, Exh. 2; *Carter Decl. ¶ 7*, Exh. 3.)  The internists' offices are all approximately 30 to 50 feet from the chemo suite. (*Joseph Decl. ¶ 3*, Exh. 1.)  The chemo suite can be seen from part of the internal medicine department.  (*Depo. at 62*, Exh. 4.)

3.  It was the normal procedure at KMC's chemo suite that, after an initial consult, the oncologist provided a written order for each chemotherapy patient setting forth the required blood tests, the acceptable parameters for the blood test results, and types and amounts of chemotherapy to be provided.

(*Carlozzi Decl. ¶ 2*, Exh. 2; *Diana Decl. ¶ 3, 4*, Exh. 5; *Carter Decl. ¶ 4*, Exh. 3.)

4.   The nurses working in KMC's chemo suite received on-the-job training, attended courses on chemotherapy treatment, and all but one of them became certified as oncology nurses, a test for which a nurse becomes eligible only after completing a certain number of hours of on-the-job training. (*Carlozzi Decl. ¶ 1*, Exh. 2; *Carter Decl. ¶ 1-3*, Exh. 3; *Diana Decl. ¶ 1, 2*, Exh. 5; *Joseph Decl. Exh. A*, Exh. 1A.)

5.   The nurses working in the chemo suite drew blood as ordered and reviewed the results of the blood tests in accordance with the parameters provided by the oncologist.  (*Carlozzi Decl. ¶ 3*, Exh. 2; *Diana Decl. ¶ 5*, Exh. 5; *Carter Decl. ¶ 5*, Exh. 3.)

6.   The nurses proceeded with chemotherapy if the blood tests were normal and alerted a physician if the tests were abnormal before proceeding with chemotherapy.  (*Carlozzi Decl. ¶ 3*, Exh. 2; *Diana Decl. ¶ 5*, Exh. 5; *Carter Decl. ¶ 5*, Exh. 3.)

7.   After confirming that the blood test results fell within the acceptable parameters set forth by the oncologist, the nurses prepared chemotherapy drugs in accordance with the oncologist's orders. (*Diana Dec. ¶ 6*, Exh. 5; *Carter Decl. ¶ 6*, Exh. 3.)

8.  An oncologist was normally present in the office at the time a chemotherapy patient received treatment.  (*Carlozzi Decl. ¶ 4*, Exh. 2; *Diana Decl. ¶ 7*, Exh. 5; *Carter Decl. ¶ 7*, Exh. 3.)

9.  If the oncologist was unavailable, another physician from the Clinic would be assigned to cover for the oncologist.  (*McKnight Decl. ¶ 2*, Exh. 6; *Carlozzi Decl. ¶ 4*, Exh. 2; *Diana Decl. ¶ 7*, Exh. 5; *Carter Decl. ¶ 7*, Exh. 3.)

10.  Physicians in the Internal Medicine Department of the Clinic, including Dr. Lockyer, covered the chemo suite if the oncologist was not present on a certain day.  (*McKnight Decl. ¶ 2*, Exh. 6; *Carlozzi Decl. ¶ 5, 7*, Exh. 2; *Diana Decl. ¶ 8, 9, 11*, Exh. 5; *Carter Decl. ¶ 7, 9*, Exh. 3.)

11.  The practice was that the covering physician would be in the chemo suite or in the Internal Medicine Department down the hall.  (*McKnight Decl. ¶ 4*, Exh. 6.)

12.  On those occasions when the oncologist was unavailable, the oncology nurses were aware of which doctor was covering, as this was arranged in advance, and the nurses would leave the medical charts of those patients seen in the chemo suite on that day with the physician who was covering. (*McKnight Decl. ¶ 3*, Exh. 6; *Carlozzi Decl. ¶ 6*, Exh. 2; *Diana Decl. ¶ 9*, Exh. 5.)  If Dr. Lockyer signed a medical chart on a given day, it meant that he was covering for that day.  (*Diana Decl. ¶ 10*, Exh. 5.)

13. Either the oncologist or a covering physician was always available for the nurses to consult when the nurses were administering chemotherapy in case of emergencies or side effects from chemotherapy. (*Carlozzi Decl. ¶ 8, 9, 10*, Exh. 2; *Diana Decl. ¶ 12, 14*, Exh. 5; *Carter Decl. ¶ 8*, Exh. 3.)

14. It was rare that the nurses had to seek a physician's assistance for emergencies while a patient was receiving chemotherapy. (*Carlozzi Decl. ¶ 10*, Exh. 2; *Diana Decl. ¶ 14*, Exh. 5; *Carter Decl. ¶ 10, 11*, Exh. 3.)

