STARN ● O'TOOLE ● MARCUS & FISHER
A Law Corporation

SHARON V. LOVEJOY 5083-0
STEPHANIE THOMPSON      8399-0
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Telephone No. (808) 537-6100
Facsimile No. (808) 537-5434
slovejoy@starnlaw.com
sthompson@starnlaw.com

Attorneys for Defendant
LEE A. EVSLIN, M.D.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf;<br><br>              Plaintiffs,<br><br>      vs.<br><br>HAWAII PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.;<br><br>              Defendants. | CIVIL NO. CV 04-00596 ACK LEK (Federal and State – Qui Tam)<br><br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT LEE A. EVSLIN, M.D.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF LOCKYER'S SECOND, THIRD AND FOURTH CLAIMS FOR RELIEF** |

## <u>MEMORANDUM IN SUPPORT OF MOTION</u>

Defendant LEE A. EVSLIN, M.D. ("Dr. Evslin") seeks summary judgment on Plaintiff James Lockyer's: (1) second claim for relief for wrongful termination and retaliation; (2) third claim for relief for whistleblower protection; and (3) fourth claim for relief for punitive damages. Plaintiff cannot prevail on these claims. The motion should be granted.

## I.    INTRODUCTION

Plaintiff Lockyer is a former physician employee of Kauai Medical Clinic ("KMC") who resigned on June 30, 2004. Dr. Evslin was the CEO of KMC during Lockyer's employment. Plaintiff Lockyer asserts in his second and third claims for relief in this action, that because of his alleged efforts to investigate the accuracy of his compensation which led to his belief there were false claims to the government, Dr. Evslin and other defendants (1) retaliated against Lockyer by seeking Lockyer's termination and reducing his pay (Complaint, ¶¶ 38, 41); and (2) constructively discharged Dr. Lockyer by notifying Dr. Lockyer there would be a further reduction in his pay (Complaint, ¶43). Plaintiff Lockyer also asserts a common law "*Parnar*" claim for violation of the public policy of the State of Hawai`i false claim statutes (Second Claim for Relief), and violation of the federal and state whistleblower protection acts (Third Claim for Relief). Plaintiff Lockyer also seeks punitive damages (Fourth Claim for Relief).

This Court should grant Dr. Evslin's motion for summary judgment on each of these claims because:

> 1. Dr. Lockyer's investigatory actions regarding the accuracy of his compensation are not protected conduct afforded whistleblower protection under the relevant statutes.

Plaintiff Lockyer questioned (or "investigated") the accuracy of his compensation calculation under KMC's applicable salary formula—he purportedly believed his compensation should have been higher.  He did not investigate fraud against the government.   Plaintiff makes this clear in his Complaint and his disclosure to the U.S. government—only after Defendant KMC produced requested documents *in arbitration* did Plaintiff Lockyer discover what he now claims are false billing claims.  *Complaint*, ¶¶ 21-22, *Disclosure*, at 2, 4 and 6.   Such investigation into compensation is not conduct that is afforded whistleblower protection under the relevant statutes.

> 2. The statutes embodying the public policy at issue in Plaintiff Lockyer's common law claim for wrongful termination/retaliation provide a sufficient remedy for violations of the statutes.

In his Second Claim for Relief, Lockyer claims the defendants violated the public policy found in specified Hawai`i statutes relating to false claims, but seeks redress in the common law.  Complaint, ¶ 36.  Where, as here, the statute embodying the public policy at issue provides a sufficient remedy for violations, the statutory

remedy is exclusive.  As a result, Lockyer's common law claim (Count 2) will not lie.

>   3.  Plaintiff Lockyer cannot present sufficient evidence to defeat this motion for summary judgment on his claims for wrongful termination and retaliation, and whistleblower protection.

First, the protection and remedies afforded whistleblowers under the relevant statutes and common law apply only to actions of ***employers***. Dr. Evslin, however, was not Plaintiff Lockyer's employer.  Further, Dr. Evslin was not Lockyer's *de facto* employer—he neither dominated nor controlled physician employment or compensation decisions at KMC.

Second, Defendants' actions relating to Dr. Lockyer's employment were for legitimate, non-retaliatory reasons.  No causal connection exists between Dr. Lockyer's alleged protected activity (investigation into false claims to the government) and alleged retaliatory actions (pursuit of Dr. Lockyer's termination and reductions in his pay)

Third, Dr. Lockyer had notice of reductions in pay well ***before*** Dr. Lockyer ever requested an accounting into the accuracy of his pay, and ***before*** he discovered alleged false claims.  They could not have been in response to his alleged investigation into false claims.  Further, each reduction in Dr. Lockyer's pay was in accordance with the contractual salary formulae applicable to all KMC outpatient clinic-based physicians.

Additionally, Dr. Lockyer received a 90-day notice of termination **before** Dr. Lockyer requested an accounting into the accuracy of his pay, and **before** he discovered alleged false claims. It could not have been in response to his alleged investigation into false claims.

Third, Defendants did not have the requisite scienter for Plaintiff to prevail on these claims. They didn't know of an alleged investigation into false or fraudulent claims to the government until early 2006 when Defendants received notice of this action.

>    4. A separate claim for relief may not be maintained for punitive damages.

Punitive damages may be recovered when sufficient evidence exists to support such damages in connection with a proper claim. Punitive damages may not be recovered as a separate and independent claim. Further, because judgment should be granted to Dr. Evslin on the wrongful termination and retaliation, and whistleblower claims, Plaintiff cannot recover punitive damages.

No genuine issue of material fact exists relating to these claims, and as a result Dr. Evslin is entitled to summary judgment as a matter of law.

