STARN • O'TOOLE • MARCUS & FISHER
A Law Corporation

SHARON V. LOVEJOY        5083-0
STEPHANIE THOMPSON    8399-0
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Telephone No. (808) 537-6100
Facsimile No. (808) 537-5434
slovejoy@starnlaw.com
sthompson@starnlaw.com

Attorneys for Defendant
WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf;<br><br>Plaintiffs,<br><br>vs.<br><br>HAWAII PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.;<br><br>Defendants. | CIVIL NO. CV 04-00596 ACK LEK<br>(Federal and State – Qui Tam)<br><br>**DECLARATION OF THOMAS B. WILLIAMSON, M.D.** |

## DECLARATION OF THOMAS B. WILLIAMSON, M.D.

I, THOMAS B. WILLIAMSON, M.D., declare that:

1. I am over the age of twenty-one (21) years and am fully competent in all respects to make this Declaration. I have personal knowledge of all such facts stated herein, unless otherwise indicated, and all such facts are true and correct.

2. I am a board certified Family Physician licensed to practice medicine in the State of Hawai'i. I am currently employed as a physician at Kauai Medical Clinic ("KMC") and have been so employed at KMC since 1994.

3. I have worked as a physician at KMC and Wilcox Memorial Hospital for the past twelve (12) years.

4. I have known and worked with Dr. Bill Evslin since 1994 and have always found him to be a conscientious, caring and competent physician and administrator.

5. In 1996, KMC merged with Wilcox Memorial Hospital and Dr. Evlsin became President/CEO of KMC.

6. In all my years at KMC, my compensation has been determined by a compensation formula established by the KMC Board of Directors, by and through

its committees and/or agents. This formula process was applied across the board to all outpatient clinic based physicians except physicians in their first year of employ with KMC (as they have no receipts on which to base the formula), and certain administrator/physicians (as they are required to spend the majority of their time in administrative duties).

7. In or about December 2001, KMC was acquired by Hawai`i Pacific Health ("HPH").

8. Sometime in 2003, Dr. Evslin accepted the position as President/ CEO of Wilcox Memorial Hospital. He served as both President/CEO of KMC and Wilcox Memorial Hospital from 2003, until he resigned in September of 2005.

9. Due to Dr. Evslin's increased duties as CEO of the hospital, I became Medical Director at KMC.

10. Not long after the merger, the physician compensation formula changed to be more in line with the cost accounting practices and procedures implemented by HPH.

11. In an effort to increase the compensation for certain medical specialties, a stipend was instituted for physicians taking internal medicine ("IM") call. Physicians taking IM call received as stipend of $12,000 per year, adjusted from an

initial $12,500. Dr. Lockyer received this stipend as he took IM call. Attached hereto as **Exhibit 35** is a true and correct copy of a memo I wrote on or about April 3, 2003, which reflects the implementation of the stipend.

12. KMC's amended the compensation formula implemented a cost accounting formula which calculated a physician's income based on his receipts, less his costs. Attached as **Exhibit 38** is a true and correct copy of the notice to physicians, dated September 30, 2003.

13. My main duties as Medical Director at KMC were threefold:

   a. To oversee the implementation of the cost accounting formula for physician compensation;

   b. To assist physicians to improve their practices by helping them cut their costs, increase patient numbers and maximize their resources; and

   c. To address patient and staff complaints.

14. It was generally understood that the implementation of the new cost accounting compensation formula might prove challenging for physicians operating on the lower end of the then current compensation model. Dr. Lockyer was one

such physician whose productivity consistently fell below the average for internists at the hospital and nationwide.

15. Because of the potential preliminary downward effect on compensation that might result from implementation of the salary formula, physicians were given the option of transitioning to the new cost accounting formula in stages. From January thru June 2004, a physician's salary would be no less than ninety percent (90%) of the prior formula. Then, for the second six months, from July through December 2004, a physician's salary would be no less than ninety percent (90%) of the prior formula. This way, a physician would have a cushion of time in which to adjust his practice to the new calculations so as not to experience sharp decreases in salary.

