

3-3420B Kuhio Highway • Lihue, HI 96766     **Kauaʻi Medical Clinic**     (808) 245-1500 • wilcoxhealth.org

September 25, 2003

To: All KMC Physicians

Fr: Lee A. Evslin, M.D., CEO

Re: Exhibit A

Enclosed please find the new Exhibit A. This Exhibit will serve as our official three month notice of a change to the Kauai Medical Clinic's Physician compensation formula. The changes and associated timeline for these changes are described in this new Exhibit A and its attachments.

The new compensation formula will go into effect January 1, 2004 (subject to certain salary floors). A physician may elect to waive the three-month notice by signing and returning the enclosed waiver form to Kauai Medical Clinic Administration, attention Barbara Davis, by October 17, 2003. For physicians who waive the three month notice period, the new compensation formula will go into effect on October 1, 2003.

The primary change to Exhibit A involves the methodology utilized to calculate the distribution of the physician's professional services receipts. The General Terms (section 2.2), the salary draw calculations, and the periodic reconciliations (section 2.1.c) contain only minor changes from our current methodology. We have been informed that we are required to establish a working cap for salary, as well as a methodology to allow for review of the cap. That cap is no less than the 90th percentile of MGMA salaries and the methodology for allowing exceptions to the cap is described in section (3) of Exhibit A. We will also distribute the latest information on the MGMA 90th percentile for each specialty.

We will soon present official information on the covenant not to compete, a retirement track, and new options for tax deferral of income. A letter from our attorney's in Washington will also follow shortly clarifying the compensation plan, their discussions with the IRS, and their formal opinion.

If you have any questions on the language or content of these enclosures, please contact me.

# EXHIBIT A

September 30, 2003

## COMPENSATION
## FOR FULL-TIME PHYSICIAN

(Regular Part-Time is Prorated)

1. The salary for the first twelve months of employment with Kauai Medical clinic will be $_____. This is based on full-time employment.

2. Following the first twelve months, the physician will be paid according to the formula presented below.

    2.1    Method of Calculating Annual Compensation.

        (a)    The Clinic shall pay Physician, and Physician agrees to accept as payment in full for all duties and obligations of Physician pursuant to this Agreement, annual compensation in an amount determined in accordance with the following formula:

    Net Professional Cash Receipts
    Less:    Direct Costs
    Less:    Indirect Cost Assessments
    Less:    Primary Care Pool Assessment
    Less:    Quality Pool Assessment
    Plus:    Contractual Stipends
    Plus:    Primary Care Distribution
    Plus:    Quality Distribution
    Equals:  Total Compensation

    (b)    Definitions:

        (i) Net Professional Cash Receipts -- Cash received from patients and/or third party payers derived from the following sources of billed revenue:

        (1)    Physician professional fees for work personally performed by the physician;

        (2)    "Incident to" billings of physician extenders or mid-level providers billed under the physician's provider number in accordance with applicable rules and regulations and supervision requirements of the Centers for Medicare and Medicaid Services (CMS);

1

(3) Independent billings of physician extenders or mid-level providers billed under independent provider numbers where the physician provides direct supervision of the provider  In general, direct supervision requires the physician to be within the same office at the time the service is performed.

(4) ~~Minor in-office ancillary services performed by the physician or a physician extender under direct physician supervision and billed "incident to" under the physician's provider number.~~

(5) Drug and medical supply revenue billable "incident to" under the physician's provider number.

(6) Certain Other Income from funding sources external to Hawaii Pacific Health, including as applicable an equitable portion of income attributable to services provided by all physicians in the in the Pod or Clinic. For example, quality bonus payments from third party payers; nursing home medical directorship stipends; contracts, etc.

(ii) Direct Costs – Costs of personnel, facilities, equipment, supplies, etc. directly associated with producing the revenue billed in section (i). For purposes of costing, the Clinic shall group physicians into costing "Pods". Generally, a Pod is a group of physicians who share a geographical location, staffing and other common costs. Direct costs can be attributable to a particular physician or can be accumulated within the Pod then allocated amongst the physicians based upon a mutually acceptable methodology consistent with applicable legal requirements.  Direct costs include, but are not limited to:

(1) Actual cost of salaries of personnel working within the Pod;

(2) Estimated cost of benefits of personnel working within the Pod;

(3) Actual cost of drugs and supplies consumed by the Pod;

(4) Occupancy costs such as rent, housekeeping, security, utilities, routine maintenance, taxes and other common area costs. At satellite locations the actual costs incurred will be charged less a Satellite Credit as described in Exhibit C for Revenue Cycle activities at the satellite. At the main clinic, a monthly, per square foot charge will be assessed based upon periodic external appraisals of comparable rent in the area applied to actual square footage occupied by the Pod. See Exhibit C.

