```
 1              IN THE UNITED STATES DISTRICT COURT

 2                     DISTRICT OF HAWAII

 3    ----------------------------------------

 4    UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER,

 5    M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D.

 6    and JAMES LOCKYER, M.D., in his own behalf,

 7              Plaintiffs,

 8

 9         vs.                  CIVIL NO. CV04-00596 ACK LEK

10

11    HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX

12    MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM

13    A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.

14              Defendants.

15    ----------------------------------------

16            DEPOSITION OF JAMES LOCKYER, M.D.

17                          VOLUME I

18         Taken on behalf of the Defendants Hawaii

19    Pacific Health, Kauai Medical Clinic, Wilcox Memorial

20    Hospital and Wilcox Health System, at the office of

21    Starn O'Toole Marcus & Fisher, Pacific Guardian

22    Center, Mauka Tower., 737 Bishop Street, Suite 1740,

23    Honolulu, Hawaii  96813, commencing at 10:00 a.m., on

24    October 12, 2006 pursuant to Notice.

25    BEFORE:     DENNIS J. YANKEE, CSR NO. 285
                  Certified Shorthand Reporter
```

Page 46

1  none of them were aware. Is that an inaccurate
2  statement that none were aware?
3      A.  To my knowledge, none of them were.
4      Q.  How many were there, how many other
5  internists were there at the time?
6      A.  At what time?
7      Q.  The time that paragraph 24 refers to.
8      A.  I don't know.
9      Q.  But you're saying that it is an accurate
10 statement that not one of them were aware that their
11 provider numbers were, were being used --
12     A.  Best of my knowledge.
13     Q.  Did you conduct any investigation of this?
14     A.  Investigation of?
15 (Mr. Yee enters room - 11:52 a.m.)
16     Q.  Whether other internist provider numbers
17 were being used on claims that they were not aware
18 of?
19     A.  I don't believe so.
20     Q.  Do you recall when you learned this?
21     A.  No.
22     Q.  Can you approximate?
23     A.  Between 1999 and 2004.
24     Q.  Do you think you could approximate it a
25 little closer?

Page 47

1      A.  Trying to be accurate.
2      Q.  Well, so in learning this did you suspect
3  fraud?
4      A.  Yes.
5      Q.  But you didn't conduct any investigation of
6  fraud?
7      A.  I'm not an investigator.
8      Q.  All right, still sticking with Exhibit 2,
9  paragraph 26. It states that you requested an
10 explanation for chemotherapy under your provider
11 number. From whom did you request an explanation?
12     A.  Diana Shaw.
13     Q.  And who is Diana Shaw?
14     A.  I believe she, she was in administration,
15 working for Lee Evslin.
16     Q.  And when did you request this explanation
17 of Ms. Shaw?
18     A.  I don't remember the date.
19     Q.  Do you remember the year?
20     A.  No.
21     Q.  Paragraph 27 of Exhibit 2: During
22 approximately a one-month period in May 2002,
23 Defendants KMC and Doctor Evslin attempted to require
24 the defendant KMC internal medicine department
25 physicians to sign off on chemotherapy when no

Page 48

1  oncologist was present on Kauai.
2         Do you agree with that allegation?
3      A.  Yes.
4      Q.  What does sign off on chemotherapy mean?
5      A.  We weren't sure.
6      Q.  Well, what did you mean? You said that you
7  agreed with that statement. What does the allegation
8  mean? What are you alleging that KMC and Doctor
9  Evslin attempted to require the internal medicine
10 physicians to do?
11         MR. YEE: Objection. Argumentative.
12 It also misstates the quotation. It's clear from the
13 quotation that this is something that was asked of
14 him. It's not his statement.
15         MS. KIM: Join.
16         MR. SILVER: Mr. Yee, I, I would
17 prefer -- never mind. But this is his allegation,
18 and I'm attempting to find out what he meant by it.
19 It's his complaint.
20 BY MR. SILVER:
21     Q.  What do you mean by sign off on
22 chemotherapy?
23         MR. YEE: Same objection. The term
24 "sign off", you're assuming, was a term he used, not
25 a term that was used towards him by another

Page 49

1  individual.
2         MS. KIM: Join.
3  BY MR. SILVER:
4      Q.  Do you recall what Doctor Evslin said to
5  you?
6         MS. KIM: Vague and ambiguous.
7         MR. SILVER: If you understand the
8  question, please answer.
9      A.  Not entirely.
10 BY MR. SILVER:
11     Q.  Do you recall what Doctor Evslin attempted
12 to require you to do?
13     A.  Yes.
14     Q.  And what was that?
15     A.  Put my signature on charts.
16     Q.  What kind of charts?
17     A.  From the chemotherapy room.
18     Q.  And what did those charts signify?
19     A.  I didn't understand.
20     Q.  What did your signature signify?
21     A.  I didn't understand the request.
22     Q.  Did you ask Doctor Evslin what he meant?
23     A.  I believe so.
24     Q.  And what did he respond to you?
25     A.  He just wanted me to sign the charts.

