STARN • O'TOOLE • MARCUS & FISHER
A Law Corporation

SHARON V. LOVEJOY        5083-0
STEPHANIE THOMPSON     8399-0
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Telephone No. (808) 537-6100
Facsimile No. (808) 537-5434
slovejoy@starnlaw.com
sthompson@starnlaw.com

Attorneys for Defendant
LEE A. EVSLIN, M.D.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf;<br><br>Plaintiffs,<br><br>vs.<br><br>HAWAII PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.;<br><br>Defendants. | CIVIL NO. CV 04-00596 ACK LEK (Federal and State – Qui Tam)<br><br>**DECLARATION OF LEE A. EVSLIN, M.D.** |

## DECLARATION OF LEE A. EVSLIN, M.D.

I, LEE A. EVSLIN, M.D., aka Bill Evslin, declare that:

1.   I am a board certified pediatrician licensed to practice medicine in the State of Hawai'i, and am fully competent in all respects to make this Declaration. I have personal knowledge of all such facts stated herein, except as otherwise noted.

2.   I served as President of Kauai Medical Group from 1990 until 1996, when Kauai Medical Group merged with Wilcox Memorial Hospital ("Wilcox") and became Kauai Medical Clinic ("KMC"). From that time until my resignation in September 2005, I served as President/CEO of KMC. I also served as President/CEO of Wilcox from January 2003 until I resigned in September 2005.

3.   My duties as President/CEO of KMC were prescribed and guided by the KMC By-Laws. The 1998 and 2001 Amended and Restated By-Laws of the Kauai Medical Clinic were the relevant By-Laws during the years of Dr. James Lockyer's employment at KMC. With respect to KMC employee-physician salaries, my duties included such things as reviewing and executing employment agreements with the physicians, reviewing spreadsheets containing information regarding the physicians' actual receipts for the services he or she provided and the physicians' current salary draw on

61105

a monthly basis, participating in discussions regarding physician's performance criteria under the salary formula, and approval of physician salary draw within the salary formula guidelines. I did not have the power to deviate from the compensation formula. Before December 2001, deviations from the formula were approved by a subcommittee of KMC's board, led by Dave Patton, CEO of Wilcox Health Systems. After early 2002, deviations from the formula were granted or denied by Gail Lerch, as a representative of Hawaii Pacific Health's board.

4. Dr. James Lockyer began his employment with KMC in December 1999. On or about January 1, 2000, Dr. Lockyer signed an Employment Offer ("Offer") which set forth the terms of his employment. Attached hereto as **Exhibit 7** is a true and correct copy of Dr. Lockyer's Employment Offer. Dr. Lockyer agreed that his salary draw would be set at $125,000 for the first year of employment, and then periodically reviewed and adjusted based on the salary formula.

5. Dr. Lockyer signed a formal Employment Agreement ("Agreement") with KMC on March 1, 2001. Attached hereto as **Exhibit 9** is a true and correct copy of Dr. Lockyer's Employment Agreement.

6. Pursuant to the Agreement, Dr. Lockyer's salary, after the first year of employment, was determined through the salary formula.

61105

7. On December 19, 2001, the Agreement was amended to provide that a physician would be paid 45% of all receipts over $350,000, rather than 45% of receipts over $350,000 and 40% of receipts over $500,000. Attached hereto as **Exhibit 5** is a true and correct copy of the amendment to Dr. Lockyer's Agreement.

8. Exhibit A to the Agreement sets forth the salary formula used to determine Dr. Lockyer's salary. Exhibit A to the Agreement also provides the process for making salary payments to the physician. Under Exhibit A to the Agreement, KMC could adjust the physician's salary draw and reduce the payment made to the physician on a monthly basis, raise the salary draw on a quarterly basis, and perform a full reconciliation of amounts due to the physicians or owed by the physicians every six months.

9. During my time as CEO of KMC, each outpatient clinic based employee-physician entered into an employment agreement with KMC similar to Dr. Lockyer's Agreement. Each outpatient clinic based physicians' salary was determined pursuant to the salary formula set forth in the employment agreement and the physicians were to be paid according to the process set forth in the employment agreement.

