# Exhibit 2

Of Counsel:
ROBBINS & ASSOCIATES
Attorneys at Law
A Law Corporation

KENNETH S. ROBBINS      1000-0
LEIGHTON M. HARA   7826-0
WENDY M. YAMAMOTO     8049-0
2200 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-2355
Facsimile: (808) 526-0290
Email: defend@robbinsandassociates.net

PATTON BOGGS LLP
Attorneys at Law

HARRY R. SILVER
2440 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6453
Facsimile: (202) 457-6315
Email:  hsilver@pattonboggs.com


Attorneys for Defendants
HAWAI'I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH SYSTEM

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ex rel. JAMES LOCKYER, M.D., ) <br> STATE OF HAWAII, ex rel. JAMES ) <br> LOCKYER, M.D., and JAMES ) <br> LOCKYER, M.D., in his own behalf ) <br> ) | CIVIL NO. 04-00596 ACK LEK <br> (Federal and State – Qui Tam) |

4845709

|                                   |   |
|-----------------------------------|---|
| Plaintiffs,                       | ) |
|                                   | ) |
|                                   | ) |
| v.                                | ) |
|                                   | ) |
| HAWAI'I PACIFIC HEALTH, *et al.*  | ) |
|                                   | ) |
| Defendants.                       | ) |
|                                   | ) |

## DECLARATION OF BETH CARLOZZI

I, Beth Carlozzi, do hereby declare that the following information is based on personal knowledge, that I am competent to so testify and that it is both true and correct.

1. I was hired by Kauai Medical Clinic ("KMC") in 1995 after receiving my associate's degree in nursing. I became an oncology nurse at KMC in 1996 and became oncology certified in 1998. I worked at KMC until 2002.

2. When I worked at KMC, a chemotherapy patient would have an initial consult with the oncologist, who at the time was Dr. Hayward. Then, the oncologist would provide a written order for a chemotherapy patient setting forth the required blood tests and the types and amounts of chemotherapy to be administered.

3. When a patient returned for chemotherapy, I would draw blood as ordered and review the results of the blood tests. I would proceed with administering chemotherapy if the blood test results were normal. If the blood test

4845709

results showed abnormalities, I would alert the physician of those abnormalities before proceeding with chemotherapy.

4. The oncologist would normally be in the office at the time a chemotherapy patient received treatment. If the oncologist was not available, another doctor in the Clinic would be assigned to "cover" for the oncologist.

5. Physicians in the Internal Medicine department of the Clinic, including Dr. Lockyer, covered the chemotherapy suite if the oncologist was not present on a certain day. The Internal Medicine suite is on the same floor as the chemotherapy suite.

6. The issue of who was covering was discussed with the physicians ahead of time and the physicians were aware of the process before it was implemented. I, and other nurses, would leave the medical charts with the physician who was covering the chemotherapy suite that day for his signature.

7. I recall Dr. Lockyer complaining about covering because he believed he should be paid more to do it.

8. Either the oncologist or a covering physician was always available when I and the other nurses administered chemotherapy. If no physician was available to cover, we would not administer chemotherapy.

4845709

9. The most common potential side effects of chemotherapy are low white blood cell and/or red blood cell counts, nausea or vomiting, hypersensitivity reactions (which was rare), and diarrhea.

10. To the best of my knowledge, the responsibility of the covering physician was to be available in the case of an emergency. If the blood results were within the range appropriate for chemotherapy and there are no side effects or emergencies resulting from chemotherapy, I can think of no reason why a covering physician would ever see the patient.

11. I never did, or saw, anything that in any way compromised patient care.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December _10_, 2006.

_____
Beth Carlozzi