# Exhibit 4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF HAWAII

 3    -----------------------------------------

 4    UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER,

 5    M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D.

 6    and JAMES LOCKYER, M.D., in his own behalf,

 7              Plaintiffs,

 8

 9         vs.                    CIVIL NO. CV04-00596 ACK LEK.

10

11    HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX

12    MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM

13    A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.

14              Defendants.

15    -----------------------------------------

16              DEPOSITION OF JAMES LOCKYER, M.D.

17                      VOLUME I

18         Taken on behalf of the Defendants Hawaii

19    Pacific Health, Kauai Medical Clinic, Wilcox Memorial

20    Hospital and Wilcox Health System, at the office of

21    Starn O'Toole Marcus & Fisher, Pacific Guardian

22    Center, Mauka Tower., 737 Bishop Street, Suite 1740,

23    Honolulu, Hawaii  96813, commencing at 10:00 a.m., on

24    October 12, 2006 pursuant to Notice.

25    BEFORE:      DENNIS J. YANKEE, CSR NO. 285
                   Certified Shorthand Reporter
```

34

| 11:24 | 1 | A. I don't know. |

11:24    2    Q. So you are not aware of that, so that's

3    your testimony, that you are not aware of ever having

4    covered the chemotherapy suite?

11:25    5    A. That's not what you asked.

11:25    6    Q. Okay, that's what I'm asking now. Are you

7    aware of ever having covered the chemotherapy suite

8    at Kauai Medical Center?

11:25    9    A. No.

11:25    10    Q. So you're not aware of ever having covered

11    the chemotherapy suite?

11:25    12    A. No.

11:25    13    Q. Are you aware of ever having been on-call

14    for the chemotherapy suite at Kauai Medical Center?

11:25    15    A. No.

11:25    16    Q. Did you ever see a patient receiving

17    chemotherapy at the Kauai Medical Center?

11:25    18            MS. KIM: Vague and ambiguous.

11:25    19    A. I'm, I'm not sure.

11:25    20    BY MR. SILVER:

11:25    21    Q. Did you ever go into the chemotherapy suite

22    and observe the patient receiving the administration

23    of a chemotherapy drug?

11:26    24    A. I'm not sure.

26    25    Q. So you don't know if you ever saw it?

39

| | 1 | which Qui Tam Provider Lockyer never provided. |

```
        37      2              First of all, do you agree with that

                3  allegation?

11:37           4      A.   Yes.

11:37           5      Q.   How did you discover this?

11:38           6      A.   I'm not sure what you mean by that.

11:38           7      Q.   Well, the allegation says that you

                8  discovered that Defendant KMC was charging and

                9  receiving thousands of dollars of reimbursements from

               10  the Medicare/Medicaid programs for services to

               11  patients which Qui Tam Plaintiff Lockyer never

               12  ordered to be provided.  How did you make this

               13  discovery?

11:38          14      A.   As it says, by analyzing the billings.

11:38          15      Q.   Okay, and what did you analyze?

11:38          16              MS. KIM:  Asked and answered.  You can

               17  answer that.

11:38          18              MR. SILVER:  Asked and answered when?

11:38          19              MS. KIM:  He said analyzed billings.

11:38          20  BY MR. SILVER:

