# Exhibit 5

Of Counsel:
ROBBINS & ASSOCIATES
Attorneys at Law
A Law Corporation

KENNETH S. ROBBINS          1000-0
LEIGHTON M. HARA   7826-0
WENDY M. YAMAMOTO          8049-0
2200 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-2355
Facsimile: (808) 526-0290
Email: defend@robbinsandassociates.net

PATTON BOGGS LLP
Attorneys at Law

HARRY R. SILVER
2550 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6453
Facsimile: (202) 457-6315
Email:  hsilver@pattonboggs.com


Attorneys for Defendants
HAWAI'I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH SYSTEM

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ex rel. JAMES LOCKYER, M.D., ) <br> STATE OF HAWAII, ex rel. JAMES ) <br> LOCKYER, M.D., and JAMES ) <br> LOCKYER, M.D., in his own behalf ) <br> ) | CIVIL NO. 04-00596 ACK LEK <br> (Federal and State – Qui Tam) |

|                              |     |
| ---------------------------- | --- |
| Plaintiffs,                  | )   |
|                              | )   |
| v.                           | )   |
|                              | )   |
| HAWAI'I PACIFIC HEALTH, *et al.* | ) |
|                              | )   |
| Defendants.                  | )   |
| _____ | )   |

## DECLARATION OF SALLY DIANA

I, Sally Diana, do hereby declare that the following information is based on personal knowledge, that I am competent to so testify and that it is both true and correct.

1.  I was hired by Kauai Medical Clinic ("KMC") in 1994 as an LPN and became an RN in 1995 after receiving my associate's degree in nursing from Kauai Community College. I became an oncology nurse (designated as Specialized Nurse II) at KMC in 1998 and remained in that position for approximately seven years. I currently work for Wilcox Memorial Hospital.

2.  As a nurse in the chemotherapy suite, I received on-the-job training from other oncology nurses and attended courses on the treatment of oncology patients.

3.  It was the normal procedure at KMC's chemotherapy suite for the oncologist to provide a written order for a chemotherapy patient setting forth the required blood tests, the range of the red blood cell count, white blood cell count, and platelet count necessary for the administration of chemotherapy, and the types and amounts of chemotherapy to be administered.

4832484

4.  The day before the scheduled chemotherapy, I would prepare my patients' charts and verify that they contained a written order for chemotherapy, a written an order for blood work, and insurance authorization.

5.  I would draw the patient's blood and send it to the lab for testing within 24 hours of treatment.  When the results came back, I reviewed them to see if the red blood cell count, white blood cell count and platelet count were within the range specified by the oncologist in the order.  I was very familiar with reading lab results from my training and from the number of years I had worked as an oncology nurse.  If the blood test results fell within the appropriate range, I did not need to consult a physician before proceeding with chemotherapy.  If the results were borderline, I always checked with the oncologist or the covering physician.

6.  Once the blood tests confirmed that a patient was eligible for chemotherapy that day, I prepared the chemotherapy drugs as specified in the oncologist's order.

7.  An oncologist would normally be in the office at the time a chemotherapy patient received treatment.  If the oncologist was not available, another doctor in the Clinic would be assigned to "cover" for the oncologist.

8.  Physicians in the Internal Medicine Department of the Clinic covered the chemotherapy suite if the oncologist was not present on a certain day.  The Internal Medicine suite is on the same floor as the chemotherapy suite.

9.  The Clinic administration assigned a physician in advance to cover the chemotherapy suite after first checking with the doctor.  I recall Drs. Braun, Pixler, Lockyer, maybe Dr. McKnight, and maybe Dr. Jackson covering chemotherapy.

10. If Dr. Lockyer signed a chemotherapy chart on a given day it meant that he was covering that day.

11. I distinctly recall discussing chemotherapy patients' blood work with Dr. Lockyer on days he was covering.

12. Either the oncologist or a covering physician was always available when I and the other nurses administered chemotherapy.  If no physician was available to cover, we would not administer chemotherapy.

13. A new patient would not be scheduled for the first day of chemotherapy if the oncologist was unavailable on that day.

14.  The most common potential side effects of chemotherapy are mild reactions, such as hives, shortness of breath, or chest tightness.  Reactions to chemotherapy rarely occurred.  I can only recall approximately three times during my seven years as an oncology nurse at KMC when I needed a physician immediately to see a patient receiving chemotherapy.  I do not recall any patients during my seven years who needed to be admitted to the hospital or taken to the ER because of any reaction to chemotherapy.

15. To the best of my knowledge, the responsibility of the covering physician was to be available in the case of an emergency. If the blood results were within the range appropriate for chemotherapy and there are no side effects or emergencies resulting from chemotherapy, I can think of no reason why a covering physician would ever see the patient.

16. I never did, or saw, anything that in any way compromised patient care. I loved my patients. They became like family. I always did the absolute best for them that I possibly could.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December *12*, 2006.

*Sally Diana*

Sally Diana