JANICE P. KIM                3436
Kaimuki Business Plaza
3615 Harding Avenue, Suite 206
Honolulu, Hawaii 96816
Telephone: (808) 732-0522
Facsimile: (808) 735-0459
kimj054@hawaii.rr.com

ARLEEN D. JOUXSON        7223
RAFAEL G. DEL CASTILLO  6909
JOUXSON-MEYERS & DEL CASTILLO
Attorneys at Law, A Limited Liability Law Company
302 California Avenue, Suite 209
Wahiawa, Hawaii 96786
Telephone: (808) 621-8806
Fax: (808) 422-8772
rdelcastillo@physicianslawfirm.com

Attorneys for James Lockyer, M.D.

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf, | ) ) ) ) | CIVIL NO. CV 04-00596 ACK LEK (Federal and State - Qui Tam) |
| Plaintiffs, | ) ) ) ) | PLAINTIFF JAMES LOCKYER, M.D.'S, MEMORANDUM IN OPPOSITION TO DEFENDANTS HAWAI`I PACIFIC HEALTH'S, KAUAI MEDICAL CLINIC'S, WILCOX MEMORIAL |
| vs. | ) ) ) ) | HOSPITAL'S, AND WILCOX HEALTH SYSTEM'S MOTION FOR SUMMARY JUDGMENT; DECLARATIONS OF JAMES |
| HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; AND | ) ) ) ) | LOCKYER, M.D., JONATHAN K. CHO, M.D., MICHAEL S. BRAUN, M.D., R. CRAIG NETZER, M.D., LAWRENCE R. RAITHAUS, M.D., |

| | | |
|---|---|---|
| WILLIAM A. EVSLIN, M.D. AKA | ) | CHRISTINA NEWBOLD, NANCY |
| LEE A. EVSLIN, M.D. | ) | BOOKBINDER AND RAFAEL G. |
| Defendants. | ) | DEL CASTILLO; EXHIBIT 1; |
| | ) | CERTIFICATE OF SERVICE |
| | ) | |
| | ) | HEARING |
| | ) | |
| | ) | Date:    March 27, 2007 |
| | ) | Time:    10:30 A.M. |
| | ) | |
| | ) | |
| | ) | Trial Date:    September 18, 2007 |
| _____ | ) | Judge:    Honorable Alan C. Kay |

PLAINTIFF JAMES LOCKYER, M.D.'S
MEMORANDUM IN OPPOSITION TO DEFENDANTS
HAWAI`I PACIFIC HEALTH'S, KAUAI MEDICAL
CLINIC'S, WILCOX MEMORIAL HOSPITAL'S, AND
<u>WILCOX HEALTH SYSTEM'S MOTION FOR SUMMARY JUDGMENT</u>

<u>TABLE OF CONTENTS</u>

I.   Factual Background ............................................................6

   A.  Defendants' Submitted Claims for Chemotherapy That Was Administered
   While No Physician Was Supervising As Required................................7

   B.  Defendants Failed to Show the Absence of a Genuine Issue of Material Fact
   as to Whether the Nurses Assigned to the KMC Oncology Department Were
   Sufficiently Credentialed or Qualified to Administer Chemotherapy Without
   Continuous Direct Supervision ................................................9

   C.  Dr. Lockyer Became Suspicious That Defendants Were Intentionally
   Misrepresenting the Facts of KMC Finances and Health Care Claims.............11

      1.  Defendant Evslin's Attempts to Coerce the Internal Medicine Department
      Physicians to Sign Chemotherapy Patient Charts Raised Dr. Lockyer's
      Suspicious About Oncology Claims .........................................13

      2.  Dr. Lockyer's Inquiries About Defendants' Misuse of His Provider
      Number Caused Them To Change Their Practices .........................15

   D.  Defendants Continue to Delay and Object to Plaintiffs' Discovery of
   Material Facts and Evidence .................................................16

II.   The HPH-Entities' Motion attempts to mislead .............................................18

III.  Standard of Review .........................................................................................24

IV.   The Regulations and the Law and Legal Standard .........................................26

V.    Defendants Are Not Entitled To Summary Judgment ....................................30

Because Material Facts Are Genuinely in Dispute ....................................................30

    1.  For Supervision, the Essential Element is Awareness ..............................31

    2.  Certification Also Requires Awareness .....................................................33

    3.  A Reasonable Jury Could Determine That All Required Elements For a
    Retaliation Claim Are Met...........................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)....................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548
   (1986) .............................................................................................................24

*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980).......................24

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574, 587
   (1986) .............................................................................................................24

*National Screen Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir.
   1962) ..............................................................................................................25

*Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323
   (4th Cir. 1995).................................................................................................25

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)..........28

*United States v. Idaho Falls Assocs.*, 81 F. Supp. 2d 1033, 1038 (D. Idaho 1999) 24

*United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006) ..................28

**Statutes**

False Claims Act (FCA), 31 U.S.C. §§ 3729, et seq. ............................................28

31 U.S.C. § 3729(b) ...............................................................................................28

31 U.S.C. §§ 3729(a)(1)............................................................... 28, 30, 31

31 U.S.C. § 3729(a)(2)................................................................... 28, 33

42 U.S.C. § 1395nn.................................................................................................27


**Rules**

Fed. R. Civ. P. 56 ......................................................................................... 24, 25

**Regulations**

42 C.F.R. § 410.26(b) (2002)............................................................... 26, 27

42 C.F.R. § 410.32(b)(3)(ii) ................................................................. 27, 32

42 C.F.R. § 411.355(b)(1)(iii)................................................................................27

PLAINTIFF JAMES LOCKYER, M.D.'S
MEMORANDUM IN OPPOSITION TO DEFENDANTS
HAWAI`I PACIFIC HEALTH'S, KAUAI MEDICAL
CLINIC'S, WILCOX MEMORIAL HOSPITAL'S, AND
WILCOX HEALTH SYSTEM'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs JAMES LOCKYER, M.D., respectfully requests that this

Court enter an order DENYING Defendants Hawaii Pacific Health, Kauai Medical

Clinic, Wilcox Hospital, and Wilcox Health System's Motion for Summary

Judgment [76], and the Motion for Joinder by William A. Evslin [84].[1]  Defendants

stole Plaintiff-Relator Dr. Lockyer's[2] medical identity to submit false claims to

Medicare.  Plaintiffs' Complaint details 359 verified claims Defendants submitted

to Medicare under Dr. Lockyer's provider number which were false claims

because they were for chemotherapy services Dr. Lockyer never knew was being

administered to patients he either never saw or did not see for physician services

on those occasions.

