IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf,<br><br>　　　　　Plaintiffs,<br>vs.<br><br>HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; AND WILLIAM A. EVSLIN, M.D. AKA LEE A. EVSLIN, M.D.<br>　　　　　Defendants. | CIVIL NO. CV 04-00596 ACK LEK<br>(Federal and State - Qui Tam)<br><br>DECLARATION OF MICHAEL S. BRAUN, M.D.; EXHIBITS B1-B3<br><br><br>HEARING<br><br>Date:　March 27, 2007<br>Time:　10:30 A.M.<br><br>Trial Date:　September 18, 2007<br>Judge:　Honorable Alan C. Kay |

DECLARATION OF MICHAEL S. BRAUN, M.D.

　　　　I, MICHAEL S. BRAUN, M.D., do hereby declare that the following facts are based on personal knowledge, and that I am competent to so testify:

　　　　1.　I am a physician licensed to practice medicine in the State of Hawai`i, and am over 18 years of age.

　　　　2.　I am a resident of the Island of Kauai.

　　　　3.　I am board certified in internal medicine.

　　　　4.　I was employed by Kauai Medical Clinic ("KMC") from October 1, 2000 to April 14, 2006.

5. I opened my own private internal medicine practice after I resigned from KMC.

6. My private practice collection ratio is materially better than it was when KMC was collecting receipts for my services while I was on KMC's staff.

7. I served as the chairperson of the Department of Internal Medicine while I was employed by KMC.

8. The following physicians were members of the Department of Internal Medicine during my employment with KMC:

Mary Pixler, M.D.
James Lockyer, M.D.
Larry McKnight, M.D.
Diane Noyes, M.D.
R. Craig Netzer, M.D.
Arnulfo Diaz, M.D.
Douglas Duvauchelle, M.D.
Neal G. Sutherland, M.D.

9. There was no call schedule for the chemotherapy suite. I was assigned to sign the chemotherapy charts at the end of the day. I was not present in the chemotherapy suite during the administration of the chemotherapy but was in the adjacent area seeing my Internal Medicine Clinic patients.

10. Chemotherapy medical charts were left outside my door which I was expected to sign. I was never asked to "cover" the chemotherapy room for the day the when the charts were left outside my office.

11. No one ever had my permission to use my provider number to submit claims for the administration of chemotherapy.

12. On or around January, 2002, Dr. Sutherland left the Department of Internal Medicine to become the KMC oncologist.

13. Dr. Sutherland took over oncology after John Hayward, M.D. resigned from KMC.

14. KMC eventually hired Grace Inouye, M.D. for oncology. Dr. Sutherland remained in the Oncology Department and did not return to the Internal Medicine Department after KMC hired Dr. Inouye.

15. Sometime in the Spring of 2002, Dr. Evslin asked to meet with the Internal Medicine Department, at which time he requested that the internal medicine physicians "cover" chemotherapy patients when Dr. Sutherland was absent. We (the internists) objected on the grounds that we had our own full work load of scheduled patients.

16. Dr. Evslin responded that all he was asking us to do was sign all of the charts for chemotherapy patients at the end of the day, and "sign off" on all labs.

17. We again objected, raising patient safety concerns and questioning whether we could sign off on the charts of patients that we never saw for chemotherapy we had not ordered. We reached no consensus.

18. Within days of the aforementioned meeting, I found that someone had deposited stacks of chemotherapy patient charts outside of my office.

19. I remained after clinic hours until about 11:00 p.m. reviewing the charts and lab reports of patients unknown to me, and became convinced that it was inappropriate for me to be signifying anything with respect to the labs, many of which reported extreme results which I would have been unable to say were acceptable for the patient.

20. Dr. Lockyer reported to me that he had decided to decline to sign chemotherapy patient charts and labs after reviewing a number of them, as did other internists in the KMC Internal Medicine Department.

