IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf, | ) ) ) ) | CIVIL NO. CV 04-00596 ACK LEK (Federal and State - Qui Tam) DECLARATION OF R. CRAIG NETZER, M.D.; EXHIBITS N1-N5 |
|        Plaintiffs, | ) ) | |
| vs. | ) ) | |
| HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; AND WILLIAM A. EVSLIN, M.D. AKA LEE A. EVSLIN, M.D. | ) ) ) ) ) ) ) | HEARING Date:   March 27, 2007 Time:   10:30 A.M. |
|        Defendants. | ) ) ) | Trial Date:   September 18, 2007 Judge:   Honorable Alan C. Kay |

## DECLARATION OF R. CRAIG NETZER, M.D.

      I, R. CRAIG NETZER, M.D., do hereby declare that the following facts are based on personal knowledge, and that I am competent to so testify:

      1.     I am a physician licensed to practice medicine in the State of Hawai`i, and am over 18 years of age.

      2.     I am a resident of the Island of Kauai.

      3.     I hold dual board certifications: one in internal medicine and one in family practice.

      4.     I was employed by Kauai Medical Clinic ("KMC") from July 2002 to October 2004.

5.      I believe that KMC was materially underreporting the collections on claims for my services during my employment.

6.      I opened my own private internal medicine practice after I resigned from KMC.

7.      My private practice collection ratio is materially better than it was when KMC was collecting receipts for my services while I was on KMC's staff.

8.      I agreed to be interviewed during the first week of March, 2006, by an attorney whose name I do not have, but who said he was from Oregon and was representing KMC.

9.      The Oregon attorney asked whether I was familiar with the "cross-coverage for the chemotherapy room" and I confirmed that I was.

10.      I related that I was aware the Department of Internal Medicine had been asked, as a group, by Dr. Evslin to sign chemotherapy patient charts at the end of the day, but the group objected.  Dr. Evslin chided the group for being negative and not acting like team players.  The group ultimately refused to take part in the signing.

11.      I related other concerns I had about issues that appeared to me to be improper and contributed to my decision to resign.

12.    I also mentioned that Dr. Evslin repeatedly attempted to fire Dr. Lockyer or force him to resign without any legitimate grounds.  I was present for at least one Internal Medicine meeting in April 2004 at which Dr. Evslin lobbied for Dr. Lockyer's contract to be terminated.

13.    I was outraged at the April 2004 meeting because Dr. Evslin misrepresented to my internal medicine colleagues that I had called for the meeting, which was materially false, because Dr. Evslin had called the meeting. He had approached me by stating that there were some unaddressed concerns in the Internal Medicine Department, but did not specify the nature of the concerns.  I responded that departmental concerns should be addressed at a Departmental meeting.  Dr. Evslin then called the meeting, but excluded Dr. Lockyer, and attempted to persuade the Department members to call for Dr. Lockyer's contract to be terminated.

14.    The members of the Department rejected Dr. Evslin's attempts to terminate Dr. Lockyer's employment on more than one occasion.

15.    Never during the time I was employed by KMC did Dr. Evslin present any trustworthy grounds for terminating Dr. Lockyer.

16.    I was never asked to supervise the administration of chemotherapy in the oncology suite at KMC, nor did I ever accept such an assignment.

17.    I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

18.    I was never asked to be on call for the KMC oncology suite or to cover the KMC oncology suite during the clinic day.

19.    I never considered it among my duties or assignment as a KMC-employed physician to supervise the administration of chemotherapy in the oncology suite at KMC.

20.    I never arranged my schedule so that I would be in my office suite at KMC during the entire time chemotherapy was being administered in the oncology suite at KMC, nor was I ever asked to be present or to be immediately available to furnish assistance throughout the entire time chemotherapy was being administered in the oncology suite at KMC on any given day.

21.    I had my own patients which I saw in my own office suite each day, and I was never asked to, nor did I, arrange my schedule such that I was available to immediately respond to an emergency in the oncology suite throughout the time chemotherapy was being administered on any particular day.

22.    I have not measured the distance from my suite of exam rooms and private office to the chemotherapy room, but assuming I was in my office suite and able to respond to an announced emergency in the chemotherapy room, I

would have been required to navigate two fairly lengthy perpendicular corridors to arrive at the chemotherapy room.

