# REPORT OF EXPERT WITNESS

I, Terry S. Coleman, have been retained to provide expert testimony in this case. The opinions that I will express in the case are as follows:

(a) Medicare covers drugs administered in physician offices by non-physician employees of the physician, and the related drug administration services, only if a supervising physician is present in the same office suite where the items and services are furnished and the supervising physician is immediately available to provide assistance. Drugs and drug administration services that are not furnished in accordance with this requirement are not eligible for Medicare payment. These same requirements apply to all services furnished by non-physician staff that are covered by Medicare as services furnished incident to a physician's service.

(b) The supervising physician must be present in the suite and immediately available throughout the procedure to meet the requirements for Medicare coverage. If the physician arrives in the suite after drug administration procedures have begun, or leaves the suite for lunch, to conduct hospital rounds, or for other reasons, Medicare does not cover any drugs and drug administration services that were furnished in whole or part during the absence of the supervising physician.

(c) If the employer of the supervising physician submits claims to Medicare for the supervised services, such claims would be improper if the supervising physician was unaware that he or she was performing the supervising function. The supervising physician must sign the Medicare claim form unless, as is usually the case, the signature is on file. In either case, by submission of the claim form to Medicare, the supervising physician certifies that the services for which Medicare payment is claimed were furnished under the physician's immediate personal supervision. If the physician was not aware that he or she was supervising services, that

# EXHIBIT 1

certification cannot properly be made by an entity submitting the claim on behalf of the physician. In addition, if the physician is not aware that he is supervising services, he may not take care to be in the office suite and immediately available to provide assistance without any absences during the course of the day. To the extent that the employer of Dr. James Lockyer submitted claims to Medicare that state he was the supervising physician for services, and Dr. Lockyer was not knowingly supervising such services, such claims were improper and not eligible for Medicare payment.

My opinion is based on the following:

Under the Social Security Act, Medicare covers drugs administered by non-physician staff in physician offices, as well as the drug administration services furnished by non-physician staff, under the benefit for items and services furnished incident to a physician's service.

The regulations and the Medicare manuals set forth conditions that must be satisfied before any item or service will be covered by Medicare as an incident-to service. One of the requirements is that the items and services must be furnished under the "direct supervision" of a physician. The physician directly supervising the personnel administering the drugs does not have to be the same physician who is treating the patient. (42 C.F.R. § 410.26(b)(5))

Direct supervision is defined in the office setting as meaning that "the physician must be present in the office suite and immediately available to furnish assistance throughout the performance of the procedure." The physician does not have to be present in the room when the procedure is performed. (42 C.F.R. §§ 410.26(a)(2), 410.32(b)(3)(ii))

A similar requirement for physician supervision exists under the so-called Stark Law (42 U.S.C. § 1395nn). That law prohibits physicians from referring patients to their own staff for drugs unless certain requirements are met. One of the requirements is that the staff furnishing

7247721_1

2

the drugs must be "directly supervised" by the physician ordering the administration of the drugs or by another physician in the same group practice. If that requirement is not met, the physician is not permitted to bill Medicare or the patient for the drugs involved. In the case of incident-to services like the furnishing of drugs, the regulations implementing the Stark Law interpret "directly supervised" as meaning that the physician must comply with the supervision requirements applicable to incident-to services. (42 C.F.R. § 411.355(b)(1)(iii)) Thus, if the supervision requirements of the incident-to rules are not met, the Stark Law prohibits submitting claims for drugs to Medicare.

If the physician who supervises the drug administration service is not the same physician who is treating the patient and ordered the service, the names of both physicians must appear on the claim form that is submitted to Medicare for payment. The name of the ordering physician is entered on the form as the "referring physician," and the supervising physician is required to sign the form. An actual signature is not required if the signature is on file or the field states "Signature on File" and/or a computer-generated signature.

The signature of the supervising physician indicates that the supervising physician agrees with the statement: "I certify that the statements on the reverse apply to this bill and are made a part thereof." On the back of the form, it states in part: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."

Copies of Medicare regulations and policies that support my position are attached as exhibits.

7247721_1

## Qualifications

I am a graduate of the University of Minnesota (B.A., summa cum laude) and Harvard Law School (J.D., magna cum laude). From July 1981 through March 1989, I held various positions in the U.S. Department of Health and Human Services that were related to administration of the Medicare program. These positions included, from November 1986 to September 1988, Chief Counsel of the Health Care Financing Administration (HCFA), which is the agency that administers Medicare and is now called the Centers for Medicare & Medicaid Services, and from September 1988 to March 1989, Deputy Administrator of HCFA. During the period from July 1981 through November 1986, I held senior positions in the Department of Health and Human Services' Office of General Counsel – Principal Deputy General Counsel, Deputy General Counsel for Regulations, and, from November 1984 to November 1985, Acting General Counsel of the Department.

From 1989 to the present, I have been engaged in the private practice of law. Much of my practice has related to Medicare policies, including specifically the Medicare policies related to the coverage of drugs and drug administration services. I have advised numerous clients regarding those policies.

To the best of my recollection, the following is a list of all publications that I have authored within the preceding ten years:

*Books –*

MEDICARE LAW (Second Edition), American Health Lawyers Association, 2006.

MEDICARE LAW, American Health Lawyers Association, 2001.

PRACTICAL TIPS FOR THE PRACTICING ONCOLOGIST (Third Edition), American Society of Clinical Oncology, 2004 (credited as principal author in the Foreword).

PRACTICAL TIPS FOR THE PRACTICING ONCOLOGIST (Second Edition), American Society of Clinical Oncology, 2000 (credited as principal author in the Foreword).

PRACTICAL TIPS FOR THE PRACTICING ONCOLOGIST, American Society of Clinical Oncology, 1997 (credited as principal author in the Foreword).

*Book Chapter –*

"Economic and Regulatory Issues Affecting Cancer," (with Joseph S. Bailes) in Charles M. Haskell, CANCER TREATMENT (Fifth Edition), 2001, at pp. 484-492.

*Articles and Miscellaneous –*

"Perspectives on Achieving OIG Compliance: Proceedings from a roundtable seminar conducted March 28, 2004, in Washington, DC," Thomson Medical Education, 2004 (roundtable participant).

"The HIPAA Security Regulations," (with Kimberlee C. Seah), in JOURNAL OF ONCOLOGY PRACTICE, July 2005, at p. 47.

"Oncologists and the Stark Law," in JOURNAL OF ONCOLOGY PRACTICE, May 2005, at p. 26.

## Compensation

I am charging my normal hourly rate plus expenses.  My hourly rate in 2007 is $730.

## Other Cases

I have not testified at trial or by deposition in any other cases within the past four years.

_____
Terry S. Coleman

## EXHIBITS

1 – 42 C.F.R. § 410.26

2 – 42 C.F.R. § 410.32

3 – 42 C.F.R. § 411.355

4 – Medicare Benefit Policy Manual, Chapter 15, §§ 50-60.3

5 – Medicare Carriers Manual, Part 3, §§ 2049.3-2050.3

6 – CMS-1500 (Health Insurance Claim Form)

7 – Medicare Claims Processing Manual, Chapter 26, §§ 10-10.4

8 – 66 Fed. Reg. 55267-68 (Nov. 1, 2001)