IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf,<br><br>    Plaintiffs,<br><br>vs.<br><br>HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; AND WILLIAM A. EVSLIN, M.D. AKA LEE A. EVSLIN, M.D.<br>    Defendants. | CIVIL NO. CV 04-00596 ACK LEK<br>(Federal and State - Qui Tam)<br><br>DECLARATION OF JAMES LOCKYER, M.D.; EXHIBITS L1-L4<br><br><br><br>HEARING<br><br>Date: March 27, 2007<br>Time: 10:30 A.M.<br><br>Trial Date: September 18, 2007<br>Judge: Honorable Alan C. Kay |

## DECLARATION OF JAMES LOCKYER, M.D.

I, JAMES LOCKYER, M.D., do hereby declare that the following information is based on personal knowledge, and that I am competent to so testify:

   1. I am a physician licensed to practice medicine in the State of Hawai`i, and am over 18 years of age.

   2. I am a resident of the Kapaa, Island of Kauai.

   3. The Kauai Medical Clinic ("KMC") is located in a three-storey building located at 3-3420 Suite B Kuhio Highway, Lihue.

   4. Wilcox Memorial Hospital does not "adjoin" the KMC clinic building.

5.      Within weeks of my employment by Defendant Lee A. Evslin at KMC, I learned of a proposed merger of KMC and Wilcox Memorial Hospital. About 1 1/2 years after my employment began I learned of a proposed merger between Wilcox/KMC and the Kapi`olani and Straub entities on Oahu.

6.      Defendant Evslin was encouraging all of the KMC doctors to support the merger.  I recall that he and Dr. Sutherland were very enthusiastic about the proposed merger after Evslin returned from a visit to the Sutter Health home office in approximately March 2000.  Defendant Evslin described sumptuous offices and entertainment, and I recall remarks about the merger making "us rich." In December of 2001 it was suddenly announced that the physicians would be holding a vote.  I remember a number of doctors voicing our concern about doing so before we had had adequate time to consider and examine the proposal adequately.  I remember Dr. Arnulfo Diaz stating that us merging with two losers doesn't make a winner.  I remember voicing my concern that many of the doctors were already on Christmas vacation or would be gone during the vote and I didn't see why we couldn't hold the vote after the start of the new year.  Nonetheless the vote was conducted under closed balloting.  When Defendant Evslin announced that the motion had passed with only six dissenting votes I remember being surprised since I knew of more than six doctors who had stated they voted against the merger.

7.     I have read the supporting declarations for the HPH-Entity Defendants' Motion for Summary Judgment, and I dispute the allegations as follows:

a.     I dispute Beth Carlozzi's declaration as far as anything that occurred in 2002 or thereafter because she was no longer employed in the KMC Oncology Department, and she has not declared the basis on which she has personal knowledge of what occurred thereafter.

b.     I dispute the allegation Beth Carlozzi declared at paragraph 5 of her Declaration, that I and the physicians of the Internal Medicine Department "covered the chemotherapy suite if the oncologist was not present on a certain day." I do not know what Nurse Carlozzi means by "covered" but I certainly never covered the chemotherapy room no matter how she defined it.   I was, however, willing and qualified to respond to life threatening emergencies when they occurred, assuming I was in the immediate vicinity at the time of such an event and I was made aware of the event. This is a standard expected of all physicians, and in no way constitutes supervising or being responsible for the operation of a particular area or department of the medical office.  I did, in fact, respond to one or two such

emergencies because I happened to be on the second floor at the time and the oncology nurses asked me to help the patient. I was not, however, "covering" the chemotherapy room at the time and had not been asked to cover or supervise the chemotherapy room on those particular days.

c.      I dispute the allegation Nurse Carlozzi declared at paragraph 6 of her Declaration, that anyone "discussed" with me "ahead of time" that I was assigned to "cover" the chemotherapy room because that never happened. I see nothing in Nurse Carlozzi's declaration alleging that she was ever personally present at such a discussion.

d.      I further dispute the allegation in Nurse Carlozzi Declaration at paragraph 6 that I was ever asked to cover the chemotherapy room on any day chemotherapy medical charts were left outside my door which I was expected to sign. I was never asked to "cover" the chemotherapy room for the day the when the charts were left outside my office.

e.      I dispute the allegation Nurse Carlozzi declared at paragraph 7 of her Declaration, that she heard me complain about "covering" the chemotherapy room "because he believed he should be

