# ERRATA

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf,<br><br>        Plaintiffs,<br>vs.<br><br>HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; AND WILLIAM A. EVSLIN, M.D. AKA LEE A. EVSLIN, M.D.<br>        Defendants. | CIVIL NO. CV 04-00596 ACK LEK (Federal and State - Qui Tam)<br><br>DECLARATION OF JAMES LOCKYER, M.D.; EXHIBITS L1-L4<br><br>HEARING<br><br>Date:   March 27, 2007<br>Time:   10:30 A.M.<br><br>Trial Date:   September 18, 2007<br>Judge:   Honorable Alan C. Kay |

## DECLARATION OF JAMES LOCKYER, M.D.

I, JAMES LOCKYER, M.D., do hereby declare that the following information is based on personal knowledge, and that I am competent to so testify:

1. I am a physician licensed to practice medicine in the State of Hawai`i, and am over 18 years of age.

2. I am a resident of the Kapaa, Island of Kauai.

3. The Kauai Medical Clinic ("KMC") is located in a three-storey building located at 3-3420 Suite B Kuhio Highway, Lihue.

4. Wilcox Memorial Hospital does not "adjoin" the KMC clinic building.

## ERRATA

**The Internists Refused to Sign Chemotherapy Patient Charts and Labs**

11. On or around May 2002, Defendant Evslin asked to meet with the Internal Medicine Department. At that meeting, he requested that the internal medicine physicians sign all of the progress notes for chemotherapy patients at the end of the day, and "sign off" on all labs when Dr. Sutherland was absent. Pursuant to KMC clinic policy, the patients' main charts were kept in the chart room, so we were only provided nurse progress notes and lab reports for the day from the chemotherapy department.

12. Dr. Sutherland had recently left the Department of Internal Medicine to become the KMC oncologist after John Hayward, M.D., an excellent and highly-regarded oncologist whom KMC was very fortunate to have, resigned from KMC. I have confirmed that Dr. Sutherland, who is a graduate of Baylor, was never board certified or board eligible in the subspecialty of medical oncology. He was board certified in internal medicine.

13. In 2003, KMC hired Grace Inouye, M.D. for oncology, and I believe that Dr. Sutherland continued as the oncologist for some patients after KMC hired Dr. Inouye. ~~RAFAEL: we need to get a better idea of her hire date for a number of reasons. After our chart review at Wilcox, it may be sooner than July.~~

14. We (the internists) objected on the grounds that we had our own full work load of scheduled patients. We raised patient safety concerns and we

7

# ERRATA

23. I did not consider Defendant Evslin's request, once he clarified that he was only asking the internists to sign charts and labs at the end of the day, to be a request or assignment to supervise the administration of chemotherapy in the oncology suite, or to be on call for the oncology suite. Subsequent to the May 2002 meeting, I did not agree to supervise chemotherapy or to permit KMC to submit claims under my provider number for chemotherapy.

24. One day in October, 2003, about midmorning, as I was entering the second floor KMC Internal Medicine Department, Nurse Deb Dannog rushed up to me and told me that the nurses were administering chemotherapy to patients but that all of the oncology doctors were off the island until the next week..

25. I declined Nurse Dannog's request, and told her that I would have to ask Dr. Williamson, then KMC Medical Director, what it meant for me to "cover" chemotherapy from legal and medical perspectives, and whether it was permissible for me to agree.

26. I sent Dr. Williamson an e-mail requesting an explanation. He telephoned me within a few minutes and told me he had it "handled" and I need not concern myself further.  ~~RAFAEL: wasn't there a reply email in which he said Dr. Inouye would sign them upon her return?~~

27. I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

10

evaluate the reasons the collections appeared to be low. He refused. I pressed the request but Defendant Evslin gave me no further response. I found the response confusing and disturbing, but I wanted to believe Defendant Evslin was dealing with me in good faith. Over the next few weeks I repeatedly inventoried whether I knew of any reason or rule why I would not be permitted to see the claims KMC was submitting under my provider number, and finally had to conclude that I knew of none.

      40.    My exchange with Defendant Evslin in August ~~2002~~2000 was repeated a few times when he subsequently reviewed monthly "results." During those meetings, I began suggesting that it would be useful to have a financial audit to determine why the collection ratio was consistently well below industry norms.

      41.    I raised my concern about being denied access to my claims with my KMC colleagues many of whom had been expressing disbelief in the reports they were provided in private discussions with me and certain of their other KMC colleagues, and found that none of them had been granted access to their claims. Understandably, none relished the thought of sifting through hundreds of claims, but I recognized that their inability to review the claims was as dangerous as giving a bookkeeper check-signing authority and thereafter never reviewing the checks. I suggested that an audit would afford all of us comfort that our claims were proper and corresponded to our charge slips, and that we were being credited

**ERRATA**

for all claims and receipts. I have attached as Exhibits L1 through L4 true and correct copies of e-mails I received from Drs. Duvauchelle, ~~Brichard~~Birchard, DeNigris, and ~~Enron~~ Erron who answered a small survey I conducted.

42. By late 200<u>0</u>, I began suggesting to my colleagues that we should collectively demand an audit.

43. These discussions continued through 2001 during which I was very busy building my practice, and seeing many uninsured patients referred to me because it became known among the KMC doctors that I would not refuse to see any patient just because they were unable to pay.

44. I formally proposed an audit at a December 2001 Department meeting at Kilohana (Gaylord's) Restaurant attended by Drs. Pixler (chair), Braun, McKnight, Diaz, and Sutherland and Dr. Duvauchelle. Dr. Sutherland became quite emphatic that Dr. Evslin would never permit an audit of the books. Dr. Pixler had called the December 2001 meeting to propose that KMC establish a minimum salary for our department members because I was seeing the majority of the uninsured patients, which benefited other physicians and was being told that my pay was going to be reduced dramatically by Dr. Evslin. I disbelieved that I needed my colleagues to chip in for my salary. I expressed confidence that an audit would prove that the receipts from the claims submitted for my services were higher than reported and sufficient to pay my minimum salary.

**ERRATA**

  f. Failing to advertise for and hire a nurse for me when my regular nurse resigned so that I had no regular help to run my clinic.

  g. Threatening the new nurse I worked with that her probation period would be extended if she did not sign an agreement to monitor my activities and report back to nursing administration.

  h. Frequently reassigning the temporary nurse assigned to work with me to another location in the clinic, and then bringing someone else in during the middle of the clinic operation, disrupting operations and requiring me to stop seeing patients to orient a new nurse literally every few hours.

  i. Eventually assigning me a nurse on a permanent basis who had been removed from the Internal Medicine Department by the formal request of all of the Department members on account of her unacceptable performance.

  j. Accusing me of failing to turn in my daily billing slips when in fact one of the clerical staff had been instructed by "someone" to keep them up at the front desk, preventing them from being turned in to accounting.

  k. Keeping tabs on my whereabouts by assigning hospital ~~nurses~~ clerks to call in to report as soon as I arrived in the department.

20