Paragraph 1 Excerpts

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf,<br><br>                    Plaintiffs,<br><br>vs.<br><br>HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; AND WILLIAM A. EVSLIN, M.D. AKA LEE A. EVSLIN, M.D.<br>                    Defendants. | CIVIL NO. CV 04-00596 ACK LEK (Federal and State - Qui Tam)<br><br>DECLARATION OF JAMES LOCKYER, M.D.; EXHIBITS L1-L4<br><br><br><br>HEARING<br><br>Date:    March 27, 2007<br>Time:    10:30 A.M.<br><br>Trial Date:    September 18, 2007<br>Judge:    Honorable Alan C. Kay |

DECLARATION OF JAMES LOCKYER, M.D.

I, JAMES LOCKYER, M.D., do hereby declare that the following information is

based on personal knowledge, and that I am competent to so testify:

1.    I am a physician licensed to practice medicine in the State of

Hawai`i, and am over 18 years of age.

2.    I am a resident of the Kapaa, Island of Kauai.

3.    The Kauai Medical Clinic ("KMC") is located in a three-storey

building located at 3-3420 Suite B Kuhio Highway, Lihue.

4.    Wilcox Memorial Hospital does not "adjoin" the KMC clinic

building.

para 2

Plaintiff Lockyer's Concise Statement of Facts at ¶¶ 1-2

5.    Within weeks of my employment by Defendant Lee A. Evslin | para 1

at KMC, I learned of a proposed merger of KMC and Wilcox Memorial Hospital. About 1 1/2 years after my employment began I learned of a proposed merger between Wilcox/KMC and the Kapi`olani and Straub entities on Oahu.

6.    Defendant Evslin was encouraging all of the KMC doctors to support the merger. I recall that he and Dr. Sutherland were very enthusiastic about the proposed merger after Evslin returned from a visit to the Sutter Health home office in approximately March 2000. Defendant Evslin described sumptuous offices and entertainment, and I recall remarks about the merger making "us rich." In December of 2001 it was suddenly announced that the physicians would be holding a vote. I remember a number of doctors voicing our concern about doing so before we had had adequate time to consider and examine the proposal adequately. I remember Dr. Arnulfo Diaz stating that us merging with two losers doesn't make a winner. I remember voicing my concern that many of the doctors were already on Christmas vacation or would be gone during the vote and I didn't see why we couldn't hold the vote after the start of the new year. Nonetheless the vote was conducted under closed balloting. When Defendant Evslin announced that the motion had passed with only six dissenting votes I remember being surprised since I knew of more than six doctors who had stated they voted against the merger.

# Paragraph 5 Excerpts

## REPORT OF EXPERT WITNESS

I, Terry S. Coleman, have been retained to provide expert testimony in this case. The opinions that I will express in the case are as follows:

(a) Medicare covers drugs administered in physician offices by non-physician employees of the physician, and the related drug administration services, only if a supervising physician is present in the same office suite where the items and services are furnished and the supervising physician is immediately available to provide assistance. Drugs and drug administration services that are not furnished in accordance with this requirement are not eligible for Medicare payment. These same requirements apply to all services furnished by non-physician staff that are covered by Medicare as services furnished incident to a physician's service.

(b) The supervising physician must be present in the suite and immediately available throughout the procedure to meet the requirements for Medicare coverage. If the physician arrives in the suite after drug administration procedures have begun, or leaves the suite for lunch, to conduct hospital rounds, or for other reasons, Medicare does not cover any drugs and drug administration services that were furnished in whole or part during the absence of the supervising physician.

para 5.i.

(c) If the employer of the supervising physician submits claims to Medicare for the supervised services, such claims would be improper if the supervising physician was unaware that he or she was performing the supervising function. The supervising physician must sign the Medicare claim form unless, as is usually the case, the signature is on file. In either case, by submission of the claim form to Medicare, the supervising physician certifies that the services for which Medicare payment is claimed were furnished under the physician's immediate personal supervision. If the physician was not aware that he or she was supervising services, that

para 5.g.

Plaintiff Lockyer's Concise Statement of Facts at ¶ 5

certification cannot properly be made by an entity submitting the claim on behalf of the physician.  In addition, if the physician is not aware that he is supervising services, he may not take care to be in the office suite and immediately available to provide assistance without any absences during the course of the day.  To the extent that the employer of Dr. James Lockyer submitted claims to Medicare that state he was the supervising physician for services, and Dr. Lockyer was not knowingly supervising such services, such claims were improper and not eligible for Medicare payment.

My opinion is based on the following:

Under the Social Security Act, Medicare covers drugs administered by non-physician staff in physician offices, as well as the drug administration services furnished by non-physician staff, under the benefit for items and services furnished incident to a physician's service.

The regulations and the Medicare manuals set forth conditions that must be satisfied before any item or service will be covered by Medicare as an incident-to service.  One of the requirements is that the items and services must be furnished under the "direct supervision" of a physician.  The physician directly supervising the personnel administering the drugs does not have to be the same physician who is treating the patient.  (42 C.F.R. § 410.26(b)(5))

para 5.b.

Direct supervision is defined in the office setting as meaning that "the physician must be present in the office suite and immediately available to furnish assistance throughout the performance of the procedure."  The physician does not have to be present in the room when the procedure is performed.  (42 C.F.R. §§ 410.26(a)(2), 410.32(b)(3)(ii))

para 5.a.

A similar requirement for physician supervision exists under the so-called Stark Law (42 U.S.C. § 1395nn).  That law prohibits physicians from referring patients to their own staff for drugs unless certain requirements are met.  One of the requirements is that the staff furnishing

para 5.d.

the drugs must be "directly supervised" by the physician ordering the administration of the drugs or by another physician in the same group practice.  If that requirement is not met, the physician is not permitted to bill Medicare or the patient for the drugs involved.  In the case of incident-to services like the furnishing of drugs, the regulations implementing the Stark Law interpret "directly supervised" as meaning that the physician must comply with the supervision requirements applicable to incident-to services.  (42 C.F.R. § 411.355(b)(1)(iii))  Thus, if the supervision requirements of the incident-to rules are not met, the Stark Law prohibits submitting claims for drugs to Medicare.

para 5.d.

If the physician who supervises the drug administration service is not the same physician who is treating the patient and ordered the service, the names of both physicians must appear on the claim form that is submitted to Medicare for payment.  The name of the ordering physician is entered on the form as the "referring physician," and the supervising physician is required to sign the form.  An actual signature is not required if the signature is on file or the field states "Signature on File" and/or a computer-generated signature.

The signature of the supervising physician indicates that the supervising physician agrees with the statement:  "I certify that the statements on the reverse apply to this bill and are made a part thereof."  On the back of the form, it states in part:  "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."

para 5.h.

Copies of Medicare regulations and policies that support my position are attached as exhibits.

Bookbinder Decl.

