# ERRATA

*Formatted: Centered*

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf,<br><br>       Plaintiffs,<br>vs.<br><br>HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; AND WILLIAM A. EVSLIN, M.D. AKA LEE A. EVSLIN, M.D.<br>       Defendants. | CIVIL NO. CV 04-00596 ACK LEK<br>(Federal and State - Qui Tam)<br><br>DECLARATION OF JAMES LOCKYER, M.D.; EXHIBITS L1-L4<br><br><br><br>HEARING<br>Date:   March 27, 2007<br>Time:   10:30 A.M.<br><br>Trial Date:   September 18, 2007<br>Judge:   Honorable Alan C. Kay |

## DECLARATION OF JAMES LOCKYER, M.D.

I, JAMES LOCKYER, M.D., do hereby declare that the following information is based on personal knowledge, and that I am competent to so testify:

1. I am a physician licensed to practice medicine in the State of Hawai'i, and am over 18 years of age.

2. I am a resident of the Kapaa, Island of Kauai.

3. The Kauai Medical Clinic ("KMC") is located in a three-storey building located at 3-3420 Suite B Kuhio Highway, Lihue.

4. Wilcox Memorial Hospital does not "adjoin" the KMC clinic building.

## ERRATA

5.  Within weeks of my employment by Defendant Lee A. Evslin at KMC, I learned of a proposed merger of KMC and Wilcox Memorial Hospital. About 1 1/2 years after my employment began I learned of a proposed merger between Wilcox/KMC and the Kapi`olani and Straub entities on Oahu.

6.  Defendant Evslin was encouraging all of the KMC doctors to support the merger. I recall that he and Dr. Sutherland were very enthusiastic about the proposed merger after Evslin returned from a visit to the Sutter Health home office in approximately March 2000. Defendant Evslin described sumptuous offices and entertainment, and I recall remarks about the merger making "us rich." In December of 2001 it was suddenly announced that the physicians would be holding a vote. I remember a number of doctors voicing our concern about doing so before we had had adequate time to consider and examine the proposal adequately. I remember Dr. Arnulfo Diaz stating that us merging with two losers doesn't make a winner. I remember voicing my concern that many of the doctors were already on Christmas vacation or would be gone during the vote and I didn't see why we couldn't hold the vote after the start of the new year. Nonetheless the vote was conducted under closed balloting. When Defendant Evslin announced that the motion had passed with only six dissenting votes I remember being surprised since I knew of more than six doctors who had stated they voted against the merger.

2

**ERRATA**

Formatted: Font: Bold
Formatted: Centered

7. I have read the supporting declarations for the HPH-Entity Defendants' Motion for Summary Judgment, and I dispute the allegations as follows:

a. I dispute Beth Carlozzi's declaration as far as anything that occurred in 2002 or thereafter because she was no longer employed in the KMC Oncology Department, and she has not declared the basis on which she has personal knowledge of what occurred thereafter.

b. I dispute the allegation Beth Carlozzi declared at paragraph 5 of her Declaration, that I and the physicians of the Internal Medicine Department "covered the chemotherapy suite if the oncologist was not present on a certain day." I do not know what Nurse Carlozzi means by "covered" but I certainly never covered the chemotherapy room no matter how she defined it. I was, however, willing and qualified to respond to life threatening emergencies when they occurred, assuming I was in the immediate vicinity at the time of such an event and I was made aware of the event. This is a standard expected of all physicians, and in no way constitutes supervising or being responsible for the operation of a particular area or department of the medical office. I did, in fact, respond to one or two such

3

**ERRATA**

<!-- Formatted: Font: Bold -->
<!-- Formatted: Centered -->

emergencies because I happened to be on the second floor at the time and the oncology nurses asked me to help the patient. I was not, however, "covering" the chemotherapy room at the time and had not been asked to cover or supervise the chemotherapy room on those particular days.

 c. I dispute the allegation Nurse Carlozzi declared at paragraph 6 of her Declaration, that anyone "discussed" with me "ahead of time" that I was assigned to "cover" the chemotherapy room because that never happened. I see nothing in Nurse Carlozzi's declaration alleging that she was ever personally present at such a discussion.

 d. I further dispute the allegation in Nurse Carlozzi Declaration at paragraph 6 that I was ever asked to cover the chemotherapy room on any day chemotherapy medical charts were left outside my door which I was expected to sign. I was never asked to "cover" the chemotherapy room for the day the when the charts were left outside my office.

 e. I dispute the allegation Nurse Carlozzi declared at paragraph 7 of her Declaration, that she heard me complain about "covering" the chemotherapy room "because he believed he should be

4

**ERRATA**

certainly never covered the chemotherapy room no matter how she defined it.

8. If I had been aware that I was to supervise the chemotherapy room and had agreed, I would have asked one of the other internists to take over-(cover) for me if I had to leave the second floor. I was never aware and never agreed, so I never thought I had to ask anyone to assume the responsibility for me. No other doctor ever said to me, "I have to leave the building but I am responsible for (or supervising) chemotherapy today. Could you assume the responsibility for me while I am gone?"

