July 16, 2002

Dear Dr. Evslin:

I write in response to your letter dated July 15, 2002 concerning your request that I meet with the Quality Assurance Committee. I will be happy to provide the Quality Assurance Committee with the facts and my views about the problems that arose in medical records management the week before I left on vacation. As I explained to you, numerous problems arose from the fact that the administration assigned a succession of nurses to me that week without providing them with clear directions on how to handle the inevitable problems from frequent interruptions in continuity. Ideally, management should have assigned one replacement nurse to cover my office for the whole period rather than rotate nurses in and out from other services for a few hours at a time. Management should have anticipated that the lack of continuity and consistency it created could very likely lead to serious breaches in communication. We were never provided with a plan for the changes, so the substitutions occurred frequently and unpredictably. I want to reiterate that the issue concerns clinic management under those circumstances, and that I am not raising concerns regarding the performance of the staff assigned to my office. I believe that the nurses I was assigned performed their duties as best can be expected under the extreme circumstances presented by the rotation to which they were subjected. In other words, I blame the rotation schedule, and not the nurses.

The communication system in the Clinic will, of course, always have flaws and we cannot expect it to be 100% effective at ensuring that all messages are always delivered in a timely fashion to all physicians under all circumstances. Surely, it is unlikely that management will ever face the circumstances that were present in my case again. Nonetheless, unpredictable situations are predictable, and management should have at hand plans for dealing with them.

The frequent surprise staff substitutions the administration made the week before I left on vacation created unacceptable risks to quality of care because the surprise interruptions in continuity it caused made it very difficult for the nurses to keep track of the charts and various messages they were handling. That poorly taken and unmonitored management decision, in turn, led to the "complaints" you say were made about me. As you know, my practice is very busy. Ms. Ako ordered my practice template revised--I assume temporarily--because, in her view, I see too many patients for one nurse to handle. It seems to me that the administration could have easily predicted that the load would prove too much for the nurses when they were transferred in and out of my office so frequently that they had no chance to catch up with the work their predecessors were unable to complete. If management had no available alternatives to this nurse-in-nurse-out arrangement, then it should have predicted the communication problems that were sure to arise, and put in place system safeguards to protect patients from the adverse effects of the staffing problems. As you know, dozens of messages may be received and dealt with every day, in addition to chart entries and generation of routing slips. The system management relies on apparently depends too heavily on staff remembering which tasks must be completed. Obviously, some information may be overlooked or forgotten when a staffing change occurs suddenly and without allowing time for an orderly transition. The administration clearly had a duty to maintain a level of awareness of potential communication problems that may arise under certain unpredictable circumstances and to tailor the orientation of its nurses accordingly. Even if the administration had not had the capacity to predict the problems, the fact that my numerous

**EXHIBIT 11**

complaints about the situation fell on deaf ears indicates to me that the administration calculated that the problems created were not worth the trouble to make alternative arrangements.

Several of the messages to which you refer were requests for appointments. Obviously, I do not schedule my own appointments. Therefore, it is clear that messages were mis-directed and then left unanswered, further indicating that management's decision to rotate substitute nurses through my office that week without an adequate plan was a bad one. Once again, I do not fault the staff. The problem is with communications management and the fact that the staff have not been provided with a consistent procedure for conveying messages and ensuring timely responses. Furthermore, there does not appear to be a system for ensuring that messages are not simply left in the office of a physician who will be out of the office for one or more days. This latter problem is, of course, known to occur where staff are not provided consistent procedures for re-routing messages whenever such an absence occurs. The problem is long overdue in being addressed. I am nonetheless very concerned about the fact that the messaging system failed to get some of the messages from my patients to me before I left, particularly in the case of those calls, as you say, that were received a few days before my departure. I would like to have a list so that I may contact them and personally reassure them of our concern for their care and that KMC is reviewing its practices and policies in an attempt to ensure it does not happen to them again.

I would also like to share with the Quality Assurance Committee that too much is left to chance in the Clinic's communications system even under optimum circumstances. Management may not have paid sufficient attention to the potential problems because it is known that patients will nearly always call again if their physician fails to return a call. I am sure that the Committee will agree that we should not rely on our patients to provide a failsafe for KMC's communication system, and that the system is long overdue for a review and evaluation. My case has simply drawn attention to this problem. I will be happy to provide the Committee with more specific facts, although I believe the problems are well known.

I assume that the Quality Assurance Committee will not be interested in the issue of a few routing slips apparently going astray, so I will write separately about that issue to avoid confusion.

Sincerely,

James R. Lockyer, MD

## INTRODUCTION

I am attending this meeting of the Quality Assurance Committee at Dr. Evslin's request. It is my understanding that this meeting is part of an informal process by Dr. Evslin, which he incorporated in a letter to me dated May 1, 2002. I am providing the Committee with this written response because Dr. Evslin's May 1 letter states that I shall submit a written response to the Committee.

