JANICE P. KIM  3436
Kaimuki Business Plaza
3615 Harding Avenue, #206
Honolulu, Hawaii 96816
Telephone No. (808) 732-0522
Facsimile No. (808) 735-0459
kimj054@hawaii.rr.com

ARLEEN D. JOUXSON 7223-0
RAFAEL G. DEL CASTILLO 6909-0
JOUXSON-MEYERS & DEL CASTILLO
Attorneys at Law, A Limited Liability Law Company
302 California Avenue, Suite 209
Wahiawa, Hawaii 96786
Telephone: (808) 621-8806
Fax: (808) 422-8772
rafa@rafael1224.clearwire.net

Attorneys for Plaintiff
JAMES LOCKYER, M.D.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D. AND JAMES LOCKYER, M.D., in his own behalf,<br><br>Plaintiffs,<br><br>vs.<br><br>HAWAI'I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. CV 04-00596 ACK LEK<br>(Federal and State - Qui Tam)<br><br>PLAINTIFF JAMES LOCKER, M.D.'S MEMORANDUM IN OPPOSITION TO DEFENDANT LEE A. EVSLIN, M.D.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF LOCKYER'S SECOND, THIRD AND FOURTH CLAIMS FOR RELIEF<br><br><u>HEARING</u><br>Date:    March 27, 2007<br>Time:    10:30 A.M. |

WILCOX MEMORIAL HOSPITAL;          )
WILCOX HEALTH SYSTEM; AND          )     Trial Date:    September 18, 2007
WILLIAM A. EVSLIN, M.D. AKA        )     Judge:         Honorable Alan C. Kay
LEE A. EVSLIN, M.D.                )
              Defendants.          )
_____        )

PLAINTIFF JAMES LOCKER, M.D.'S MEMORANDUM IN OPPOSITION
TO DEFENDANT LEE A. EVSLIN, M.D.'S MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFF LOCKYER'S SECOND, THIRD AND
<u>FOURTH CLAIM FOR RELIEF FILED DECEMBER 22, 2006</u>

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES………………………………………………………iv

I.    Factual History........................................................................1

II.   Procedural History..................................................................11

III.  Standard.................................................................................11

IV.   Discussion..............................................................................13

      A.    Defendant Evslin Was the De Facto Employer of Realtor..............13

      B.    Dr. Lockyer's FCA Retaliation Claims Are Sustainable
            Under 3730(h).................................................................15

      C.    Defendant Evslin's Actions Indicate A Knowledge That
            Dr. Lockyer Was Investigating Fraud..............................20

      D.    Dr. Lockyer Requested Access To His Billings And Receipts
            Before Any Adverse Employment Actions Began.......................21

      E.    The Salary Formulas and Their Application To
            Dr. Lockyer....................................................................22

F.     The Same Facts that Hold Defendant Evslin Individually
       Liable For The FCA Claims Apply To The Hawaii
       Whistleblower Protection Act (HWPA)..........................................23

G.     The Wrongful Termination Claims For Violations Of
       Public Policy Advanced By Dr. Lockyer i.e. The Parnar
       Claims Are Pleaded In The Alternative And Should Not Be
       Dismissed......................................................................................24

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 048 49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)....................................................................12, 13

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L.Ed. 2d 265, 106 S. Ct. 2548 (1968)........................................................................13, 14

Hinden v. UNC/Lear Services, Inc., 362 F. Supp. 2d 1023 (U.S. Dist. Hawaii 2005).................................................................23

Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996)................................16, 18, 19

Lindahl v. Air France, 930 F.2d 1434, 1437 (9th Cir. 1991) ......................14

McKenzie v. BellSouth Telecommunications, Inc., 219 F. 3d 508, 518 (6th Cir. 2000).........................................................................22

Mruz v. Caring, Inc., 991 F. Supp. 701 (D.N.J. 1998)..............................13

Sweeney v. Manorcare Health Service Inc., 2006 U.S. Dist. Lexis 26991 (D. Wash. 2006)...................................................................17

United States v. Idaho Falls Assocs., 81 F. Supp. 2d 1033, 1038 (D. Idaho 1999).........................................................................12

United States ex rel. Lincoln v. Med-Data, Inc., 2006 U.S. Dist Lexis 64288 (D. Wash. 2006)...................................................................16

Statutes

31 U.S.C. 3730(h)........................................................................13, 15

H.R.S. §378-69.........................................................................23
Miscellaneous

S. Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), printed in 1986 U.S.C.C.A.N. 5266, 5299.......................................................................18, 22