15. If the blood results were within the prescribed parameters and no emergency occurred, it is likely that a physician would not see a chemotherapy patient even though the physician was supervising for the day. (*Carlozzi Decl. ¶ 10*, Exh. 2; *Diana Decl. ¶ 15*, Exh. 5; *Carter Decl. ¶ 11*, Exh. 3.)

16. If no physician was available, the nurses would not administer chemotherapy. (*Carlozzi Decl. ¶ 10*, Exh. 2; *Diana Decl. ¶ 12*, Exh. 5.)

17. In an email dated May 10, 2006, Dorothy Shannon of CMS indicated that KMC's practices, as described above, were in compliance with the "incident to" rules. (*Rauzi Decl. Exh. B*, Exh. 7B.)  Ms. Shannan responded to an inquiry as to whether Medicare requires that the supervising physician for chemotherapy services be an oncologist as follows:

> The supervising physician must be a member of the group, but does not have to be the same specialty as the ordering physician.  The supervisor must be available and able to render assistance (as interpreted by the carrier).

6

(*Rauzi Decl. Exh. B*, Exh. 7.)  In response to the inquiry as to whether Medicare requires the supervising physician to review the results of blood tests prior to the oncology nurses administering chemotherapy, Ms. Shannon stated: "The supervisor does not have to review the CBC or the nurse's notes, as long as the nurse is qualified to do that."  (*Id.*)

18. The Carrier Medical Director reviewed KMC's Medicare billings in general and for chemotherapy in particular.  (*Fong Decl. ¶ 8*, Exh. 8.)  The Carrier Medical Director interpreted the regulations governing "incident to" billing and determined that KMC was compliant.  (*Fong Decl. ¶ 6*, Exh. 8.)

19. The recognized standard of care in oncology does not require the presence of an oncologist when chemotherapy is administered.  (*Gelmann Decl. ¶ 4*, Exh. 9; *Vanderbilt University Center, Cytotoxic Drug (CHEMOTHERAPY) Administration & Management at 4*, Exh. 10; *Cho Decl. ¶ 3*, Exh. 21.)

20. There is no requirement under the "incident to" rules that a supervising physician who is covering for another physician in his group be of the same specialty.  (*Rauzi Decl. Exh. B*, Exh. 7B; *Fong Decl. ¶ 6*, Exh. 8.)

21. Dr. Lockyer stated that he was available if the chemotherapy nurses needed to consult him about emergencies relating to chemotherapy in instances where the oncologist was not available.  (*Depo. at 83-84*, Exh. 4; *Depo. at 106-8*, Exh. 4.)

22. Dr. Lockyer received compensation for covering the chemotherapy suite. (*Email d: 6/3/02*, Exh. 1B; *Ltr. D:8/23/02*, Exh. 11; *Email d:8/16/02*, Exh. 1C; *Depo. at 78*, Exh. 4.)

23. KMC's medical records demonstrate that Dr. Lockyer was the supervising physician on occasions in the chemotherapy suite and covered for other physicians in the group. (*George P. Medical Record d:6/7/02*, Exh. 12; *Henry H. Medical Record d:5/8/02*, Exh. 13; *Thomas D. Medical Record d: 2/16/01*, Exh. 14; *Annette I. Medical Record d: 8/6/01*, Exh. 15; *Lenore S. Medical Record d: 5/10/02*, Exh. 16; *Angeline B. Medical Record d: 5/22/03*, Exh. 17; *Ramona L. Medical Record d: 10/9/01*, Exh. 18; *Ramona L. Medical Record d: 11/1/01*, Exh. 19; *Depo. at 51*, Exh. 4.) These medical records are true and accurate copies. (*Tachibana Decl.*, Exh. 20.)

24. Dr. Lockyer initiated a dispute with KMC over his compensation. In the course of the arbitration, Dr. Lockyer obtained KMC's Medicare billings utilizing his Medicare provider number from December 1999 – September 2003. (Compl. ¶ 21.) Believing he had discovered fraud, Dr. Lockyer abandoned the arbitration and initiated this case under the *qui tam* provisions of the FCA.

DATED: Honolulu, Hawaii, December 22, 2006.

/s/ Kenneth S. Robbins
KENNETH S. ROBBINS
JOHN-ANDERSON L. MEYER

Attorneys for Defendants
HAWAI`I PACIFIC HEALTH, KAUAI
MEDICAL CLINIC, WILCOX
MEMORIAL HOSPITAL AND WILCOX
HEALTH SYSTEM

Civil No. CV04-00596 ACK LEK; USA, ex rel. Lockyer, et al. v. Hawaii Pacific Health, et al.; DEFENDANTS HAWAI`I PACIFIC HEALTH, KAUAI MEDICAL CLINIC, WILCOX MEMORIAL HOSPITAL AND WILCOX HEALTH SYSTEM'S CONCISE STATEMENT OF FACTS