## II.    FACTUAL BACKGROUND

KMC employed Plaintiff Lockyer as an internist from December 1, 1999 until he resigned on June 30, 2004. *Emp. Offer,* Exh. 7*; Res. Ltr.,* Exh.8. Dr. Lockyer signed a formal Employment Agreement ("Agreement") with KMC

on February 24, 2000. *Agreement*, Exh. 9. During Dr. Lockyer's employment with KMC, Dr. Evslin, a pediatrician by training, was the CEO of KMC. From January 2003, Dr. Evslin also served as President/CEO of Wilcox Memorial Hospital. *Evslin Decl.*, ¶ 2; *Knudsen Decl.*, ¶¶ 5,6.

KMC agreed to pay Dr. Lockyer $125,000 for the first year of employment and as determined pursuant to a salary formula established by the Agreement for subsequent years. *Offer,* Exh. 7, ¶ 1; *Agreement,* Exh. 9, ¶ 4. Dr. Lockyer's compensation under the KMC salary formula was to be based on a number of factors, including the physician's productivity as determined by the physician's prior twelve months' of receipts, his/her costs, insurance reimbursements and collections, and was tied to data published by the Medical Group Management Association.[1] Based on periodic computations, a physician's monthly compensation could be reduced or increased. *See Exh. "A" to Agreement,* Exh. 9; *Knudsen Decl.*, ¶ 11. The salary formula in place from time to time at KMC was to be applied to all KMC physicians. *Evslin Decl.,* ¶ 9; *Knudsen Decl.*, ¶ 13. During Dr. Lockyer's employment, KMC paid Dr. Lockyer at or above the salary formula calculation. *Evslin Decl.*, ¶ 42; *Knudsen Decl.*, ¶ 50.

---

[1] The Medical Group Management Association is a national trade organization and the "the principal voice" for medical group practice across the country. *See About MGMA* (Nov. 14, 2006), at http://www.mgma.com/about/default.aspx?id=96.

**A.    Dr. Lockyer Had Difficulty With the Compensation Formula from the Start of His Employment.**

After the first full year of Dr. Lockyer's employment, KMC's Salary & Finance and Executive Committees (collectively "Committees") reviewed Dr. Lockyer's receipts and performance for his first year of work, and notified him that by the end of his first full fiscal year (June 30, 2001), "[i]t is possible you will not meet your target" to retain his $125,000 compensation. *Committees' Ltr., d:01/05/01*, Exh. 10.    The Committees were concerned that Dr. Lockyer's template[2] "continued to be quite limited despite discussions with him about the effect this may have on his salary approximately 3 months ago." *Committees'. Mins., d: 01/30/01,* Exh. 11; *Evslin Decl., ¶ 14*.  The Committees decided to reduce Dr. Lockyer's salary to $110,000. *Id.*

Dr. Evslin met with Dr. Lockyer in February 2001 to discuss ways Dr. Lockyer might be able to increase his patient work load and cut costs, in an effort to augment Dr. Lockyer's compensation under the formula.  Dr. Lockyer asked Dr. Evslin to ask the Committees to keep his salary at $125,000. Dr. Lockyer committed to making changes that would increase the number of patients seen by him, including, among other things, arriving to work by 8:30-9:00 a.m.  As requested, Dr. Evslin asked, and preliminary permission was granted, to

---

[2] The "template" referred to the appointment time slots in a physician's schedule available for patient visits. *See Williamson Decl.,* 16¶.

keep Dr. Lockyers' salary at $125,000. *Evslin Ltr. to Lockyer, d:02/13/01*, Exh. 12; *Evslin Decl., ¶ 15*.  Because of Dr. Lockyer's commitment to making changes in his template and schedule, the Committees agreed to maintain the salary, but would review it in 45 days. *Committees' Mins., d: 02/27/01*, Exh. 13.  Due to improved performance, Dr. Lockyer's salary remained stable during the next review.  *Committees Mtg. Min., d: 05/29/01*, Exh. 14.

A short time later though, in June 2001, the Committees again noted that Dr. Lockyer's numbers substantiated a salary draw of only $101,000, not $125,000. *Committees' Mins., d: 06/26/01*, Exh. 15.  Yet, the Committees anticipated an increase in Lockyer's productivity numbers, and voted to reduce his salary but only to $120,000.  *Id.*  Through June 2001, Dr. Lockyer never met his target production numbers (relative value units, or RVUs).  *Summary,* Exh. 55.

By November 2001, Dr. Lockyer's projected salary, based on his productivity, fell (*Evslin Ltr. to Lockyer, d: 11/29/01,* Exh. 16) and in December 2001, the Committees again proposed to reduce Dr. Lockyer's salary to $98,000, based on his receipts.[3]  *Committees' Mins., d: 12/28/01*, Exh. 18.    Again, Dr. Evslin advocated on behalf of Dr. Lockyer by recommending to the Committees that Lockyer's salary be set instead at $115,000 since he had shown

---

[3] Also in December 2001, the compensation formula was amended to include, *inter alia*, payment at the rate of 45% for **all** receipts totaling over $350,000, (eliminating the clause limiting payment of receipts over $500,000 at 40%) thereby potentially increasing a physicians compensation. *Empl. Agrmt. Am*, Exh. 17.