16. As Dr. Lockyer had been under-producing, I met with him frequently in 2003 and 2004 in an effort to help him increase his patient flow and cut his costs. One of the problems with Dr. Lockyer's productivity dealt with time management. Dr. Lockyer continuously reported late to work,

showing up around 9:00 or 9:30. He often ran late, facilitating the need for patients to be rescheduled. Moreover, he frequently took time off. Some of the options addressed in these meetings included opening up his schedule, or template, to allow for more time to see patients. It appeared to me, however, that our conversations and my repeated suggestions had little effect. During the last six months of his employ

at KMC, Dr. Lockyer began taking the afternoons off. Attached hereto as **Exhibit 39** is a true and correct copy of a letter I wrote and sent to Dr. Lockyer, dated 02/26/04 addressing these issues. Also attached hereto as **Exhibit 54** is a true and correct copy of a memo, dated 02/26/04, which I wrote and included in Dr. Lockyer's file regarding my meetings with him.

17. Dr. Lockyer continuously proved unable to accept responsibility for his own behavior and his patients' care. Attached hereto as **Exhibit 41** is a true and correct copy of a letter I wrote and sent to Dr. Lockyer, dated 03/09/04, regarding quality of care issues.

18. Attached hereto as **Exhibit 43** is a true and correct copy of a letter, dated 03/31/04 that I received from Dr. Lockyer which addresses some of the quality of care issues and complaints raised against him. Also attached hereto as **Exhibit 42** is a true and correct copy of a letter from Dr. Lockyer to me, dated 05/09/04. In this letter, Dr. Lockyer implies retaliation on the part of Dr. Evslin for Lockyer's "demand[ ] to see [his] billings."

19. Sometime in March 2004, it was discovered that Dr. Lockyer allowed his children to stay overnight, unattended in the clinic while Dr. Lockyer took call.

Although physicians often brought their children to their clinics, no other physician, of which I am aware, left his/her children unattended overnight at the clinic. My decision to formally disallow this practice was out of safety concerns for the Lockyer children and liability concerns for the Clinic. Dr. Evslin never directed me to limit Dr. Lockyer regarding his children. Attached hereto as **Exhibit 41** is a true and correct copy of a letter I wrote, dated 04/12/04, and sent to Dr. Lockyer regarding, among other things, this situation involving his children.

20. Dr. Evslin did not direct or control any of my, or the Quality Management Committee's decisions to reprimand or restrict Dr. Lockyer.

21. Dr. Evslin did not direct or control how Dr. Lockyer was to be treated. I did not hear, nor did I personally witness, any action by Dr. Evslin that led me to believe that Dr. Evslin sought to retaliate against Dr. Lockyer, for any reason, including his request for billing records.

22. As the complaints continued against Dr. Lockyer, the Quality Management ("QM") Committee reprimanded Dr. Lockyer for his behavior. Attached hereto as **Exhibit 45** is a true and correct copy of a letter I wrote and sent to Dr. Lockyer, dated 05/18/04, regarding these quality of care issues. Dr. Evslin neither instructed nor directed my or the QM Committee's actions in the decision to reprimand Dr. Lockyer.

23. On or about June 28, 2006, I received a letter from Dr. Lockyer's attorneys submitting Dr. Lockyer's resignation. Dr. Lockyer only provided two days' notice to KMC of his intent to resign. Attached hereto as **Exhibit 8** is a true and correct copy of a letter I received from Mr. R. del Castillo, dated 06/28/04, regarding Lockyer's resignation.

24. In the year and a half that I directly supervised Dr. Lockyer' employment at KMC, I was never informed by Dr. Lockyer or his attorneys that he was investigating fraud against the government. I never received any impression from Dr. Lockyer, his attorneys or the staff and administrators at KMC that Lockyer's requests for records, the subsequent arbitration and his resignation dealt with anything other than Lockyer's disagreement regarding his compensation.

DATED:    Honolulu, Hawaii,    12/22/06    .

_____
Dr. Thomas B. Williamson