(5) An annually determined flat charge for estimated MD benefits. See Exhibit C.

2

  (6) An annually determined flat charge for malpractice insurance costs as determined by specialty and actuarially adjusted for Clinic risk and experience. See Exhibit D.

  (7) Depreciation charge for equipment purchased for use by the Pod based upon Generally Accepted Accounting Principles;

  ~~(8) Reasonable actual cost for Physician travel and Continuing Medical Education (CME) expenses incurred in accordance with Clinic and HPH policies and procedures;~~

  (9) Transcription costs per line. See Exhibit C.

  (10) Other direct costs incurred by the Pod which may include, but not limited to, locums tenens costs, office supplies, miscellaneous expenditures, etc. as authorized by the physicians in the Pod.

(iii) Indirect Cost Assessments – Indirect costs incurred by the Clinic in support of the physician's practice will be assessed for Revenue Cycle and General Overhead.

 (1) Revenue Cycle shall include the costs related to registration, coding, billing, collections, payer follow up, cash posting, and medical records.

 (2) General Overhead shall include general and administrative costs of the clinic including but not limited to administration, corporate overhead, legal, human resources, payer contracting, compliance, accounting, finance, and the like.

 (3) Indirect Cost Assessment Percentages are described in Exhibit C.

 (4) Indirect Cost Assessment formula is Net Professional Cash Receipts multiplied by the Assessment Percentages.

 For Drug, Immunization, and Medical Supply receipts only, should the Indirect Cost Assessment exceed the direct margin for such drug and medical supply, then the assessment shall be the direct margin amount. Direct margin shall be defined as drug and medical supply net receipts less direct drug and medical supply costs. If there is no direct margin the Indirect Cost Assessment will not be applied to the Drug, Immunization and Medical supply receipts

(iv) Primary Care Pool Assessment – An assessment percentage applied to the Indirect Cost Assessment Formula that is charged in order to share the higher costs of delivering primary care amongst all physicians in the Clinic. See Exhibit C for assessment percentage.

3

(v) Quality Pool Assessment – An assessment percentage applied to the Indirect Cost Assessment Formula that is charged in order provide an incentive pool which will be distributed to all physicians who achieve pre-agreed quality outcomes targets developed by the Clinic Executive Committee. See Exhibit C for assessment percentage.

(vi) Contractual Stipends – Physician compensation received for administrative work and other obligations that are supported by contractual agreements with Wilcox Memorial Hospital or other Hawaii Pacific Health (HPH) entities. For example, but not limited to, Hospital Medical Directorships; Clinic Administrative Stipends; Clinical Trials, Grants and Contracts income through HPH Research Institute; First Year Salary Guarantees; other contracted activities.

(vii) Primary Care Distribution – For purposes of distribution of the PCP pool, primary care physicians include the specialties of Internal Medicine, Family Practice and Pediatrics. See Exhibit C.

(viii) Quality Distribution – Physician's earned distribution based upon achieving quality outcomes as outlined by the Clinic Executive Committee.

(ix) Total Compensation – Individual physician's income that can be paid in cash or deferred under the Clinic benefit programs.

(c) Payment of Cash Compensation. Cash Compensation shall be calculated as Total Compensation less amounts deferred in advance under Clinic benefit programs. Cash Compensation shall be paid to Physician as follows:

(i) Annually each physician will elect the amount of the physician's Draw, up to a maximum of up to ninety-five percent (95%) of Physician's anticipated Cash Compensation, based on Physician's performance over the immediately preceding twelve (12) month period. The Draw shall be paid to Physician in equal bi-weekly installments, on or before the 15th and last day of each month.

(ii) The amount paid for each six (6) month period of the Term shall be adjusted at the end of the sixth (6th) and twelfth (12th) months of such Term based on the application of the Annual Compensation Formula for the immediately preceding six (6) month period; provided, however, that Clinic shall have the right to adjust the Annual Compensation amount and the amount paid at more frequent intervals (which intervals will be no more frequent than monthly for downward adjustments and no more frequent than quarterly for upward adjustments) if, in Clinic's sole judgment, the anticipated Annual Compensation for Physician and the amount paid is more or less than Physician's anticipated compensation, based on Physician's current performance, and Physician is likely to be underpaid or overpaid, as the case might be. If, by reason of Physician's actual performance during any six (6) month period, the amount computed in accordance with the Annual Compensation Formula for such six (6) month period exceeds the Draw paid to such Physician during such six (6) month period, the excess amount shall be paid to Physician at the end of such six (6) month period. If, by reason of

4

Physician's actual performance during any six (6) month period, the amount computed in accordance with the Annual Compensation Formula for such six (6) month period is less than the amount actually paid to such Physician during such six (6) month period, Clinic shall deduct the amount of the difference from the amount to be paid to Physician during the following six (6) month period in order to recover the overpaid amount.