Page 150

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                      DISTRICT OF HAWAII
 3
 4    UNITED STATES OF AMERICA, ex    )
 5    rel. JAMES LOCKYER, M.D.,       )
 6    STATE OF HAWAII, ex rel. JAMES  )
 7    LOCKYER, M.D. and JAMES         )
 8    LOCKYER, M.D., in his own       )
 9    behalf,                         )
10                                    )
11                      Plaintiffs,   )
12                                    )
13                                    )
14           vs.                      ) Civil No.
15                                    ) CV04-00596-ACK LEK
16    HAWAI'I PACIFIC HEALTH; KAUAI   ) (Federal and State -
17    MEDICAL CLINIC; WILCOX          )  Qui Tam)
18    MEMORIAL HOSPITAL; WILCOX       )
19    HEALTH SYSTEM; and WILLIAM A.   ) (Deposition of
20    EVSLIN, M.D. aka LEE A.         )  James Lockyer, M.D.)
21    EVSLIN, M.D.,                   )
22                                    )  VOLUME II
23                      Defendants.   )
24    _____  )
25
```

Page 275

1  I don't want him -- am I correct about that?
2         MR. SILVER: That is correct.
3         MR. DEL CASTILLO: Am I to understand
4  you, Ms. Lovejoy, have concluded your questioning?
5         MS. LOVEJOY: I have a lot of follow up
6  questions, but I need to figure out what we're going to
7  do relative to the six o'clock flight that we have to
8  take.
9         MR. DEL CASTILLO: Well, there is a
10 seven o'clock flight. And remember, I said at the
11 beginning they're handing out free changes because of the
12 mess that happened.
13        MS. LOVEJOY: But the question is are
14 we going to get on the seven o'clock flight and I've got
15 a babysitter with kids. We can do this off the record,
16 by the way.
17        MR. DEL CASTILLO: Take a break.
18        MS. LOVEJOY: We'll have to see what's
19 available.
20        (Break taken from 4:46 p.m. to 4:50
21 p.m.)
22        MS. LOVEJOY: Okay, I have a couple
23 questions.
24        MR. DEL CASTILLO: Okay. We're back
25 on.

Page 276

1         MS. LOVEJOY: Yes.
2         MR. DEL CASTILLO: Okay, note the time,
3  please.
4    Q.   (By Ms. Lovejoy) When did you first ask for an
5  audit of your salary from the administration at the
6  hospital or the clinic? I'm sorry, the clinic.
7    A.   I don't remember. I mentioned it a few times.
8  I formally raised it in the meeting of December of 2001.
9    Q.   That was an internal meeting with the
10 internists, correct?
11   A.   Yes. But it had come up before that.
12   Q.   When did you raise it with anybody in the
13 administration?
14   A.   I don't know.
15   Q.   After the meeting in December 2001, is that
16 correct?
17   A.   No. I believe I said that it didn't make sense
18 and maybe we ought to take a good look at the numbers.
19 If there's nothing to hide it shouldn't matter to
20 anybody.
21   Q.   You think you said that when and to whom?
22   A.   I don't remember when. It was talked around, I
23 don't remember exactly by whom.
24   Q.   It was -- what did you say?
25   A.   Talked around by a number of us. We were all

Page 277

1  frustrated.
2    Q.   You don't have any recollection of asking
3  anybody in the administration for an audit of your
4  salary?
5    A.   I believe my first formal position that we
6  should have an audit was in December of 2001 at the
7  meeting.
8    Q.   Okay. I want you to -- you're a smart guy, I
9  want you to answer my question. When did you first talk
10 to somebody in the administration, not your colleagues in
11 internal medicine, but with the clinic administration
12 about asking for an audit regarding your salary?
13   A.   I don't -- I'm not sure.
14   Q.   Did you ever make such a request?
15   A.   I'm not sure I did. Not formally.
16   Q.   You don't recall ever informally making such a
17 request either to somebody in the administration at the
18 clinic?
19   A.   I know I mentioned it to my colleagues.
20   Q.   Okay. And in fact, no formal audit request was
21 made into the arbitration either, correct?
22   A.   I don't know.
23        MR. DEL CASTILLO: Objection to the
24 extent it calls for a legal conclusion.
25        MS. LOVEJOY: Okay. That's it.

Page 278

1         MR. DEL CASTILLO: For the record,
2  according to my timekeeping, you have an additional 30
3  minutes that you could have taken. We're prepared to
4  stay.
5         MS. LOVEJOY: I understand. I'll
6  complete for the record that I made as late of a flight
7  arrangement as I could believing that we were starting at
8  9:30. I understand you couldn't start at 9:30 and there
9  were problems. You know, if we have to take up an
10 additional 30 minutes, maybe we will, hopefully we won't,
11 but you know, you missed the plane, we started late, it's --
12        MR. DEL CASTILLO: We're prepared to
13 stay. There's a flight at seven and we're not coming
14 back absent an order from the judge.
15        MS. LOVEJOY: I hear what you're
16 saying.
17        MR. DEL CASTILLO: Okay. Thank you.
18        (Deposition concluded at 4:54 p.m.)
19
20
21
22
23
24
25

33 (Pages 275 to 278)