61105

10. During the period of Dr. Lockyer's employment at KMC, Ken Shimonishi served as Financial Planning Manager at KMC. Mr. Shimonishi created a spreadsheet each month that contained receipt, cost and salary information for the previous twelve months for each physician. Based on the information in the spreadsheet, a physician's annual salary draw might be adjusted. Before December 2001, the Salary and Finance Committee, of which I was a non-voting member, reviewed the spreadsheet on a monthly basis and made recommendations regarding compensation.

11. After the acquisition of Wilcox and KMC by Hawaii Pacific Health in December 2001, the Medical Executive Staff Committee advised the Board on physician compensation issues. I, Mr. Shimonishi, a Dr. Thomas Williamson participated in a subcommittee of the Medical Executive Staff Committee that reviewed the physicians' salary draws on a monthly basis. Gail Lerch, Vice President of Human Resources at Hawaii Pacific Health, represented the Hawaii Pacific Health board and made the final decisions on physician compensation.

12. Attached as **Exhibit 6** is a sample of two months of the spreadsheet provided by Mr. Shimonishi which reflects information for all of the physicians in Dr. Lockyer's Internal Medicine ("IM") Department at

61105

KMC for a twelve month period ending January 31, 2001 and March 31, 2001.

13. KMC reminded Dr. Lockyer on several occasions that his salary would be determined pursuant to the salary formula. For example, on January 2, 2001, the beginning of Dr. Lockyer's second year of employment, reminded Dr. Lockyer that his salary would no longer be a set amount, but would be based on the salary formula pursuant to his Agreement, and that production did not substantiate a salary of $125,000 under the salary formula. Notice to Dr. Lockyer of the change in his salary draw based on the formula was also given to Dr. Lockyer by the Executive and Salary & Finance Committees. (*See* **Exhibit 10**).

14. The Salary & Finance and Executive Committees met on January 30, 2001 and confirmed that based on the salary formula and Dr. Lockyer's productivity, Dr. Lockyer's salary warranted a reduction to $104,000. The Committees voted to set Dr. Lockyer's salary to $110,000. I personally attended this meeting. Attached hereto as **Exhibit 11** is a true and correct copy of the Minutes of a Joint Meeting of the Committees, held on January 30, 2001.

15. Dr. Lockyer asked me to try to get agreement to keep his salary level at $125,000, and said that he would work on increasing his productivity.

61105

On February 13, 2001, I sent Dr. Lockyer another letter telling him that KMC agreed to leave his salary at $125,000 based on the representations that I had made to the Committees on behalf of Dr. Lockyer, at his request. I also reminded him that if his receipts did not support his then $125,000 salary, his salary would be reduced. Attached hereto as **Exhibit 12** is a true and correct copy of my February 13, 2001 letter to Dr. Lockyer. Also attached hereto as **Exhibit 13** is a true and correct copy of the Minutes of the Joint Committees, held February 27, 2001. I personally attended the meeting.

16.   The Committees again reviewed salary draws in June 2001. The Committees noted that Dr. Lockyer's receipts again did not substantiate his then current salary draw of $125,000, but instead warranted a salary of $101,000. Because of the transfer of patients to Dr. Lockyer, the Committees anticipated an increase in Dr. Lockyer's productivity numbers and voted to set his salary, instead at $120,000. Attached as **Exhibit 15** is a true and correct copy of the Minutes of the Joint Committees, held June 26, 2001. I personally attended this meeting and then drafted the minutes within a short time after the meeting's conclusion.

17.   From February through November 2001 Dr. Lockyer consistently under-produced relative to his then current salary draw based on the compensation formula.

61105

18. On November 29, 2001, I sent Dr. Lockyer a letter again informing him that his receipts did not support the salary that he was being paid and that his projected annual salary for 2002 would be only $96,000 pursuant to the salary formula. Attached hereto as **Exhibit 16** is a true and correct copy of the November 29, 2001 letter that I sent to Dr. Lockyer.

19. In December 2001, the Committees proposed to reduce Dr. Lockyer's salary to $98,000 based on the formula. I related to the Committees that I had seen improvements with Dr. Lockyer's practice and recommended that the Committees again forestall the valid salary reductions, but instead set his salary at $115,000 in anticipation that he would be able to increase his productivity. The Committees voted to set Dr. Lockyer's salary draw at $115,000. Attached hereto as **Exhibit 18** is a true and correct copy of the Minutes of the Joint Committees, held December 28, 2001. I personally attended this meeting.