11:38          21      Q.   What billings?  What did you analyze?  Did

               22  you see any actual billings that were provided to

               23  Medicare?

11:38          24      A.   I was never privy to the billing

               25  information.
```

41

| | | |
|---|---|---|
| 11:41 | 1 | Q.   So if I were to ask you, looking at |
| | 2 | Exhibit 5, to describe for me billings submitted by |
| | 3 | KMC under your provider number to Medicare or |
| | 4 | Medicaid, could you? |
| 11:41 | 5 | A.   I'm sorry, ask that again? |
| 11:41 | 6 | Q.   Could you look at Exhibit 5 and describe |
| | 7 | billings submitted by KMC under your provider number |
| | 8 | to Medicare or Medicaid? |
| 11:41 | 9 | A.   Well, I'm not, I'm not sure.  This doesn't |
| | 10 | have my name anywhere on it. |
| 11:41 | 11 | Q.   Okay.  Are you familiar -- again, I would |
| | 12 | point out that this is an exhibit to your written |
| | 13 | disclosure submitted to the government. |
| 11:42 | 14 | Are you familiar with a CMS 1500 form? |
| 11:42 | 15 | A.   I'm not sure. |
| 11:42 | 16 | Q.   Have you ever seen one? |
| 11:42 | 17 | A.   I'm not sure. |
| 11:42 | 18 | Q.   Do you know about, do you know how services |
| | 19 | that you perform are billed to federal programs such |
| | 20 | as Medicare?  You know, in what form how a provider |
| | 21 | such as KMC would submit a claim to Medicare for |
| | 22 | services that you provide? |
| 11:43 | 23 | A.   No. |
| 11:43 | 24 | Q.   What is the basis for the statement in |
| | 25 | paragraph 22 that KMC charged and received |

| | | |
|---|---|---|
| 11:53 | 1 | A. Trying to be accurate. |
| 53 | 2 | Q. Well, so in learning this did you suspect |
| | 3 | fraud? |
| 11:53 | 4 | A. Yes. |
| 11:53 | 5 | Q. But you didn't conduct any investigation of |
| | 6 | fraud? |
| 11:53 | 7 | A. I'm not an investigator. |
| 11:54 | 8 | Q. All right, still sticking with Exhibit 2, |
| | 9 | paragraph 26. It states that you requested an |
| | 10 | explanation for chemotherapy under your provider |
| | 11 | number. From whom did you request an explanation? |
| 11:55 | 12 | A. Diana Shaw. |
| 11:55 | 13 | Q. And who is Diana Shaw? |
| 11:55 | 14 | A. I believe she, she was in administration, |
| | 15 | working for Lee Evslin. |
| 11:55 | 16 | Q. And when did you request this explanation |
| | 17 | of Ms. Shaw? |
| 11:55 | 18 | A. I don't remember the date. |
| 11:55 | 19 | Q. Do you remember the year? |
| 11:55 | 20 | A. No. |
| 11:56 | 21 | Q. Paragraph 27 of Exhibit 2: During |
| | 22 | approximately a one-month period in May 2002, |
| | 23 | Defendants KMC and Doctor Evslin attempted to require |
| | 24 | the defendant KMC internal medicine department |
| | 25 | physicians to sign off on chemotherapy when no |

12:03  1      Q.    Is that your signature in the lower

       2  right-hand corner of the first page?

12:03  3      A.    No.

12:03  4      Q.    Is that your signature to the left of, in

       5  the center of the bottom of the first page?

12:03  6      A.    It appears to be.

12:03  7      Q.    And at the top on the left-hand side of the

       8  first page it does say Kauai Medical Clinic

       9  Outpatient Oncology, does it not?

12:03 10      A.    It appears to.

12:03 11      Q.    So it is something from oncology that you

      12  signed?

12:04 13      A.    It appears to be.

12:04 14      Q.    But you don't recall if this was what you

      15  are complaining about in the complaint in

      16  paragraph 27, correct?

12:04 17      A.    I'm not sure.

12:04 18      Q.    Also, if you look under where, in the first

      19  page, left-hand side, under where it says Outpatient

      20  Oncology the date is May 8th, 2002, correct?

12:04 21      A.    It appears to be.

12:04 22      Q.    The bottom of the page on the left there is

      23  a signature line, and there is a signature there.

      24  Actually, it looks like D. Dannog, D-A-N-N-O-G, but

      25  it has an RN next to it.  Do you see that?

12:16    1      A.    Labs were not reviewed prior to giving

2  chemotherapy by a doctor.

12:16    3      Q.    What's the basis for that allegation?

12:16    4      A.    There was no oncologist there.

12:16    5      Q.    So it's your understanding that prior to

6  the administration of chemo an oncologist must review

7  the lab results?

12:17    8      A.    I'm not sure.

12:17    9      Q.    Well, you just said that there was no

10  review because there was no oncologist there.  So I'm

11  just asking if that stems from that understanding

12  that an oncologist must review the labs prior to the

13  administration of chemo?

12:17   14     A.    No.

12:17   15     Q.    Then what is the basis for your allegation

16  that the labs were not reviewed?