Defendants admit that they billed under Dr. Lockyer's medical

identity and the medical identity of numerous other doctors instead of the medical

identity of an oncologist who prescribed the chemotherapy because no oncologist

was present for the day.  Defendants' excuse that those claims were for services

---

[1] Hereafter, the entity Defendants, Hawai`i Pacific Health, Kauai Medical Clinic,
Wilcox Hospital, and Wilcox Health System, are referred to as the "HPH-Entity
Defendants."  The Defendants are hereafter collectively referred to as
"Defendants."

[2] Hereafter, Plaintiff-Relator Dr. Lockyer is referred to simply as "Dr. Lockyer."

"incident to" the physician services is an 'ex post facto' legal argument

unsupported by any contemporaneous evidence that they ever contacted CMS,

Nordian (the Medicare carrier), or any authority for approval of the arrangement.

It is a position Defendants never asserted in response to Dr. Lockyer's objections

to Defendants misuse of his provider number to submit claims to Medicare for

chemotherapy administration in early 2003.  In fact, in response to Dr. Lockyer's

objections, Defendants gave him an affidavit <u>denying that he provided any services</u>

in connection with those claims.  Evslin Defense Declaration of Ken Shimonishi,

"Exhibit A" (hereafter "Shimonishi Affidavit").  Defendants have now reversed

that position, and the evidence they have attempted to marshal falls far short of

supporting their ex post facto legal argument.

          Unless otherwise expressly stated herein, Plaintiffs dispute each and

every allegation contained in Defendants' Concise Statements of Fact for the

reasons set forth herein.  Defendants have based their Motion on half-truths,

mischaracterizations, and misrepresentations of the facts and circumstances that

obtained during the relevant period, and no undisputed admissible exculpatory

evidence.  This Opposition shows that, despite the fact that Defendants possess

documents and evidence which they have thus far refused to disclose, genuine

disputes of material facts remain on which it is no strain to imagine a jury returning

a verdict in Plaintiffs' favor.  If Defendants had admissible evidence proving that

the internal medicine doctors knew they were designated to supervise

chemotherapy and that claims were being submitted under their provider numbers,

they failed to come forward with it.  Despite the fact that nine internal medicine

doctors have worked for KMC during the relevant period, Defendants failed to

provide a single declaration to support their contention that they assigned the

internal medicine physicians to supervise chemotherapy.[3]  Furthermore,

Defendants failed to come forward with a scintilla of admissible evidence that the

claims for chemotherapy for a given day were actually submitted with the provider

number of the physician they contend was assigned to supervise.  Defendants have

no admissible evidence on any of the aforementioned issues that would provide

them with a defense to Plaintiffs' claims.  The real question now is whether

Defendants should be allowed to go forward with such specious arguments.

      Plaintiffs furthermore expect discovery to show that Defendants

submitted false claims for the administration of chemotherapy services under the

provider numbers <u>of other physicians without their knowledge or consent</u>.

Plaintiffs further expect discovery to show that Defendants routinely submitted a

second claim for a physician office visit when patients came for chemotherapy,

_____

[3] Dr. McKnight, their employee, would only say that Dr. Inouye occasionally asked him to "cover" chemotherapy.  Declaration, Defense Exhibit 6.  Dr. Inouye was hired in 2003, after Dr. Lockyer challenged Defendants' use of his provider number on chemotherapy claims. Declaration of James Lockyer, M.D. (hereafter, "Lockyer Decl.")

which claims also failed to comply with Medicare's billing regulations.

Defendants admit chemotherapy was mixed and infused or injected into cancer patients not by qualified physicians, but by nurses. Medicare does cover claims by nurses for chemotherapy administration. Plaintiffs have obtained and submit herewith the expert opinion of Terry S. Coleman, Esq., nationally-known authority on Medicare law and regulations, and the sole author of the legal treatise, *Medicare Law*. *See* EXHIBIT 1. Mr. Coleman has provided the opinion that Medicare covers drugs administered in physician offices by non-physician employees of the physician <u>only if</u> a supervising physician is present <u>in the same office suite where the chemotherapy is administered throughout</u> the administration and the supervising physician is immediately available to provide assistance. Mr. Coleman has specifically pointed out that if the physician arrives in the suite after drug administration procedures have begun, or leaves the suite for lunch, to conduct hospital rounds, or for other reasons, Medicare does not cover any drugs and drug administration services that were furnished in whole or part during the absence of the physician. EXHIBIT 1. Furthermore, drugs and drug administration services must be furnished in accordance with this requirement to be eligible for Medicare payment. EXHIBIT 1.

Defendants' Motion should be denied because it asks this Court to weigh conflicting evidence on the central question of whether the physicians

whose medical identities they used to submit the claims had agreed to supervise the administration of chemotherapy, which the Court may not do under Rule 56.  Drs. Lockyer, Braun, and Netzer deny they ever gave Defendants permission to submit claims for chemotherapy administration using their medical identities, or that they understood and agreed they were supervising throughout the administration of chemotherapy.[4]  Dr. Lockyer's medical assistant, Christina Newbold, denies being informed that he was ever assigned to supervise chemotherapy.[5]  To grant Defendant's Motion this Court would be required to accept the allegations in the declarations of the three nurses attached to Defendants' Motion (Exhibits 2, 3, and 5) who have a stake,[6] and reject the corroborating declarations of two physicians and one medical assistant who have no stake in this case.  The conflict must thus be weighed and decided by a jury unless discovery subsequently reveals, as Plaintiffs expect, that the nurses did not personally know the facts their declarations were constructed to imply.

Plaintiffs' Oppositions demonstrate that genuine issues of material fact are in dispute, and that a jury could return a verdict for Plaintiffs on every one of the issues, such that the Motion for Summary Judgment should be denied.

---

[4] Declaration of Michael S. Braun, M.D. ("Braun Decl."); Declaration of R. Craig Netzer, M.D. ("Netzer Decl.")

[5] Declaration of Christina Newbold ("Newbold Decl.")

[6] For the reasons set forth infra, even though Dr. McKnight was still employed by Defendants when he gave his Declaration, he has not contravened Plaintiffs' facts.