21. I agreed to meet at KMC during the first week of March, 2006, with an attorney from Seattle who identified himself as "Ed Rauzi" and said he was KMC's attorney.

22. Mr. Rauzi told me during the interview that the "FBI was trying to act like Al Capone had moved to Lihue."

23. I related the facts stated in numbers 14 through 22 above to Mr. Rauzi. He asked me why the internists had refused to stay after clinic hours to sign a few charts. I responded that it was inappropriate and potentially dangerous for non-oncologists to be monitoring treatment and reviewing labs on cancer patients who were unknown to me and whose full charts were not available to review after

hours. These patients typically exhibit white blood counts of 100,000 or a hematocrits of 19%, which are extremely abnormal results, and could be considered acceptable for one patient and life threatening for another depending on the individual treatment plan devised by the oncologist.

24. Mr. Rauzi also asked whether I believed that KMC had retaliated against Dr. Lockyer, and I confirmed that I did. Mr. Rauzi was shocked when I asked whether *he* thought that paying a full-time board certified internist only $10,000 a year would constitute retaliation.

25. I was present at a meeting of the physicians in the KMC Internal Medicine Department at Kilohana Restaurant in December 2001 when Dr. Lockyer called for the Department to hire a CPA to audit the billings and receipts, or to call for KMC to undergo an audit and report the results to us. Drs. Pixler (chair), Sutherland, Diaz, and McKnight were present at the meeting with Dr. Lockyer and me. There was a consensus that Dr. Evslin would never allow our Department to audit the books.

26. KMC held meetings ostensibly for the physicians to debate various issues and reach a consensus on the action to be taken or the position to adopt, but Dr. Evslin dominated these meetings by controlling the agenda, the debate, and the voting. The meetings were orchestrated to create the argument—and the impression for outside observers—that the actions which were actually

fiats, were the product of considered decisions reached by a group of professional peers.

27. I was present for at least one KMC Executive Board meeting and at least two or more Internal Medicine meetings, from which Dr. Evslin excluded Dr. Lockyer, at which Dr. Evslin lobbied the members to call for the termination of Dr. Lockyer's contract, and the members refused by a majority vote.

28. I also recall that either no minutes were made of those meetings, or the minutes attributed actions to one or the other of the physicians who had attended the meeting, when it was in fact Dr. Evslin who had raised the issue and his decision or position which had been accepted.

29. I was never asked to supervise the administration of chemotherapy in the oncology suite at KMC, nor did I ever accept such an assignment.

30. Once Dr. Evslin clarified that he was only asking the internists to sign chemotherapy patient charts and labs at the end of the day, I did not consider his request to be for supervision throughout the administration of chemotherapy in the oncology suite, or to be on call for oncology.

31. I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

32. I was never asked to be on call for the KMC oncology suite.

33. I never considered it among my duties or assignment as a KMC-employed internal medicine physician to supervise the administration of chemotherapy in the oncology suite at KMC.

34. I never arranged my schedule so that I would be in my office suite at KMC during the entire time chemotherapy was being administered in the oncology suite at KMC, nor was I ever asked to be present or to be immediately available to furnish assistance throughout the entire time chemotherapy was being administered in the oncology suite at KMC on any given day.

35. I had my own patients which I saw in my own office suite each day, and I was never asked to, nor did I, arrange my schedule such that I was available to immediately respond to an emergency in the oncology suite throughout the time chemotherapy was being administered on any particular day.

36. I had no particular knowledge or awareness of when chemotherapy was commenced or completed on any particular day in the oncology suite at KMC, nor did anyone ever make any effort that I know of to inform me of the goings-on in the chemotherapy room at KMC.

37. I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

> I certify that the services shown on this form were
> medically indicated and necessary for the health of

the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

I, MICHAEL S. BRAUN, M.D., do declare under penalty of law that the forgoing is true and correct.

DATED: Honolulu, Hawai`i, March 8, 2007

_Michael S. Braun_ 3/8/07

MICHAEL S. BRAUN, M.D.