23.     I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

24.     No one ever had my permission to say that I covered the chemotherapy suite or to use my provider number to submit claims for the administration of chemotherapy.

25.     On several occasions, I asked Lynn Joseph to confirm that KMC had never submitted any claims using my provider number for the administration of chemotherapy or any services or lab tests in connection with chemotherapy services I did not order.

26.     Ms. Joseph failed to confirm to my satisfaction that KMC had never submitted claims using my provider number for chemotherapy services, so I sent her a letter on November 27, 2006, requesting such confirmation.  A true and correct copy of my letter to Lynn Joseph is attached as Exhibit N1.

27.    I received a response from Ms. Joseph which I do not consider a sufficient confirmation. I have attached a copy of the response, dated December 27, 2006, to this Declaration as Exhibit N2.

28.    I dispute the allegation Nurse Carlozzi declared at paragraph 6 of her Declaration, attached hereto as Exhibit N3, that anyone "discussed" with me "ahead of time" that I was assigned to "cover" the chemotherapy room because that never happened. I see nothing in Nurse Carlozzi's Declaration alleging that she was ever personally present at such a discussion or ever spoke a word to me about "covering" the chemotherapy room. She never did.

29.    I further dispute the allegation by Nurse Carlozzi in paragraph 6 of Exhibit N3 that I was ever asked to cover the chemotherapy room on any day chemotherapy medical charts were left outside my door which I was expected to sign. I was never asked to "cover" the chemotherapy room for the day the when the charts were left outside my office.

30.    I dispute the allegation Nurse Carter declared in paragraph 5 of her Declaration, attached hereto as Exhibit N4, that she ever asked me about a borderline blood test result for a chemotherapy patient because I was the "covering physician" for the chemotherapy room.

31.    I dispute the allegation Nurse Carter declared at paragraph 7 of Exhibit N4, that "If the oncologist was not available, an internist from the Clinic

covered the chemotherapy suite." I do not know what Nurse Carter meant by the term "covered," but whatever she may have meant, I did not "cover" the chemotherapy suite.

32.    I dispute the allegation in Nurse Sally Diana's Declaration, attached hereto as Exhibit N5, that I was ever assigned by KMC administration "in advance to cover the chemotherapy suite." I do not know what Nurse Diana meant by the term "cover," but whatever she meant, no one ever asked me in advance to "cover" the chemotherapy suite.

33.    No one ever had my permission to say that I covered the chemotherapy suite or to use my provider number to submit claims for the administration of chemotherapy.

I, R. CRAIG NETZER, M.D., do declare under penalty of law that the forgoing is true and correct.

DATED: Honolulu, Hawai`i, March ___, 2007

R. CRAIG NETZER, M.D.

# R. Craig Netzer, M.D., Inc.
### 4473 Pahe'e Street, Suite O
### Lihue, HI 96766
### 808-246-2002

11/27/06

To:  Lynn Joseph
Corporate Compliance Officer
Hawaii Pacific Health

Re: Billing for Chemo services.


This is my formal request, in writing, for a specific answer to my question posed to you in July, and again in September, of this year.  Specifically, Has KMC/Wilcox/HPH billed for any chemotherapy services, or any other services, without my knowledge, or in a scenario where I was not directly involved in patient care.  Back in 2004, I received printed documents which referenced "chemo suite" charges.  When I asked Rick Robel and Bill Evslin what these charges were for, they were not able to answer me.  I have a copy of this document.

Could you please send me a written response to my querry.

Thank you for your attention to this matter.

3-3420B Kuhio Highway • Lihue, HI 96766    *Kauaʻi Medical Clinic*    (808) 245-1500 • wilcoxhealth.org

December 27, 2006

R. Craig Netzer, M.D.
4473 Pahe'e Street, Suite O
Lihue, HI 96766

Re:  Billing for Chemotherapy Services

Dear Dr. Netzer:

This letter is in response to your November 27, 2006 memorandum asking about
chemotherapy billing.  As I responded verbally to your previous requests, my search of
Kauai Medical Clinic records for 1999-2004 has not revealed any billing for supervising
chemotherapy using your UPIN.
You have twice referred to a document that you said that you would send to me that
references "chemo suite" charges.  I have not yet received a copy, but will look into your
concerns once I receive it.