4

paid more to do it." The statement is false. An oncology nurse may have heard me complain that I was not being paid to stay at work until late at night reading oncology progress notes and lab work which made no sense in the absence of the related patient charts. However, it is my understanding from Ms. Carlozzi's Declaration that she worked until 2002. I was not asked to sign off on the progress notes and lab work until May 2002.

f.    I dispute the allegation Nurse Carter declared in paragraph 5 of her Declaration that she ever asked me about a borderline blood test result for a chemotherapy patient because I was the "covering physician" for the chemotherapy room.

g.    I dispute the allegation Nurse Carter declared at paragraph 7 of her Declaration that "If the oncologist was not available, an internist from the Clinic covered the chemotherapy suite." I do not know what Nurse Carter meant by the term "covered," but whatever she may have meant, I did not "cover" the chemotherapy suite.

h.    I dispute the allegation Nurse Carter declared at paragraph 9 of her Declaration, that I "covered the chemotherapy suite." I do not know what Nurse Carter means by "covered" but I

certainly never covered the chemotherapy room no matter how she defined it.

8.    If I had been aware that I was to supervise the chemotherapy room and had agreed, I would have asked one of the other internists to take over- (cover) for me if I had to leave the second floor.  I was never aware and never agreed, so I never thought I had to ask anyone to assume the responsibility for me. No other doctor ever said to me, "I have to leave the building but I am responsible for (or supervising) chemotherapy today.  Could you assume the responsibility  for me while I am gone?"

9.    I contacted Georgetown University Medical School and confirmed that Dr. Gelmann was not in private practice in circumstances which are similar to the circumstances at KMC.  *See* Defense Exhibit 9.  Dr. Gelmann no longer teaches at the Georgetown University Medical School, but while he was at Georgetown, he only saw patients at the Lombardi Clinic (as his declaration states) along with faculty colleagues and did not have a medical office-based practice.

10.    I have examined Exhibits 12-20 of Defendants' Motion for Summary Judgment and I dispute the conclusions they have put forward about those exhibits.

## **The Internists Refused to Sign Chemotherapy Patient Charts and Labs**

11.    On or around May 2002, Defendant Evslin asked to meet with the Internal Medicine Department.  At that meeting, he requested that the internal medicine physicians sign all of the progress notes for chemotherapy patients at the end of the day, and "sign off" on all labs when Dr. Sutherland was absent. Pursuant to KMC clinic policy, the patients' main charts were kept in the chart room, so we were only provided nurse progress notes and lab reports for the day from the chemotherapy department.

12.    Dr. Sutherland had recently left the Department of Internal Medicine to become the KMC oncologist after John Hayward, M.D., an excellent and highly-regarded oncologist whom KMC was very fortunate to have, resigned from KMC.  I have confirmed that Dr. Sutherland, who is a graduate of Baylor, was never board certified or board eligible in the subspecialty of medical oncology. He was board certified in internal medicine.

13.    In  2003, KMC hired Grace Inouye, M.D. for oncology, and I believe that Dr. Sutherland continued as the oncologist for some patients after KMC hired Dr. Inouye.

14.    We (the internists) objected on the grounds that we had our own full work load of scheduled patients.  We raised patient safety concerns and we

were questioning whether we could sign off on the charts of patients that we never saw for chemotherapy we had not ordered.

15.    In my experience, during an oncologist's planned absences from a clinic in this community, the clinic hires a temporary (*locum tenans*) oncologist so that the patients continue to receive qualified care.  KMC's failure to hire a *locum tenans* for Dr. Sutherland appeared to us to be motivated by the desire to avoid the cost of hiring a proper substitute for the oncologist.  We were unwilling to support that decision because it meant patients could receive less than the accepted standard of care, and might be subjected to unjustified risks.

16.    Within days of the meeting Defendant Evslin held at which he asked the internists to sign off on the chemotherapy progress notes and lab reports, I found that someone had deposited stacks of them outside of my office.

17.    I stayed after work for several hours reviewing the progress notes and labs.  The more I saw, the more alarmed I became because the lab results were extreme in many cases, and I had no idea whether the results were within acceptable parameters for that particular patient because of his or her prescribed treatment, or actually signified a life-threatening situation.  I know that chemotherapy is sometimes intended by the oncologist to induce reactions that produce extreme lab results, but I am not trained in oncology and could not, with reasonable certainty, determine whether the lab results were appropriate.  The

patient's historical medical charts were locked away in the chart room, so I had only the day's notes and lab reports.