Exhibits 2, 3, and 5 the Declarations of Beth Carlozzi, Beth Carter, and Sally

Diana.  I have also read and considered the Declarations of Jonathon K. Cho,

M.D., Bernard W.D. Fong, M.D., and George P. Gelmann, M.D., Exhibits 21, 8,

and 9, respectively.

  7. The following facts, which are consistent with the statements

declared by Drs. Cho and Fong, are relevant to the appropriateness of billings and

claims to Government health care benefit programs in this case:

  a. It is the standard of care in treating cancer patients for

them to be initially evaluated and a treatment plan devised by a board

certified or board eligible medical oncologist.

  b. If the treatment plan includes a course of chemotherapy,

a specially trained and qualified oncology nurse may administer the

chemotherapy under the supervision of the oncologist or another

physician.

  c. Supervision means that the supervising physician must be

present in the same office suite where the items and services are being

provided, and immediately available to render assistance and direction

throughout the performance of the procedure.

para 5.a., f.

3

The Medicare regulations set forth at 42 C.F.R. § 410.26, govern services and supplies incident to a physician's professional service that are administered by a nonphysician, such as a nurse, under the "direct supervision" of a physician. "Direct supervision" means present in the office suite and immediately available to furnish assistance and direction, but does not mean present in the same room. 42 C.F.R. §§ 410.26 (a)(2), 410.32(b)(3)(ii).  Moreover, if a nurse is giving a flu shot incident to the services of Dr. A, the direct supervision may be provided by Dr. B. 42 C.F.R. § 410.26(a)(5).  Under those circumstances, the regulations require that Dr. B's Medicare provider number be used to bill for the treatment even if he never saw the patient.  66 Fed. Reg. 55267 (Nov. 1, 2001).

para 5.a.
b., f.

To place this in concrete terms, an attorney for the HPH Defendants posed, as a hypothetical, the facts of this case to the individuals within the Centers for Medicare and Medicaid Services ("CMS"), the agency that wrote and administers the "incident to" regulations – the U.S. Attorney's Office's "client" in this case. CMS was asked whether the incident to rules would be satisfied where services are provided by oncology nurses and an internist was in the adjacent suite available to assist.  The response was that the general incident to rules would apply.  (*Rauzi Decl. Exh. B*, Exh. 7B.)  When asked whether the supervising physician must be an oncologist, CMS responded that the supervising physician need not be the same specialty as the ordering physician, but must be available to render assistance.

diagnosis or treatment of an injury or illness.
(3) Services and supplies must be commonly furnished without charge or included in the bill of a physician (or other practitioner).
(4) Services and supplies must be of a type that are commonly furnished in the office or clinic of a physician (or other practitioner).
(5) Services and supplies must be furnished under the direct supervision of the physician (or other practitioner). <u>The physician (or other practitioner) directly supervising the auxiliary personnel need not be the same physician (or other practitioner) upon whose professional service the incident to service is based.</u>
(6) Services and supplies must be furnished by the physician, practitioner with an incident to benefit, or auxiliary personnel.
(7) A physician (or other practitioner) may be an employee or an independent contractor. (emphasis added).

Because the regulations effective January 1, 2002 incorporated the then-existing policy set forth in the Medicare Carriers Manual, the same "incident to" rules applied during the entire relevant period of this litigation.

para 5.e.

The term "direct supervision" as used in 42 C.F.R. § 410.26 is defined by reference to 42 C.F.R. § 410.32(b)(3)(ii), which provides: "Direct supervision in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." This mirrors the definition of "direct personal supervision" contained in the Medicare Carriers Manual § 2050.1B.

para 5.a., f.

para 5.c.

CMS has not defined the term "office suite," but has deferred to the carrier for its interpretation. (*Rauzi Decl. Exh. B*, Exh. 1B (informal guidance from CMS

18

Plaintiff Lockyer's Concise Statment of Facts at ¶¶ 7, 8

**Centers for Medicare & Medicaid Services, HHS**                    **§ 410.26**

(ii) Individual with a family history of glaucoma; or

(iii) African-Americans age 50 and over.

(3) *Screening for glaucoma* means the following procedures furnished to an individual for the early detection of glaucoma:

(i) A dilated eye examination with an intraocular pressure measurement.

(ii) A direct ophthalmoscopy examination, or a slit-lamp biomicroscopic examination.

(b) *Condition for coverage of screening for glaucoma.*

Medicare Part B pays for glaucoma screening examinations provided to eligible beneficiaries as described in paragraph (a)(2) of this section if they are furnished by or under the direct supervision in the office setting of an optometrist or ophthalmologist who is legally authorized to perform these services under State law (or the State regulatory mechanism provided by State law) of the State in which the services are furnished, as would otherwise be covered if furnished by a physician or incident to a physician's professional service.

(c) *Limitations on coverage of glaucoma screening examinations.*

(1) Payment may not be made for a glaucoma screening examination that is performed for an individual who is not an eligible beneficiary as described in paragraph (a)(2) of this section.

(2) Payment may be made for a glaucoma screening examination that is performed on an individual who is an eligible beneficiary as described in paragraph (a)(2) of this section, after at least 11 months have passed following the month in which the last glaucoma screening examination was performed.

[66 FR 55328, Nov. 1, 2001]

**§ 410.24  Limitations on services of a doctor of dental surgery or dental medicine.**

Medicare Part B pays for services furnished by a doctor of dental surgery or dental medicine within the scope of his or her license, if the services would be covered as physicians' services when

performed by a doctor of medicine or osteopathy.[1]

[51 FR 41339, Nov. 14, 1986, as amended at 56 FR 8852, Mar. 1, 1991]

**§ 410.25  Limitations on services of a podiatrist.**

Medicare Part B pays for the services of a doctor of podiatric medicine, acting within the scope of his or her license, if the services would be covered as physicians' services when performed by a doctor of medicine or osteopathy.

**§ 410.26  Services and supplies incident to a physician's professional services: Conditions.**

(a) *Definitions.* For purposes of this section, the following definitions apply:

(1) *Auxiliary personnel* means any individual who is acting under the supervision of a physician (or other practitioner), regardless of whether the individual is an employee, leased employee, or independent contractor of the physician (or other practitioner) or of the same entity that employs or contracts with the physician (or other practitioner).

(2) *Direct supervision* means the level of supervision by the physician (or other practitioner) of auxiliary personnel as defined in § 410.32(b)(3)(ii).

(3) *Independent contractor* means an individual (or an entity that has hired such an individual) who performs part-time or full-time work for which the individual (or the entity that has hired such an individual) receives an IRS–1099 form.

(4) *Leased employment* means an employment relationship that is recognized by applicable State law and that is established by two employers by a contract such that one employer hires the services of an employee of the other employer.

(5) *Noninstitutional setting* means all settings other than a hospital or skilled nursing facility.

---

[1] For services furnished before July 1, 1981, Medicare Part B paid only for the following services of a doctor of dental surgery or dental medicine:

Surgery on the jaw or any adjoining structure; and

Reduction of a fracture of the jaw or other facial bone.