9. I contacted Georgetown University Medical School and confirmed that Dr. Gelmann was not in private practice in circumstances which are similar to the circumstances at KMC. *See* Defense Exhibit 9. Dr. Gelmann no longer teaches at the Georgetown University Medical School, but while he was at Georgetown, he only saw patients at the Lombardi Clinic (as his declaration states) along with faculty colleagues and did not have a medical office-based practice.

10. I have examined Exhibits 11-20 of Defendants' Motion for Summary Judgment and I dispute the conclusions they have put forward about those exhibits.

6

**ERRATA**

*Formatted: Font: Bold*
*Formatted: Centered*

or spoke to me in his office on several occasions to review summaries he had prepared of the claims and receipts for my services.

*Deleted: 2002*

37. At one such meeting in August 2000, Defendant Evslin told me that he had projected claims for my services that would not generate sufficient receipts to pay my guaranteed salary. Once the receipts for my services exceeded my guaranteed salary, under my employment agreement I was supposed to receive half of the receipts. I was surprised because I believed that I was seeing about the same number of patients per day as the internists on either side of my office, and I was very busy with hospital patients and complex cases.

38. I estimated the collection ratio apparent from the summary report Defendant Evslin was referring to and commented that it appeared to be very low, approximately 50%. I determined from further questioning that according to Defendant Evslin the collections summarized in his report for any given month were unrelated to the claims summarized for the month. I requested a report that identified the receipts for each claim. Defendant Evslin responded that it was "impossible" for him to provide me such a report. I then stated that there must be a mechanism to collate the individual claims with the receipts collected. He stated very clearly that it was physically impossible to do that.

39. I asked Defendant Evslin to arrange for me to see the claims and receipts data on which the report was based for myself, so that I could better

13

**ERRATA**

evaluate the reasons the collections appeared to be low. He refused. I pressed the request but Defendant Evslin gave me no further response. I found the response confusing and disturbing, but I wanted to believe Defendant Evslin was dealing with me in good faith. Over the next few weeks I repeatedly inventoried whether I knew of any reason or rule why I would not be permitted to see the claims KMC was submitting under my provider number, and finally had to conclude that I knew of none.

40.  My exchange with Defendant Evslin in August 2000 was repeated a few times when he subsequently reviewed monthly "results." During those meetings, I began suggesting that it would be useful to have a financial audit to determine why the collection ratio was consistently well below industry norms.

41.  I raised my concern about being denied access to my claims with my KMC colleagues many of whom had been expressing disbelief in the reports they were provided in private discussions with me and certain of their other KMC colleagues, and found that none of them had been granted access to their claims. Understandably, none relished the thought of sifting through hundreds of claims, but I recognized that their inability to review the claims was as dangerous as giving a bookkeeper check-signing authority and thereafter never reviewing the checks. I suggested that an audit would afford all of us comfort that our claims were proper and corresponded to our charge slips, and that we were being credited

14

Formatted: Font: Bold
Formatted: Centered

for all claims and receipts. I have attached as Exhibits L1 through L4 true and correct copies of e-mails I received from Drs. Duvauchelle, Brichard, DeNigris, and Enron who answered a small survey I conducted.

42.  By late 2000, I began suggesting to my colleagues that we should collectively demand an audit.

43.  These discussions continued through 2001 during which I was very busy building my practice, and seeing many uninsured patients referred to me because it became known among the KMC doctors that I would not refuse to see any patient just because they were unable to pay.

44.  I formally proposed an audit at a December 2001 Department meeting at Kilohana (Gaylord's) Restaurant attended by Drs. Pixler (chair), Braun, McKnight, Diaz, and Sutherland and Dr. Duvauchelle. Dr. Sutherland became quite emphatic that Dr. Evslin would never permit an audit of the books. Dr. Pixler had called the December 2001 meeting to propose that KMC establish a minimum salary for our department members because I was seeing the majority of the uninsured patients, which benefited other physicians and was being told that my pay was going to be reduced dramatically by Dr. Evslin. I disbelieved that I needed my colleagues to chip in for my salary. I expressed confidence that an audit would prove that the receipts from the claims submitted for my services were higher than reported and sufficient to pay my minimum salary.

15

ERRATA

Formatted: Font: Bold
Formatted: Centered

**My Audit Request Was Defendants' Sole Reason for Retaliating Against Me**

58.     I knew my practice was well-regarded. Dr. Mary Pixler, former chair of the KMC Internal Medicine Department, approached me at about 8:30 a.m. on Thursday, February 6, 2003 while I was completing my hospital rounds. She offered to speak to Defendant Evslin on my behalf to express her opinion that it was inappropriate to compare the number of patients I was seeing in clinic with the number of patients seen by physicians in the satellite clinics, as she had learned while on call at the hospital that I was seeing an extraordinarily high ratio of patients with very complex issues. She commented that the overwhelming majority of patient encounters in the outlying clinics were not professionally-demanding cases, involving simple colds and abrasions.

59.     A few days prior to Dr. Pixler's offer, my assistant, Christina Newbold, also mentioned to me that the billing department had made observed that we were submitting the most complete and accurate coding sheets in the KMC Clinic.

I, JAMES LOCKYER, M.D., do declare under penalty of law that the forgoing is true and correct.

DATED: Honolulu, Hawai`i, March 9, 2007

//s James Lockyer, M.D.
_____
JAMES LOCKYER, M.D.

21