I am not aware that the Committee is meeting is being conducted pursuant to Quality Management Committee policy and procedure manual entitled, "Acute Care - Medical Staff Concurrent and Retrospective Review" ("QM 1.0"). The Committee has not provided me with a written statement of issues, or a complaint report, to which I might respond. I have not been provided any notice of any disciplinary recommendation.

My presentation to the Committee is based on the understanding I received from Dr. Evslin that this meeting is an informal discussion of issues that arose from the handling of charts and communications that occurred during the week before I left for vacation, and that I am here to provide the Committee with the facts. My understanding is also based on the fact that I have never been advised that this meeting was being held in accordance with the QM policy, and my understanding that Dr. Evslin has not followed the steps required by the policy and has not advised me that he was invoking that policy at any time.

My understanding of the purpose of the meeting is wholly consistent with the fact that the issues in consideration arose from extraordinary circumstances that will never occur again in my practice, and the Committee therefore is not considering any corrective measures with respect to me or my practice.

No risk or threat of injury or other danger to the health or welfare of any individual is present. No patient was harmed or placed at risk of imminent harm. I have been given no information indicating that this meeting concerns any adverse patient outcomes. I have not been provided with copies of any patient complaints, and have therefore concluded that this meeting does not concern any patient complaints. (See QM 1.0 Purpose Statement.) In fact, I am aware that the Clinic has received numerous complaints from my patients about delays in getting appointments and long waiting times to see me because I am so busy.
If my understanding of the purpose of my attendance at this meeting is not correct, I request that I be provided with a statement of the purpose of my attendance and the issues, and the meeting be rescheduled to provide me with a reasonable time in which to respond.

## STATEMENT OF FACTS

I previously reported to Dr. Evslin in 2 consecutive letters, in accordance with Section 7, paragraph 8 of the Kauai Medical Clinic Physician Handbook, the problems I observed relating my concerns that the administration's frequent substitution of nurses in my practice during the week before my vacation created unnecessary risks to the quality of care and should be addressed. I have attached copies of those letters and provide a summary of the facts below.

I gave the administration notice of my plans several weeks in advance, and there was considerable discussion of whether I should take a leave of absence when I learned that the the

**EXHIBIT**

accounting department believed I had 1 week less in my vacation account than I had thought. In fact, Dr. Evslin encouraged me to take the leave. My request was approved by my department chair and Dr. Evslin.

My nurse, Chris, had been out for several weeks by mid-June--during which time I had been assigned Nurse Duarte--and the administration knew that Chris would not be returning to assist me in the week prior to the beginning of my vacation. My appointments from Monday through Thursday were full, and that information was readily available to the administration.

The administration never gave me any indication that it could not accommodate my appointment schedule administratively, nor was I given any notice that Nurse Duarte would have a substitute on Tuesday of that week; and the substitute would have a substitute, who would then be replaced again by Nurse Duarte, and so on. In all, I had 4 different nurses in 4 days, and there were 4 unannounced substitutions, so that I never knew who I would find in my office from one day, and even from one break, to the next. During that week, I worked Monday, Tuesday, and Wednesday and saw approximately 57 patients in my office.

With the exception of Toni Duarte, who had become somewhat familiar with my requirements, each of the substitute nurses arrived with her own idea about where my messages should be posted and how charts should be handled. Messages were posted, for example, on the back of my door, my desk, and inside of charts that were left in a pile of charts on which I had completed my work. Patient requests for appointments were forwarded to me in these ways. Obviously, I do not make my own appointments.

During the week, charts piled up and their status apparently became confusing for the succession of substitutes. I did what I could to keep track of the charts I needed to complete, and repeatedly requested that the pile of charts that ebbed and flowed be better attended to. Every time the administration sent in a new substitute, she had to educate herself about the situation, and the substitutions were so frequent that, by the time a nurse understood the situation, she was replaced. It appeared to me during the week that the nurses were doing the best they could under such extremely disruptive circumstances. I made several requests to the administration to stop the substitutions, but I do not know whether they had any effect. I was unable to bring my concerns to Dr. Evslin before I left for vacation because he left for the mainland before I did.

I am certain that I completed my work on the chart for every patient I saw the week of June 10. When I left for vacation, I left the charts I had completed in my office, and I noted that the nurses had not completely cleared up some charts accumulated from previous days. My office was, of course, accessible, and I have no way of knowing whether any of the clinic staff brought in messages or charts and left them there after I was gone, as may occur when staff are not provided with directions about what to do in such cases.

Respectfully,

James R. Lockyer, MD