PLAINTIFF JAMES LOCKER, M.D.'S MEMORANDUM IN OPPOSITION
TO DEFENDANT LEE A. EVSLIN, M.D.'S MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFF LOCKYER'S SECOND, THIRD AND
FOURTH CLAIM FOR RELIEF FILED DECEMBER 22, 2006

## I.     FACTUAL HISTORY

Defendant Evslin was the President/CEO of Kauai Medical Clinic

from 1996 to 2005.   Plaintiff James Lockyer, M.D. work at KMC from December

1, 1999 until June 30, 2004.   In 1999, The Camden Group, a management

consulting firm reviewed KMC's management structure.   In its report dated May

10, 1999, the consultant opined as to the consolidated power wielded by Defendant

Evslin in the day to day operations of KMC:

> The current organizational structure does not facilitate effective
> delegation of responsibilities:
>
> Far too many operational issues and problems must be resolved by the
> President/CEO.  This includes physician leadership issues (physician
> behavior, staffing, etc.) As well as day- to-day operational problems
> (e.g. patient billing complaints).

In addition, the consultants found that the Clinic's governance structure was

ineffective at disseminating power:

> The Clinic governance structure does not facilitate a clear path for
> decision-making and establishing direction for KMC.
>
> The Executive Committee (composed of department chairs) is
> regarded as primarily a forum for information exchange and has
> suffered from a lack of attendance. (Exhibit 1)

Dr. Michael Braun served as chairperson of the Internal Medicine Department from October 1, 2000 to April 14, 2006 and as such sat on the Executive Committee.  He recalls the following:

> KMC held meetings ostensibly for the physicians to debate various issues and reach a concensus on the action to be taken or the position to adopt, but Dr. Evslin dominated these meetings by controlling the agenda, the debate, and the voting.  The meetings were orchestrated to create the argument - and the impression for outside observers - that the actions which were actually fiats, were the product of considered decisions reached by a group of professional peers. ( Braun Decl. ¶ 26 )

In August of 2000, Dr. Lockyer began demanding access to his actual financial billings and receipts for Medicare and other insurers.   Defendant Evslin refused Dr. Lockyer's request for access to that information.  Defendant Evslin told Dr. Lockyer that it was impossible for KMC to provide a true report of collections relating to the claims.  Dr. Lockyer's offered to do his own assessment of his own claims and receipts.   Again, Defendant Evslin refused. (Lockyer Decl ¶37, 38, 39) At a dinner meeting in December 2001, Dr. Lockyer encouraged his internal medicine colleagues, as a department, to insist on the hiring of a CPA to do a complete financial audit which would determine the accuracy of billings, including Medicare billings, and check on receipts.  (Braun Decl. ¶ 25; Lockyer

2

Decl. ¶ 44)  At least one participant stated that Defendant Evslin would not like

that.  (Braun Decl  ¶ 25) Had Defendant Evslin and KMC given that information in

2000 or 2001 to Dr. Lockyer it would have become evident that Defendant Evslin

and KMC were involved in medicare fraud by misappropriating Dr. Lockyer's

UPIN number, i.e his medical identity, to fraudulently obtain payments from

Medicare for chemotherapy drugs and administration as if the Dr. Lockyer were

rendering professional services to cancer patients and/or accepting assignments to

cover the chemo suite. (Coleman Report ; Exhibit 2 ) To date, Dr. Lockyer has

identified billings to Medicare for payment of chemotherapy charges using Dr.

Lockyer's UPIN as early as January 12, 2000 (Exhibit 2 line item 525-526) and as

late as July of 2003. (Exhibit 2 line item 604-605).  In total throughout the years

2000 until 2003 KMC submitted 571 false claims to Medicare and others for

chemotherapy drugs and administration under Dr. Lockyer's UPIN number.

(Exhibit 2) When Dr. Lockyer finally forced KMC to provide him his billing

information, he did not recognize some of the patient names.  Because Dr. Lockyer

kept his "day sheets" which indicated all of the patients he had seen on a given

day, he knew many of the patients listed for the 571 fraudulent claims were not

seen by him nor were they his patients.  (Lockyer Decl ¶ 55, 56; Exhibit 8)  Dr.