"improvement trends."  Based on Dr. Evslin's recommendation, the Committees voted to set Dr. Lockyer's compensation at $115,000.  *Id.*

Unfortunately, Dr. Lockyer's performance still did not improve.  In March 2002, the Committees voted to give Dr. Lockyer ninety days' notice of intent to terminate employment due to underperformance and complaints from both patients and medical staff. *Committees' Mins.*, *d: 03/26/02*, Exh. 19; *Evslin Ltr. to Lockyer, d: 04/02/02,* Exh. 20.  Dr. Lockyer appealed the decision, with the result that the Committees rescinded the notice of termination, and issued a work improvement plan to Dr. Lockyer, drafted by Gail Lerch, V.P. of Human Resources for HPH. *Committees' Mins.*, *d: 04/04/02*, Exh.21; *Work Impr. Plan Ltr. #1, d: 04/09/02,* Exh. 22; *Evslin Decl., ¶ 22.*  Dr. Lockyer objected to the work improvement plan by letter dated April 20, 2002.[4]  After considering Dr. Lockyer's various objections, the Committees replaced the 04/09/02 work improvement plan letter, with a modified work improvement plan letter dated May 1, 2002.  The plan addressed the changes Dr. Lockyer requested, and kept Dr. Lockyer's annual salary draw at $115,000 until July 1, 2002, when a new salary draw would be implemented if indicated by the salary formula based on Dr. Lockyer's productivity from April 1, 2002 to July 1, 2002.  *Work Impr. Plan Ltr. #2, d:*

---

[4] Significantly, Dr. Lockyer stated his belief that "the actions being taken to terminate me are discriminatory on the grounds that I am a single parent." *Lockyer Ltr. to Evslin, d:04/20/02,* Exh. 23.

*05/01/02,* Exh. 24; *Evslin Decl, ¶ 24.*   In response, Dr. Lockyer's attorneys requested documents regarding his pay (i.e., charges slips, reimbursements and collections), expressing Dr. Lockyer's belief that "he may have been underpaid." *Jouxson-Meyers Ltr., d: 05/24/02,* Exh. 25; *see also del Castillo Ltr., d: 06/13/02*, Exh. 26.   This was Dr. Lockyer's first request for documents regarding his compensation.  *Lockyer Depo*. Exh. 53 at 276-277.

Dr. Lockyer took vacation/leave of absence for 30 days, from June 17, 2002 through July 12, 2002. *See Evslin Ltr. (draft) d: 06/10/02*, Exh. 27; *see also R. del Castillo Ltr., d: 06/13/02,* Exh. 26. While he was gone an additional issue came to light regarding charts accumulating in Dr. Lockyer's office which required responses from him prior to his vacation. Per the modified work plan, the complaint was to be presented to KMC's Quality Assurance Committee. Dr. Lockyer was invited to meet with Drs. Evslin and Johnston to discuss the many issues regarding Dr. Lockyer's employment.  Dr. Lockyer declined, stating that he would not attend until he verified the accuracy of his pay.  *Lockyer Ltr. to Evslin, d: 07/16/02*, Exh. 52; *Evslin Decl.*, ¶ 28.

On July 8, 2002, Dr. Lockyer demanded arbitration regarding whether he was underpaid.  *Jouxson-Meyers Ltr. to Evslin, d: 07/08/02,* Exh. 28; *Agreement,* Exh. 9, ¶ 16; *Jouxson-Meyers Ltr. to DPR, d: 07/12/02,* Exh. 29.

Based on complaints by staff and patients regarding Dr. Lockyer's deficiencies in charting, patient care, and compliance with the work plan, the Executive Committee voted to place Dr. Lockyer on ninety-days probation. The action was not related to Dr. Lockyer's request for documents. *Exec. Comm. Min., d: 07/26/02/*, Exh. 30; *Evslin Ltr. to Lockyer, d: 07/26/02,* Exh. 31.

Dr. Lockyer's salary did not change at the next review. *Evslin Ltr. to Dr. Lockyer, d: 08/23/02,* Exh. 32; *Evslin Decl.,* ¶ 30. By the end of November 2002, however, based on the prior 3 months' of productivity, KMC decreased Dr. Lockyer's salary to $90,000 under the compensation formula. *Wilcox Assoc. Change of Status, d: 11/29/02,* Exh. 33. His salary was reduced again effective February 2003, to $83,132. *Wilcox Assoc. Change of Status, d: 02/26/03*, Exh. 34.

In April 2003, KMC notified physicians taking internal medicine call, like Dr. Lockyer, that they would receive an additional annual stipend of $12,500.[5] *Williamson Memo, d: 04/03/03,* Exh. 35; *Wilcox Assoc. Change of Status, d: 04/03/03,* Exh. 36. Additionally, in September 2003, KMC notified all clinic-based physicians of a change in the salary compensation formula (Exhibit A-1 to the employment agreements). *Notice to physicians, d: 09/25/03*, Exh. 38; *Evslin Decl,* ¶ 35. Implementation of the new salary formula was to be over a one year period. Physicians had the option of going to the new formula, or taking 90% of

---

[5] The stipend was later corrected to $12,000. *Wilcox Assoc. Change of Status, Revised, d: 04/14/03,* Exh. 37; *Knudsen Decl.*, ¶ 39.

the prior formula for January through June 2004, and 80% of the prior formula for the July through December 2004, with full participation in the new formula required by January 2005. *Id*.

Despite KMC's efforts, Dr. Lockyer continued to under perform under the compensation formula. Further, Dr. Lockyer continued having problems with his practice, including patient complaints, addressing patient care issues in a timely manner, and changing work schedules/practice. *Williamson/Jackson Ltr. to Lockyer, d: 02/26/04,* Exh. 39; *Williamson Ltr. to Lockyer, d: 03/09/04,* Exh. 40, *Williamson Ltr. to Lockyer, d: 04/12/04,* Exh. 41.[6] To address one of the problems, KMC had to reassign Dr. Lockyer's long-term care patients to other physicians because Lockyer refused to maintain privileges at the hospital, and his general indifference to these patients. *Yee Memo, d: 04/26/04,* Exh. 44; *Williamson Ltr. to Lockyer, d: 05/18/04,* Exh. 45. During this same time period, KMC diligently gathered and produced documents in response to arbitration discovery requests made by Dr. Lockyer regarding his compensation. *P. Jones Ltr. to Jouxson-Meyers, d: 04/11/03,* Exh. 46.[7]

---

[6] *See also Dr. Lockyer's Response Ltrs., d:05/09/04 and 03/31/04*, Exhs. 42-43. Note that Dr. Lockyer again expresses his belief that KMC is retaliating against him, this time because of requests to see his billing records.