(d) ~~On the termination of this Agreement, Physician's Annual Compensation shall be computed through the date of termination in accordance with the Annual Compensation Formula, and Physician shall receive, or there shall be deducted from Physician's final payment, as the case might be, the amount of any excess or deficiency, as the case might be, between the~~ amounts computed in accordance with the Annual Compensation Formula and the amounts paid to Physician in accordance with this Agreement through the date of termination. If the amount of any excess payments exceeds the amount of Physician's final payment, Physician shall pay the balance to Clinic within 30 days; if the amount of payments made to Physician are deficient, Clinic shall pay such deficiency to Physician with Physician's final payment.

2.2   **General Terms.**

(a)   If the Agreement is terminated prior to the end of any year during the Term, only the pro rata portion of the compensation due Physician for such fiscal year for services performed up to the effective date of termination shall be due and payable to Physician.

(b)   The salary formulas set forth above are premised upon the full-time employment of Physician by Clinic. In the event a Physician is allowed to work on a part-time basis, readjustment of such Physician's Annual Compensation will be made by the Clinic at that time. Correspondingly, if a part-time Physician is allowed to work on a full-time basis, readjustment of such Physician's Annual Compensation will be made by the Clinic at that time.

(c)   The salary formulas set forth above shall terminate on the earlier of: (i) termination of the Agreement; or (ii) adoption of a new salary formula by Clinic. Upon the adoption of a new salary formula by Clinic, all receipts collected after the adoption of the new salary formula shall be applied to the new formula. Physician shall <u>not</u> be entitled to receive a "tail" for receipts collected after termination of employment except as outlined in Exhibit B-2.

(d)   If a Physician takes a leave of absence without pay, which is approved by the Clinic, all receipts collected during that leave will be tracked. When this Physician returns to practice in the clinic, such receipts will be used to set the base compensation for this Physician.

(e)   Subject to the provisions of Section 1.1(a) above, the Clinic shall have the right to adopt a new salary formula on not less than three (3) months' prior notice to Physician;

(f)   Modifications and adjustments made by Clinic to the amount of Annual Compensation paid to Physician and to the method of calculating Physician's Annual Compensation permitted or authorized under this Exhibit A shall be evidenced by a payroll form which shall be executed by Clinic or a revised Exhibit A.

5

(g) All formulas are and will be based on the underlying concept that no patient may be turned away by any physician for reasons based on ability to pay or type of insurance and that the providing of charity care by Physician will be fully encouraged. The policies and procedures of the Clinic for charity care shall comply with Statement No. 15 of the Principles and Practices Board of the Healthcare Financial Management Association, "Valuation and Financial Statement Presentation of Charity Service and Bad Debt by Institutional Healthcare Providers".

(h) Physician covenants and agrees to code correctly. The Clinic shall have the right to audit the coding recorded by Physician and to make adjustments for billing and recording inaccuracies, discrepancies or abnormal billing profiles of Physician.

(i) The salary and compensation provided for above does not preclude Clinic and Physician from contracting for additional services to be separately provided to Clinic by Physician, if such services are outside the scope of Physician's customary duties and responsibilities and are separately agreed to in writing by Physician and Clinic; provided, however, that Physician shall in no event receive compensation which is in excess of reasonable and fair compensation for such services. For example, Clinic and Physician shall have the right to agree that Physician shall, on a voluntary basis, provide, during Physician's free time, additional physician services for the Clinic's urgent care unit.

3. Maximum Salary Cap

(a) Effective January 1, 2004, a maximum salary cap shall be established by specialty. The cap shall be no less than the 90th percentile of Medical Group Management Association (MGMA) survey of physician compensation by specialty in effect on December 1st of each year.

(b) The cap may exceed the MGMA 90th percentile with prior approval by the Independent Compensation Committee of HPH based upon alternative and additional data that justifies the reasonableness of the cap based on comparable information, productivity or community need.

(c) Annually, the Independent Compensation Committee of HPH shall establish in advance the maximum salary caps for the subsequent year. Should the Annual Compensation Formula result in a salary higher than the maximum cap during the year, no amounts shall be paid to the physician above the cap until the Independent Compensation Committee of HPH has reviewed and approved the excess based upon additional information as provided in Section 3(b) and has determined that the amount is reasonable as provided in Section 4(b).