20. Dr. Lockyer's productivity did not improve, however. In light of his under-performance and various the complaints received from patients and staff regarding his conduct and practice, the Committees met on March 26, 2002 and voted to give Dr. Lockyer a ninety day notice of termination of employment. Attached hereto as **Exhibit 19** is a true and correct copy of the

61105

Minutes of the Joint Committees, held March 26, 2002. I personally attended this meeting.

21. I also sent Dr. Lockyer a letter informing him of the Committees' decision at the March 26, 2002 meeting, and his right to appeal the decision. I also had a personal discussion with Dr. Lockyer regarding his right to appeal. Attached hereto as **Exhibit 20** is a true and correct copy of the letter I wrote and sent to Dr. Lockyer on April 2, 2002.

22. Dr. Lockyer appealed the Committees' decision at a joint meeting of the Executive and Salary & Finance Committees and the Internal Medicine Department, held on April 4, 2002. The body voted to rescind the termination notice and to issue a work plan designed for improvement in Dr. Lockyer's practice. Ms. Gail Lerch, V.P. of Human Resources for HPH drafted the work plan which I signed and sent to Dr. Lockyer on or about April 9, 2002. Attached as **Exhibit 21** is a true and correct copy of the Minutes of the Joint Meeting of the Committees and the Internal Medicine Department held on April 4, 2002 which I personally attended. Attached as **Exhibit 22** is a true and correct copy of the work plan letter, drafted by Gail Lerch, signed by me, and then sent to Dr. Lockyer, dated April 9, 2002.

23.   Dr. Lockyer objected to the proposed work plan. Attached as **Exhibit 23** is a true and correct copy of the letter, dated April 20, 2002 that I received from Dr. Lockyer objecting to his work plan.

24.   After review of Dr. Lockyer's objections, the Committees reissued another work plan by letter, dated May 1, 2002, and signed by me. (An earlier version with the wrong date, April 9, 2002, was first delivered, and then corrected with the correct date). The Committees agreed to keep Dr. Lockyer's salary at $115,000 until it was reassessed by the Committees in July 2002. Based on the compensation formula, his salary would then be reduced pursuant to the Agreement unless his productivity supported the salary by that date. Dr. Lockyer also was instructed to meet with Mr. Boyd Murayama to review the proper coding and documentation procedures. The Committees also outlined procedures for improving patient flow, chart completion, and patient complaints. Attached as **Exhibit 24** is a true and correct copy of the letter, dated May 1, 2002 that I signed and sent to Dr. Lockyer.

25.   On or around May 24, 2002, KMC received notice that Dr. Lockyer had engaged the services of attorneys "to assist him with resolving the issues . . . regarding his employment by KMC." Attached as **Exhibit 25** is

a true and correct copy of the letter I received, dated May 24, 2002, and signed by Ms Jouxson-Meyers.

26. Dr. Lockyer still failed to increase his productivity to meet his salary draw and failed to implement the work plan. Indeed, Dr. Lockyer decreased his patient load when he stopped seeing a normal number of patients on Fridays, and he turned patients over to the Hospitalist service further decreasing his opportunity to increase productivity. Dr. Lockyer also took a vacation and an extended leave of absence for thirty (30) days—from June 17 until July 12, 2002. Attached hereto as **Exhibit 27** is a true and correct copy of a draft of the letter I wrote and sent to Dr. Lockyer on or about June 10, 2002, granting him approval for his vacation and leave of absence but noting that such leave would affect his productivity numbers. (Also attached hereto as **Exhibit 26** is a response dated June 13, 2002, sent to me by Dr. Lockyer's attorneys, confirming receipt of my June 10, 2002 letter.)

27. I received Dr. Lockyer's demand for arbitration dated July 8, 2002 relating to his compensation. Attached as **Exhibit 28** is a true and correct copy of Dr. Lockyer's arbitration demand to me. Also attached as **Exhibit 29** is a true and correct copy of letter I received by Mr. R. del Castillo's to Mr. Keith Hunter at Dispute Prevention and Resolution ("DPR"), dated July 12, 2002.