12:17   17     A.    If no one reviews them, then they weren't

18  reviewed.

12:17   19     Q.    Well, if there was no oncologist there but

20  there were other personnel there?

12:17   21     A.    I don't know that.

12:17   22     Q.    So you don't know if there was anyone else

23  there who may have reviewed the labs?

12:18   24     A.    Yes.

18    25     Q.    Yes, you don't know?

| | | |
|---|---|---|
| 13:33 | 1 | A. Not from my office. |
| 33 | 2 | Q. But from the, from the entrance of the |
| | 3 | internal medicine suite? |
| 13:34 | 4 | A. Not from the entrance, no. |
| 13:34 | 5 | Q. From any part of the internal medicine |
| | 6 | suite? |
| 13:34 | 7 | A. Yes. |
| 13:34 | 8 | Q. Did you look at any documents in |
| | 9 | preparation for today's deposition? |
| 13:34 | 10 | A. The interrogatories. |
| 13:34 | 11 | Q. Which interrogatories? |
| 13:34 | 12 | A. The only one I was given. |
| 13:34 | 13 | Q. The ones that we served on you or? |
| 13:34 | 14 | A. I believe so. |
| 13:34 | 15 | Q. Did you look at any other documents? |
| 13:34 | 16 | A. No. |
| 13:34 | 17 | Q. About how long did you take to prepare for |
| | 18 | today's deposition? |
| 13:34 | 19 | MS. KIM: Vague and ambiguous. |
| 13:34 | 20 | A. I don't know. |
| 13:34 | 21 | BY MR. SILVER: |
| 13:34 | 22 | Q. Hours? |
| 13:35 | 23 | A. I'm not sure. |
| 13:35 | 24 | Q. More than one day? |
| 35 | 25 | MS. KIM: Asked and answered. |

|         |    |                                                            |
|---------|----|------------------------------------------------------------|
|         | 1  | he was offered a stipend to be on-call.  That is a         |
|         | 2  | different question, counsel.                               |
| 14:00   | 3  | A.   No.                                                   |
| 14:00   | 4  | BY MR. SILVER:                                             |
| 14:00   | 5  | Q.   Thank you.  Were you ever offered a stipend           |
|         | 6  | to sign oncology charts?                                   |
| 14:00   | 7  | A.   Yes.                                                  |
| 14:00   | 8  | Q.   When was that?                                        |
| 14:00   | 9  | A.   When Lee called us into his office he said            |
|         | 10 | he would give us some money to do it.                      |
| 14:00   | 11 | Q.   Okay.  That was in May of 2002?                       |
| 14:00   | 12 | A.   Somewhere there --                                    |
| 14:00   | 13 | Q.   -- said in the complaint?                             |
| 14:00   | 14 | A.   Yes.                                                  |
| 14:00   | 15 | Q.   And did you agree to do it?                           |
| 14:00   | 16 | A.   No.                                                   |
| 14:00   | 17 | Q.   You told him no?                                      |
| 14:00   | 18 | A.   Yes.                                                  |
| 14:01   | 19 | Q.   Exhibit 6, though, has your signature on              |
|         | 20 | it, does it not (Indicating)?                              |
| 14:01   | 21 | A.   Yes.                                                  |
| 14:01   | 22 | Q.   So you ultimately did do it?                          |
| 14:01   | 23 | A.   Not ultimately.                                       |
| 14:01   | 24 | Q.   Then what?                                            |
| 14:01   | 25 | A.   I did it on several occasions.                        |

1  Yes.

2      Q.   What if there was an adverse reaction of

3  any type that nurses thought required review by a

4  physician, consultation with a physician, were you

5  ever available in that instance when an oncologist

6  wasn't available?

7      A.   Not for stable oncological issues.

8      Q.   What do you mean by that, "stable

9  oncological issues"?

10      A.   Something pertaining to chemotherapy.

11      Q.   What about if there was an emergency

12  pertaining to chemotherapy?

13      A.   Well, yes, I said emergencies.

14      Q.   But so, but relating to the chemotherapy

15  you would have been available, at times?  I'm just

16  trying to understand whether you're saying I never

17  had anything, they could have never come to me ever,

18  or were there times that you were available in the

19  event a physician was needed right, I understand it's

20  almost right next door, maybe I'm off on that, but

21  almost right next door, in the event something

22  happened in the chemotherapy suite with a physician,

23  where a physician consult was being necessary?

24          MS. KIM:  Assumes facts, compound,

25  speculative, argumentative, lack of foundation.  You

1   can answer that if you feel you can.

13   2                WITNESS:  I'll try.