5

I.    FACTUAL BACKGROUND

This case concerns false claims Defendants Evslin and KMC submitted to government-funded health care benefit programs in violation of billing regulations.  To make the claims, Defendants misappropriated the personal professional medical identities Medicare issued to numerous physicians they employed.  The Kauai Medical Clinic is located in a three-storey building located at 3-3420 Suite B Kuhio Highway, Lihue.  Lockyer Decl.  Evslin/KMC ostensibly employed physicians under individual contracts which divided receipts on account of a physician's professional services between Defendant KMC and the physician.  *Id.*  The physician provided professional services, and KMC assumed responsibility for all administrative services, including employment of staff and preparation and submission of health care claims for the physician's professional services under each physician's personal medical identity.

KMC submitted virtually all claims electronically.  Lockyer Decl. Neither Dr. Lockyer nor any other physician he knows of who was employed by KMC was permitted to see the electronic claims submitted under their respective medical identities, nor anything related to such claims.  *Id.*  The physicians never signed the claims, and were not allowed to review and approve all claims on which KMC used their medical identities before they were submitted. *Id.*  Defendant Evslin required the physicians to accept on faith that all claims submitted using

6

their medical identities were proper and lawful and that they were given full credit for the claims and receipts thereon. *Id.* Defendant Evslin only permitted the physicians to see monthly summaries of claims and receipts allegedly pertaining to their respective medical identities. *Id.*

Claims an employer of a supervising physician submits to Medicare as supervised services are false claims if the supervising physician was unaware that he or she was performing the supervising function. *See* EXHIBIT 1. The submission of the claim form to Medicare under the supervising physician's medical identity certifies that the services were furnished under that physician's immediate personal supervision. *Id.* If a physician was not aware that he or she was designated as the supervising physician, that certification cannot properly be made by an entity submitting the claim under that physician's medical identity. *Id.* Defendant Evslin's ban prohibiting physicians from properly reviewing all claims prevented physicians from detecting misuse of their provider numbers. Lockyer Decl. Because Defendant Evslin's ban prevented the physicians from ever reviewing their actual claims, Defendants' representations to Medicare that the claims were certified by the physicians were presumptively false.

A.     Defendants' Submitted Claims for Chemotherapy That Was Administered While No Physician Was Supervising As Required

During nine or more continuous hours between 8:00 a.m. and 5:00 p.m. or later, the nurses assigned to the KMC Oncology Department mixed toxic

chemicals, with which they injected or infused cancer patients based upon dosages they calculated from orders they have alleged were written by an oncologist[7] who was often not present in the KMC oncology subspecialty suite.  Lockyer Decl.; Newbold Decl.  Plaintiffs believe there were no written orders for individual patients, and that the nurses followed standard protocols which Defendants have refused to produce for examination.

The nurses mixing chemicals, computed dosages, and administered the mixed chemotherapy agents throughout the day irrespective of whether an oncologist or other supervising physician was present in the oncology subspecialty suite to supervise.  The nurses arrived sometime between 7:00am and 7:30am and cancer patients were receiving their chemotherapy by 7:30 or 8:00am.  Newbold Decl.  The first physicians did not usually arrive on the Clinic's second floor after conducting their hospital rounds until after 8:30 a.m.  *Id.*  Chemotherapy was administered continuously throughout the day.  *Id.*  The nurses staffing the chemotherapy room frequently complained that the continuous chemotherapy administration required them to take staggered lunch breaks because the chemotherapy room never closed for lunch.  *Id.*  The KMC Internal Medicine Department was closed from noon until 2:00 p.m.  *Id.*  The physicians left for lunch, conferences, to check on hospital patients, or personal business.  *Id.*

---

[7] Except that from approximately April 2002 through early 2003, KMC had no medical oncologist on staff.  Lockyer Decl.

Even after Dr. Lockyer disputed claims Defendants submitted for chemotherapy using his medical identity in early 2003, the chemotherapy room schedule did not change and the nurses administered chemotherapy when no doctor was present on the second floor.  One day in October, 2003, Dr. Lockyer entered the second floor KMC Internal Medicine Department when Nurse Diana Dannog rushed up to him and exclaimed that the nurses were administering chemotherapy to patients but no physician was available to "cover." Lockyer Decl.  Nurse Dannog requested that Dr. Lockyer agree to "cover" chemotherapy that day.  *Id.*

Previously, Dr. Lockyer had responded on one or two occasions to emergency requests for a physician's assistance in the chemotherapy room.  *Id.* Dr. Lockyer had no reason to believe he was designated to supervise the administration of chemotherapy throughout the day on either of those occasions, nor had he consented to supervise or to allow Defendants to use his provider number to submit claims.  *Id.*  Nurse Dannog's request was the first time anyone had asked Dr. Lockyer to "cover" the chemotherapy room in advance.  *Id.* Dr. Lockyer contacted KMC Medical Director Benny Williamson, M.D., and requested that he explain the meaning of "cover" before he agreed.  *Id.*  Dr. Williamson responded that he would make other arrangements.  *Id.*

    B.    Defendants Failed to Show the Absence of a Genuine Issue of Material Fact as to Whether the Nurses Assigned to the KMC Oncology Department Were Sufficiently Credentialed or Qualified to Administer Chemotherapy Without Continuous Direct Supervision

Defendants acknowledge that it is material whether the oncology nurses are trained and qualified. A physician's presence is required in the chemotherapy room throughout the administration of chemotherapy unless the nurse administering the chemotherapy and performing all of the related tasks and skills has met the necessary training and qualification criteria. Nurses must be specifically trained in antineoplastic administration procedures. Declaration of Jonathan K. Cho, M.D. Declaration of Nancy Bookbinder ("Bookbinder Decl.").[8] Licensure as a registered nurse or physician assistant, and certification as an oncology-certified nurse are highly desirable. *Id.* For example, for certification registered nurses must learn and be tested upon, *inter alia*, pharmacology of cytotoxic and immunologic agents, principles of safe preparation, storage, labeling, and disposal of chemotherapeutic, proper use of personal protective equipment, monitoring patients receiving chemotherapy, and patient education on chemotherapy side effects and related symptom management. Bookbinder Decl. Additionally, nurses must achieve established training objectives and demonstrate their qualifications and ability. Defense Exhibit 9 ("Gelmann Decl.")

Neither of Defendants' oncologist declarants, Drs. Cho and Gellman, has given the opinion that any of the six nurses who were assigned to the Oncology Department was sufficiently trained and qualified. *See* Defense Exhibits 21 and 9

---

[8] Nationally-known expert Bookbinder has agreed to submit an expert report.

respectively. Defendants have attempted to get by without offering any objective proof, by alleging that the nurses had certain certificates without supporting documentation; or that they were qualified, supported only by the Declarations of three of the six nurses who were assigned to the KMC Oncology Department stating that they were qualified. Based upon the declarations the HPH-Entities submitted in support of their Motion, during the period from January, 2002 through at least September, 2003, Defendants did not employ any nurses in the Oncology Department who possessed any recognized certification. Bookbinder Decl.