Best wishes for the New Year.  Please call me if I may be of further assistance.

*Lynne Joseph*
Lynne Joseph
Compliance Officer

*An affiliate of Hawaii Pacific Health*

EXHIBIT N2

Of Counsel:
ROBBINS & ASSOCIATES
Attorneys at Law
A Law Corporation

KENNETH S. ROBBINS        1000-0
LEIGHTON M. HARA   7826-0
WENDY M. YAMAMOTO        8049-0
2200 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-2355
Facsimile: (808) 526-0290
Email: defend@robbinsandassociates.net

PATTON BOGGS LLP
Attorneys at Law

HARRY R. SILVER
2440 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6453
Facsimile: (202) 457-6315
Email:  hsilver@pattonboggs.com


Attorneys for Defendants
HAWAI'I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH SYSTEM

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES OF AMERICA      )
ex rel. JAMES LOCKYER, M.D.,        )
STATE OF HAWAII, ex rel. JAMES )        CIVIL NO. 04-00596 ACK LEK
LOCKYER, M.D., and JAMES          )        (Federal and State – Qui Tam)
LOCKYER, M.D., in his own behalf  )
                                                        )

EXHIBIT N3

4845709

<pre>
                    Plaintiffs,       )
                                      )
          v.                          )
                                      )
HAWAI'I PACIFIC HEALTH, et al.  )
                                      )
                    Defendants.       )
_____)
</pre>

## DECLARATION OF BETH CARLOZZI

I, Beth Carlozzi, do hereby declare that the following information is based on personal knowledge, that I am competent to so testify and that it is both true and correct.

1.  I was hired by Kauai Medical Clinic ("KMC") in 1995 after receiving my associate's degree in nursing.  I became an oncology nurse at KMC in 1996 and became oncology certified in 1998.  I worked at KMC until 2002.

2.  When I worked at KMC, a chemotherapy patient would have an initial consult with the oncologist, who at the time was Dr. Hayward.  Then, the oncologist would provide a written order for a chemotherapy patient setting forth the required blood tests and the types and amounts of chemotherapy to be administered.

3.  When a patient returned for chemotherapy, I would draw blood as ordered and review the results of the blood tests.  I would proceed with administering chemotherapy if the blood test results were normal.  If the blood test

results showed abnormalities, I would alert the physician of those abnormalities before proceeding with chemotherapy.

4. The oncologist would normally be in the office at the time a chemotherapy patient received treatment. If the oncologist was not available, another doctor in the Clinic would be assigned to "cover" for the oncologist.

5. Physicians in the Internal Medicine department of the Clinic, including Dr. Lockyer, covered the chemotherapy suite if the oncologist was not present on a certain day. The Internal Medicine suite is on the same floor as the chemotherapy suite.

6. The issue of who was covering was discussed with the physicians ahead of time and the physicians were aware of the process before it was implemented. I, and other nurses, would leave the medical charts with the physician who was covering the chemotherapy suite that day for his signature.

7. I recall Dr. Lockyer complaining about covering because he believed he should be paid more to do it.

8. Either the oncologist or a covering physician was always available when I and the other nurses administered chemotherapy. If no physician was available to cover, we would not administer chemotherapy.

9.   The most common potential side effects of chemotherapy are low white blood cell and/or red blood cell counts, nausea or vomiting, hypersensitivity reactions (which was rare), and diarrhea.

10. To the best of my knowledge, the responsibility of the covering physician was to be available in the case of an emergency.  If the blood results were within the range appropriate for chemotherapy and there are no side effects or emergencies resulting from chemotherapy, I can think of no reason why a covering physician would ever see the patient.

11. I never did, or saw, anything that in any way compromised patient care.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on December   *10*   , 2006.