18.     I resolved to refuse to "sign-off" on any progress notes or labs.

19.     I discussed my decision with the chair of the Internal Medicine Department, Dr. Braun.  He told me that he had also decided to refuse to sign charts and lab after he had stayed until about 11:00 p.m. reviewing the nursing notes and lab reports that were deposited outside of his office, and was disturbed by the extreme lab results and his inability to gauge whether they represented a risk to the patients.

20.     Dr. Braun shared with me that he expected other internists in the KMC Internal Medicine Department to refuse to sign off.

21.     I was never asked to supervise the administration of chemotherapy in the oncology suite at KMC, nor did I ever accept such an assignment.  Prior to the May 2002 meeting with Defendant Evslin, I recall no occasion on which I was asked to supervise the chemotherapy room, sign notes or labs,  for oncology or chemotherapy, and no occasion on which I was ever asked whether my provider number may be used to submit claims for chemotherapy.

22.     Defendant Evslin did not explain at the meeting in May 2002 that KMC would be submitting claims to Medicare and other insurers with our respective provider numbers.  He never mentioned claims at the meeting.

23.    I did not consider Defendant Evslin's request, once he clarified that he was only asking the internists to sign charts and labs at the end of the day, to be a request or assignment to supervise the administration of chemotherapy in the oncology suite, or to be on call for   the oncology suite.  Subsequent to the May 2002 meeting, I did not agree to supervise chemotherapy or to permit KMC to submit claims under my provider number for chemotherapy.

24.    One day in October, 2003, about midmorning, as I was entering the second floor KMC Internal Medicine Department, Nurse Deb Dannog rushed up to me and told me that the nurses were administering chemotherapy to patients but that all of the oncology  doctors were off the island until the next week..

25.    I declined Nurse Dannog's request, and told her that I would have to ask Dr. Williamson, then KMC Medical Director, what it meant for me to "cover" chemotherapy from legal and medical perspectives, and whether it was permissible for me to agree.

26.    I sent Dr. Williamson an e-mail requesting an explanation.  He telephoned me within a few minutes and told me he had it "handled" and I need not concern myself further.

27.    I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

28.    I was never asked to be on call for the KMC oncology suite or to cover the KMC oncology suite during the clinic day prior to Nurse Dannog's request in October 2003.

29.    I never considered it among my duties or assignment as a KMC-employed physician to supervise the administration of chemotherapy in the oncology suite at KMC.

30.    I never arranged my schedule so that I would be in my office suite at KMC during the entire time chemotherapy was being administered in the oncology suite at KMC,

31.    I had my own patients over in the hospital and in my own office suite which I saw each day, and I would not have been able to arrange my schedule such that I could immediately respond to a page from the oncology suite at any particular moment.

32.    I routinely made daily rounds on my patients in the hospital before commencing my clinic hours, and at times, due to pressing needs in the hospital, I might not reach my office until mid-morning.  I would also on occasion return to the hospital at various times during the day to attend to urgent or emergent problems that developed with my patients who were hospitalized.

33.    I had no particular knowledge or awareness of when chemotherapy was commenced or completed on any particular day in the oncology

suite at KMC, nor did anyone ever make any effort that I know of to inform me of the goings-on in the chemotherapy room at KMC.

34.     I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

35.     I recall that KMC instituted a policy during my employment requiring that a physician be present to supervise all blood transfusions in the chemotherapy room.  The policy was instituted after two separate severe transfusion reactions occurred in the in the chemotherapy room when no physician was present.   It was my understanding that the policy was replaced by a policy requiring all transfusions to be performed in the hospital because the KMC oncology staff was not able to comply consistently with requirement of having a physician present in the KMC Clinic.

**Defendant Evslin Retaliated Against Me Because I Called for an Audit**

36.     Defendant Evslin began retaliating against me shortly after I began asking for an audit of KMC's finances.  Defendant Evslin came to my office

or spoke to me in his office on several occasions to review summaries he had

prepared of the claims and receipts for my services.

37.    At one such meeting in August 2000, Defendant Evslin told me

that he had projected claims for my services that would not generate sufficient

receipts to pay my guaranteed salary.  Once the receipts for my services exceeded

my guaranteed salary, under my employment agreement I was supposed to receive

half of the receipts.  I was surprised because I believed that I was seeing about the

same number of patients per day as the internists on either side of my office, and I

was very busy with hospital patients and complex cases.