(ii) Diagnostic tests personally furnished by a qualified audiologist as defined in section 1861(ll)(3) of the Act.

(iii) Diagnostic psychological testing services personally furnished by a clinical psychologist or a qualified independent psychologist as defined in program instructions.

(iv) Diagnostic tests (as established through program instructions) personally performed by a physical therapist who is certified by the American Board of Physical Therapy Specialties as a qualified electrophysiologic clinical specialist and permitted to provide the service under State law.

(v) Diagnostic tests performed by a nurse practitioner or clinical nurse specialist authorized to perform the tests under applicable State laws.

(vi) Pathology and laboratory procedures listed in the 80000 series of the Current Procedural Terminology published by the American Medical Association.

(3) *Levels of supervision.* Except where otherwise indicated, all diagnostic x-ray and other diagnostic tests subject to this provision and payable under the physician fee schedule must be furnished under at least a general level of physician supervision as defined in paragraph (b)(3)(i) of this section. In addition, some of these tests also require either direct or personal supervision as defined in paragraphs (b)(3)(ii) or (b)(3)(iii) of this section, respectively. (However, diagnostic tests performed by a physician assistant (PA) that the PA is legally authorized to perform under State law require only a general level of physician supervision.) When direct of personal supervision is required, physician supervision at the specified level is required throughout the performance of the test.

(i) *General supervision* means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.

(ii) *Direct supervision* in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed.

(iii) *Personal supervision* means a physician must be in attendance in the room during the performance of the procedure.

(c) *Portable x-ray services.* Portable x-ray services furnished in a place of residence used as the patient's home are covered if the following conditions are met:

(1) These services are furnished under the general supervision of a physician, as defined in paragraph (b)(3)(i) of this section.

(2) The supplier of these services meets the requirements set forth in part 486, subpart C of this chapter, concerning conditions for coverage for portable x-ray services.

(3) The procedures are limited to—

(i) Skeletal films involving the extremities, pelvis, vertebral column, or skull;

(ii) Chest or abdominal films that do not involve the use of contrast media; and

(iii) Diagnostic mammograms if the approved portable x-ray supplier, as defined in subpart C of part 486 of this chapter, meets the certification requirements of section 354 of the Public Health Service Act, as implemented by 21 CFR part 900, subpart B.

(d) *Diagnostic laboratory tests.* (1) *Who may furnish services.* Medicare Part B pays for covered diagnostic laboratory tests that are furnished by any of the following:

(i) A participating hospital or participating RPCH.

(ii) A nonparticipating hospital that meets the requirements for emergency outpatient services specified in subpart G of part 424 of this chapter and the laboratory requirements specified in part 493 of this chapter.

(iii) The office of the patient's attending or consulting physician if that physician is a doctor of medicine, osteopathy, podiatric medicine, dental surgery, or dental medicine.

Lockyer Decl

certainly never covered the chemotherapy room no matter how she

defined it.

8.    If I had been aware that I was to supervise the chemotherapy

room and had agreed, I would have asked one of the other internists to take over-

(cover) for me if I had to leave the second floor.  I was never aware and never

agreed, so I never thought I had to ask anyone to assume the responsibility for me.

No other doctor ever said to me, "I have to leave the building but I am responsible

for (or supervising) chemotherapy today.  Could you assume the responsibility  for

me while I am gone?"

para 5.i.

9.    I contacted Georgetown University Medical School and

confirmed that Dr. Gelmann was not in private practice in circumstances which are

similar to the circumstances at KMC.  *See* Defense Exhibit 9.  Dr. Gelmann no

longer teaches at the Georgetown University Medical School, but while he was at

Georgetown, he only saw patients at the Lombardi Clinic (as his declaration states)

along with faculty colleagues and did not have a medical office-based practice.

10.    I have examined Exhibits 11-20 of Defendants' Motion for

Summary Judgment and I dispute the conclusions they have put forward about

those exhibits.

Braun Decl.

33.    I never considered it among my duties or assignment as a KMC-employed internal medicine physician to supervise the administration of chemotherapy in the oncology suite at KMC.

34.    I never arranged my schedule so that I would be in my office suite at KMC during the entire time chemotherapy was being administered in the oncology suite at KMC, nor was I ever asked to be present or to be immediately available to furnish assistance throughout the entire time chemotherapy was being administered in the oncology suite at KMC on any given day.

para 5.i.

35.    I had my own patients which I saw in my own office suite each day, and I was never asked to, nor did I, arrange my schedule such that I was available to immediately respond to an emergency in the oncology suite throughout the time chemotherapy was being administered on any particular day.

36.    I had no particular knowledge or awareness of when chemotherapy was commenced or completed on any particular day in the oncology suite at KMC, nor did anyone ever make any effort that I know of to inform me of the goings-on in the chemotherapy room at KMC.

37.    I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

> I certify that the services shown on this form were
> medically indicated and necessary for the health of

Netzer Decl

17.    I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

18.    I was never asked to be on call for the KMC oncology suite or to cover the KMC oncology suite during the clinic day.

19.    I never considered it among my duties or assignment as a KMC-employed physician to supervise the administration of chemotherapy in the oncology suite at KMC.

20.    I never arranged my schedule so that I would be in my office suite at KMC during the entire time chemotherapy was being administered in the oncology suite at KMC, nor was I ever asked to be present or to be immediately available to furnish assistance throughout the entire time chemotherapy was being administered in the oncology suite at KMC on any given day.

para 5.i.

21.    I had my own patients which I saw in my own office suite each day, and I was never asked to, nor did I, arrange my schedule such that I was available to immediately respond to an emergency in the oncology suite throughout the time chemotherapy was being administered on any particular day.

22.    I have not measured the distance from my suite of exam rooms and private office to the chemotherapy room, but assuming I was in my office suite and able to respond to an announced emergency in the chemotherapy room, I

# Paragraph 6 Excerpts

Newbold Decl.

f.    I typically left for the day at approximately 6:00 p.m.

g.    Kauai Medical Clinic operated a chemotherapy infusion room in the oncology medical suite on the second floor of the KMC building.

h.    The chemo nurses arrived sometime between 7:00am and 7:30am and cancer patients were receiving their chemotherapy by 7:30 or 8:00am.

para 6.a.

i.    The first physicians did not usually arrive on the second floor after conducting their hospital rounds until after 8:30 a.m.

para 6.b.

j.    Chemotherapy was administered continuously throughout the day, such that the nurses staffing the chemotherapy room frequently complained that because the chemotherapy room did not close during lunch as all other departments did, which required them to take staggered lunch breaks.

para 6.a., d.

k.    All other KMC departments were required to close for lunch from noon until 2:00 p.m., during which time the physicians left for lunch, conferences, to check on patients in the hospital, or on personal business.

para 6.c.