Lockyer also knew that the billing codes were for drugs and administration of

3

chemotherapy, a practice that was not his specialty or training. (Lockyer Decl. ¶ 55)  In addition, KMC never assigned Dr. Lockyer to supervise chemotherapy treatments nor would he have consented to do so. (Lockyer Decl. ¶ 7)

Medicare requires that Dr. Lockyer have knowledge that he is the supervising physician for the submission of claims to Medicare.  Mr. Terry S. Coleman former Chief Counsel of the Health Care Financing Administration (HCFA) which is the agency that administers Medicare and is now called the Centers for Medicare and Medicaid Services and former Deputy Administrator of HCFA opined in his Declaration. (Coleman Report)

> If the employer of the supervising physician submits claims to Medicare for the supervised services, such claims would be improper if the supervising physician was unaware the he or she was performing the supervising function.  The supervising physician must sign the Medicare claim form unless, as is usually the case, the signature is on file.  In either case, by submission of the claim form to Medicare, the supervising physician certifies that the services for which Medicare payment is claimed were furnished under the physician's immediate personal supervision.  If the physician was not aware that he or she was supervising services, that certification cannot properly be made by an entity submitting the claim on behalf of the physician.  In addition, if the physician is not aware that he is supervising services, he may not take care to be in the office suite and immediately available to provide assistance without any absences during the course of the day.  To the extent that the employer of Dr. James Lockyer submitted claims to Medicare that state he was the supervising physician for services, and Dr. Lockyer was not knowingly supervising such services, such claims were improper and not eligible for Medicare payment.

4

Mr. Coleman noted:

> The signature of the supervising physician indicates that the supervising physician agrees with the statement: "I certify that the statements on the reverse apply to this bill and are made a part thereof." On the back of the form, it states in part: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations." (Coleman Report)

Defendant Evslin has admitted to the false billing in this instant Motion. The affidavit of Ken Shimonishi dated January 22, 2003 is attached as Exhibit A to his Declaration in Defendant's Motion. Mr. Shimonishi, the head of the Accounting Department at KMC, described how physicians were compensated using a spread sheet and columns:

> Column C entitled "Less Chemo Receipts," subtracts the full amount of **receipts for chemotherapy drugs and administration**...Column E is a small portion of the chemotherapy drug and administration receipts. Under a strict reading of the Employment Agreement, Column E **should not be included in the calculation because it is not received "on account of professional services rendered" by the physician**. (Emphasis - bolded sections added) (Exhibit 3**,** Shimonishi Affidavit ¶ 10, also attached to Shimonishi Decl. to Defendant Evslin's Concise Statement of Facts)

The Employment Agreement under which Dr. Lockyer worked while

5

at KMC defined "professional services" as those "assigned by the clinic." (Exhibit 4, Employment Agreement attached as Exhibit 3 at KMCL-000685 to the Declaration of Ken Shimonishi in Defendant Evslin's Motion for Summary Judgment). Dr. Michael Braun, Dr. R. Craig Netzer and Dr. Lockyer have submitted declarations to the effect none of them were designated to their knowledge to supervise the administration of chemotherapy or asked to be on call to cover the chemotherapy suite during the clinic day. None of them considered it among their duties or assignments to supervise the administration of chemotherapy in the suite at KMC. ( Braun Decl ¶ 30-34, Netzer Decl ¶ 16-19; Lockyer Decl. ¶ 7)

Dr. Lockyers behavior evidences that he did not know he was supervising the drugs and administration of chemotherapy at KMC. On at least 3 occasions, KMC billed Medicare for chemotherapy drugs and administration when Dr. Lockyer was not physically at KMC. (Exhibit 5) Thus, he was not at work and not in the building and made no arrangements, because he did not know to do so, to find someone to cover the chemotherapy suite where patients were receiving chemotherapy.

In and around the time when Dr. Lockyer began his quest to obtain KMC's billing records, discussions regarding a merger of KMC and HPH were

6

taking place. (Lockyer Decl. ¶ 6)  Defendant Evslin encouraged the merger.  On

December 21, 2001, KMC and HPH merged.(Lockyer Decl. ¶ 6)  As a result of the

merger, Defendant Evslin gained a substantial personal benefit in that his salary

increased from $182,007 per year to $350,369 per year.  (Exhibit 7)  The

investigation of Dr. Lockyer into his billing and receipts filed by KMC with

Medicare and other insurers would have brought to light the Medicare false claim

filings before the merger.  As it was, when Dr. Lockyer obtained his billing

information, KMC's whole practice of Medicare fraud was exposed.