[7] See also *Ltrs. between Counsel,* Exhs. 47, 48, 49.

On June 28, 2004, Dr. Lockyer **resigned** from KMC, effective June 30, 2004. *Res. Ltr., d: 06/28/04,* Exh. 8.[8]

## III.    STATEMENT OF THE CASE

Within three months of Dr. Lockyer's resignation, Plaintiff Lockyer filed his Complaint under seal on or about October 1, 2004.  Defendants received notice of the abandonment by the Plaintiff of the then-pending arbitration on or about January 18, 2005. *Refund from DPR to P. Jones, d: 01/18/05,* Exh. 50.

The U.S. Attorney for the District of Hawai`i intervened on behalf of the U.S. on January 27, 2006, and defendants were then notified for the first time of the claims in this litigation.

## IV.    STANDARD OF REVIEW

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.[9] *See Thrifty Oil*

---

[8] Dr. Lockyer was under an apparent misimpression that he would be required to be fully on the new salary formula by July 2004.  In reality, the phase-in period was still in place until January 2005. *See Notice,* Exh. 38.

[9] Disputes as to immaterial issues of fact do not preclude summary judgment. *Lynn v. Sheet Metal Workers Int'l Assn*, 804 F.2d 1472, 1478 (9th Cir. 1986).

*Co. v. Bank of America Natl Trust & Sav. Assn*, 310 F.3d 1188, 1194 (9th Cir. 2002) (internal citations omitted).  A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," then no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citation omitted).

While it is understood that the court, when considering a motion for summary judgment, must draw all justifiable inferences in favor of the non-moving party,  the non-moving party must establish more than the "mere existence of  a scintilla of evidence in support of the [its] position. *Anderson,* 477 U.S. at 252.  To prevail on summary judgment, the moving party has the burden of persuading the Court that the non-moving part "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex,* 477 U.S. at 322.

Where a party brings a properly supported motion for summary judgment, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment.  Instead, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a

genuine issue for trial.' *T.W. Elec. Serv. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted) (emphasis added). At least some "significant probative evidence tending to support" the defense must be produced to overcome the motion. *Id.* at 630 (*quoting First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)).

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment. *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied*, 484 U.S. 1006 (1988). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnotes omitted). Indeed, if the factual context makes the non-moving party's claim or defense implausible, the party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue of trial." *Franciscan Ceramics*, 818 F.2d at 1468 (*citing Matsushita,* 475 U.S. at 587). Uncorroborated allegations and self-serving testimony will not create a genuine issue of material fact. *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Summary judgment may be granted [i]f the

evidence is merely colorable or is not significantly probative. *Nor-Cal Plumbing*, 48 F.3d at 1471 (citations omitted) (modification in original).

## V.    ARGUMENT

Initially, it is important to make clear that Plaintiff is barred by the statute of limitations from pursuing any claim for whistleblower protection under either the federal statute (31 U.S.C. § 3730(h)) or Hawaii state statute (Haw. Rev. Stat. § 378-62) based on anything that took place before October 1, 2002—2 years before Plaintiff filed this action. *See U.S. ex rel. Hinden v. UNC/Lear Services, Inc.*, 362 F.Supp. 2d 1203 (D. Haw. 2005) (limitations period of Hawaii's Whistleblower Protection Act, Haw. Rev. Stat. § 378-61, *et. seq.*, applies to claims under 31 U.S.C. §3730(h) in the U.S. District Court for the District of Hawaii.  Since April 26, 2002, that limitations period has been 2 years).

### A.    Plaintiff Cannot Prevail on His Federal Whistleblower Protection Claim, 31 U.S.C. § 3730(h).

To prevail under § 3730(h) of the FCA a Plaintiff must prove: (1) he engaged in conduct protected under the act; (2) his employer knew he was engaged in the protected conduct; **and** (3) his employer retaliated against him because of the  protected conduct. *Moore v. California Inst. Of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002); *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).  If the Plaintiff establishes a prima facie case, the burden of production shifts to the employer to prove that the Plaintiff would have been

terminated even if he had not engaged in the protected activity. *Karvelas v. Melrose-Wakefield Hospital,* 360 F.3d 220, 235 (1st Cir. 2004) *cert. denied,* 125 S.Ct. (2004); S.Rep. No. 99-345.

Plaintiff Lockyer cannot make a prima facie case here.

**1. Dr. Evslin was not Dr. Lockyer's "Employer" Under the FCA.**

Courts have consistently limited liability for retaliation and/or wrongful termination under the FCA to **the actual employing entity only**, not mere individual supervisors or officers. *U.S. ex. rel. Palladino v. VNA of Southern New Jersey, et. al.,* 68 F.Supp. 2d 455, 464 (D. N.J. 1999) (corporate officers and supervisors were not subject to individual liability for retaliation under the FCA)*;U.S. ex rel. Lamar v. Burke,* 894 F.Supp. 1345, 1347-48 (E.D. Mo. 1995) (the narrower, ordinary and natural meaning of "employer" for purposes of the FCA did not impose individual liability on employee/supervisors); *Cabinet for Families and Children v. Cummings,* 163 S.W. 3d 425, 431-32 (Ken. 2005) (declining to allow individual liability under Kentucky's whistleblower statute based on similar definitions of "employer" contained in "parallel federal acts and whistleblower acts of other states."). It is undisputed that **KMC** employed Dr. Lockyer as an "employee-physician in its internal medicine department." Complaint, ¶ 20. Lockyer's employer was KMC, not Dr. Evslin. *Agreement,* Exh. 9, ¶1; *Res. Ltr.,* Exh. 8.