4. Independent Compensation Committee of HPH

(a) The Independent Compensation Committee of HPH is an authorized body selected by the HPH Board of Directors and is comprised of members who do not have a conflict of interest.

(b)     The Independent Compensation Committee shall meet at a minimum annually to review the Total Compensation of each physician for reasonableness of compensation in accordance with Internal Revenue Service regulations applicable to tax exempt organizations.

(c)     Notwithstanding any other provision of this Agreement or any of its Exhibits, in no event shall physician be paid any compensation in excess of the amount determined by the Independent Compensation Committee to be reasonable under Section 4(b).

## Exhibit A-1

In recognition of the significant change in compensation formula from the prior formula, the Clinic will observe a phased transition to the Annual Compensation Formula described in Exhibit A. Implementation will be as follows:

1. Physicians eligible for this phased transition are any physician employed by the Clinic on September 30, 2003.

2. Minimum Compensation Floor:

   - January 1, 2004 to June 30, 2004 – Physician compensation will be no less than 90% of the prior formula in the Exhibit A that became effective July 1, 2003.

   - July 1, 2004 to December 31, 2004 – Physician compensation will be no less than 80% of the prior formula in Exhibit A that became effective July 1, 2003. Any physician utilizing this 80% floor agrees to work with Clinic management on a written plan of action to improve operating results.

3. Optional election to begin earlier – Physician may elect to waive the 3-month notice of change in formula and implement the new Exhibit A as of October 1, 2003. The "Waiver of 3-Month Notification" form must be received by the Clinic no later than October 17, 2003 in order for physician to exercise this optional election.

8

# Exhibit C

Effective January 1, 2004 – June 30, 2005 items to be charged in the Annual Compensation Formula as follows:

1. Occupancy Costs for space in the Main Clinic - $2.00 per square foot per month for the actual square footage occupied by a Pod. Costs included in this rate are rent, housekeeping, security, utilities, routine maintenance, taxes and other common area costs.

2. Occupancy Costs for satellite clinics – The actual costs incurred by the satellite location less a Satellite Credit for certain Revenue Cycle activities which reside at the satellite location.

3. Satellite Credit – A credit for certain Revenue Cycle activities which reside at the satellite location that are included in the indirect assessment percentages consisting of the following:

    a. Actual square footage of medical records storage space multiplied by the actual rent per square foot for the location, plus
    b. A credit of $11,476 per physician for clerical registration staff which approximates .35 clerical FTE salary and benefits.

4. Physician benefits will be charged at a rate of $16,389 per physician. The benefit charge will apply to every physician who is considered a .5 FTE or more and receives Clinic Basic Benefits.

5. Transcription Costs: 14 cents per line.

6. Assessment Percentages shall be as follows:

    a. Revenue Cycle Assessment = 9%
    b. General Overhead Assessment = 6%
    c. Primary Care Pool Assessment = 2%
    d. Quality Pool Assessment = 2%

7. Primary Care Pool Distributions:

    a. $12,500 per physician who participates in the night call pool
    b. $19,235 per Primary Care Physician as an initial estimate; to be adjusted based upon actual Primary Care Pool size in the reconciliation described in Section 2.1(c)(ii) of Exhibit A.

# Exhibit D

Malpractice insurance premium estimates to be effective for January 1, 2004 through June 30, 2004.

The Clinic has requested underwriting estimates by individual physician from its carrier based upon specialty and experience. Actuarial estimates will not be available for the January 1, 2004 implementation date. As such, the following preliminary estimates will be used for the initial transition period.

| Medical Specialty | KMC Physician Malpractice Premium |
|---|---|
| Anesthesiology | 14,443 |
| Cardiology | 8,944 |
| Dermatology | 6,973 |
| Ear/Nose/Throat | 6,973 |
| Emergency Medicine | 16,474 |
| Family Practice | 8,799 |
| Gastroenterology | 6,973 |
| Hospital Service Physicians | 6,973 |
| Internal Medicine | 7,257 |
| Nephrology | 6,973 |
| Neurology | 7,969 |
| Obstetrics & Gynecology | 49,805 |
| Oncology/Hematology | 6,973 |
| Orthopedic Surgery | 26,231 |
| Pediatrics | 7,213 |
| Pulmonology | 6,973 |
| Radiology | 11,010 |
| Surgery | 26,397 |
| Urgent Care | 8,799 |
| Urology | 17,884 |