61105

28. During Dr. Lockyer's extended leave it was discovered that Dr. Lockyer had not completed charts prior to his departure. Timely handling charts had been an issue in Dr. Lockyer's practice. Pursuant to the new work plan, this issue was turned over to the Quality Assurance/Management Committee. Dr. Lockyer was invited to meet with Dr. Johnston and myself, on his return to work, to discuss his many issues relating to his employment. Unfortunately, Dr. Lockyer declined. Attached hereto as **Exhibit 52** is a true and correct copy of a letter I received, dated July 16, 2002, from Dr. Lockyer, declining my and Dr. Johnston's invitation to talk.

29. Because of the complaints from patients and staff, continued deficiencies in chart completion and work plan compliance, the Executive Committee met with a majority of the internists at a meeting on July 26, 2002. The Executive Committee voted to place Dr. Lockyer on ninety day probation. I sent Dr. Lockyer a letter, dated July 26, 2002, summarizing the Committee's and the internists' disciplinary action. The Committee required that Dr. Lockyer be at work by 9:00 a.m. and make himself available to see patients until 5:00 p.m. The Committee also required, among other things, that Dr. Lockyer meet with Mr. Boyd Murayama for counseling regarding coding and billing. Attached hereto as **Exhibit 30** is a true and correct copy of the Minutes of the Executive Committee, held July 26, 2002. I personally

attended this meeting. Also attached hereto as **Exhibit 31** is a letter I wrote and sent to Dr. Lockyer, dated July 26, 2002 summarizing the disciplinary action taken by the Committee.

30. Despite KMC's encouragement and efforts, Dr. Lockyer's productivity numbers did not increase. Attached hereto as **Exhibit 32** is a letter I wrote and sent Dr. Lockyer, dated August 23, 2002, in which he is again reminded of the likelihood of a salary decrease pursuant to the formula.

31. Subsequently, KMC administration, in accordance with procedures, drafted a payroll form, which I signed, notifying Dr. Lockyer of a reduction of his salary draw to $90,000. Attached hereto as **Exhibit 33** is a true and correct copy of the payroll form which I signed in my capacity as President/CEO.

32. The review and reduction of Dr. Lockyer's salary in November 2002 was part of the regular review of all physicians' salaries. At least three other physicians' salaries were reduced pursuant to the November monthly review.

33. Again, on or about February 26, 2003, Dr. Lockyer's salary was again decreased based on his Agreement and the salary formula. Attached

61105

hereto as **Exhibit 34** is a true and correct copy of the payroll form, dated February 26, 2003.

34.  In April 2003, all KMC doctors taking IM call would receive a yearly stipend of $12,000. (*See Exhibits 36-38*).

35.  In September 2003, KMC notified the physicians of a new cost salary formula for physicians. Under this formula, a physician's salary would equal his receipts less costs attributable to him. KMC implemented this formula in stages—with full implementation effective January 2005. During the period January 2004 to July 2004, Physicians would be compensated no less than 90% of the prior formula, and for the period July through December 2004, physicians would be paid no less than 80% of the prior formula. **Exhibit 38** is a true and correct copy of the notice of the new formula.

36.  Because of my increased duties as President/CEO of KMC and Wilcox, Dr. Williamson took charge of the implementation of the new salary formula and patient quality of care issues.

37.  On or about June 24, 2004, I learned of Dr. Lockyer's resignation from KMC.

38.  I discussed in meetings problems KMC was having with Dr. Lockyer relative to issues concerning productivity and patient and staff

complaints. The recommendation of the Executive committee changed from a decision to terminate to a decision allow him to continue working with the written warnings about quality and productivity. I did attempt on repeated occasions to have Dr Lockyer understand the importance and validity of these issues but never, did I instruct, or direct employees at KMC to harass or otherwise retaliate against Dr. Lockyer in response to his disagreements about salary or because of his requests for documents relating to his compensation.

39. I did not direct Dr. Williamson to prohibit Dr. Lockyer from allowing his children to stay in the Clinic, unattended overnight. I did, however, support his decisions for the reasons he cited.

40. In all my dealings with Dr. Lockyer, I never understood, nor did he or his counsel represent to me, that they were investigating suspicions of fraud against the government.

41. I learned of Dr. Lockyer's allegations of false claims to the government for the first time in early 2006 when I learned of this lawsuit.

42. While employed at KMC, Dr. Lockyer received compensation either at or in excess of that which was due him based on the salary formula.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge.

DATED: Kapaa, Hawaii, __12/22/06__.

_Lee A. Evslin_
Lee A. Evslin, M.D.

61105