14:13   3        A.    I was available for emergencies.

4   Emergencies in medicine go to final common pathways,

5   a person has no pulse, they stop breathing, they

6   exsanguinate, something like that.  Beyond that, you

7   said consultation, I didn't do consultations.

14:14   8   BY MS. LOVEJOY:

14:14   9        Q.    And I may be using a term of art that I'm

10   not meaning to use as a term of art, so, forgive me

11   there.  What I mean is to be consulted with.

14:14   12              Right you're saying now is you're objecting

13   to, as I understand it, to the term "coverage",

14   you're objecting, basically, so you don't know what I

15   mean, you're saying we don't know, you don't know

16   what we mean when we say on-call.

14:14   17              So I'm trying to use a terminology that we

18   can find some common ground for some dialogue here.

19   So if there's some word that you'd like to offer up

20   I'll try to use it.

14:14   21                MS. KIM:  So I'm going to object.

22   Vague and ambiguous.

14:14   23        A.    I'm not an oncologist.

14:14   24   BY MS. LOVEJOY:

14   25        Q.    Understood.

| 14:14 | 1 | A. That requires years of extra training. I |
| | 2 | wouldn't presume to be practicing oncology. |
| 14:15 | 3 | Q. Okay. Is it do you believe that oncologist |
| | 4 | is the only one who could treat a patient for side |
| | 5 | effects from chemotherapy? |
| 14:15 | 6 | MS. KIM: Vague and ambiguous. |
| 14:15 | 7 | WITNESS: I answer it? |
| 14:15 | 8 | MS. KIM: Yes. |
| 14:15 | 9 | A. I suppose anyone could treat them. |
| 14:15 | 10 | BY MS. LOVEJOY: |
| 14:15 | 11 | Q. Could you treat them for -- |
| 14:15 | 12 | A. -- no -- |
| 14:15 | 13 | Q. -- for, say, for example, use the example |
| | 14 | Mr. Silver used, for example, for a rash. Could you |
| | 15 | take a look at a patient and make a decision on what |
| | 16 | may needed to be done next, is that something you're |
| | 17 | capable of doing? |
| 14:15 | 18 | MS. KIM: Vague and ambiguous. |
| 14:15 | 19 | A. For a rash? |
| 14:15 | 20 | BY MS. LOVEJOY: |
| 14:15 | 21 | Q. From chemotherapy. Excuse me. |
| 14:15 | 22 | A. I would consult an oncologist. |
| 14:15 | 23 | Q. Okay. So, what oncologist would you |
| | 24 | consult if the oncologist that would typically work |
| | 25 | in the chemotherapy suite was unavailable? |

1    not?  It's our money.

30    2         And he said they'll never allow it and they

3    won't pay for it.  And I said why don't we pay for it

4    and bring in an independent auditor.  And he got very

5    nervous and said Billy's not going to like to hear

6    this, not one bit, Jim.

14:31    7         Q.    Okay.  And your concern at the time was

8    that you were being underpaid what you believed you

9    were entitled to, correct?

14:31    10         A.    Yes.

14:31    11         Q.    In or about that time did you talk to

12    anybody else other than the internal medicine people

13    about -- I'm sorry, did you request financial

14    documents supporting your pay from anybody else?

14:31    15         A.    Yes.

14:31    16         Q.    Who?

14:31    17         A.    Lee Evslin.

14:31    18         Q.    When did that happen?

14:31    19         A.    I don't remember exactly.  It was around

20    that same time.

14:32    21         Q.    After that meeting, after the internal

22    medicine meeting?

14:32    23         A.    I believe before that and then after that.

14:32    24         Q.    Okay.  Did you specifically ask Doctor

25    Evslin for a financial audit?

1    just now.  Did anything else -- you had the meeting

2    with the internist, you talked with Doctor Evslin.

3    Did you do anything else around that time?  And I

4    think you were saying it was December-ish of '01.

14:34    5        A.    Yes.

14:34    6        Q.    Anything else you did on that issue?

14:34    7        A.    No.

14:34    8        Q.    Did you ask for an explanation of why it

9    would be impossible to collate the billings to the

10    receipts?

14:34    11        A.    No.

14:34    12        Q.    Ultimately your pay became a subject of

13    arbitration, correct?

14:34    14        A.    Yes.

14:34    15        Q.    Okay.  And as part of that arbitration was

16    there any other claim other than the fact that you

17    were underpaid?

14:35    18        A.    I believe that was the principal claim at

19    the time.

14:35    20        Q.    Did you abandon that arbitration or -- let

21    me ask you this.  At some point the arbitration

22    didn't proceed forward, correct?

14:35    23        A.    Correct.

14:35    24        Q.    Okay, why?

35    25        A.    Because with the disclosures that were

14:37  1      Q.    You said other irregularities were