      Plaintiffs requested copies of Defendants' personnel records for the nurses, and the protocols or policies and procedures for the administration of chemotherapy to ascertain whether Defendants had adequate and appropriate safeguards in place to ensure that no patient received a lethal dose of medication and that none were either under-dosed or overdosed. Defendants produced no personnel records or applicable protocols or policies and procedures in response, nor have Defendants provided this Court with objective proof that the nurses assigned to the KMC Oncology Department in fact met the necessary criteria.

    C.    Dr. Lockyer Became Suspicious That Defendants Were Intentionally <u>Misrepresenting the Facts of KMC Finances and Health Care Claims</u>
      Plaintiffs hereby incorporate their Opposition to Defendant Lee A.

Evslin's Motion for Summary Judgment on Plaintiff Lockyer's Second, Third, and Fourth Claims for Relief ("Evslin Motion"), filed March 9, 2007 ("Evslin

Opposition"), wherein they have set forth a more detailed chronology of the events

which gave rise to Dr. Lockyer's suspicions that Defendants were engaged in fraud

with the claims the submitted under his medical identity.  In summary, the scheme

to defraud health care benefit programs began to surface after Dr. Lockyer first

suggested in August 2000, and subsequently openly lobbied for, a financial audit

of KMC's books.  Lockyer Decl.  Dr. Lockyer's employment agreement with

Defendant KMC provided that his compensation be based upon Defendants'

receipts from the professional services he provided.  *Id.*  Defendant Evslin visited

Dr. Lockyer in his office with summary reports of the claims and receipts KMC

had allegedly submitted and received on account of his services in the preceding

months.  *Id.*  Dr. Lockyer disbelieved the accuracy of the summary reports, partly

because the collection ratios seemed inordinately low.  *Id.*  Defendant Evslin

declined to allow Dr. Lockyer access to a detailed listing of claims and claims

information.  *Id.*

Facts eventually confirmed the suspicions Dr. Lockyer had formed as

a result of Defendant Evslin's ban prohibiting the physicians from reviewing actual

claims.  One day in approximately February 2002, a KMC-employed clerk

involved with claims processing complained to Dr. Lockyer  that she was told to

"forget" about a report she made about claims Evslin/KMC submitted for a

physician who had long since left KMC's employ.  *Id.*  Based on the facts related

to him, Dr. Lockyer was suspicious that the claims were false because no services had been provided in connection with them. *Id.* He thus concluded he had a duty to report his concerns and began searching for an attorney. *Id.*

Dr. Lockyer believed that a financial audit would necessarily discover not only receipts underreporting, but medical identity theft, claims for services not provided or not for the actual services provided, and other abuses suggested by the facts he was observing. *Id.* After August 2000, Dr. Lockyer suggested to physicians that Defendant KMC's books should be audited. *Id.* At a December, 2001, Internal Medicine Department meeting, Dr. Lockyer argued publicly to other physicians in his Department, including the Department chairperson and KMC Executive Committee member, Neal Sutherland, M.D., that they should hire their own outside auditor to conduct a full forensic audit to help them investigate their various complaints and issues. *Id.* Dr. Sutherland warned that Defendant Evslin would be displeased. *Id.*

1.    Defendant Evslin's Attempts to Coerce the Internal Medicine
Department Physicians to Sign Chemotherapy Patient Charts
<u>Raised</u> <u>Dr. Lockyer's Suspicious About Oncology Claims</u>

Sometime in Spring 2002, around the time John Hayward, M.D., the KMC-employed oncologist resigned, Defendant Evslin asked the six internal medicine subspecialty physicians to sign chemotherapy patient medical chart notes and labs at the end of the day when Dr. Sutherland, the internist covering

13

oncology, was absent. *Id.*; Braun Decl.; Netzer Decl. After they began reviewing the notes they were being asked to sign without the benefit of the full charts, the physicians objected and refused to comply because Defendant Evslin was unwilling to address their quality of care concerns. *Id.* Defendant Evslin did not explain that claims were being submitted using their provider numbers or that they were deemed the supervisors for the chemotherapy room.

The chemotherapy problem, the Sutherland warning, and disparities in care and patient encounters, and Defendant Evslin's absolute refusals to allow Dr. Lockyer to examine the claims submitted for his own services made Dr. Lockyer more and more suspicious of that Defendants Evslin and KMC were engaged in intentional fraudulent schemes involving medical identity theft and excessive or improper claims, and that Defendant Evslin was harassing him because he insisted on inciting the KMC physicians to call for a forensic audit. *Id.*

Defendants never provided access to any source documents or medical charts and related materials in the arbitration, but after Dr. Lockyer compelled them in arbitration to provide him with lists of claims he found that Defendants were failing to credit him with the receipts on a number of claims. *Id.* Dr. Lockyer found listed numerous chemotherapy-related claims for patient encounters he never had, with patients he had never met. *Id.* In response to his challenges to the chemotherapy claims, Defendants provided the Shimonishi

14

Affidavit which denies that Dr. Lockyer had provided any professional services on which the claims were based.

Just as he recognized the potential abuses that could take place when physicians were denied the right to review claims submitted under their medical identities, Dr. Lockyer recognized that claims Defendants denied were for services he provided were false under the meaning of the False Claims Act. The Complaint and Disclosure identify the claims the Shimonishi Affidavit refers to which Defendants submitted to Medicare using his provider number for patients he did not know or had not seen when the services were allegedly provided. *Id.* All of the claims were for chemotherapy or erythropoietin shots he did not order or administer, and none of which were for an office visit type of patient encounter. *Id.* Defendants had also submitted claims to other health care benefit programs for chemotherapy or erythropoietin shots for patients Dr. Lockyer had not seen. *Id.*

Dr. Lockyer filed the Complaint with Disclosure Statement and Motion to File Under Seal in this matter on October 1, 2004, and duly served Plaintiff USA with the Complaint and Disclosure Statement on October 8, 2004 after the Motion to Seal was granted. The USA filed its Notice of Election to Intervene January 27, 2006, together with an Order unsealing the Complaint, which the Court entered that same day.