*Beth Carlozzi*
Beth Carlozzi

Of Counsel:
ROBBINS & ASSOCIATES
Attorneys at Law
A Law Corporation

KENNETH S. ROBBINS        1000-0
LEIGHTON M. HARA   7826-0
WENDY M. YAMAMOTO        8049-0
2200 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-2355
Facsimile: (808) 526-0290
Email: defend@robbinsandassociates.net

PATTON BOGGS LLP
Attorneys at Law

HARRY R. SILVER
2550 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6453
Facsimile: (202) 457-6315
Email:  hsilver@pattonboggs.com

Attorneys for Defendants
HAWAI'I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH SYSTEM

Attorneys for Defendants
HAWAI'I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH SYSTEM

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

# EXHIBIT N4

4832430

UNITED STATES OF AMERICA )
ex rel. JAMES LOCKYER, M.D., )
STATE OF HAWAII, ex rel. JAMES )
LOCKYER, M.D., and JAMES )
LOCKYER, M.D., in his own behalf )
                                 )
           Plaintiffs, )
                                 )
           v. )
                                 )
HAWAI'I PACIFIC HEALTH, *et al.* )
                                 )
           Defendants. )
_____ )

CIVIL NO. 04-00596 ACK LEK
(Federal and State – Qui Tam)

## DECLARATION OF BETH CARTER

      I, Beth Carter, do hereby swear and affirm under the penalties of perjury that the following information is based on personal knowledge, that I am competent to so testify and that it is both true and correct.

      1.  I was employed by the Kauai Medical Clinic ("KMC") from 1997 through 2001 as a Registered Nurse and worked in the chemotherapy suite on occasion during that time. I worked in the ER from 2001 through 2003.

      2.  I returned to KMC in 2003 where I have worked as a nurse in the chemotherapy suite, except for approximately one year that I spent on maternity leave.

      3.  As a nurse in the chemotherapy suite, I received on-the-job training from other oncology nurses and attended a two-day course on treatment of chemotherapy patients. After completing the required hours of on-the-job training,

I was eligible to become certified as an oncology nurse. I passed the certification test in 2004.

4. During the time I worked at KMC's chemotherapy suite it was the normal procedure for the oncologist to provide a written order for a chemotherapy patient setting forth the required blood tests before administration of chemotherapy, the parameters of the blood test results for administration of chemotherapy, and the types and amounts of chemotherapy to be administered.

5. I would normally draw blood and send the blood to the lab for testing within 24 hours of treatment. Once the results came back, I reviewed the results and compared them with the parameters provided by the oncologist in the order. I am very familiar with the appropriate parameters from my training and my experience. If the blood tests results fell within the appropriate range, I did not need to consult a physician before proceeding with chemotherapy. If the results were borderline, I would check with the oncologist or covering physician before administering chemotherapy.

6. Once the blood tests confirmed that a patient was eligible for chemotherapy that day, I prepared the chemotherapy drugs as specified in the oncologist's order.

7. It was the normal procedure at KMC's chemotherapy suite for an oncologist to be in the office at the time a chemotherapy patient received

treatment. If the oncologist was not available, an internist from the Clinic covered the chemotherapy suite. The Internal Medicine suite is on the same floor as the chemotherapy suite.

8. The oncologist or a covering internist was always available when the we administered chemotherapy.

9. I recall Dr. Lockyer covering the chemotherapy suite.

10. The most common side effect of chemotherapy is hypersensitivity to a drug. I do not recall ever having to seek a physician for any kind of emergency reaction as a result of the chemotherapy.

11. If the blood results were within the appropriate parameters and no emergency occurred, a physician may not ever see a chemotherapy patient when supervising.

12. Patient care was never compromised in administering chemotherapy.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 12, 2006.

_____
Beth Carter

Of Counsel:
ROBBINS & ASSOCIATES
Attorneys at Law
A Law Corporation

KENNETH S. ROBBINS       1000-0
LEIGHTON M. HARA   7826-0
WENDY M. YAMAMOTO        8049-0
2200 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-2355
Facsimile: (808) 526-0290
Email: defend@robbinsandassociates.net

PATTON BOGGS LLP
Attorneys at Law

HARRY R. SILVER
2550 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6453
Facsimile: (202) 457-6315
Email:  hsilver@pattonboggs.com


Attorneys for Defendants
HAWAI'I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH SYSTEM