38.    I estimated the collection ratio apparent from the summary

report Defendant Evslin was referring to and commented that it appeared to be

very low, approximately 50%.  I determined from further questioning that

according to Defendant Evslin the collections summarized in his report for any

given month were unrelated to the claims summarized for the month.  I requested a

report that identified the receipts for each claim.  Defendant Evslin responded that

it was "impossible" for him to provide me such a report.  I then stated that there

must be a mechanism to collate the individual claims with the receipts collected.

He stated very clearly that it was physically impossible to do that.

39.    I asked Defendant Evslin to arrange for me to see the claims

and receipts data on which the report was based for myself, so that I could better

evaluate the reasons the collections appeared to be low.  He refused.  I pressed the request but Defendant Evslin gave me no further response.  I found the response confusing and disturbing, but I wanted to believe Defendant Evslin was dealing with me in good faith.  Over the next few weeks I repeatedly inventoried whether I knew of any reason or rule why I would not be permitted to see the claims KMC was submitting under my provider number, and finally had to conclude that I knew of none.

40.     My exchange with Defendant Evslin in August 2000 was repeated a few times when he subsequently reviewed monthly "results." During those meetings, I began suggesting that it would be useful to have a financial audit to determine why the collection ratio was consistently well below industry norms.

41.     I raised my concern about being denied access to my claims with my KMC colleagues many of whom had been expressing disbelief in the reports they were provided in private discussions with me and certain of their other KMC colleagues, and found that none of them had been granted access to their claims.  Understandably, none relished the thought of sifting through hundreds of claims, but I recognized that their inability to review the claims was as dangerous as giving a bookkeeper check-signing authority and thereafter never reviewing the checks.  I suggested that an audit would afford all of us comfort that our claims were proper and corresponded to our charge slips, and that we were being credited

for all claims and receipts. I have attached as Exhibits L1 through L4 true and correct copies of e-mails I received from Drs. Duvauchelle, Birchard, DeNigris, and Erron who answered a small survey I conducted.

42.    By late 2000, I began suggesting to my colleagues that we should collectively demand an audit.

43.    These discussions continued through 2001 during which I was very busy building my practice, and seeing many uninsured patients referred to me because it became known among the KMC doctors that I would not refuse to see any patient just because they were unable to pay.

44.    I formally proposed an audit at a December 2001 Department meeting at Kilohana (Gaylord's) Restaurant attended by Drs. Pixler (chair), Braun, McKnight, Diaz, and Sutherland and Dr. Duvauchelle. Dr. Sutherland became quite emphatic that Dr. Evslin would never permit an audit of the books. Dr. Pixler had called the December 2001 meeting to propose that KMC establish a minimum salary for our department members because I was seeing the majority of the uninsured patients, which benefited other physicians and was being told that my pay was going to be reduced dramatically by Dr. Evslin. I disbelieved that I needed my colleagues to chip in for my salary. I expressed confidence that an audit would prove that the receipts from the claims submitted for my services were higher than reported and sufficient to pay my minimum salary.

15

45.    In January 2002, Defendant Evslin reduced my compensation by 8% or $10,000.  At that time, KMC reports I subsequently obtained show that it was submitting an average of $28,000 per month in claims under my provider number.

46.    Defendant Evslin subsequently reduced my pay repeatedly. Eventually in March 2004, I was forced to resign from KMC on being informed that my compensation would be further reduced to approximately $14,000 per year.  And that if they unilaterally decided that my overhead continued to rise even further than it inexplicably already was, that I might even be obligated to pay the clinic money to make up the "deficit"

47.    The retaliation and harassment by Defendant Evslin caused me great hardship and I have lost substantial earnings and the opportunities I would have enjoyed.

48.    I believe Defendants have "blackballed" me in the Kauai health care community such that I have been prevented from obtaining employment in my profession as a consequence of having called for financial audits and my disagreements with Defendant Evslin about whether I should have access to the claims KMC submitted to Medicare and other payors using my provider number. While still in arbitration about the accuracy of my billings and receipts I was told

16

by Dr. Williamson that the "fact" that I was suing KMC was hurting my chances of ever getting by.

## My Suspicions That Defendants Were Cheating Patients and Insurers

49.     I became more and more suspicious as Defendant Evslin responded belligerently to my requests to see the source data and supporting documentation for the reports he was giving me.