10.    Dr. Lockyer was highly regarded by his patients, other KMC physicians, and KMC staff.  He was noted for being very caring, but also attending

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf, | ) CIVIL NO. CV 04-00596 ACK LEK<br>) (Federal and State - Qui Tam)<br>)<br>) DECLARATION OF CHRISTINA<br>) NEWBOLD |
|     Plaintiffs, | ) |
| vs. | ) |
| | ) |
| HAWAI'I PACIFIC HEALTH;<br>KAUAI MEDICAL CLINIC;<br>WILCOX MEMORIAL HOSPITAL;<br>WILCOX HEALTH SYSTEM; AND<br>WILLIAM A. EVSLIN, M.D. AKA<br>LEE A. EVSLIN, M.D.<br>    Defendants. | ) <u>HEARING</u><br>) Date:  March 27, 2007<br>) Time:  10:30 A.M.<br>)<br>) Trial Date: September 18, 2007<br>) Judge:  Honorable Alan C. Kay |

<u>DECLARATION OF CHRISTINA NEWBOLD</u>

I, CHRISTINA NEWBOLD, do hereby declare that the following facts are based on personal knowledge, and that I am competent to so testify:

    1.  I am a medical technician/phlebotomist, and am over 18 years of age.

    2.  I am a resident of the Island of Kauai.

    3.  I was employed by Kauai Medical Clinic ("KMC") from January 8, 1997 to March 23, 2003 as a medical assistant.

    4.  I was assigned to work for Dr. Lockyer from December 1999 to March 23, 2003and as part of my duties, it was necessary for me to keep his

para 6.f.,g.

appointment schedule and have knowledge of all of his assignments, including those occasions when he was on-call.

para 6.k.

5.    There was always a written call schedule that indicated when Dr. Lockyer was on call.

para 6.f.,g.

6.    When Dr. Lockyer was on call for the Hospital, I frequently had to cancel his clinic appointments because there were so many emergencies that his presence was required at the Hospital all day.

7.    Dr. Lockyer was regularly assigned to be on call for Wilcox Memorial Hospital.  I recall no occasion on which Dr. Lockyer was on call for the oncology department, or assigned to supervise the nurses in the Chemo Suite.

8.    I never heard of or saw any written or formal call schedules for the Chemo Suite.

para 6.e.

9.    During the period from January 1999 through March, 23, 2003, the date I resigned from KMC,

    a.    I was required to report for work by 8:00 a.m.

    b.    My lunch break was between 12:30 pm and 1:30 pm

    c.    I was required to work until 5:30 p.m.

    d.    I typically arrived at work at approximately 7:30 a.m.

    e.    We sometimes had to work through our lunch break due to our workload.

Lockyer Decl

patient's historical medical charts were locked away in the chart room, so I had only the day's notes and lab reports.

18.    I resolved to refuse to "sign-off" on any progress notes or labs.

19.    I discussed my decision with the chair of the Internal Medicine Department, Dr. Braun.  He told me that he had also decided to refuse to sign charts and lab after he had stayed until about 11:00 p.m. reviewing the nursing notes and lab reports that were deposited outside of his office, and was disturbed by the extreme lab results and his inability to gauge whether they represented a risk to the patients.

20.    Dr. Braun shared with me that he expected other internists in the KMC Internal Medicine Department to refuse to sign off.

21.    I was never asked to supervise the administration of chemotherapy in the oncology suite at KMC, nor did I ever accept such an assignment.  Prior to the May 2002 meeting with Defendant Evslin, I recall no occasion on which I was asked to supervise the chemotherapy room, sign notes or labs,  for oncology or chemotherapy, and no occasion on which I was ever asked whether my provider number may be used to submit claims for chemotherapy.

para 6.f.

22.    Defendant Evslin did not explain at the meeting in May 2002 that KMC would be submitting claims to Medicare and other insurers with our respective provider numbers.  He never mentioned claims at the meeting.

Braun Decl

fiats, were the product of considered decisions reached by a group of professional peers.

27.    I was present for at least one KMC Executive Board meeting and at least two or more Internal Medicine meetings, from which Dr. Evslin excluded Dr. Lockyer, at which Dr. Evslin lobbied the members to call for the termination of Dr. Lockyer's contract, and the members refused by a majority vote.

28.    I also recall that either no minutes were made of those meetings, or the minutes attributed actions to one or the other of the physicians who had attended the meeting, when it was in fact Dr. Evslin who had raised the issue and his decision or position which had been accepted.

29.    I was never asked to supervise the administration of chemotherapy in the oncology suite at KMC, nor did I ever accept such an assignment.

30.    Once Dr. Evslin clarified that he was only asking the internists to sign chemotherapy patient charts and labs at the end of the day, I did not consider his request to be for supervision throughout the administration of chemotherapy in the oncology suite, or to be on call for oncology.

31.    I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

32.    I was never asked to be on call for the KMC oncology suite.

para 6.f.

Netzer Decl

17.    I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

18.    I was never asked to be on call for the KMC oncology suite or to cover the KMC oncology suite during the clinic day.

19.    I never considered it among my duties or assignment as a KMC-employed physician to supervise the administration of chemotherapy in the oncology suite at KMC.

20.    I never arranged my schedule so that I would be in my office suite at KMC during the entire time chemotherapy was being administered in the oncology suite at KMC, nor was I ever asked to be present or to be immediately available to furnish assistance throughout the entire time chemotherapy was being administered in the oncology suite at KMC on any given day.

21.    I had my own patients which I saw in my own office suite each day, and I was never asked to, nor did I, arrange my schedule such that I was available to immediately respond to an emergency in the oncology suite throughout the time chemotherapy was being administered on any particular day.

22.    I have not measured the distance from my suite of exam rooms and private office to the chemotherapy room, but assuming I was in my office suite and able to respond to an announced emergency in the chemotherapy room, I

Lockyer Decl

patient's historical medical charts were locked away in the chart room, so I had

only the day's notes and lab reports.

18.    I resolved to refuse to "sign-off" on any progress notes or labs.

19.    I discussed my decision with the chair of the Internal Medicine

Department, Dr. Braun.  He told me that he had also decided to refuse to sign

charts and lab after he had stayed until about 11:00 p.m. reviewing the nursing

notes and lab reports that were deposited outside of his office, and was disturbed

by the extreme lab results and his inability to gauge whether they represented a risk

to the patients.

20.    Dr. Braun shared with me that he expected other internists in

the KMC Internal Medicine Department to refuse to sign off.

21.    I was never asked to supervise the administration of

chemotherapy in the oncology suite at KMC, nor did I ever accept such an

assignment.  Prior to the May 2002 meeting with Defendant Evslin, I recall no

occasion on which I was asked to supervise the chemotherapy room, sign notes or

labs,  for oncology or chemotherapy, and no occasion on which I was ever asked

whether my provider number may be used to submit claims for chemotherapy.    para 6.h.

22.    Defendant Evslin did not explain at the meeting in May 2002

that KMC would be submitting claims to Medicare and other insurers with our

respective provider numbers.  He never mentioned claims at the meeting.