Within a few months of Dr. Lockyer's investigation into KMC's

billing practices, Dr. Evslin began his harassment of Dr. Lockyer.  By April 9,

2002, Dr. Lockyer was under the threat of termination.  This ostensibly arose out

of a combination of events which occurred in short order.  For instance, there was a

complaint about Dr. Lockyer not responding to pages. (Exhibit 9 ) Dr. Lockyer

documented that these complaints were unfounded.  The paging system at KMC

was not functioning efficiently leading to delayed pages.  Dr. Lockyer experienced

this while present for half an hour in the ER room while another physician was

attempting to page him.  Though Dr. Lockyer was in the ER and available, he got

the page 17 minutes after it was sent.  The second complaint involved an

accusation against him that he was not available when on call and paged and had

directly refused to come to the hospital when requested. Dr. Lockyer and the physician to whom the allegation was attributed denied the event. (Exhibit 10) Second, there was an allegation that Dr. Lockyer had a number of charts left in his room when he went on vacation. Dr. Lockyer noted that KMC, in the week before his vacation, provided him with no less than four different nurses in one week, substituting multiple nurses in one day. This lead to the accumulation of charts. In addition, messages were not transmitted to Dr. Lockyer, leading to dissatisfied patients. (Exhibit 11) Third, as part of Defendant Evslin and KMC rescinding of their threatened termination, Dr. Lockyer was required to have his files reviewed for compliance with Medicare regulations governing billing and documentation. The Summary Finding of that review were as follows:

1. The services reviewed for Doctor Lockyer were well documented and in all but on case, reported correctly.
2. In one case, the medical record documentation supported a service level potentially higher than that which was reported.
3. In all cases, the diagnosis code selected accurately and completely described the presenting problem.
4. In some of the cases reviewed was a suggestion of a time element noted. (Exhibit 12)

In addition the charge was leveled that Dr. Lockyer made his patients wait inordinately long time before being seen. A study comparing Dr. Lockyer's waiting time to others showed his patients waited an average of 15 minutes, less

than other physicians at KMC. (Exhibit 13)

At or around this same time, Dr. Evslin attempted to have the Internal

Medicine doctors sign patient charts for the administration of chemotherapy. Dr.

Michael Braun recalls the actions of Dr. Evslin which closely followed Dr.

Lockyer's request for financial audits:

> Sometime in the Spring of 2002, Dr. Evslin asked to meet with the Internal Medicine Department, at which time he requested that the internal medicine physicians "cover" chemotherapy patients when Dr. Sutherland was absent.
>
> We (the internists) objected on the grounds that we had our own full work load of scheduled patients.
>
> Dr. Evslin responded that all he was asking us to do was sign all of the charts for chemotherapy patients at the end of the day, and "sign off" on all labs.
>
> We again objected, raising patient safety concerns and questioning whether we could sign off on the charts of patients that we never saw for chemotherapy we had not ordered. We reached no consensus. (Braun Decl ¶15-17)

Within days of that meeting, chemotherapy charts appeared, at the end of the day,

for review and signature by Dr. Braun. (Braun Decl 18)

Defendant Evslin's campaign to terminate Dr. Lockyer continued into

2003 and 2004 when it finally succeeded. In a series of attempts to fire Dr.

Lockyer, Defendant Evslin excluded Dr. Lockyer from meetings of his own

9

department. Dr. Braun recalls:

> I was present for at least one KMC Executive Board meeting and at least two or more Internal Medicine meetings, from which Dr. Evslin excluded Dr. Lockyer, at which Dr. Evslin lobbied the members to call for the termination of Dr. Lockyer's contract...
>
> I also recall that either no minutes were made of those meetings, or the minutes attributed actions to one or the other of the physicians who had attended the meeting, which it was in fact Dr. Evslin who had raised the issue and his decision or position which had been accepted. (Braun Decl 25-28)

Dr. R. Craig Netzer also recalls Defendant Evslin's behavior:

> ...Dr. Evslin repeatedly attempted to fire Dr. Lockyer or force him to resign without any legitimate grounds. I was present for at least one Internal Medicine meeting in April 2004 at which Dr. Evslin lobbied for Dr. Lockyer's contract to be terminated
>
> I was outraged at the April 2004 meeting because Dr. Evslin misrepresented to my internal medicine colleagues that I had called for the meeting, which was materially false, because Dr. Evslin had called the meeting. He approached me by stating that there were some unaddressed concerns in the Internal Medicine Department, but did not specify the nature of the concerns. I responded that departmental concerns should be addressed at a Departmental meeting. Dr. Evslin then called the meeting, but excluded Dr. Lockyer, and attempted to persuade the Department members to call for Dr. Lockyer's contract to be terminated. (Netzer Decl 12,13)

Finally on June 30, 2004, after months of harassment, Dr. Lockyer resigned his position at KMC. Dr. Lockyer continued his pursuit of his billing

data from KMC.  On October 1, 2004, Dr. Lockyer filed his Qui Tam complaint

and his retaliation complaint for the harassment that followed his attempts to gain

access to the Medicare billing and other financial information regarding KMC.  On

January 27, 2006, the U.S. Government intervened in Dr. Lockyer's case.