Although under certain, limited situations individuals have been found to be *de facto* employers, that concept is not applicable here. *See Mruz v. Caring Inc.*, 991 F. Supp. 701 (D.N.J. 1998) (extending liability to a *de facto* employer); *see also U.S. ex rel. Kent v. Aiello*, 836 F.Supp. at 723 (extending liability to a past corporate employer). In *Mruz v. Caring, Inc.,* the U.S. District Court of New Jersey noted that an individual may be liable under § 3730(h) where the defendant is shown to be Plaintiff's *de facto* employer—one who has dominated and dictated the actions of [the corporation] in a way that benefited him/her, *inter alia*, personally. *Id*. at 710.

Dr. Evslin cannot be deemed Dr. Lockyer's *de facto* employer. Dr Evslin did not control the terms of Lockyer's employment, including salary and discharge. Under the 1998 (Exh. 1), and 2001 (Exh. 2) Amended and Restated By-Laws of Kauai Medical Clinic, the CEO/President could not make hiring and firing decisions for physicians. *See* Exh. 1, ¶ 7.2; Exh. 2, ¶ 4.1. Before December 2001, KMC's professional affairs committee monitored issues of quality assurance, physician performance and credentialing, and employment and termination of physicians. Exh. 1, ¶ 8.4 (a) – (d). KMC's Salary and Finance Committee made recommendations for physician salary for determination by the Board. After December 2001, the Medical Executive Staff Committee (a.k.a. the Executive Committee) advised the Board on physician compensation issues. Exh. 2, ¶ 7.1.

The CEO was an *ex officio* non-voting member of the board. *See also,* Exh. 2, ¶ 4.1; Evslin Decl., ¶ ¶ 3, 11. Dr. Evslin did not control these issues. He cannot be deemed Dr. Lockyer's *de facto* employer.[10]

Dr. Evslin cannot be held individually liable under § 3730(h).

2. **Dr. Lockyer Was Not Engaged in Activity Protected by § 3730(h).**

Section §3730(h), 31 U.S.C., "only protects employees who have acted 'in furtherance of an action' under the FCA." *Hopper,* 91 F.3d at 1269. The employee must be "investigating matters which are calculated, or reasonably could lead, to a viable FCA action. *Moore* at 845. The Ninth Circuit Court requires more than the discovery of alleged fraud. The investigatory actions undertaken by the Plaintiff must have a nexus to the FCA. *Hopper,* 91 F.3d at 1269. "[A]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore* at 845.

---

[10] Ironically, it was Dr. Evslin who, on two separate occasions, successfully advocated on behalf of Lockyer **not** to reduce the salary. *See* Exhs. 12-13 and 18. Further, if Dr. Evslin wanted Dr. Lockyer's employment terminated and if he had the power to make it happen, the July 26, 2002 Executive Committee meeting would not have ended in a 6-0 vote **not to terminate.** *Exec. Mins.*, Exh. 30. Evlsin clearly did not "dominate" the process. This vote must be seen as conclusive evidence of his lack of dominance and control over the employment decisions affecting Plaintiff Lockyer.

In *Hopper,* the Ninth Circuit held that Hopper was not engaging in protected activity as she was not investigating the school district for fraud against the government:

> The entire record fails to demonstrate Hopper was engaged in "furtherance of an action" under the FCA.  Rather, the record quite clearly shows Hopper was merely attempting to get the School District to comply with Federal and State regulations.  Her numerous written complaints, seventy letters and over fifty telephone calls were all directed to this end.  ***She was not trying to recover money for the government***; she was attempting to get classroom teachers into IEP evaluations sessions.  ***She was not investigating fraud. She was not whistleblowing as envisioned in the paradigm qui tam FCA action*** . . . Correcting regulatory problems may be a laudable goal, but not one actionable under the FCA in the absence of actual fraudulent conduct.  Her FCA allegations were not sufficient to pass summary judgment muster.  Her investigatory activity did not have any nexus to the FCA.  Thus, the district court should have granted the School District's motion for judgment as a matter of law.

*Id*. at 1269 (emphasis added).  Thus, unless the employee is "trying to recover money for the government" or "investigating fraud" against the government, he or she is not engaged in protected conduct under the FCA.[11]  *Id*.; *see also U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp*., 360 P.3d 220 (1st Cir. 2004) (where an

---

[11] The requirement of purposeful investigation of fraud against the government comports with the intent of Congress in enacting § 3730(h), which was to further encourage disclosure of fraud against the government.  S.Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. "Divorcing the fraudulent ingredient from the acts is wholly contrary to what Congress intended." *Luckey v. Baxter Healthcare Corp*., 2 F.Supp.2d 1034, 1052 (N.D. Ill. 1998), *aff'd*, 183 F.3d 730 (7th Cir. 1999) (plaintiff's investigations must be "fueled by" or "directed at" exposing a fraud against the government. *Id*. at 1050-51).

employee has not engaged in protected conducted under the FCA, he cannot meet the second and third elements of an FCA retaliation claim, as those depend upon the first).