2    discovered through the arbitration.  What other

3    irregularities did you discover through the

4    arbitration?

14:37  5      A.    That chemotherapy was being billed under my

6    provider number.

14:37  7      Q.    How was that discovered?

14:37  8      A.    On the spreadsheets that we were provided.

14:38  9      Q.    That were produced through the arbitration

10   proceeding?

14:38  11     A.    Yes.

14:38  12     Q.    Is that the first time that you had any

13   knowledge of, that the irregularity that you just

14   testified to, I don't have your language exactly, but

15   that chemotherapy services were being billed under

16   your provider number?

14:38  17     A.    That was the first confirmation.

14:38  18     Q.    Okay.  Did you have, did some knowledge of

19   it before?

14:38  20     A.    Knowledge?

14:38  21     Q.    You said first confirmation.  Why did you

22   make the distinction that was the first confirmation?

14:38  23     A.    Well, there was proof there.  That's

24   knowledge.

38  25     Q.    Okay, okay.

15:13    1                    MS. KIM:  Asked and answered.  You can

         2      answer the question.

15:13    3           A.   No.

15:13    4      BY MS. LOVEJOY:

15:13    5           Q.   No?

15:13    6           A.   Was I asked to cover the chemo?  No.

15:13    7           Q.   And did you ever cover the chemotherapy

         8      suite?

15:13    9                    MS. KIM:  Asked and answered.

15:13   10           A.   No.

15:13   11      BY MS. LOVEJOY:

15:13   12           Q.   Were you ever available to cover the

        13      chemotherapy suite?

1 .:13  14           A.   No.

15:13   15           Q.   Did you ever receive calls from

        16      chemotherapy nurses about, or a chemotherapy nurse

        17      about a patient in the chemotherapy suite who had had

        18      some type of reaction to chemotherapy?

15:13   19           A.   I'm not sure that's what caused -- I'm, I'm

        20      not sure.

15:13   21           Q.   Did you ever receive a call from a nurse in

        22      the chemotherapy suite about a patient in the

        23      chemotherapy suite?

15:13   24           A.   Yes.

   13   25           Q.   Okay, could you tell me when that happened?

15:14   1          A.    I can't remember.

14      2          Q.    How many times did that happen?

15:14   3          A.    Once, twice.

15:14   4          Q.    Okay.  Can you tell me whatever it is you

        5    recall about those incidents or incident?

15:14   6          A.    Patient had passed out.

15:14   7          Q.    Okay.  That's what you were told over the

        8    phone?

15:14   9                MS. KIM:  Assumes facts, vague and

        10   ambiguous.

15:14   11         A.    I don't remember whether -- I don't think

        12   it was over the phone.

15:14   13   BY MS. LOVEJOY:

15:14   14         Q.    Okay, do you recall the circumstance of

        15   having received that information?

15:14   16         A.    Not specifically.

15:14   17         Q.    Generally?

15:14   18         A.    Someone from the chemo room said we don't

        19   have a doctor, and one of the patients passed out.

15:14   20         Q.    Do you recall what you did or said in

        21   response to that information?

15:14   22         A.    Well, I remember going, going in there.

15:15   23         Q.    And?

15:15   24         A.    Checked their blood pressure.

15      25         Q.    Anything else?

| | | |
|---|---|---|
| 15:15 | 1 | A.   Put another IV in 'em. |
| 15 | 2 | Q.   Anything else? |
| 15:15 | 3 | A.   Ran fluids, saline. |
| 15:15 | 4 | Q.   Okay, anything else? |
| 15:15 | 5 | A.   Asked where the oncologist was. |
| 15:15 | 6 | Q.   Okay, did you receive an answer? |
| 15:15 | 7 | A.   They said they didn't know. |
| 15:15 | 8 | Q.   Anything else you recall? |
| 15:15 | 9 | A.   I believe I said this, this person needs to |
| | 10 | go to the emergency room. |
| 15:15 | 11 | Q.   Who was the oncologist at the time, do you |
| | 12 | know? |
| 15:15 | 13 | A.   I don't remember.  There wasn't one. |
| 15:15 | 14 | Q.   Who would have been -- |
| 15:15 | 15 | A.   I don't remember, I don't know. |
| 15:15 | 16 |       MS. KIM:  Let her ask the question. |
| 15:15 | 17 | BY MS. LOVEJOY: |
| 15:15 | 18 | Q.   Did you ever followup to find out where the |
| | 19 | oncologist was at that time? |
| 15:15 | 20 | A.   I don't recall. |
| 15:15 | 21 | Q.   Did you ever speak to anybody about |
| | 22 | concerns about the oncologist not being available at |
| | 23 | that time? |
| 15:16 | 24 | A.   Specifically at that time, I don't recall. |
| 16 | 25 | Q.   Do you recall any similar event where you |

149