> 2.    Dr. Lockyer's Inquiries About Defendants' Misuse of His
>        <u>Provider Number Caused Them To Change Their Practices</u>

Defendants changed their conduct after taking the position that the chemotherapy claims involved no professional services by Dr. Lockyer,[9] and he objected that Defendants had fraudulently submitted claims for chemotherapy administration without his knowledge or consent.  Lockyer Decl.  Although Defendants have blocked discovery, Plaintiffs have acquired data showing that the chemotherapy claims under the medical identities of the KMC Internal Medicine Department physicians were approximately the same in number during 2001 and 2002, and dropped by over 40% in 2003.

     D.    Defendants Continue to Delay and Object to Plaintiffs' Discovery of Material Facts and Evidence

With less than seven months remaining before trial, Defendants have not substantially satisfied Plaintiffs' initial discovery requests and continue to obstruct the discovery process.

DEEFENDANTS HISTORY OF DELAY

Defendants requested an extension of time to answer the Complaint on the grounds that they wished to explore the possibility of an early settlement. Plaintiffs agreed to make an informal presentation of their case on January 17, 2006 at the U.S. Attorney's offices.  Defendants delayed.  The parties eventually met at the U.S. Attorney's offices on February 23, 2006.  Plaintiffs advised that they were ready to proceed immediately with an investigation, live interviews, and

---

[9] Shimonisi Affidavit.

16

data collection and analysis of various areas of concern.  Defendants requested the investigation be delayed to afford them time to respond.

Defendants delayed the meeting for their response until May 16, 2006, during which time Mr. Rauzi contacted CMS staff and misled them as set forth in the USA's Opposition Memorandum to the Motion, which Plaintiffs adopt and incorporate herein to avoid repetition.  Defendants first presented Bernard Fong, M.D., retired medical director for Noridan Administrative Services, Medicare's contracted carrier in Hawai`i for Part A and Part B.  Dr. Fong had nothing to say indicating that Defendants had apprised him of the circumstances that are the basis for Plaintiffs' claims.

The meeting was promptly concluded when Mr. Rauzi presented copies of an e-mail communication showing that he had inappropriately communicated with CMS staff without permission from the U.S. Attorney. Defendants requested more time to consider Plaintiffs' comments and further extension of time to file their respective answers to the Complaint until June 20, 2006.

The HPH Defendants served their first discovery requests August 25, 2006, to which Plaintiffs timely and duly responded.  Defendants deposed Dr. Lockyer.  Plaintiffs also provided Defendants copies of all sealed documents in time for their deposition of Dr. Lockyer.  Having satisfied their discovery needs,

17

Defendants filed their respective Motions for Summary Judgment, while delaying and blocking Plaintiffs' access to relevant documents and information they required to conduct depositions. Plaintiffs served their first set of discovery requests on September 20, 2006. Plaintiffs filed a Motion for Extension of Time to Complete Discovery on December 28, 2006, and by January 3, 2007, all Defendants had joined in that Motion which the Court resolved by continuing trial and discovery cut-off.

II.    THE HPH-ENTITIES' MOTION ATTEMPTS TO MISLEAD

On December 22, 2006, the HPH Entities filed their Motion for Summary Judgment, together with their Memorandum in Support and twenty-one "exhibits" among which were various declarations and also document exhibits, which they subsequently amended January 23, 2007. Defendant Evslin filed a Motion for Joinder in the HPH-Entities' Motion for Summary Judgment on December 27, 2006. The Motion was set for February 20, 2007 and subsequently continued to March 27, 2007 at 10:30 a.m.

Defendants' Motion uses half-truths, mischaracterizations, and outright falsehoods to support their attempt to justify their fraudulent conduct ex post facto, which only serves to show that their request for summary judgment is both ill-timed and ill-conceived. The primary statements and declarations submitted in support of Defendants' Motion are either false, unsupported, or

misrepresented as follows:

Edwin D. Rauzi, in his e-mail dated April 21, 2006 (Defense Exhibit 7), represents to an unsuspecting Terrance L. Kay at CMS: "Pursuant to our call today, I seek policy guidance from CMS concerning the 'incident to' rules in the context of providing chemotherapy. My request deals with general policies, and not as applied in a particular case." Defense Exhibit 7 at 6. That representation was materially false and misleading. Mr. Kay forwarded Rauzi's e-mail to John Warren, CMS Acting Director of the Division of Practitioner Services. *Id.* at 5. Rauzi subsequently e-mailed Mr. Kay: "John Warren did not get back to me and is out of the office until May 15th. Unfortunately, that is the date when need the advice." *Id.* The reference was to the meeting Defendants had scheduled with Plaintiffs' counsel to present a response to Plaintiffs February 23, 2006 presentation. Rauzi brought a copy of the April 21, 2006 e-mail Ms. Shannon's response (omitting the intervening correspondence) to the May 16, 2006 meeting.

First, the Rauzi hypothetical on which Defendants now rely for their argument provides relevant admissions as to the circumstances that did exist during the relevant period.

> [T]he Group submits claims to Medicare for the chemotherapy with the following characteristics--
> • the Group uses a CMS-1500 form
> • in field 31 of the CMS-1500 form, the Group's billing office inserts the UPIN of the internal medicine physician/employee

19

• the signature of the physician is indicated to be "on file"
• the form includes claims for chemotherapy drugs (e.g., the J code for
rituximab), chemotherapy administration (e.g., CPT 96410) and,
occasionally, a CPT 99211 for something "extra" done by the
oncology nurse. . . .
• Medicare pays for the items and services provided to the oncology
patient on the day that the oncologist was out of the area
• the payment is made to the Group

P.S. Does the answer change if the internal medicine physician goes
to lunch in the cafeteria of the adjoining hospital during a
chemotherapy session that extends over several hours?[10] Does it help
that there is "always" one of the Group's employed physicians in the
building where the chemotherapy suite is located?

Defense Exhibit 7 at 6.  The circumstances at KMC during the relevant

period did not differ materially from those stated in the e-mail.  The Rauzi

hypothetical differs, however, in the following material respects from the

circumstances that existed at KMC during the relevant period:

5. the Group employs nurses who are experienced in providing
chemotherapy

Defense Exhibit 7 at 6.  Rauzi failed to disclose to CMS that it is the nurses who

have concluded they are experienced, not an objective review.  The experience and

qualifications of the actual nurses Defendants allege were assigned to the

Oncology Department is set forth in Defense Exhibits 1, 2, 3, and 5, and it must be

assumed to comprise the sum total of the evidence because Defendants have

prevented Plaintiffs' experts from examining their personnel files on the basis of

alleged privacy grounds.  The Defense Exhibits pertaining to the nurses'

_____

[10] Wilcox Hospital does not "adjoin" the KMC clinic building.  Lockyer Decl.

experience provide no admissible evidence to support the nurses' own opinions.