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA      )<br>ex rel. JAMES LOCKYER, M.D.,      )<br>STATE OF HAWAII, ex rel. JAMES )<br>LOCKYER, M.D., and JAMES      )<br>LOCKYER, M.D., in his own behalf )<br>                                                 ) | CIVIL NO. 04-00596 ACK LEK<br>(Federal and State – Qui Tam) |

4832484

# EXHIBIT N5

|                              |     |
|------------------------------|-----|
| Plaintiffs,                  | )   |
|                              | )   |
| v.                           | )   |
|                              | )   |
| HAWAI'I PACIFIC HEALTH, *et al.* | ) |
|                              | )   |
| Defendants.                  | )   |
|                              | )   |

## DECLARATION OF SALLY DIANA

I, Sally Diana, do hereby declare that the following information is based on personal knowledge, that I am competent to so testify and that it is both true and correct.

1. I was hired by Kauai Medical Clinic ("KMC") in 1994 as an LPN and became an RN in 1995 after receiving my associate's degree in nursing from Kauai Community College. I became an oncology nurse (designated as Specialized Nurse II) at KMC in 1998 and remained in that position for approximately seven years. I currently work for Wilcox Memorial Hospital.

2. As a nurse in the chemotherapy suite, I received on-the-job training from other oncology nurses and attended courses on the treatment of oncology patients.

3. It was the normal procedure at KMC's chemotherapy suite for the oncologist to provide a written order for a chemotherapy patient setting forth the required blood tests, the range of the red blood cell count, white blood cell count, and platelet count necessary for the administration of chemotherapy, and the types and amounts of chemotherapy to be administered.

4832484

4. The day before the scheduled chemotherapy, I would prepare my patients' charts and verify that they contained a written order for chemotherapy, a written an order for blood work, and insurance authorization.

5. I would draw the patient's blood and send it to the lab for testing within 24 hours of treatment. When the results came back, I reviewed them to see if the red blood cell count, white blood cell count and platelet count were within the range specified by the oncologist in the order. I was very familiar with reading lab results from my training and from the number of years I had worked as an oncology nurse. If the blood test results fell within the appropriate range, I did not need to consult a physician before proceeding with chemotherapy. If the results were borderline, I always checked with the oncologist or the covering physician.

6. Once the blood tests confirmed that a patient was eligible for chemotherapy that day, I prepared the chemotherapy drugs as specified in the oncologist's order.

7. An oncologist would normally be in the office at the time a chemotherapy patient received treatment. If the oncologist was not available, another doctor in the Clinic would be assigned to "cover" for the oncologist.

8. Physicians in the Internal Medicine Department of the Clinic covered the chemotherapy suite if the oncologist was not present on a certain day. The Internal Medicine suite is on the same floor as the chemotherapy suite.

4832484

9.  The Clinic administration assigned a physician in advance to cover the chemotherapy suite after first checking with the doctor.  I recall Drs. Braun, Pixler, Lockyer, maybe Dr. McKnight, and maybe Dr. Jackson covering chemotherapy.

10. If Dr. Lockyer signed a chemotherapy chart on a given day it meant that he was covering that day.

11. I distinctly recall discussing chemotherapy patients' blood work with Dr. Lockyer on days he was covering.

12. Either the oncologist or a covering physician was always available when I and the other nurses administered chemotherapy.  If no physician was available to cover, we would not administer chemotherapy.

13. A new patient would not be scheduled for the first day of chemotherapy if the oncologist was unavailable on that day.

14.  The most common potential side effects of chemotherapy are mild reactions, such as hives, shortness of breath, or chest tightness.  Reactions to chemotherapy rarely occurred.  I can only recall approximately three times during my seven years as an oncology nurse at KMC when I needed a physician immediately to see a patient receiving chemotherapy.  I do not recall any patients during my seven years who needed to be admitted to the hospital or taken to the ER because of any reaction to chemotherapy.

15. To the best of my knowledge, the responsibility of the covering physician was to be available in the case of an emergency. If the blood results were within the range appropriate for chemotherapy and there are no side effects or emergencies resulting from chemotherapy, I can think of no reason why a covering physician would ever see the patient.

16. I never did, or saw, anything that in any way compromised patient care. I loved my patients. They became like family. I always did the absolute best for them that I possibly could.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December *12* , 2006.

Sally Diana