50.     By the time Defendant Evslin requested that the internists sign off on chemotherapy charts, I was suspicious of any request he made that seemed irregular because, in addition to his direct attacks on me, I had witnessed several incidents that suggested KMC and Defendant Evslin were intent on organizing services to maximize profits in ways that often jeopardized the quality of care or diminished it, without sufficient explanations as to why those changes and practices were ethical, and disclosed to third party payors:

51.     One such incident occurred in February 2002.  A KMC-employed clerk involved with claims processing remarked to me that she had been told to forget about a report she made about claims submitted under the provider number of a physician who had long since left KMC's employ.

52.     A claims specialist at HMSA had contacted the clerk to question approximately $30,000 in such claims HMSA had received over a six-

week period.  They concluded that the claims probably should have been submitted under Dr. Thomas Potter's number because of the nature of the claims.

53.    I privately doubted that Dr.  Potter would fail to notice the absence of $30,000 in claims from the summary reports Defendant Evslin provided him.  I concluded that either the summary reports he received misrepresented that the claims had been submitted under his provider number, or the claims were not for his services.  I began searching for legal counsel because I felt that I had a duty to report to an outside authority because the incident too strongly confirmed my suspicions that Defendant Evslin/KMC were engaging in fraud.

54.    I ultimately demanded arbitration with the assistance of counsel and compelled Defendants to produce detailed reports of claims submitted under my provider number.  We also requested day sheets to compare with the claims reports, but Defendants represented that the day sheets were routinely destroyed.

55.    In the lists of claims and receipts, I found numerous chemotherapy-related claims for patient encounters.  I never had, with patients  I had never met. The claims were for chemotherapy or erythropoietin shots I did not order or administer, and none of which were for an office visit type of patient encounter.  These lists indicated that Defendants had also submitted claims to other health care benefit programs for chemotherapy or erythropoietin shots for patients I had not seen.

18

56.    I was able to confirm I had never seen the patients because my medical assistant, Chris Newbold, had saved copies of every day sheet for each day's appointments.

57.    Defendant Evslin ordered that various measures be carried out to retaliate against me and harass me to stop raising questions and resign from my contract, including the following (in approximate chronological order):

a.    Changing my appointment template so that my clinic schedule was disrupted, about which I complained to Dr. Pixler.

b.    Having to hire my own answering service in order to refute the very false accusation that I was not answering my pages and Defendant Evslin replacing the contact numbers the Hospital had on file for me with incorrect numbers.

c.    An additional meeting from which I was excluded in April 2004 meeting at which Defendant Evslin insisted that the Internal Medicine doctors vote for on a call to terminate my contract.

d.    Posting a sentry at my door in April 2004, who followed me and recorded my every move, prompting patient privacy complaint.

e.    Revocation of my hospital privileges

f.    Failing to advertise for and hire a nurse for me when my regular nurse resigned so that I had no regular help to run my clinic.

g.    Threatening the new nurse I worked with that her probation period would be extended if she did not sign an agreement to monitor my activities and report back to nursing administration.

h.    Frequently reassigning the temporary nurse assigned to work with me to another location in the clinic, and then bringing someone else in during the middle of the clinic operation, disrupting operations and requiring me to stop seeing patients to orient a new nurse literally every few hours.

i.    Eventually assigning me a nurse on a permanent basis who had been removed from the Internal Medicine Department by the formal request of all of the Department members on account of her unacceptable performance.

j.    Accusing me of failing to turn in my daily billing slips when in fact one of the clerical staff had been instructed by "someone" to keep them up at the front desk, preventing them from being turned in to accounting.

k.    Keeping tabs on my whereabouts by assigning hospital clerks to call in to report as soon as I arrived in the department.

20

## My Audit Request Was Defendants' Sole Reason for Retaliating Against Me

58.    I knew my practice was well-regarded. Dr. Mary Pixler, former chair of the KMC Internal Medicine Department, approached me at about 8:30 a.m. on Thursday, February 6, 2003 while I was completing my hospital rounds. She offered to speak to Defendant Evslin on my behalf to express her opinion that it was inappropriate to compare the number of patients I was seeing in clinic with the number of patients seen by physicians in the satellite clinics, as she had learned while on call at the hospital that I was seeing an extraordinarily high ratio of patients with very complex issues.  She commented that the overwhelming majority of patient encounters in the outlying clinics were not professionally-demanding cases, involving simple colds and abrasions.

59.    A few days prior to Dr. Pixler's offer, my assistant, Christina Newbold, also mentioned to me that the billing department had made observed that we were submitting the most complete and accurate coding sheets in the KMC Clinic.

I, JAMES LOCKYER, M.D., do declare under penalty of law that the forgoing is true and correct.