9

Braun Decl

11.    No one ever had my permission to use my provider number to submit claims for the administration of chemotherapy.

12.    On or around January, 2002, Dr. Sutherland left the Department of Internal Medicine to become the KMC oncologist.

13.    Dr. Sutherland took over oncology after John Hayward, M.D. resigned from KMC.

14.    KMC eventually hired Grace Inouye, M.D. for oncology.  Dr. Sutherland remained in the Oncology Department and did not return to the Internal Medicine Department after KMC hired Dr. Inouye.

15.    Sometime in the Spring of 2002, Dr. Evslin asked to meet with the Internal Medicine Department, at which time he requested that the internal medicine physicians "cover" chemotherapy patients when Dr. Sutherland was absent.  We (the internists) objected on the grounds that we had our own full work load of scheduled patients.

16.    Dr. Evslin responded that all he was asking us to do was sign all of the charts for chemotherapy patients at the end of the day, and "sign off" on all labs.

para 6.h.

17.    We again objected, raising patient safety concerns and questioning whether we could sign off on the charts of patients that we never saw for chemotherapy we had not ordered.  We reached no consensus.

Netzer Decl

5.     I believe that KMC was materially underreporting the collections on claims for my services during my employment.

6.     I opened my own private internal medicine practice after I resigned from KMC.

7.     My private practice collection ratio is materially better than it was when KMC was collecting receipts for my services while I was on KMC's staff.

8.     I agreed to be interviewed during the first week of March, 2006, by an attorney whose name I do not have, but who said he was from Oregon and was representing KMC.

9.     The Oregon attorney asked whether I was familiar with the "cross-coverage for the chemotherapy room" and I confirmed that I was.

10.     I related that I was aware the Department of Internal Medicine had been asked, as a group, by Dr. Evslin to sign chemotherapy patient charts at the end of the day, but the group objected.  Dr. Evslin chided the group for being negative and not acting like team players.  The group ultimately refused to take part in the signing.

para 6.h.

11.     I related other concerns I had about issues that appeared to me to be improper and contributed to my decision to resign.

suite at KMC, nor did anyone ever make any effort that I know of to inform me of the goings-on in the chemotherapy room at KMC.

34.    I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

para 6.i.

35.    I recall that KMC instituted a policy during my employment requiring that a physician be present to supervise all blood transfusions in the chemotherapy room.  The policy was instituted after two separate severe transfusion reactions occurred in the in the chemotherapy room when no physician was present.   It was my understanding that the policy was replaced by a policy requiring all transfusions to be performed in the hospital because the KMC oncology staff was not able to comply consistently with requirement of having a physician present in the KMC Clinic.

**Defendant Evslin Retaliated Against Me Because I Called for an Audit**

36.    Defendant Evslin began retaliating against me shortly after I began asking for an audit of KMC's finances.  Defendant Evslin came to my office

12

33.     I never considered it among my duties or assignment as a KMC-employed internal medicine physician to supervise the administration of chemotherapy in the oncology suite at KMC.

34.     I never arranged my schedule so that I would be in my office suite at KMC during the entire time chemotherapy was being administered in the oncology suite at KMC, nor was I ever asked to be present or to be immediately available to furnish assistance throughout the entire time chemotherapy was being administered in the oncology suite at KMC on any given day.

35.     I had my own patients which I saw in my own office suite each day, and I was never asked to, nor did I, arrange my schedule such that I was available to immediately respond to an emergency in the oncology suite throughout the time chemotherapy was being administered on any particular day.

36.     I had no particular knowledge or awareness of when chemotherapy was commenced or completed on any particular day in the oncology suite at KMC, nor did anyone ever make any effort that I know of to inform me of the goings-on in the chemotherapy room at KMC.

37.     I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

para 6.i.

    I certify that the services shown on this form were medically indicated and necessary for the health of

would have been required to navigate two fairly lengthy perpendicular corridors to arrive at the chemotherapy room.

23.   I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

para 6.i.

24.   No one ever had my permission to say that I covered the chemotherapy suite or to use my provider number to submit claims for the administration of chemotherapy.

25.   On several occasions, I asked Lynn Joseph to confirm that KMC had never submitted any claims using my provider number for the administration of chemotherapy or any services or lab tests in connection with chemotherapy services I did not order.

26.   Ms. Joseph failed to confirm to my satisfaction that KMC had never submitted claims using my provider number for chemotherapy services, so I sent her a letter on November 27, 2006, requesting such confirmation.  A true and correct copy of my letter to Lynn Joseph is attached as Exhibit N1.

Netzer Decl
all pertaining to para 6.i.

27.    I received a response from Ms. Joseph which I do not consider a sufficient confirmation.  I have attached a copy of the response, dated December 27, 2006, to this Declaration as Exhibit N2.

28.    I dispute the allegation Nurse Carlozzi declared at paragraph 6 of her Declaration, attached hereto as Exhibit N3, that anyone "discussed" with me "ahead of time" that I was assigned to "cover" the chemotherapy room because that never happened.  I see nothing in Nurse Carlozzi's Declaration alleging that she was ever personally present at such a discussion or ever spoke a word to me about "covering" the chemotherapy room.  She never did.

29.    I further dispute the allegation by Nurse Carlozzi in paragraph 6 of Exhibit N3 that I was ever asked to cover the chemotherapy room on any day chemotherapy medical charts were left outside my door which I was expected to sign.  I was never asked to "cover" the chemotherapy room for the day the when the charts were left outside my office.

30.    I dispute the allegation Nurse Carter declared in paragraph 5 of her Declaration, attached hereto as Exhibit N4, that she ever asked me about a borderline blood test result for a chemotherapy patient because I was the "covering physician" for the chemotherapy room.

31.    I dispute the allegation Nurse Carter declared at paragraph 7 of Exhibit N4, that "If the oncologist was not available, an internist from the Clinic

covered the chemotherapy suite." I do not know what Nurse Carter meant by the term "covered," but whatever she may have meant, I did not "cover" the chemotherapy suite.

32.    I dispute the allegation in Nurse Sally Diana's Declaration, attached hereto as Exhibit N5, that I was ever assigned by KMC administration "in advance to cover the chemotherapy suite." I do not know what Nurse Diana meant by the term "cover," but whatever she meant, no one ever asked me in advance to "cover" the chemotherapy suite.

33.    No one ever had my permission to say that I covered the chemotherapy suite or to use my provider number to submit claims for the administration of chemotherapy.

I, R. CRAIG NETZER, M.D., do declare under penalty of law that the forgoing is true and correct.

DATED:  Honolulu, Hawai`i, March ___, 2007

R. CRAIG NETZER, M.D.

Lockyer Decl.
all pertaining to para 6.i.