II.    <u>PROCEDURAL HISTORY</u>

          Dr. Lockyer filed his complaint on October 1, 2004.  The U.S.

government intervened on January 27, 2006 and this court unsealed the complaint

and disclosures in this case on September 20, 2006.  On February 23, 2006,  a

meeting was held in which Defendants were briefed on the disclosure documents

substantiating the claims of the Relator and the U.S. Government, including but not

limited to, the day sheets of Dr. Lockyer which showed his daily patient schedule

and the billing printout of KMC showing bills to Medicare for patients not seen by

Dr. Lockyer and for chemotherapy drugs and administration that Dr. Lockyer

neither ordered or supervised.  In addition, the day sheets when compared to

KMC's billing records indicate the Dr. Lockyer's provider number was used to bill

for chemotherapy to patients on days when Dr. Lockyer was not at Kauai Medical

Clinic at all.

III.    <u>STANDARD</u>

          The Defendant, as movant, bears the initial burden of directing the

11

district court <u>to the determinative issues</u> and the available evidence that pertains to

each. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct.

2548 (1986) (holding, "[A] party seeking summary judgment always bears the

initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any' which it believes

demonstrate the absence of a genuine issue of material fact.").  The Defendant does

not bear the burden of proof at trial and, thus, they must demonstrate that there is

an absence of evidence to support Plaintiffs' case. <u>United States v. Idaho Falls</u>

<u>Assocs.</u>, 81 F. Supp. 2d 1033, 1038 (D. Idaho 1999) (citing <u>Celotex Corp.</u>, 477

U.S. at 325). Further, Summary Judgment is proper if no factual issues exist for

trial. The party opposing summary judgment must demonstrate that the fact in

contention is material, i.e., a fact that might affect the outcome of the suit under the

governing law, and that the dispute is genuine, i.e., the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  <u>Lindahl v. Air</u>

<u>France,</u> 930 F.2d 1434, 1437 (9th Cir. 1991) (quoting, <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 048 49,106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).   The

evidence of the opposing party is to be believed, and all reasonable inferences that

may be drawn from the fact placed before the court must be drawn in the light

12

most favorable to the nonmoving party. Id. (quoting, <u>Anderson</u>, 477 U.S. at 255,

106S.Ct. at 2513

IV.   <u>DISCUSSION</u>

    A.   DEFENDANT EVSLIN WAS THE DE FACTO EMPLOYER OF RELATOR

      In <u>Mruz v. Caring, Inc.</u> 991 F. Supp. 701 (D.N.J. 1998) an individual

Board member was found to be de facto employer of the relators.  In <u>Mruz,</u> the

Court found that one Board member dominated and dictated the actions of the

defendant corporations and their boards "and to have been conducting the affairs of

the [defendant corporations] in a way which benefited her...personally," thus

making her a *de facto* employer.  Individuals therefore are liable under § 3730(h)

where the defendant is shown to be one who has dominated and dictated the

actions of the corporation in a way that benefited him personally.

      The facts at bar are similar to those in <u>Mruz</u>.  This Court has before it

the Camden Group consultant report noting that Defendant Evslin as

CEO/President had control of the governance of KMC.  This included the control

of the day-to-day operations at KMC .  According to the Camden study and the

declarations of the doctors that worked at KMC, Defendant Evslin dominated

employment and staffing decisions.  A review of the documents submitted by

Defendant Evslin support the Camden Group finding that Defendant Evslin had

centralized control of KMC.  Almost every exhibit involving the harassment of Dr.

Lockyer evidences Defendant Evslin signature and control of committees at KMC.