Here, as in *Hopper,* Lockyer's "investigatory" actions do not have a nexus to the FCA.[12]   Here, Dr. Lockyer's alleged investigatory actions related to the accuracy of his compensation—not to false statements made to government officials for the purpose of obtaining money.   Plaintiff himself admits he "demanded production of his billing information from his employer [KMC] to establish whether reductions imposed on him were accurate and reasonable according to his employment contract.   *Disclosure*,   at 2.   "In fact, it bears repeating that Dr. Lockyer never knew that KMC was billing the government and other third party payors under his provider number for the patients in question until he used binding arbitration to force KMC to produce records of its billings." Disclosure, Exh 51 at 6-7.  As a result, Plaintiff's claim must fail.

Before he filed his Complaint, Lockyer never claimed the defendants defrauded the government.[13]   Although Plaintiff argues that KMC viewed Dr. Lockyer's request for, and review of his billings as "reasonably" leading to an

---

[12] Indeed, according to his testimony he was not "investigating" anything at all. *Lockyer Depo*., Exh. 53 at 46-47.

[13] Even in his resignation letter, which clearly evidences posturing by his attorneys for retaliatory claims, Lockyer does not mention or imply he believed there was a fraud against the government.  *Res. Ltr*., Exh. 8.

FCA claim, (*Complaint,* ¶ 38) Plaintiff makes clear that *he* did not so believe. Lockyer, through his counsel, first requested a copy of this records and accompanying billings at the end of May 2002 "to satisfy himself whether KMC has proper grounds for reducing his salary[.]" *Jouxson-Meyers Ltr., d: 05/24/02,* Exh. 25. He demanded arbitration in July 2002 to resolve the issues "relating to his production and compensation." *See Jouxson-Meyers Ltr. d:07/08/02,* Exh. 28.

Dr. Lockyer did not engage in activity protected under the FCA. As in *Hopper,* his claims for relief under the FCA's whistleblower provision should be denied as a matter of law. *Hopper,* 91 F.3d at 1269; *Zahodnick v. International Business Machines Corp.*, 135 F.3d 911 (4th Cir. 1998) (simply reporting a general concern of billing does not establish conduct "in furtherance of" a FCA claim).

### 3. Plaintiff Cannot Show That Defendants Knew He Was Engaged in Protected Conduct Under the FCA.

Under the second prong of § 3730(h), the Plaintiff must prove that the employer was "aware that the employee is investigating fraud" against the government under the FCA. *Hopper*, 91 F.3d at 1269; *Karvelas*, 360 P.3d 220; *see also U.S. ex rel. Yesudian v. Howard University*, 153 F.3d 731 ,743 (D.C. Cir. 1998) ("grumbling to the employer about job dissatisfaction or regulatory violations" does not demonstrate the employer was aware of the protected activity, "just as it does not constitute protected activity in the first place").

No fact supports the contention that KMC and/or Dr. Evslin **had knowledge** that Dr. Lockyer was investigating fraud against the government. Defendants first knew of Dr. Lockyer's alleged belief of FCA violations just before the Complaint was served on defendants, in January 2006. Evslin Aff., ¶ ¶ 41-42. Like the plaintiff in *Hopper*, Dr. Lockyer "never gave any indication [he] was investigating [Defendants] for defrauding the government."[14] *Hopper*, 91 F.3d at 1270; *see also Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948 (5th Cir. 1994) (where contract administrator reported concerns to his superiors regarding a "lack of verification" for maintenance and repair charges made to the government the court found that the second prong had not been met as he had not told his employer he was concerned about fraud). Absent such notice, it is impossible for Dr. Evslin or any other defendant to possess the requisite retaliatory intent to establish a violation under § 3730(h). Plaintiff Lockyer's claim therefore fails as a matter of law under the second prong for relief.

---

[14] Indeed, Dr. Lockyer testified he never investigated fraud. *Lockyer Depo.*, Exh. 53 at pp. 46-47.

### 4. Plaintiff Cannot Show Defendants' Actions Were "Because of" Dr. Lockyer's Alleged Protected Conduct.

Plaintiff must "show by a preponderance of the evidence that the employer's retaliatory actions resulted 'because' of the whistleblower's participation in a protected activity." Sen. Rep. No. 345, 99th Cong., 2d Sess. at 34 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5299. Assuming, *arguendo*, that Dr. Lockyer did engage in protected activity of which Defendants had notice (which is not conceded), Plaintiff's whistleblower claims still fail as a matter of law. There is no causal connection between the protected conduct and the adverse employment action complained of—a reduction in pay.[15] Lockyer's salary reductions began **far in advance** of any request made by Dr. Lockyer for records and were legitimately based on his receipts and the KMC compensation formula.[16]

As shown above, KMC first reduced Dr. Lockyer's salary in January 2001, June 2001, and December 2001. Dr. Lockyer received his first notice of termination from KMC in March 2002—before Dr. Lockyer requested a copy of his records at the end of May 2002. Further, in September 2003, KMC notified ***all of its physicians*** that the new compensation formula would be phased in through 2004, and fully in place January 2005. *Notice,* Exh. 38. It is based on the

---

[15] Plaintiff Lockyer alleges retaliation and wrongful termination by way of salary reductions for his request for records to confirm the accuracy of his salary calculation. *Complaint*, ¶¶ 37, 38, 41.

[16] See *Factual Background, supra*, section A.

anticipated salary under this formula that Plaintiff Lockyer claims he was forced to resign.[17] *Res. Ltr.,* Exh. 8.  The formula applied to all KMC treating physicians (Williamson Decl., ¶ 6)—its application to Dr. Lockyer cannot be deemed retaliation.  Further, Plaintiff cannot rely on the timing of his request for documents relative to a later reduction in pay to meet his burden on his retaliation claim.  *See Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

No causal connection exists between the alleged retaliatory acts and Lockyer's protected conduct (if any).  Based on this, and the fact that Plaintiff cannot satisfy any of the requirements for a § 3730(h) claim, his claim must fail.