```
 1                    C E R T I F I C A T E

 2    STATE OF HAWAII                )

 3                                   )  SS.

 4    CITY AND COUNTY OF HONOLULU    )

 5

 6            I, DENNIS J. YANKEE, do hereby certify;

 7         That on October 12, 2006, at 10:00 a.m.

 8    appeared before me JAMES LOCKYER, M.D., the witness

 9    whose deposition is contained herein; that prior to

10    being examined he was by me duly sworn;

11         That the deposition was taken down by me in

12    machine shorthand and was thereafter reduced to

13    typewritten form under my supervision; that the

14    foregoing represents to the best of my ability, a

15    true and correct transcript of the proceedings had in

16    the foregoing matter.

17         I further certify that I am not an attorney

18    for any of the parties hereto, nor in any way

19    concerned with the cause.

20         DATED this 18th day of October, 2006, in

21    Honolulu, Hawaii.

22

23

24    _____

25    DENNIS J. YANKEE, CSR 285
```

Ralph Rosenberg Court Reporters, Inc.
Ofc: (808)524-2090   Fax: (808)524-2596

150

1                IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF HAWAII

3

4        UNITED STATES OF AMERICA, ex  )

5        rel. JAMES LOCKYER, M.D.,        )

6        STATE OF HAWAII, ex rel. JAMES)

7        LOCKYER, M.D. and JAMES          )

8        LOCKYER, M.D., in his own        )

9        behalf,                          )

10                                        )

11                      Plaintiffs, )

12                                        )

13                                        )

14           vs.                       ) Civil No.

15                                      ) CV04-00596-ACK LEK

16    HAWAI'I PACIFIC HEALTH; KAUAI ) (Federal and State -

17    MEDICAL CLINIC; WILCOX           )  Qui Tam)

18    MEMORIAL HOSPITAL; WILCOX        )

19    HEALTH SYSTEM; and WILLIAM A. ) (Deposition of

20    EVSLIN, M.D. aka LEE A.          )  James Lockyer, M.D.)

21    EVSLIN, M.D.,                    )

22                                      )  VOLUME II

23                      Defendants. )

24    _____)

25


                RALPH ROSENBERG COURT REPORTERS, INC.
                  Honolulu, HI  (808) 524-2090

277

1    frustrated.

2        Q.    You don't have any recollection of asking

3    anybody in the administration for an audit of your

4    salary?

5        A.    I believe my first formal position that we

6    should have an audit was in December of 2001 at the

7    meeting.

8        Q.    Okay.  I want you to -- you're a smart guy, I

9    want you to answer my question.  When did you first talk

10   to somebody in the administration, not your colleagues in

11   internal medicine, but with the clinic administration

12   about asking for an audit regarding your salary?

13       A.    I don't -- I'm not sure.

14       Q.    Did you ever make such a request?

15       A.    I'm not sure I did.  Not formally.

16       Q.    You don't recall ever informally making such a

17   request either to somebody in the administration at the

18   clinic?

19       A.    I know I mentioned it to my colleagues.

20       Q.    Okay.  And in fact, no formal audit request was

21   made into the arbitration either, correct?

22       A.    I don't know.

23               MR. DEL CASTILLO:  Objection to the

24   extent it calls for a legal conclusion.

25               MS. LOVEJOY:  Okay.  That's it.


                RALPH ROSENBERG COURT REPORTERS, INC.
                  Honolulu, HI   (808) 524-2090

280

C E R T I F I C A T E

```
STATE OF HAWAII                    )
                                   ) SS.
CITY AND COUNTY OF HONOLULU        )
```

            I, SHIRLEY L. KEYS, Notary Public, State of

Hawaii, do hereby certify:

            That on November 28, 2006 at 11:02 a.m.,

appeared before me James Lockyer, M.D., the witness whose

deposition is contained herein; that prior to being

examined he was by me duly sworn;

            That the deposition was taken down by me in

machine shorthand and was thereafter reduced to

typewriting under my supervision; that the foregoing

represents to the best of my ability, a true and correct

transcript of the proceedings had in the foregoing

matter.

            I further certify that I am not an attorney

for any of the parties hereto, nor in any way concerned

with the cause.

            DATED this 2nd day of _____, 2006,

in Honolulu, Hawaii.

                            _____
                            SHIRLEY L. KEYS, CSR 383
                            Notary Public, State of Hawaii
                            My Commission Exp. May 19, 2007

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090