> 9. the Group either asks an employed general practitioner in internal medicine (who agrees) or assigns/instructs an employed general practitioner to "cover" or "be on call" for the chemotherapy suite on a day when the oncologist is out of the area. The internal medicine practitioner does not protest.

Defense Exhibit 7 at 6. Rauzi's e-mail suggests that the doctors who were asked to "cover" the chemotherapy suite were asked in advance: "The internal medicine practitioner does not protest." That is not factually consistent with the actual circumstances. Dr. Lockyer's medical assistant, who was responsible for keeping track of his assignments, also denies in her attached Declaration that he was assigned to "cover" the chemotherapy room. In their attached Declarations, Drs. Lockyer, Braun, and Netzer deny that they were ever asked on any particular day to "cover" the chemotherapy suite. Defendants nonetheless used their medical identities without their permission to submit claims for chemotherapy.

Defendants also failed to submit admissible evidence from which a jury could conclude that there was continuous supervision. Dr. McKnight has not declared that he was always present during the administration of chemotherapy on occasions when the Dr. Grace Inouye made an "informal verbal request" for coverage. Defense Exhibit 6, Declaration of Larry McKnight, M.D. Dr. McKnight's Declaration is silent on the relevant period prior to July 2003 when Dr. Inouye was hired. Lockyer Decl. The omission must be construed against

Defendants. Dr. Lockyer had challenged the false chemotherapy claims months

prior to Dr. Inouye being hired. *Id.* Dr. McKnight's statement that he remembered

"Drs. Braun, Sutherland and Lockyer covering the chemotherapy suite on

occasion. . . ." is silent as to when, which is essential to relate it to the dispute.

Drs. Cho and Gelmann, whose declarations Defendants submitted

with their Motion as Exhibits 21 and 9 respectively, were misled about the

circumstances. Exhibit 21 states:

> 3. It is common practice in our community for patients
> who are treated in cancer chemotherapy infusion centers, **which are
> part of the hospital**, not to have the treating oncologist physically
> present during the time that chemotherapy is being administered.
> Instead, the oncology nurses monitor the patient during the treatment
> session. Should there be a medical emergency, the nurses are trained
> to initiate appropriate treatment measures and to call physicians, such
> as, hospitalists, emergency room physicians, who are physically
> present **in the hospital**. The oncology nurses who administer
> chemotherapy are capable in identifying less severe side effects that
> may be the result of the treatments. They in turn will notify the
> treating oncologist.

Defense Exhibit 21 (emphasis added).[11] The standards, and Medicare supervision

requirements, for office-based chemotherapy infusion rooms are materially

---

[11] Dr. Gelmann's opinion is simply not relevant as he is not in private practice in
circumstances which are similar to the circumstances at KMC: "I have served as
Chief of the Division of Clinical Sciences in the Department of Oncology since
1999." Defense Exhibit 9. Dr. Gelmann no longer teaches at the Georgetown
University Medical School, but while he was at Georgetown, he saw patients at the
Lombardi Clinic along with faculty colleagues and did not have a medical office-
based practice. Lockyer Decl.

different.[12]  Dr. Cho has thus clarified his opinion in the Declaration attached to

this Opposition as follows:

> 7.     A medical oncologist is not ordinarily present
> when a trained and qualified oncology nurse administers
> chemotherapy to patient <u>in a hospital-based chemotherapy infusion
> center</u>, as physicians are always present and available in the hospital.
> 8.     The standard in medical office-based
> chemotherapy infusion suites <u>is different</u> in that an oncology nurse
> must be supervised at all times by a licensed physician when the
> oncology nurse is administering chemotherapy.  I know of no one in
> the medical oncology community in Hawai`i who would disagree.

Cho Declaration (emphasis added).

Defense Exhibits 21 and 9 indicate that Defendants asked Drs. Cho

and Gelmann to give opinions concerning oncology nurse qualifications.  Defense

Exhibits 21 and 9 appear to be providing general standard of care information as

they give no indication that Defendants disclosed the qualifications or lack thereof

of the nurses assigned to the KMC Oncology Department during the relevant

period.  Defendants' Motion invites the Court to conclude that the nurses were

qualified but fails to provide substantive proof.  Ms. Bookbinder that it "appears

from Defendants' submissions with their Motion, because it is not possible to

determine whether the nurses were properly qualified, that there was a substantial

---

[12] Rauzi e-mail requests a general policy statement for a medical office-based
chemotherapy infusion suite, not a hospital-based infusion center to which Drs.
Cho and Gelmann refer, and the e-mailed request was referred to the Acting
Director of **Practitioner Services**, NOT <u>Provider Services</u> as it would have been
had the request concerned a hospital-based infusion center.  Defense Exhibit 7 at 5.

period of time from January 2002 until at least October 2003, and possibly even until April 2004 or later, during which chemotherapy was mixed by staff without appropriate certification." Bookbinder Decl.  Defendants' Motion fails to address the question "what then?" The foregoing Declarations demonstrate that there may have been substantial periods of time during which Defendants were not permitted to simply have a physician somewhere on the second floor of the KMC building if chemotherapy was being administered as they have asked this Court to accept, and even times when the oncologist was not absent where Defendants submitted claims that violated Medicare billing regulations.

Further, Dr. Lockyer is the authority on the meaning of any additions he made to a medical record, and his testimony may not be dismissed as "self-serving" or uncorroborated.  He categorically denies, for the reasons set forth in his Declaration, the meaning Defendants have attempted to ascribe to the copies of medical records in Defendants' Exhibits 11-20.   Conspicuously absent are any declarations by the internists themselves that corroborate Defendants' allegations.

### III.   STANDARD OF REVIEW

The HPH-Entity Defendants should be granted summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56.  The facts must be construed in a light most favorable to Plaintiffs as the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574, 587 (1986). The HPH-Entity Defendants, as movant, bear the initial burden of directing this Court to the determinative issues and the available evidence that pertains to each. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (holding, "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact.").  The HPH-Entity Defendants do not bear the burden of proof at trial and thus they must demonstrate that there is an absence of evidence to support Plaintiffs' case. *United States v. Idaho Falls Assocs.*, 81 F. Supp. 2d 1033, 1038 (D. Idaho 1999) (citing *Celotex Corp.*, 477 U.S. at 325).