DATED:  Honolulu, Hawai`i, March 9, 2007

//s  James Lockyer, M.D.

_____

JAMES LOCKYER, M.D.

```
-----Original Message-----
From: Teresa Birchard [mailto:ttbirchard@hotmail.com]
Sent: Tuesday, February 06, 2007 4:06 PM
To: jlockyer@lava.net
Subject: RE: Greetings from Sanford, NC
```

1. If any claims for chemotherapy were made using my provider number, these claims were made without my knowledge or permission, and at this point I am not aware of this.  There might have been a claim for methotrexate for treatment of ectopic pregnancy made under my provider number, but no chemotherapy for cancer patients.

2. I am not aware of any claims made under my provider number for services not done or supervised by me.  My husband received an EOB for a service supposedly made by Dr. Mori for him which was a pocedure not done, and at the time he called Mori and reported this. I think he also spoke to someone from our insurance company but he is not at home right now to ask and I am not certain of details. If it is helpful I can ask him about this when he gets back from his trip to New York.  I must admit I had concerns about this but was not aware of any such billing done using my provider number.

3. I suspected that I was not being paid appropriately but had no way known to me to track the billings and collections and thus no way to challenge the payments made.  Once encounter forms were turned in I had no available tracking for what was done with them.

Teresa

EXHIBIT L1

-----Original Message-----
**From:** Lawrence.Eron@kp.org [mailto:Lawrence.Eron@kp.org]
**Sent:** Thursday, February 15, 2007 8:17 AM
**To:** jlockyer@lava.net
**Subject:** RE: hello

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

"James Lockyer" <jlockyer@lava.net>                    To  Lawrence Eron/HI/KAIPERM@KAIPERM

02/14/2007 04:06 PM                                    cc

                                                       Subject  RE: hello

**Dear Dr. Eron,**

**Thanks for your response.**

**1.   Would you please confirm to me by return e-mail that you did not know KMC was submitting chemotherapy claims under your provider number, and if you did, when you found out they were submitting claims for chemotherapy under your number?**

***--I was unaware of KMC submitting chemotherapy claims under my provider number.***

**2.   Would you also please confirm that you did not know that KMC was submitting claims for services under your provider number when you did not personally perform the service or personally supervise the service?**

***--I was unaware of KMC submitting claims under my provider number for services that I did not provide.***

**3.   Would you please confirm that you believed you were not being paid by KMC all  you were entitled to be paid under your contract with KMC?**

**--*At this time I do not have the information to answer this question.***

**Jim Lockyer**

# EXHIBIT L2

-----Original Message-----
From: denigris steve [mailto:sjd50@yahoo.com]
Sent: Wednesday, February 07, 2007 7:06 PM
To: James Lockyer
Subject: Re: A few questions


Dr Lockyer,                    2-7-07

        I was not aware that KMC was billing
chemo receipts under my name, nor was I aware they
were submitting clinic claims under my UPIN #. The
only thing I can ever recall overseeing is the signing
of several of the nurse practitioner notes for a small
Hepatitis C clinic we started on the 3rd floor. That
was legitimate work done while I was ON site in the
clinic.
Anything else beyond that would be news to me.
        Furthurmore,I never felt appropriately
compensated under their allocated costs payment
system. They probably still owe all of us a bunch of
money if it was ever recalculated. Is there any
forensic accountant who can investigate what went on
and get us compensated after the fact?
        Let me know if you need more info.
                    Dr Stephen DeNigris
                    KMC Gastroenterology (1993-2005)

EXHIBIT L3

**Hi Doug,**

**'Good talking to you.  Here are the questions as I mentioned.  If you don't mind, just reply with your own yes or no to each one of them.**

1. Would you please confirm to me by return e-mail that you did not know KMC was submitting chemotherapy claims under your provider number, and if you did, when you found out they were submitting claims for chemotherapy under your number? Jim, I was not aware  of any claims for chemotherapy being submitted under my provider number.

2. Would you also please confirm that you did not know that KMC was submitting claims for services under your provider number when you did not personally perform the service or personally supervise the service? I am also not aware of any claims being submitted for services not rendered by me.

3. Would you please confirm that you believed you were not being paid by KMC all you were entitled to be paid under your contract with KMC? I do believe that I was being paid for the sevices I have knowledge of performing, although I may have disagreed with their formula of payment. I do not have knowledge of performing chemotherapy.

Thanks,
Doug Duvauchelle

# EXHIBIT L4