7.    I have read the supporting declarations for the HPH-Entity

Defendants' Motion for Summary Judgment, and I dispute the allegations as

follows:

a.    I dispute Beth Carlozzi's declaration as far as anything

that occurred in 2002 or thereafter because she was no longer

employed in the KMC Oncology Department, and she has not

declared the basis on which she has personal knowledge of what

occurred thereafter.

b.    I dispute the allegation Beth Carlozzi declared at

paragraph 5 of her Declaration, that I and the physicians of the

Internal Medicine Department "covered the chemotherapy suite if the

oncologist was not present on a certain day." I do not know what

Nurse Carlozzi means by "covered" but I certainly never covered the

chemotherapy room no matter how she defined it.    I was, however,

willing and qualified to respond to life threatening emergencies when

they occurred, assuming I was in the immediate vicinity at the time of

such an event and I was made aware of the event. This is a standard

expected of all physicians, and in no way constitutes supervising or

being responsible for the operation of a particular area or department

of the medical office.  I did, in fact, respond to one or two such

emergencies because I happened to be on the second floor at the time and the oncology nurses asked me to help the patient. I was not, however, "covering" the chemotherapy room at the time and had not been asked to cover or supervise the chemotherapy room on those particular days.

    c.    I dispute the allegation Nurse Carlozzi declared at paragraph 6 of her Declaration, that anyone "discussed" with me "ahead of time" that I was assigned to "cover" the chemotherapy room because that never happened. I see nothing in Nurse Carlozzi's declaration alleging that she was ever personally present at such a discussion.

    d.    I further dispute the allegation in Nurse Carlozzi Declaration at paragraph 6 that I was ever asked to cover the chemotherapy room on any day chemotherapy medical charts were left outside my door which I was expected to sign. I was never asked to "cover" the chemotherapy room for the day the when the charts were left outside my office.

    e.    I dispute the allegation Nurse Carlozzi declared at paragraph 7 of her Declaration, that she heard me complain about "covering" the chemotherapy room "because he believed he should be

4

paid more to do it." The statement is false. An oncology nurse may have heard me complain that I was not being paid to stay at work until late at night reading oncology progress notes and lab work which made no sense in the absence of the related patient charts. However, it is my understanding from Ms. Carlozzi's Declaration that she worked until 2002. I was not asked to sign off on the progress notes and lab work until May 2002.

f.    I dispute the allegation Nurse Carter declared in paragraph 5 of her Declaration that she ever asked me about a borderline blood test result for a chemotherapy patient because I was the "covering physician" for the chemotherapy room.

g.    I dispute the allegation Nurse Carter declared at paragraph 7 of her Declaration that "If the oncologist was not available, an internist from the Clinic covered the chemotherapy suite." I do not know what Nurse Carter meant by the term "covered," but whatever she may have meant, I did not "cover" the chemotherapy suite.

h.    I dispute the allegation Nurse Carter declared at paragraph 9 of her Declaration, that I "covered the chemotherapy suite." I do not know what Nurse Carter means by "covered" but I

5

certainly never covered the chemotherapy room no matter how she defined it.

8.      If I had been aware that I was to supervise the chemotherapy room and had agreed, I would have asked one of the other internists to take over- (cover) for me if I had to leave the second floor.  I was never aware and never agreed, so I never thought I had to ask anyone to assume the responsibility for me.  No other doctor ever said to me, "I have to leave the building but I am responsible for (or supervising) chemotherapy today.  Could you assume the responsibility  for me while I am gone?"

9.      I contacted Georgetown University Medical School and confirmed that Dr. Gelmann was not in private practice in circumstances which are similar to the circumstances at KMC.  *See* Defense Exhibit 9.  Dr. Gelmann no longer teaches at the Georgetown University Medical School, but while he was at Georgetown, he only saw patients at the Lombardi Clinic (as his declaration states) along with faculty colleagues and did not have a medical office-based practice.

10.      I have examined Exhibits 11-20 of Defendants' Motion for Summary Judgment and I dispute the conclusions they have put forward about those exhibits.

Lockyer Decl

or spoke to me in his office on several occasions to review summaries he had prepared of the claims and receipts for my services.

37.     At one such meeting in August 2000, Defendant Evslin told me that he had projected claims for my services that would not generate sufficient receipts to pay my guaranteed salary.  Once the receipts for my services exceeded my guaranteed salary, under my employment agreement I was supposed to receive half of the receipts.  I was surprised because I believed that I was seeing about the same number of patients per day as the internists on either side of my office, and I was very busy with hospital patients and complex cases.

38.     I estimated the collection ratio apparent from the summary report Defendant Evslin was referring to and commented that it appeared to be very low, approximately 50%.  I determined from further questioning that according to Defendant Evslin the collections summarized in his report for any given month were unrelated to the claims summarized for the month.  I requested a report that identified the receipts for each claim.  Defendant Evslin responded that it was "impossible" for him to provide me such a report.  I then stated that there must be a mechanism to collate the individual claims with the receipts collected. He stated very clearly that it was physically impossible to do that.

39.     I asked Defendant Evslin to arrange for me to see the claims     para 6.l. and receipts data on which the report was based for myself, so that I could better

13

evaluate the reasons the collections appeared to be low.  He refused.  I pressed the request but Defendant Evslin gave me no further response.  I found the response confusing and disturbing, but I wanted to believe Defendant Evslin was dealing with me in good faith.  Over the next few weeks I repeatedly inventoried whether I knew of any reason or rule why I would not be permitted to see the claims KMC was submitting under my provider number, and finally had to conclude that I knew of none.

40.    My exchange with Defendant Evslin in August 2000 was repeated a few times when he subsequently reviewed monthly "results." During those meetings, I began suggesting that it would be useful to have a financial audit to determine why the collection ratio was consistently well below industry norms.

41.    I raised my concern about being denied access to my claims with my KMC colleagues many of whom had been expressing disbelief in the reports they were provided in private discussions with me and certain of their other KMC colleagues, and found that none of them had been granted access to their claims.  Understandably, none relished the thought of sifting through hundreds of claims, but I recognized that their inability to review the claims was as dangerous as giving a bookkeeper check-signing authority and thereafter never reviewing the checks.  I suggested that an audit would afford all of us comfort that our claims were proper and corresponded to our charge slips, and that we were being credited

Paragraph 7 Excerpts

**Braun Decl.**

11.    No one ever had my permission to use my provider number to submit claims for the administration of chemotherapy.

12.    On or around January, 2002, Dr. Sutherland left the Department of Internal Medicine to become the KMC oncologist.

para 7.a.

13.    Dr. Sutherland took over oncology after John Hayward, M.D. resigned from KMC.

14.    KMC eventually hired Grace Inouye, M.D. for oncology.  Dr. Sutherland remained in the Oncology Department and did not return to the Internal Medicine Department after KMC hired Dr. Inouye.

15.    Sometime in the Spring of 2002, Dr. Evslin asked to meet with the Internal Medicine Department, at which time he requested that the internal medicine physicians "cover" chemotherapy patients when Dr. Sutherland was absent.  We (the internists) objected on the grounds that we had our own full work load of scheduled patients.