The joint meetings of the Executive and Salary and Finance Advisory Committee

were chaired by Defendant Evslin and the minutes were prepared by Defendant

Evslin. (Exhibit 15,  Minutes of Joint Meetings dated January 30, 2001, February

27, 2001, May 29, 2001, December 28, 2001, March 26, 2002, April 4, 2002, July

26, 2002 (Executive Committee only) submitted with Defendant Evslin's Concise

Statement of Facts.  All of these "committee" meetings were chaired or recorded

by Defendant Evslin.  A number of Declarations of doctors (Braun, Netzer,

Raitliff) attest that Defendant Evslin's control extended to setting agendas, calling

meetings, focusing debate and controlling outcomes.  This kind of dominance

continued with regard to employment of Dr. Lockyer up to and including 2004

when Defendant Evslin even excluded Dr. Lockyer from meetings of his own

department.  Thus, Defendant Evslin dominated and dictated the actions of KMC

in a way that invested him with the power as the de facto employer of Dr. Lockyer.

          In this case, it is clear that Dr. Lockyer's calls for review of the source

documents for billings and eventually for a full financial audit started in 2000 with

Defendant Evslin and in 2001 with his colleagues.  This was at the same time that

KMC was to merge with HPH. Under the terms of that merger, Defendant Evslin almost doubled his salary gaining a substantial personal benefit. Dr. Lockyer's repeated requests for financial records, billing records including those for Medicare, would have prevented Defendant Evslin's financial gains from the merger had Defendant HPH been aware of a federal fraud case. The control which Defendant Evslin asserted continued far after the merger when Defendant Evslin continued as the head of KMC under HPH, which included continuing financial benefits for Defendant Evslin as he continued his campaign to ultimately terminate Dr. Lockyer while in the meantime alter the terms and conditions of him employment.

Under the facts as presented in this opposition, a reasonable juror could conclude that Defendant Evslin was Dr. Lockyer's de facto employer and is subject to personal liability under § 3730(h).

B.    DR. LOCKYER'S FCA RETALIATION CLAIMS ARE SUSTAINABLE UNDER 3730 (h)

Dr. Lockyer alleges retaliation under the FCA. Defendants argue that Dr. Lockyer's activity to investigate his billing and receipts by KMC was not protected activity under Section 3730 etc. To sustain a retaliation claim under the False Claims Act, a relator must be able to show that 1) he was engaging in

conduct protected by the FCA; 2) his employer knew he was engaging in such conduct; and 3) he was discriminated against because of such conduct.  Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996), cert. denied, 519 U.S. 1115, 136 L. Ed. 2d 844, 117 S. Ct. 958 (1997).   Neither the Plaintiff nor the employer need to have anticipated a False Claims Act claim either at the time of the relators investigation or the time of the alleged retaliation.  However, the employee's actions must have included investigations which reasonably could have lead to a viable FCA action. United States ex rel. Lincoln v. Med-Data, Inc., 2006 U.S. Dist. Lexis 64288 (D. Wash. 2006)

Here, Dr. Lockyer was engaged in protected activity by investigating the billing practices of KMC which, because of his medical practice, necessarily included claims filed for reimbursement from Medicare.  The actions of Defendant Evslin to deny Dr. Lockyer access to his own billing information provides evidence that Dr. Lockyer was engaged in protected activity because the Defendant tried to cover it up.  Dr. Lockyer was therefore engaged in activity protected by the FCA.  Dr. Lockyer made direct and repeated requests to Defendant Evslin, the CEO/President of KMC, for billing information and for access to review the actual bills submitted by KMC for his patients   In December 2001, he also encouraged his internal medicine colleagues to hire a CPA and demand an audit of all KMC

16

billings and receipts.  Thus, Defendant Evslin and KMC knew Dr. Lockyer was

engaged in conduct protected by the FCA.  The proximity of the time between Dr.

Lockyer's investigation and threatened termination (April 2002) provides a strong

inference that Dr. Lockyer's harassment was in retaliation for his activity.  Further,

the request of Dr. Evslin that the internal medicine department in the spring of

2002, start signing charts for chemotherapy drugs and administration indicates an

attempt to cover up or at least to ameliorate the false billing practices at KMC.  It

also further evidences the day to day control which Defendant Evslin as

CEO/President of KMC exerted at KMC.  Once KMC was compelled to divulge

the actual bills and receipts attributed to Dr. Lockyer, it led directly to a viable

FCA action.  Had KMC delivered to Dr. Lockyer the requested billing information

in 2000 when he first began asking to see the actual data, Dr. Lockyer would have

uncovered the false claims filings at that time.

   Here, Defendant asks the Court to reward it for covering up its fraud

on the government, claiming that Dr. Lockyer's investigation did not rise to the

level of investigating Medicare fraud because Dr. Lockyer may not have said to

KMC the words "investigate", "fraud" or "whistleblower".  This is similar to

Sweeney v. Manorcare Health Services Inc.  2006 U.S. Dist. Lexis 26991 (D.