    **B.**    **Plaintiff Cannot Prevail on His Claim Under the Hawai`i Whistleblower Protection Act ("HWPA").**

The HWPA, Haw. Rev. Stat. § 378-61 *et seq.*, is the State of Hawai'i analogue to 31 U.S.C. §3730(h). It provides in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:  (1) The employee . . . reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of: (A) A law, rule, ordinance, or

---

[17] Dr. Lockyer apparently misunderstood the full effective date of the new salary formula. *See Notice,* Exh. 38.

regulation, adopted pursuant to law of this State, or the United States .
. . .

Haw. Rev. Stat. § 378-62.  The statute requires the Plaintiff to prove that he either

reported, or was about to report, a violation of the law and that "the employer take

some adverse action against the employee as a result."  *Nelson v. Nat'l Car Rental*

*System, Inc.*, WL 1814341 (D. Haw. June 30, 2006).

On its face, then, the statute requires (1) retaliation by ***an employer***, (2)

***because of*** the actual or likely report of a violation of law.  Plaintiff cannot meet

either of these requirements.

### 1.  Dr. Evslin Was Not Plaintiff Lockyer's "Employer" under the HWPA.

The HWPA defines "employer" as "a person who has one or more

employees," [and includes] an agent of an employer or of the State or a political

subdivision of the State."  Haw. Rev. Stat. § 378-61.  In deciding whether a claim

under the HWPA may be asserted against a co-employee individually, Hawai`i

courts "may look for guidance to federal case law in interpreting similar

provisions." *Crosby v. State of Hawai`i*, 76 Hawai`i 332, 339, 876 P.2d 1300, 1307

(Haw. 1994).

As discussed in Section V.A.1., above, Dr. Evslin was not Dr. Lockyer's

employer under the federal analogue to the HWPA.  Further, this Court has

determined that the "agent" language in the definition of "employer" in Haw. Rev.

Stat. § 378-1 does not create liability for individual employees. *Maizner v. State of Hawaii*, 405 F.Supp. 2d 1225, 1236-37 (D. Haw. 2005). As a result, Plaintiff's claim under the HWPA fails.

### 2. There Exists No Causal Connection Between Plaintiff's Alleged Protected Activity and the Alleged Retaliatory Conduct.

To be successful on a claim under the HWPA, a plaintiff must show a causal connection between the employer's alleged retaliation and the employee's protected conduct. *Lopes v. Kapiolani Med. Ctr. for Women & Children,* 410 F.Supp. 2d 939, 953 (D. Haw. 2005), citing *Crosby*, 76 Hawai`i at 332, 876 P.2d at 1310. The plaintiff must prove that "his or her protected conduct was a 'substantial or motivating factor' in the employer's decision to terminate the employee."[18] *Crosby*, 76 Hawai`i at 332, 876 P.2d at 1310 (citations omitted).

As discussed above, Plaintiff Lockyer cannot meet this burden. It is clear that Dr. Lockyer's requests for records was not a "substantial motivating factor" (or any motivating factor) for the reduction in his pay. Adjustments to

---

[18] The legislature specifically intended the HWPA to have a "higher standard of proof than normally applied in civil, [labor discharge] cases." *Crosby*, 76 Hawai`i at 342, 876 P.2d at 1310. *citing* HSE. STAND. COM. REP. NO. 25, in HOUSE JOURNAL, at 1090. Once the employee shows that the protected activity was a substantial or motivating factor in the employer's action against him, the employer may affirmatively defend "by showing [by a preponderance of evidence] that the termination would have occurred regardless of the protected activity." *Id.* (holding that no "causal nexus" existed between plaintiff's protected expression and the alleged adverse employment action (i.e. removal from the project) where the employer's primary motive was not discriminatory).

Dr. Lockyer's salary preceded any request by Plaintiff for documents confirming the accuracy of his compensation, and were legitimately based on Dr. Lockyer's productivity and expenses under the compensation formula.  *See Sec. V.A.4., supra.*    Further, the implementation of the new compensation formula was applicable to all KMC physicians, not just Dr. Lockyer. *Notice,* Exh. 38.

Plaintiff cannot meet this element of his claim.  His claim, therefore, must fail.

## C.    Plaintiff Cannot Prevail on His Common Law Claim for Wrongful Termination and Retaliation.

In his Second Claim for relief, Plaintiff Lockyer alleges a common law claim for wrongful termination and retaliation.  The Hawai`i Supreme Court first recognized the tort of wrongful termination in violation of public policy in *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982).  In *Parnar*, the Hawai`i Supreme Court held:

> **[A]n employer** may be held liable in tort where his discharge of an employee violates a clear mandate of public policy.  In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.

*Parnar*, 65 Haw. at 380, 652 P.2d at 631. When bringing a *Parnar* claim, the plaintiff "alleging a retaliatory discharge, bears the burden of proving that the discharge violates a clear mandate of public policy." *Id*. Where the statute

embodying the public policy at issue provides a sufficient remedy for violations, however, the statutory remedy is exclusive, and further remedy under *Parnar* is unnecessary. *Hew-Len v. F. W. Woolworth*, 737 F.Supp. 1104, 1107 (D. Haw. 1990) citing *Lapinad v. Pacific Oldsmobile-GMC, Inc.,* 679 F.Supp. 991, 993 (D. Haw. 1988).

### 1.  Dr. Evslin Was Not Dr. Lockyer's Employer.

As shown above, Dr. Evslin was not Dr. Lockyer's employer. KMC was his employer. As a result, Dr. Evslin cannot be liable to Dr. Lockyer for his common law claims for wrongful discharge and retaliation.