If a reasonable jury could return a verdict for Plaintiffs, a genuine issue of material fact is presented.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must not "resolve factual disputes by weighing conflicting evidence...since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is improper even if the Court believes it unlikely that Plaintiffs

25

will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir. 1962). Furthermore, "[i]t is axiomatic that Rule 56 must be used carefully so as not improperly to foreclose trial." *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).

Defendants urge this Court to violate a fundamental tenet of Rule 56, to weigh and decide the probative value of conflicting testimony on an issue on which the case turns. That would be a matter for the jury even if Plaintiff Lockyer's Declaratory statements stood alone against the declarations of the three nurses, and were not corroborated by the Declarations of Drs. Braun and Netzer, and of his medical assistant.

IV.     THE REGULATIONS AND THE LAW AND LEGAL STANDARD

This is not a dispute about the applicable law or regulations, but about the facts, and thus it is inappropriate for summary judgment.

The parties agree that Defendants were required to comply with Medicare's "incident to" rules in order to submit the 359 claims identified in Plaintiffs' Complaint. The incident to rules presume that the circumstances meet the standard of care and that non-physician personnel are licensed and qualified to carry out all of the services they perform. Defendants' Motion attempts to address the issue because Plaintiffs' Complaint clearly alleges Defendants submitted claims for physician services provided by non-physician personnel <u>which they</u>

26

were not qualified to perform.  Under such circumstances, the supervising

physician must be present in the room or perform the service.  Thus, for example,

Medicare will not pay for a nurse performing minor surgery in an office under the

incident to or any other rule.  This case is not as simple as Defendants have

attempted to make out.  It concerns the propriety of leaving the nurses on their own

and in charge of mixing dangerous chemicals and injecting them in human

patients.  Qualifications were essential.

       The parties agree that the chemotherapy in issue was administered in a

medical office, implicating Medicare Part B:  "(b) Medicare Part B pays for

services and supplies incident to the service of a physician (or other practitioner).

(1) Services and supplies must be furnished in a noninstitutional setting to

noninstitutional patients."  42 C.F.R. § 410.26(b) (2002).  All references by

Defendants or their declarants to rules governing hospital-based infusion centers

must be disregarded as inapposite.[13]  The regulations and the Medicare manuals set

forth conditions that must be satisfied for Part B services before any item or

service will be covered by Medicare as an incident-to service.  One of the

requirements is that the items and services must be furnished under the "direct

---

[13] For example, Dr. Cho stated that infusion center nurses could call physicians
who are physically present in the hospital.  Defense Exhibit 21.

supervision" of a physician. 42 C.F.R. § 410.26(b)(5).[14]  Direct supervision is

defined in the office setting as meaning that "the physician must be present in the

office suite and immediately available to furnish assistance throughout the

performance of the procedure."  42 C.F.R. § 410.26(a)(2) (incorporating the

definition at 42 C.F.R. § 410.32(b)(3)(ii)[15]).

   If the physician who supervises the drug administration service is not

the same physician who is treating the patient and ordered the service, the names of

both physicians must appear on the claim form that is submitted to Medicare for

payment.  The name of the ordering physician is entered on the form as the

"referring physician," and the supervising physician is required to sign the form.

EXHIBIT 1.  The signature of the supervising physician indicates that the

supervising physician agrees with the statement:  "I certify that the statements on

the reverse apply to this bill and are made a part thereof."  On the back of the form,

it states in part:  "I certify that the services shown on this form were medically

indicated and necessary for the health of the patient and were personally furnished

by me or were furnished incident to my professional service by my employee

---

[14] Stark law prohibits the making of claims unless physicians directly supervises the staff.  42 U.S.C. § 1395nn.  Stark regulations require compliance with Medicare's incident to rule in § 410.26.  *See* 42 C.F.R. § 411.355(b)(1)(iii)

[15] (ii) Direct supervision in the office setting means the physician must present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present the room when the procedure is performed.

under my immediate personal supervision, except as otherwise expressly permitted

by Medicare or CHAMPUS regulations." A false certification is actionable under

the False Claims Act (FCA), 31 U.S.C. §§ 3729, et seq.  The four elements of the

false certification are a false statement, scienter, materiality, and the actual

submission of a claim. [16]

Defendants concede, as they must, that the FCA allows recovery

against any person who:

> (1) knowingly presents, or causes to be presented, to an officer
> or employee of the United States Government ... a false or fraudulent claim
> for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a
> false record or statement to get a false or fraudulent claim paid or approved
> by the Government;
> (3) conspires to defraud the Government by getting a false or
> fraudulent claim allowed or paid . . . .

31 U.S.C. §§ 3729(a)(1)-(3). Specific intent to defraud the government is not

required.  It is enough to show that Defendants had "actual knowledge of the

information," or act "in deliberate ignorance of the truth or falsity of the

information," or act "in reckless disregard of the truth or falsity of the

information." 31 U.S.C. § 3729(b).

Defendants further concede that claims made to Medicare violate the

FCA if they are furnished in violation of some controlling rule, regulation or

standard." *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006).

---

[16] *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)

Thus, if the jury finds that they violated the incident to rule, or that the nurses were

unqualified and had to be personally supervised, the 359 claims were false claims,

and any claims for office visits Defendants submitted for the same patient's

chemotherapy.  There are many more.  Discovery may uncover five or six times as

many such claims because Defendants used the provider numbers of all of the

internists to submit claims to Medicare for chemotherapy, plus discovery may

disclose additional violations underlying Defendant Evslin's ban on reviewing.

V.     DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT
       BECAUSE MATERIAL FACTS ARE GENUINELY IN DISPUTE

Defendants have admitted they must succeed at the facially daunting

task of "demonstrating" to the Court that it was lawful for them to use Dr.

Lockyer's provider number without his permission to submit claims to Medicare

for patients he never saw, and some patients he never even knew; and it was lawful

to bill for labwork that was never read by an oncologist prior to the administration

of chemotherapy.  Unfortunately for Defendants, that substantially understates

their obligations, a fact their Motion impliedly concedes.  Cancer patients entrusted

their care to Defendants.  Inherent in that trust was faith in the oncology staff, that

they were properly trained and supervised.   Even if the evidence showed that the

chemotherapy was administered under supervision, the supervision must be

appropriate to the qualifications of the oncology nurses.  Defendants' Motion

alleges that the oncology nurses were properly trained and supervised.  For proof

they offer the opinion of the nurses themselves.  Ms. Bookbinder is unable to

conclude that the nurses were qualified based upon the evidence before the Court.