16.    Dr. Evslin responded that all he was asking us to do was sign all of the charts for chemotherapy patients at the end of the day, and "sign off" on all labs.

17.    We again objected, raising patient safety concerns and questioning whether we could sign off on the charts of patients that we never saw for chemotherapy we had not ordered.  We reached no consensus.

Defense Ex 3

I was eligible to become certified as an oncology nurse.  I passed the certification test in 2004.

4.  During the time I worked at KMC's chemotherapy suite it was the normal procedure for the oncologist to provide a written order for a chemotherapy patient setting forth the required blood tests before administration of chemotherapy, the parameters of the blood test results for administration of chemotherapy, and the types and amounts of chemotherapy to be administered.

5.  I would normally draw blood and send the blood to the lab for testing within 24 hours of treatment.  Once the results came back, I reviewed the results and compared them with the parameters provided by the oncologist in the order.  I am very familiar with the appropriate parameters from my training and my experience.  If the blood tests results fell within the appropriate range, I did not need to consult a physician before proceeding with chemotherapy.  If the results were borderline, I would check with the oncologist or covering physician before administering chemotherapy.

6.    Once the blood tests confirmed that a patient was eligible for chemotherapy that day, I prepared the chemotherapy drugs as specified in the oncologist's order.

para 7.b.

7.  It was the normal procedure at KMC's chemotherapy suite for an oncologist to be in the office at the time a chemotherapy patient received

4832430

Defense Ex 5

4.  The day before the scheduled chemotherapy, I would prepare my patients' charts and verify that they contained a written order for chemotherapy, a written an order for blood work, and insurance authorization.

5.  I would draw the patient's blood and send it to the lab for testing within 24 hours of treatment.  When the results came back, I reviewed them to see if the red blood cell count, white blood cell count and platelet count were within the range specified by the oncologist in the order.  I was very familiar with reading lab results from my training and from the number of years I had worked as an oncology nurse.  If the blood test results fell within the appropriate range, I did not need to consult a physician before proceeding with chemotherapy.  If the results were borderline, I always checked with the oncologist or the covering physician.

6.  Once the blood tests confirmed that a patient was eligible for chemotherapy that day, I prepared the chemotherapy drugs as specified in the oncologist's order.

para 7.b.

7.  An oncologist would normally be in the office at the time a chemotherapy patient received treatment.  If the oncologist was not available, another doctor in the Clinic would be assigned to "cover" for the oncologist.

8.  Physicians in the Internal Medicine Department of the Clinic covered the chemotherapy suite if the oncologist was not present on a certain day.  The Internal Medicine suite is on the same floor as the chemotherapy suite.

Bookbinder Decl

agents, but that cannot be determined from the supporting information Defendants submitted with their Motion.

       d.    It is impossible to determine, based upon the information Defendants submitted with their Motion, whether the nurses who possessed only a Chemotherapy Provider Card were qualified to mix and administer chemotherapy agents without a physician present and supervising.

       10.    Medicare's "incident to" regulation is not the governing billing regulation in cases in which no qualified nurse is mixing and administering the chemotherapy agents to cancer patients.  It thus appears from Defendants' submissions with their Motion, because it is not possible to determine whether the nurses were properly qualified, that there was a substantial period of time from January 2002 until at least October 2003, and possibly even until April 2004 or later, during which chemotherapy was mixed by staff without appropriate certification.

para 7.c.

       11.    It is not possible to determine from Defendants' submissions with their Motion whether chemotherapy was administered when the only certified nurse was absent from the oncology suite.

Braun Decl

18.    Within days of the aforementioned meeting, I found that someone had deposited stacks of chemotherapy patient charts outside of my office.

19.    I remained after clinic hours until about 11:00 p.m. reviewing the charts and lab reports of patients unknown to me, and became convinced that it was inappropriate for me to be signifying anything with respect to the labs, many of which reported extreme results which I would have been unable to say were acceptable for the patient.

para 7.d.

20.    Dr. Lockyer reported to me that he had decided to decline to sign chemotherapy patient charts and labs after reviewing a number of them, as did other internists in the KMC Internal Medicine Department.

para 7.e.

21.    I agreed to meet at KMC during the first week of March, 2006, with an attorney from Seattle who identified himself as "Ed Rauzi" and said he was KMC's attorney.

22.    Mr. Rauzi told me during the interview that the "FBI was trying to act like Al Capone had moved to Lihue."

23.    I related the facts stated in numbers 14 through 22 above to Mr. Rauzi.  He asked me why the internists had refused to stay after clinic hours to sign a few charts.  I responded that it was inappropriate and potentially dangerous for non-oncologists to be monitoring treatment and reviewing labs on cancer patients who were unknown to me and whose full charts were not available to review after

Lockyer Decl.

were questioning whether we could sign off on the charts of patients that we never saw for chemotherapy we had not ordered.

15.    In my experience, during an oncologist's planned absences from a clinic in this community, the clinic hires a temporary (*locum tenans*) oncologist so that the patients continue to receive qualified care.  KMC's failure to hire a *locum tenans* for Dr. Sutherland appeared to us to be motivated by the desire to avoid the cost of hiring a proper substitute for the oncologist.  We were unwilling to support that decision because it meant patients could receive less than the accepted standard of care, and might be subjected to unjustified risks.

16.    Within days of the meeting Defendant Evslin held at which he asked the internists to sign off on the chemotherapy progress notes and lab reports, I found that someone had deposited stacks of them outside of my office.

17.    I stayed after work for several hours reviewing the progress notes and labs.  The more I saw, the more alarmed I became because the lab results were extreme in many cases, and I had no idea whether the results were within acceptable parameters for that particular patient because of his or her prescribed treatment, or actually signified a life-threatening situation.  I know that

para 7.d.

chemotherapy is sometimes intended by the oncologist to induce reactions that produce extreme lab results, but I am not trained in oncology and could not, with reasonable certainty, determine whether the lab results were appropriate.  The

patient's historical medical charts were locked away in the chart room, so I had only the day's notes and lab reports.

18.     I resolved to refuse to "sign-off" on any progress notes or labs.

19.     I discussed my decision with the chair of the Internal Medicine Department, Dr. Braun.  He told me that he had also decided to refuse to sign charts and lab after he had stayed until about 11:00 p.m. reviewing the nursing notes and lab reports that were deposited outside of his office, and was disturbed by the extreme lab results and his inability to gauge whether they represented a risk to the patients.

para 7.e.

20.     Dr. Braun shared with me that he expected other internists in the KMC Internal Medicine Department to refuse to sign off.

21.     I was never asked to supervise the administration of chemotherapy in the oncology suite at KMC, nor did I ever accept such an assignment.  Prior to the May 2002 meeting with Defendant Evslin, I recall no occasion on which I was asked to supervise the chemotherapy room, sign notes or labs,  for oncology or chemotherapy, and no occasion on which I was ever asked whether my provider number may be used to submit claims for chemotherapy.