Wash 2006) where Plaintiff did not use those words but was raising inquiries over

"billing questions and concerns." Dr. Lockyer raised concerns over his billing and receipts being filed by KMC for his treatment of patients. Defendant Evslin and KMC through their actions evidence that they were aware that the investigation of Dr. Lockyer could reasonably have lead (and did lead) to a viable FCA action. If not, why then did they fail to provide the information that was requested? It is disingenuous to feign innocence when in fact the fraud occurred and the perpetrator prevaricated, harassed and eventually drummed out the Relator. The purposes of the FCA are frustrated if in a case like this a Defendant may defeat a claim based upon their own machinations. The Court should look to the real intent of the FCA to protect the Relator. If not the FCA will actually become a weapon to encourage the early firing of employees and deny the Government valuable protection from fraud.

In Luckey v. Baxter Healthcare Corp., 2 F. Supp. 2d 1034, the Court examined the legislative record and its broad purpose in protecting whistle blowers from retaliation and concluded that  "...protected activity should...be interpreted broadly." S. Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5299. Thus, investigative activity is protected under the statute. The types of activities and who is covered are viewed through broad spectacles.

18

Defendant Evslin relies on Hopper v. Anton  91 F.3d 1261 (9th Cir 1996) as support for the dismissal of Dr. Lockyer's FCA claims.  In Hopper, the Relator was employed by a School District as a special education teacher. Beginning in April of 1989, Hopper began complaining to her superiors that the School District was failing to comply with federal and state laws regarding the handling of special education children.   The Hopper court held that, as a matter of law, an employee's investigation into her employer's regulatory non-compliance and persistent attempts to get her employer to comply with federal and state regulations, by themselves, were not activities done "in furtherance of an [FCA] action." Id. 91 F.3d at 1269.

The Hopper case differs markedly from the case at bar.  In Hopper, the intent of the Relator was compliance with administrative regulations.  In this case, Dr. Lockyer was seeking a direct financial audit of the billings and receipts of the operations at KMC.  Dr. Lockyer knew that any financial audit of the billings and receipts would have to include those billings submitted under his provider number to Medicare and more importantly, so did Defendant Evslin and KMC. Dr. Lockyer suspected irregularities in the accounting for services allocated to him and because his billing was handled directly by KMC and he was denied access to that information.  The information he received directly uncovered the fraud being

19

perpetuated against the Government which Defendant Evslin and KMC knew about.

### C.     DEFENDANT EVSLIN'S ACTIONS INDICATE A KNOWLEDGE THAT DR. LOCKYER WAS INVESTIGATING FRAUD

Defendant Evslin denies any knowledge that Dr. Lockyer was investigating fraud. The actions of Defendant Evslin indicate otherwise. First, Defendant Evslin did not allow Dr. Lockyer access to his bills and receipts at KMC. He successfully prevented Dr. Lockyer from obtaining this information. Why? If Defendant Evslin was not on notice that the fraud was being investigated then why not give Dr. Lockyer his bills and receipts. Second, Defendant Evslin tried to force the internal medicine doctors to sign charts of patients receiving chemotherapy at KMC. This attempt only occurred after Dr. Lockyer began asking to see his bills and receipts. The Court now knows that included in those bills and receipts were charged for chemotherapy going back to January of 2000. Each and every one of those charges was a false claim because Dr. Lockyer was not a supervising physician. Under the facts as presented a reasonable juror could conclude that Defendant Evslin's actions speak louder than his words and that he knew Dr. Lockyer was investigating, in part, fraud.

D.    DR. LOCKYER REQUESTED ACCESS TO HIS BILLINGS AND
RECEIPTS BEFORE ANY ADVERSE EMPLOYMENT ACTIONS
BEGAN

Dr. Lockyer's first request for access to his billings and receipts was

in August of 2000.  This was before the reduction in his salary and any notice of

termination.  The request may have germinated out of a concern over the proper

processing of his billings and receipts but when Defendant Evslin denied Dr.

Lockyer access to the most basic information upon which his livelihood was based,

Dr. Lockyer became suspicious.  Notably, Defendant Evslin and KMC did not turn

over the records.  Rather than be deterred by Defendant Evslin's tactics in refusing

to provide access to his billing data, in December of 2001 Dr. Lockyer persisted

and asked his colleagues to support a full audit by a CPA of KMC's bills and

receipts for the entire internal medicine staff.  Thereafter, Dr. Lockyer's name

appears on the agendas of the Executive and Salary and Finance *Advisory*

Committee both of which were chaired by Defendant Evslin and under his control.