### 2. Sufficient Statutory Remedies Exist For Violations Of The Public Policies Advanced By Plaintiffs.

The public policy exception to the at-will employment doctrine as expressed in *Parnar* "was intended to apply to a 'narrow class of cases' where the wrongful discharge action is seen as necessary to effectuate the public policy at stake." *Hew-Len*, 737 F. Supp at 1107- 08 (citations omitted).  Hawai`i courts, however, do not recognize *Parnar* claims where the public policy at issue is embodied in a statute and a statutory scheme provides a remedy for violations of that policy. *Batacan v. Reliant Pharmaceuticals*, 324 F. Supp. 2d 1144, 1145 (D. Haw. 2004) (barring *Parnar* a claim where the public policy sought to be protected was based on the Family Medical Leave Act ("FMLA") and the FMLA provided adequate remedy for violations); *see also Takaki v. Allied Machinery Corp.*, 87 Hawai'i 57, 951 P.2d

507, 513 (1998) (barring public policy claim that was based upon terminating an employee solely because the employee suffered a work injury, because the policy was embodied in Haw. Rev. Stat. § 378-32 and a remedy was provided in Haw. Rev. Stat. § 378-35); *Lapinad v. Pac. Oldsmobile-GMC, Inc.*, 679 F.Supp. 991, 993 (D. Haw. 1988) (barring public policy claim because the policy plaintiff sought to enforce was contained in Title VII of the Civil Rights Act); *Howard v. Daiichiya-Love's Bakery, Inc.*, 714 F.Supp. 1108, 1113 (D. Haw. 1989) (barring public policy claim based on policy in Age Discrimination in Employment Act, Haw. Rev. Stat. § 378-2); *Lui v. Intercontinental Hotels Corp.*, 634 F.Supp. 684 (D. Haw. 1986) (barring public policy claim based on Title VII and Haw. Rev. Stat. § 378-2).

Here, Plaintiff asserts that the alleged submissions of false or fraudulent claims by the Defendants are against the public policy of the State of Hawai`i as embodied in, *inter alia*, Haw. Rev. Stat. §§ 661, 28-91, and 346-14.[19] *Complaint* at ¶ 36.    He alleges his request for compensation records threatened to reveal a

---

[19] HRS § 661-21, *et seq.* sets forth the guidelines and restrictions for qui tam actions and recovery of false claims to the state.   Haw. Rev. Stat. § 28-91 delineates the duties and purpose of the Medicaid Fraud Unit.   HRS § 346-14 describes the duties of the Department of Human Services.   Plaintiff additionally cites to Title 17, Chapter 1704 and Title 11, Chapter 94 of the Hawai`i Administrative Rules ("HAR").   Title 17, Chapter 1704 addresses the fraud investigation procedures of the Department of Human Services.   Title 11, Chapter 94 of the HAR addresses the standards of care and licensing for skilled nurses and intermediate care facilities.   Plaintiff does not allege in this claim a violation of the public policy embodied in the HWPA.

practice by Defendants of submitting false claims to the State via Medicaid (*Id.*, ¶ 38) resulting in retaliation. *Complaint*, ¶ ¶ 41, 43, 44. This retaliation, according to Plaintiff, violated the letter and purpose of Haw. Rev. Stat. § 661-1, *et. seq.* which authorizes qui tam actions for false claims against the State for the restitution of money taken from the State by fraud.

The Legislature clearly considered and provided a comprehensive statutory scheme for violations against the public policy for which Haw. Rev. Stat. § 661-27 was intended to protect. Incentives for bringing claims by private citizens, as well as deterrence for violators of the statute exist in the statute itself. *See* Haw. Rev. Stat. §§ 661-27 and 661- 21. All of the damages alleged by Dr. Lockyer based on his purported "whistleblower" activities can be adequately redressed under this statutory scheme.

Based on the foregoing, Dr. Lockyer's claims of wrongful termination and retaliation are unnecessary and meritless. As a result, Plaintiff's Second Claim for Relief is barred.

**D.  Summary Judgment Should Be Granted to Defendants on Plaintiff's Claim for Punitive Damages.**

Plaintiffs may not recover punitive damages as an independent cause of action—recovery of punitive damages is entirely based on prevailing on underlying tort claims. *Otani v. City and County of Haw.*, 126 F.Supp. 2d 1299, 1309 (D. Haw. 1998) (punitive damages is not an independent cause of action).

*See Dorsett-Felicelli, Inc. v. Co. of Clinton,* 2006 WL 2792746 *2 (N.D N.Y. 2006) (a claim for punitive damages is derivative and cannot stand on its own). Plaintiff's attempt to recover punitive damages in an independent cause of action must fail.

Further, because Plaintiff cannot prevail on any underlying claim for which punitives might be recovered, Dr. Evslin is entitled to summary judgment as a matter of law. *Welch v. Hawaii Medical Service Ass'n,* 2002 WL 31028641, *11 (D. Haw. 2002) (absent an underlying claim, the court dismissed plaintiff's claim for punitive damages).

## VI.   CONCLUSION

For the foregoing reasons, Defendant Evslin respectfully requests that this Court grant his motion for summary judgment.

DATED:    Honolulu, Hawaii, December 22, 2006.


        __/s/Stephanie E. W.Thompson
        SHARON V. LOVEJOY
        STEPHANIE THOMPSON
        Attorneys for Defendant
        LEE A. EVSLIN, M.D.

Civil No. CV04-00596 ACK LEK; USA, ex rel. Lockyer, et al. v. Hawaii Pacific Health, et al.; MEMORANDUM IN SUPPORT OF DEFENDANT LEE A. EVSLIN, M.D.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF LOCKYER'S SECOND, THIRD AND FOURTH CLAIMS FOR RELIEF