Defendants admit that Defendant Evslin asked the internists to sign

the lab results, but offer no explanation why they thought that necessary.  Therein

lies the problem because Drs. Braun and Lockyer were so concerned by the lab

results they were asked to sign that they labored for hours over them and

eventually felt ethically compelled to refuse.  Braun Decl; Lockyer Decl.

Defendants' assertion that the nurses were qualified must thus be subjected to

further scrutiny.

1.    For Supervision, the Essential Element is Awareness

Conspicuously absent from Defendants' Motion is proof that the

internists had any idea whatsoever that Defendants were submitting claims to

Medicare using their medical identities prior to the meeting in Spring 2002 when

Defendant Evslin started pressuring them to sign off on progress notes and

labwork.  Even if that is broadly construed as a request or command that the

internists supervise chemotherapy, the internists attempted it and rejected it.

Subsequent claims were clearly false and violated 31 U.S.C. § 3729(a)(1) because

they used the internists' provider numbers without their knowledge after they had

expressly declined.

The Spring 2002 meeting raises the question, why did Defendants

31

need to have the internists "sign-off" on the progress charting and labwork, unless it was to create evidence of supervision?   It also highlights the absence of prior discussions during a period when Defendants submitted hundreds of claims to Medicare and other payors under Dr. Lockyer's medical identity.  Evslin Opposition; Lockyer Decl.  Those claims violated 31 U.S.C. § 3729(a)(1) because Dr. Lockyer was unaware that he could not leave the second floor during chemotherapy administration, and likely did respond to hospital emergencies and for various reasons.  Noridian's "5-minute rule" offers no salvation, Defense Memo at 19, because he was unaware and thus could have been 30 minutes away.

Defendants have changed rationales whenever it suits them.  In Spring 2002, Defendant Evslin just needed the internists to be "team players" and sign off as professionals on chemotherapy progress notes and labs without disclosing that claims were being submitted under their provider numbers.  In January 2003, it suited them to deny that Dr. Lockyer had performed any professional services justifying those claims:

> 10. Column E is a small portion of the chemotherapy drug and administration receipts. Under a strict reading of the Employment Agreement, Column E should not be included in the calculation because it is not received "on account of professional services rendered" by the physician.

Shimonishi Affidavit at ¶ 10. (Emphasis added.)  Now that the question is whether Dr. Lockyer and the other internists knew and agreed to perform the professional

services of supervising the chemotherapy room, Defendants meant that all along.

The Rauzi e-mail admits that prior to April 2006, Defendants did not have the answers to the essential questions whether the supervision for chemotherapy administration they now claim was present was sufficient:

> P.S. Does the answer change if the internal medicine physician goes to lunch in the cafeteria of the adjoining hospital during a chemotherapy session that extends over several hours? Does it help that there is "always" one of the Group's employed physicians in the building where the chemotherapy suite is located?

The clear answer found in Medicare's regulations is "No."  "The physician must be present in the office suite and immediately available to furnish assistance throughout the performance of the procedure."  42 C.F.R. § 410.32(b)(3)(ii)).  If the internal medicine physician goes to lunch in the hospital, a several minute walk from the clinic, during a chemotherapy administration, he is not in the office suite, and Medicare does not cover. *See* EXHIBIT 1.  Plaintiffs have already established two dates on which Defendants submitted claims under Dr. Lockyer's provider number when he was absent.  Evslin Opposition. Discovery Plaintiffs have been thus far deprived of is expected to show that the requirement of presence was not met.

### 2.    Certification Also Requires Awareness

A physician must at all times be freely permitted to review every claim submitted to Medicare under his or her provider number, or those claims,

33

whether paper or electronic, are potentially false where they indicate the foregoing

certification.  Conspicuously absent from Defendants' Motion is evidence that the

internists had free and unfettered access to all claims Defendants were submitting

using their provider numbers so that they could satisfy themselves at any time that

their certifications were truthful. The 359 claims Defendants submitted to

Medicare for chemotherapy administration under Dr. Lockyer's provider number

were false claims because they failed to meet Medicare coverage requirements and

because they contained a false certification.  EXHIBIT 1 at 1.  As Mr. Coleman

states, a physician may not take care to be in the office suite and immediately

available to provide assistance without any absences during the administration of

chemotherapy if he or she is unaware of being assigned to supervise services.  *Id.*

Furthermore, a physician cannot agree under such circumstances with the required

certification for the submission of claims to Medicare because it would be false.

*See* EXHIBIT 1.  Plaintiffs confirmed 359 Medicare received and paid under Dr.

Lockyer's provider number which he never certified or intended to certify that the

services "were personally furnished by me or were furnished incident to my

professional service by my employee under my immediate personal supervision."

Lockyer Decl. Thus, those claims were false, in violation of 31 U.S.C. § 3729(a)(2)

because they made use of a statement which could not be true, the foregoing

certification, to get a false or fraudulent claim paid or approved by the

Government.

      3.     A Reasonable Jury Could Determine That All Required
              Elements For a Retaliation Claim Are Met

For the reasons set forth in the Evslin Opposition, Defendants are not

entitled to summary judgment on Dr. Lockyer's retaliation claims. Dr. Lockyer's

simple insistence that he be allowed to see the data underlying Defendant Evslin's

manufactured compensation reports, and the potential fallout therefrom, was the

real reason Defendant Evslin retaliated against him by repeatedly slashing his

compensation, and relentlessly harassed him for over two years. Defendant Evslin

abjectly refused to permit Dr. Lockyer to see any data underlying his manufactured

reports until Dr. Lockyer had to compel him to turn them over in arbitration.

      Dr. Lockyer's reasons for insisting on being allowed to examine every

claim Evslin/KMC submitted under his provider number are unchallenged by

anything more than unsupported speculation. For summary judgment, Defendants

were required to show the absence of evidence to support Dr. Lockyer's position

that he was engaged in protected conduct, which they failed to do.

CONCLUSION

      For all of the foregoing reasons, this Court should DENY Defendants

Hawaii Pacific Health, Kauai Medical Clinic, Wilcox Hospital, and Wilcox Health

System's Motion for Summary Judgment.

DATED:     Honolulu, Hawaii, March 9, 2007

35

// Rafael del Castillo

JANICE P. KIM
ARLEEN D. JOUXSON
RAFAEL G. DEL CASTILLO

Attorneys for Plaintiff
JAMES LOCKYER, M.D.