22.     Defendant Evslin did not explain at the meeting in May 2002 that KMC would be submitting claims to Medicare and other insurers with our respective provider numbers.  He never mentioned claims at the meeting.

9

Lockyer Decl

23.    I did not consider Defendant Evslin's request, once he clarified that he was only asking the internists to sign charts and labs at the end of the day, to be a request or assignment to supervise the administration of chemotherapy in the oncology suite, or to be on call for   the oncology suite.  Subsequent to the May 2002 meeting, I did not agree to supervise chemotherapy or to permit KMC to submit claims under my provider number for chemotherapy.

24.    One day in October, 2003, about midmorning, as I was entering the second floor KMC Internal Medicine Department, Nurse Deb Dannog rushed up to me and told me that the nurses were administering chemotherapy to patients but that all of the oncology  doctors were off the island until the next week.. `para 7.f.`

25.    I declined Nurse Dannog's request, and told her that I would have to ask Dr. Williamson, then KMC Medical Director, what it meant for me to "cover" chemotherapy from legal and medical perspectives, and whether it was permissible for me to agree.

26.    I sent Dr. Williamson an e-mail requesting an explanation.  He telephoned me within a few minutes and told me he had it "handled" and I need not concern myself further.

27.    I was never, to my knowledge, designated to supervise the administration of chemotherapy in the oncology suite at KMC.

Paragraph 8 Excerpts

Lockyer Decl

suite at KMC, nor did anyone ever make any effort that I know of to inform me of the goings-on in the chemotherapy room at KMC.

34.    I never signed any charge slips or claim forms for the administration of chemotherapy or any office visits in connection with chemotherapy services to indicate that I agreed with the following statement:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

35.    I recall that KMC instituted a policy during my employment requiring that a physician be present to supervise all blood transfusions in the chemotherapy room.  The policy was instituted after two separate severe transfusion reactions occurred in the in the chemotherapy room when no physician was present.   It was my understanding that the policy was replaced by a policy requiring all transfusions to be performed in the hospital because the KMC oncology staff was not able to comply consistently with requirement of having a physician present in the KMC Clinic.

**Defendant Evslin Retaliated Against Me Because I Called for an Audit**

36.    Defendant Evslin began retaliating against me shortly after I began asking for an audit of KMC's finances.  Defendant Evslin came to my office

para 8.a.

12

or spoke to me in his office on several occasions to review summaries he had prepared of the claims and receipts for my services.

37.     At one such meeting in August 2000, Defendant Evslin told me that he had projected claims for my services that would not generate sufficient receipts to pay my guaranteed salary.  Once the receipts for my services exceeded my guaranteed salary, under my employment agreement I was supposed to receive half of the receipts.  I was surprised because I believed that I was seeing about the same number of patients per day as the internists on either side of my office, and I was very busy with hospital patients and complex cases.

38.     I estimated the collection ratio apparent from the summary report Defendant Evslin was referring to and commented that it appeared to be very low, approximately 50%.  I determined from further questioning that according to Defendant Evslin the collections summarized in his report for any given month were unrelated to the claims summarized for the month.  I requested a report that identified the receipts for each claim.  Defendant Evslin responded that it was "impossible" for him to provide me such a report.  I then stated that there must be a mechanism to collate the individual claims with the receipts collected. He stated very clearly that it was physically impossible to do that.

39.     I asked Defendant Evslin to arrange for me to see the claims and receipts data on which the report was based for myself, so that I could better

evaluate the reasons the collections appeared to be low.  He refused.  I pressed the request but Defendant Evslin gave me no further response.  I found the response confusing and disturbing, but I wanted to believe Defendant Evslin was dealing with me in good faith.  Over the next few weeks I repeatedly inventoried whether I knew of any reason or rule why I would not be permitted to see the claims KMC was submitting under my provider number, and finally had to conclude that I knew of none.

para 8.c.

40.    My exchange with Defendant Evslin in August 2000 was repeated a few times when he subsequently reviewed monthly "results." During those meetings, I began suggesting that it would be useful to have a financial audit to determine why the collection ratio was consistently well below industry norms.

para 8.a.

41.    I raised my concern about being denied access to my claims with my KMC colleagues many of whom had been expressing disbelief in the reports they were provided in private discussions with me and certain of their other KMC colleagues, and found that none of them had been granted access to their claims.  Understandably, none relished the thought of sifting through hundreds of claims, but I recognized that their inability to review the claims was as dangerous as giving a bookkeeper check-signing authority and thereafter never reviewing the checks.  I suggested that an audit would afford all of us comfort that our claims were proper and corresponded to our charge slips, and that we were being credited

para 8.b., d

by Dr. Williamson that the "fact" that I was suing KMC was hurting my chances of ever getting by.

### My Suspicions That Defendants Were Cheating Patients and Insurers

49.    I became more and more suspicious as Defendant Evslin responded belligerently to my requests to see the source data and supporting documentation for the reports he was giving me.

50.    By the time Defendant Evslin requested that the internists sign off on chemotherapy charts, I was suspicious of any request he made that seemed irregular because, in addition to his direct attacks on me, I had witnessed several incidents that suggested KMC and Defendant Evslin were intent on organizing services to maximize profits in ways that often jeopardized the quality of care or diminished it, without sufficient explanations as to why those changes and practices were ethical, and disclosed to third party payors:

51.    One such incident occurred in February 2002.  A KMC-employed clerk involved with claims processing remarked to me that she had been told to forget about a report she made about claims submitted under the provider number of a physician who had long since left KMC's employ.

para 8.e.

52.    A claims specialist at HMSA had contacted the clerk to question approximately $30,000 in such claims HMSA had received over a six-

17

week period.  They concluded that the claims probably should have been submitted

under Dr. Thomas Potter's number because of the nature of the claims.

para 8.e.

53.    I privately doubted that Dr.  Potter would fail to notice the

absence of $30,000 in claims from the summary reports Defendant Evslin provided

him.  I concluded that either the summary reports he received misrepresented that

the claims had been submitted under his provider number, or the claims were not

for his services.  I began searching for legal counsel because I felt that I had a duty

to report to an outside authority because the incident too strongly confirmed my

suspicions that Defendant Evslin/KMC were engaging in fraud.

54.    I ultimately demanded arbitration with the assistance of counsel

and compelled Defendants to produce detailed reports of claims submitted under

my provider number.  We also requested day sheets to compare with the claims

reports, but Defendants represented that the day sheets were routinely destroyed.

55.    In the lists of claims and receipts, I found numerous

chemotherapy-related claims for patient encounters.  I never had, with patients  I

had never met. The claims were for chemotherapy or erythropoietin shots I did not

order or administer, and none of which were for an office visit type of patient

encounter.  These lists indicated that Defendants had also submitted claims to other

health care benefit programs for chemotherapy or erythropoietin shots for patients I

had not seen.