Members sitting on those committees have acknowledged Defendant Evslin's

dominating force in setting agendas and determining outcomes.  Though Defendant

may point out a paper structure that looks like he did not directly dominate the

employment of Dr. Lockyer, those sitting on those committees have said

otherwise.

21

The legislative history of the FCA states that the employee must show that "the retaliation was motivated *at least in part* by the employee's engaging in protected activity." McKenzie v. BellSouth Telecommunications, Inc. 219 F.3d 508, 518 (6th Cir. 2000)(citing S. Rep. No. 99-345, at 45). The timing of the actions of Defendant Evslin and his refusal to give Dr. Lockyer access to his own billing information could lead a jury to conclude that Defendant Evslin's harassment and eventual termination of Dr. Lockyer was motivated "at least in part" by his investigation.

E.     THE SALARY FORMULA'S AND THEIR APPLICATION TO DR. LOCKYER

Defendant Evslin claims that Dr. Lockyer would have sustained his reductions in salary in any event because those reductions were based upon formulae applicable to all KMC physicians.  This argument ignores the evidence of the control to which Defendant Evslin dominated decisions at KMC and with that control could elevated certain physician's functions over others.  For instance, Dr. Lockyer saw the most indigent and difficult cases in the Internal Medicine Department.  These two categories of patients meant that reimbursement for care was lower and the time needed to properly provide medical services per patient was longer.  Engineering a system of compensation that did not recognize and

22

fairly compensate for these kinds of services disadvantaged Dr. Lockyer.

      F.     THE SAME FACTS THAT HOLD DEFENDANT EVSLIN
              INDIVIDUALLY LIABLE FOR THE FCA CLAIMS APPLY TO
              <u>THE HAWAII WHISTLEBLOWER PROTECTION ACT (HWPA)</u>

      Defendant Evslin repeats his arguments to attempt to defeat the HWPA claims of Dr. Lockyer. Dr. Lockyer incorporates by reference the facts and arguments regarding Defendant Evslin's status as Dr. Lockyer's de facto employer, the evidence regarding Defendant Evslin's recognition that the investigation by Dr. Lockyer would lead to a reported violation of law and the manner in which compensation was changed to disadvantage Dr. Lockyer. Notable H.R.S. 378-69 directs the Court to expand the interpretation of this statute to give the broadest possible protection to the whistleblower and, thus, this action should be sustained:

> The rights created herein shall not be construed to limit the development of the common law nor to preempt the common law rights and remedies on the subject matter of discharges which are contrary to public policy. In the event of a conflict between the terms and provisions of this part and any other law on the subject the more beneficial provisions favoring the employee shall prevail.

      Defendant argues to this Court that the two year statute of limitations applies to limit the reach of the HWPA and the FCA claims to two years prior to the filing of the complaint. <u>Hinden v. UNC/Lear Services, In.</u> 362 F. Supp. 2d 1203 (U.S. Dist. Hawaii 2005). However in this case, the Defendant acted

23

deliberately to conceal the fraudulent billing information until it was compelled to release that information in the arbitration.  Under the circumstances because the Defendant acted to conceal the fraud, this Court should apply the date of discovery doctrine and/or the last discriminatory act doctrine to allow all of Defendant's actions to be considered a continuing and ongoing violation of this statute and litigated in this case.

G.    THE WRONGFUL TERMINATION CLAIMS FOR VIOLATIONS OF PUBLIC POLICY ADVANCED BY DR. LOCKYER i.e. THE PARNAR CLAIMS ARE PLEADED IN THE ALTERNATIVE AND SHOULD NOT BE DISMISSED

Here Defendant argues that the FCA action adequately addresses Dr. Lockyer's claims for wrongful termination.  If Defendant prevails on its motion for Summary Judgment and this Court dismisses Dr. Lockyer's FCA claims it, therefore, removes any overlap with the Parnar claims.  Dr. Lockyer is entitled to plead in the alternative and thus it is premature for this Court to dismiss this claim at this time.

DATED: Honolulu, Hawaii, March 9, 2007.

/s/  Janice P. Kim
JANICE P. KIM
ARLEEN D. JOUXSON
RAFAEL G. DEL CASTILLO
Attorneys for Plaintiff
JAMES LOCKYER, M.D.

24