reply re HPH MSJ

Of Counsel:

ROBBINS & ASSOCIATES

Attorneys at Law

A Law Corporation

KENNETH S. ROBBINS                    1000-0
JOHN-ANDERSON L. MEYER          8541-0
2200 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 524-2355
Facsimile:  (808) 526-0290
Email:  defend@robbinsandassociates.net

DAVIS WRIGHT TREMAINE LLP          CIVIL NO. CV04-00596 ACK KSC

EDWIN D. RAUZI                    4292-0
1501 4th Avenue, Suite 2600
Seattle, Washington  98101
Telephone:  (206) 622-3150
Facsimile:  (206) 628-7699
Email:  edrauzi@dwt.com

PATTON BOGGS LLP

HARRY R. SILVER
2550 M Street NW
Washington, D.C.  20037
Telephone:  (202) 457-6453
Facsimile:  (202) 457-6315
Email:  hsilver@pattonboggs.com

Attorneys for Defendants
HAWAI`I PACIFIC HEALTH,
KAUAI MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL and WILCOX HEALTH SYSTEM

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf,<br><br>    Plaintiffs,<br><br>    v.<br><br>HAWAI`I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.,<br><br>    Defendants.<br>_____ | CIVIL NO. CV04-00596 ACK KSC<br>(Federal and State - Qui Tam)<br><br>DEFENDANTS HAWAI`I PACIFIC HEALTH, KAUAI MEDICAL CLINIC, WILCOX MEMORIAL HOSPITAL AND WILCOX HEALTH SYSTEM'S REPLY TO PLAINTIFF JAMES LOCKYER, M.D.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS HAWAI`I PACIFIC HEALTH'S, KAUAI MEDICAL CLINIC'S, WILCOX MEMORIAL HOSPITAL'S, AND WILCOX HEALTH SYSTEM'S MOTION FOR SUMMARY JUDGMENT; LR7.5 CERTIFICATE OF COMPLIANCE; DECLARATION OF KENNETH S. ROBBINS; EXHIBITS "22"-"32"; CERTIFICATE OF SERVICE<br><br>HEARING<br>DATE:  March 27, 2007<br>TIME:  10:30 a.m.<br>JUDGE: Alan C. Kay<br><br>TRIAL: 9/18/07<br>JUDGE: Alan C. Kay |

2

## TABLE OF CONTENTS

<u>Page</u>

I.  ARGUMENT ........................................................................................ 2

    A.  The "Incident to" Rules ........................................................... 2

    B.  Coverage ................................................................................... 4

        1.  "Identity Theft" .................................................................. 4

        2.  There is Overwhelming Evidence that Dr. Lockyer Covered
            Chemotherapy ..................................................................... 5

        3.  Dr. Lockyer Did Not Have to Be Aware that He Was
            Covering in Order to Bill Using His Medicare Number ............ 8

    C.  The Evidentiary Record Supports the Undisputed Fact that the
        KMC Nurses Are Qualified; However, the FCA Should Be
        Used to Address Quality of Care Arguments .................................. 14

II.  CONCLUSION .................................................................................. 18

# TABLE OF AUTHORITIES

Page

## CASES

*Casumpang v. Int'l Longshore & Warehouse Union, Local 142,*
  361 F.Supp.2d 1195 (D. Haw. 2005) ........................................................................ 8

*Hagood v. Sonoma County Water Agency*
  81 F.3d 1465 (9th Cir. 1996) ................................................................................. 14

*United States ex rel Mikes v. Straus,*
  274 F.3d 687 (2d Cir. 2001) ............................................................................ 17, 18

*United States ex rel. Lamers v. City of Green Bay,*
  168 F.3d 10013 (7th Cir. 1999) ............................................................................ 14

*United States ex rel. Philips v. Permian Residential Care Ctr.,*
  386 F. Supp. 2d 879 (W.D. Tex. 2005) .................................................................. 17

*United States ex rel. Swan v. Covenant Care, Inc.,*
  279 F. Supp. 2d 1212 (E.D. Cal. 2002) .......................................................... 17, 18

*United States ex. rel. Bailey v. Ector County Hosp.,*
  386 F. Supp. 2d 759 (W.D. Tex. 2004) .......................................................... 17, 18

*United States v. NHC Healthcare Corp.,*
  115 F. Supp. 2d 1149 (W.D. Mo. 2000) ........................................................ 17, 18

*United States v. Prabhu,*
  442 F. Supp. 2d 1008 (D. Nev. 2006) ................................................................... 14


## STATUTES

42 U.S.C. § 1395 .................................................................................................... 17


## OTHER AUTHORITIES

Medicare Benefit Policy Manual, CH 15, § 60.3 ............................................... 9, 11


## REGULATIONS

42 C.F.R. § 410.26 ................................................................................................... 2
42 C.F.R. § 410.26 (a)(2) ......................................................................................... 2
42 C.F.R. § 410.26(a)(5) .......................................................................................... 2
42 C.F.R. § 410.32(b)(3)(ii) ..................................................................................... 2
66 Fed. Reg. 55267 (Nov. 1, 2001) ......................................................................... 2

DEFENDANTS HAWAI`I PACIFIC HEALTH, KAUAI MEDICAL CLINIC,
WILCOX MEMORIAL HOSPITAL AND WILCOX HEALTH SYSTEM'S
REPLY TO PLAINTIFF JAMES LOCKYER, M.D.'S MEMORANDUM IN
OPPOSITION TO DEFENDANTS HAWAI`I PACIFIC HEALTH'S, KAUAI
MEDICAL CLINIC'S, WILCOX MEMORIAL HOSPITAL'S , AND WILCOX
<u>HEALTH SYSTEM'S MOTION FOR SUMMARY JUDGMENT</u>

This case involves allegations that Defendants committed fraud in
connection with their submission of claims to Medicare for chemotherapy at Kauai
Medical Clinic ("KMC").  In moving for summary judgment, the HPH Defendants
demonstrated that their billings for chemotherapy were fully consistent with all
applicable statutes, regulations and rulings.  As such, the HPH Defendants' claims
for reimbursement could not be *false* claims.

In his Opposition, Dr. Lockyer raises many points, some of which are
irrelevant (<u>e.g.</u>, Dr. Evslin prevented the internists from reviewing claims that were
filed), and some of which are simply silly (<u>e.g.</u>, Defendants stole Dr. Lockyer's
medical identity), in an effort to convince this Court that summary judgment
cannot be appropriate.  Cutting through the clutter and distractions of Relator's
arguments, however, there are no *material* issues of fact in dispute and the HPH
Defendants are, accordingly, entitled to judgment as a matter of law.  The HPH
Defendants did not violate any applicable statutes or regulations, and certainly
could not have committed fraud.

I.    ARGUMENT

A.    The "Incident to" Rules

As fully set forth in the HPH Defendants' summary judgment motion, the Medicare regulations set forth at 42 C.F.R. § 410.26 govern services and supplies incident to a physician's professional services, that are administered by a non-physician, such as a nurse, under the "direct supervision" of a physician. "Direct supervision" means present in the office suite and immediately available to furnish assistance and direction, but does not mean present in the same room. 42 C.F.R. §§ 410.26 (a)(2), 410.32(b)(3)(ii). Moreover, if a nurse is giving a flu shot incident to the services of Dr. A, the direct supervision may be provided by Dr. B. 42 C.F.R. § 410.26(a)(5). Under those circumstances, the regulations *require* that Dr. B's Medicare provider number be used to bill for the treatment even if he never saw the patient. 66 Fed. Reg. 55267 (Nov. 1, 2001).

This is exactly what was done in connection with chemotherapy at KMC. When the oncologist was away from the Clinic, which was 2%-5% of the time (*Dannog Decl.* ¶ 8, Ex. 22, attached hereto[1]), an internist was present in the office suite and immediately available to furnish assistance and direction. In compliance

---

[1] For the convenience of the Court, HPH Defendants have continued the sequence of the exhibit numbers used in the Motion for Summary Judgment, filed on December 22, 2006, to which were attached Exhibits 1-21 (Exhibits 12-20 were filed under seal). All references herein to Exhibits 1 through 21 refer to the exhibits attached to HPH Defendants' Motion for Summary Judgment, filed December 22, 2006.

with the regulations, it was at such times an internist's Medicare provider number on the claim form, not that of the oncologist.

The individuals within the Centers for Medicare and Medicaid Services (CMS), confirmed that the incident to rules would be satisfied where services are provided by oncology nurses and an internist was in the adjacent suite available to assist. (*Rauzi Decl.*, Ex. 7B.) When asked whether the supervising physician must be an oncologist, CMS responded that the supervising physician need not be the same specialty as the ordering physician, but must be available to render assistance. (*Id.*). Finally, CMS was asked whether the supervising physician (the internist) must review the lab work prior to the nurses initiating chemotherapy. (*Id.*) The response was "no" as long as the nurse is qualified. (*Id.*)

The carrier, Medicare's contractor responsible for reviewing claims for eligibility for payment, reviewed KMC's claims, including its claims for chemotherapy, and determined them to be "entirely consistent" with applicable regulations. (*Fong Decl.* ¶ *8*, Ex. 8.) The Carrier's Medical Director for the 2000-2004 period has stated flatly that, in the case of chemotherapy, the "supervising" physician need not be an oncologist, is unlikely to ever see the patient, and is required to use his Medicare provider number when billing for chemotherapy. (*Id. at* ¶¶ *6,7*) Given this, it is difficult to see how the HPH Defendants could be accused of violating the billing rules, much less defrauding Medicare.

3

Relator contends that material issues of fact are raised with respect to (1) whether certain internists, including Relator, "gave Defendants permission to submit claims for chemotherapy using their medical identities, or that they understood and agreed they were supervising" (Lockyer Opp. at 5); and (2) whether the oncology nurses who administered the chemotherapy were qualified to do so.  As the HPH Defendants now demonstrate, neither of these issues constitutes a genuine issue of *material* fact sufficient to defeat summary judgment.

    B.    <u>Coverage</u>

        1.    <u>"Identity Theft"</u>

At the outset, notwithstanding Relator's dramatic phraseology, there is no "identity theft," medical or otherwise, at issue here.  Indeed, there is no issue regarding whether Relator gave his permission to HPH Defendants to submit claims using his provider number.  He did, as did Drs. Braun and Netzer.  On October 10, 1999, Relator signed a Form HCFA 855 in which he acknowledged that, under the terms of his contract, KMC "is entitled to claim or receive any fees or charges for my services." (*Lockyer HCFA 855*, Ex. 30, attached hereto).  The other internists executed the same form.  (*Braun HCFA 855*, Ex. 31, attached hereto; *Netzer HCFA 855*, Ex. 32, attached hereto).  The reason for this is that the doctors were all employees of KMC and all fees, including Medicare reimbursement, went to the Clinic to be allocated pursuant to the Clinic's

compensation formula. Indeed, it is the internal allocation of those fees that was the genesis of this whole case. It is, however, no concern of Medicare how the reimbursement is allocated internally. In any event, however, there was no "theft" of anyone's identity and all of the internists contractually authorized KMC to submit claims to Medicare with or without their permission.

      2.     There is Overwhelming Evidence that Dr. Lockyer Covered Chemotherapy

As set forth in the HPH Defendants' summary judgment motion, if Dr. Lockyer signed a medical chart on a given day, it meant he was covering for that day. (*Diana Decl. ¶ 10*, Ex. 5.) Dr. Lockyer alleges, however, that while he was ordered to "sign off" on oncology charts by Dr. Evslin, he was never asked to "supervise" the administration of chemotherapy or to cover the chemotherapy suite. (Lockyer Declaration, attached to Plaintiff/Relator Lockyer's Memorandum in Opposition to the instant Motion ("Lockyer Decl."), at ¶¶ 11, 27, 28.) Dr. Lockyer also states that "[p]rior to the May 2002 meeting with Dr. Evslin, I recall no occasion on which I was asked to supervise the chemotherapy room, sign notes or labs, for oncology or chemotherapy . . . ." (*Id.* at ¶ 21.) Dr. Lockyer fails reconcile this statement with the chemotherapy charts he signed prior to May 2002. (*T.D. Medical Record d:2/16/01*, Ex. 14; *A.I. Medical Record d:8/6/01*, Ex. 15.) Nor does Dr. Lockyer reconcile his contention that he did not cover the chemotherapy room after he was ordered to simply sign charts in May 2002, with

the medical record showing Dr. Lockyer treating a patient for a side effect of
chemotherapy in June 2002.  (*G.P. Medical Record d:6/7/02*, Ex. 12.)
Notwithstanding this medical record evidence, Dr. Lockyer simply "disputes" the
declarations of three oncology nurses that he covered the chemotherapy room,
even claiming that he does not know what they mean by "cover."  ( Lockyer Decl.
¶ 7.)  Curiously, he does not address the declarations of a third nurse and an
internist that Dr. Lockyer did act as the covering physician for the chemotherapy
room.  (*Diana Decl. ¶ 9*, Ex.5; *McKnight Decl. ¶ 5*, Ex. 6.)  Nor does Dr. Lockyer
address the contemporaneous emails establishing a coverage schedule for June
2002 and confirming that Dr. Lockyer did cover on his assigned day.  (*Joseph
Decl.*, Exs. 1B and 1C.)

In addition to disputing the declarations of the oncology nurses, Dr. Lockyer
submits the declarations of two internists, R. Craig Netzer, M.D. and Michael S.
Braun, M.D.  Dr. Netzer's declaration is baffling in that he disputes the
declarations of the oncology nurses that he ever covered the chemotherapy room.
Neither the nurses nor anyone else, however, had stated that Dr. Netzer covered
chemotherapy.  Thus, all that Dr. Netzer's declaration accomplishes is the rebuttal
of something that was never asserted.  Dr. Braun's declaration is ambiguous and
contradictory.  Dr. Braun denies that he was ever asked to cover the chemotherapy
room (¶ 10), states that Dr. Evslin asked the internists to cover (¶ 15), denies it

again (¶¶ 31, 32), and finally says that he did not consider Dr. Evslin's request "to be for supervision *throughout the administration of chemotherapy* in the oncology suite, or to be on call for oncology." (¶ 30)(emphasis added).

On the other hand, Mary G. Pixler, M.D., former Chair of the Internal Medicine Department, states that she had been asked to cover the chemotherapy room on several occasions (*Pixler Decl.* ¶¶ *6, 8, 9, 10*, attached to Dr. Evslin's Reply.)  She goes on to state that "[t]he term 'cover' *is a generally understood term in the medical profession* meaning that while a physician is unavailable, a 'covering' physician would render necessary services on behalf of the unavailable physician."  (*Id.*, ¶ 6 (emphasis added).)  Dr. Pixler further states that when she was requested to "cover" the chemotherapy room, she "understood that request to mean that [she] would be immediately available to render necessary medical care should an incident arise in the administration of chemotherapy, which required the attention of a physician."  (*Id.,* ¶ 8.)

Similarly, Arnulfo Diaz, M.D., an internist who has worked at KMC for 33 years, states that KMC internists covered the chemotherapy room when the oncologist was away.  (*Diaz Decl.,* ¶ *4*, Ex. 22, attached hereto).  Thus, on the one side are the actual medical records; emails documenting that Dr. Lockyer was scheduled to, and did, cover the chemotherapy room; declarations from four oncology nurses, two of whom are no longer employed by KMC (*i.e.*, Beth

7

Carlozzi and Debra Dannog, *Joseph Decl.*, Ex. 1A); and declarations from four

internists, two of whom are no longer employed by KMC (McKnight and Pixler).

On the other side are Dr. Netzer's denials of facts that were never alleged, Dr.

Braun's confusing and contradictory declaration, and Dr. Lockyer's self serving

denials.  Such denials are insufficient to create a genuine issue of material fact.

*Casumpang v. Int'l Longshore & Warehouse Union, Local 142,* 361 F.Supp.2d

1195, 1201 (D. Haw. 2005).

> 3.     Dr. Lockyer Did Not Have to Be Aware that He Was Covering in Order to Bill Using His Medicare Number

Even if Dr. Lockyer's awareness that he was covering is a disputed factual

issue, it is not a *material* factual issue.  Relator's Opposition states, at 4-5, that

"Defendants' Motion should be denied because it asks this Court to weigh

conflicting evidence on the central question of whether the physicians whose

medical identities they used to submit the claims had agreed to supervise the

administration of chemotherapy . . . ."  As demonstrated above, Dr. Lockyer and

the other internists had already agreed to permit KMC to submit claims using their

provider numbers by executing assignments.  The remaining issue appears to be

whether Dr. Lockyer and the other internists were aware they were covering.  As

HPH Defendants now demonstrate, whether these docctors knew does not matter.

KMC is a departmentalized physician directed clinic.  The term "physician directed clinic" is defined in the Medicare Benefit Policy Manual, CH 15, § 60.3 (*Rodriquez Report*, Ex. 23A), as a clinic where:

> 1. A physician (or a number of physicians) is present to perform medical (rather than administrative) services at all times the clinic is open;
>
> 2. Each patient is under the care of a clinical physician; and
>
> 3. The nonphysician services are under medical supervision.

KMC meets this definition.  Of particular importance to the issues in this case, a number of physicians were present to perform medical services at all times the clinic was open.  According to Dr. Diaz, who has been with KMC for 33 years, during the 1999-2004 time period relevant to this case, there were, on average, five to seven internists working on the second floor of the Clinic on any given day. (*Diaz Decl.* ¶¶ *1,2*, Ex. 22.)  This number does not include those internists with a subspecialty such as cardiology.  (*Diaz Decl.* ¶ *2*, Ex. 22.)  Dr. Diaz's declaration in this regard is corroborated by Dr. Pixler and four oncology nurses.  (*Pixler Decl.* ¶ *18*, attached to Dr. Evslin's Reply; *Dannog Decl.* ¶ *16*, Ex. 25, attached hereto; *Carlozzi Suppl. Decl.* ¶ *2*, Ex. 26, attached hereto; *Diana Suppl. Decl.* ¶ *2*, Ex. 27, attached hereto; *Carter Suppl. Decl.* ¶ *6*, Ex. 28, attached hereto) The second floor of the Clinic is the location of both the Internal Medicine Department and the chemotherapy room.  As the floor plan illustrates (*Joseph Suppl. Decl*, Ex. 24A, attached hereto), the chemotherapy room is not only on the same floor as the

9

Internal Medicine Department, it is physically *within* the Internal Medicine suite.
This means that there were multiple doctors literally within steps of the
chemotherapy room on any given day.

Dr. Diaz states that he knows of no time during the day when there was no
internist on the second floor. (*Diaz Decl. ¶ 3*, Ex. 22.) Even during the hours of
noon to 2:00 p.m., when the Clinic was officially closed for lunch, physicians
remained on the second floor. (*Id.*) Thus, Dr. Pixler was asked to cover during the
lunch break. (*Pixler Decl. ¶ 9*, attached to Dr. Evslin's Reply.) Moreover, while
patient preparation may have commenced early in the morning, actual
chemotherapy was not administered until a doctor arrived in the morning.
(*Dannog Decl. ¶ 11*, Ex. 25; *Carlozzi Suppl. Decl. ¶ 1*, Ex. 26; *Diana Suppl. Decl.*
*¶ 1*, Ex. 27; *Carter Suppl. Decl. ¶ 5*, Ex. 28.) In short, on those rare days when the
oncologist was not present (2%-5% of the time, *Dannog Decl. ¶ 8*, Ex. 25), there
was always an internist available to furnish assistance and direction, as required by
the regulations.

This kind of group responsibility for coverage is expressly contemplated by
the Medicare Benefit Policy Manual which states, in connection with incident to
services in a clinic setting:

> In highly organized clinics, particularly those that are
> departmentalized, direct physician supervision may be the
> responsibility of several physicians as opposed to an individual
> attending physician. *In this situation, medical management of all*

10

> *services provided in the clinic is assured.* The physician ordering a
> particular service need not be the physician who is supervising the
> service.  Therefore, services performed by auxiliary personnel and
> other aides are covered even though they are performed in another
> department of the clinic.

(Manual § 60.3 (emphasis added).)  On this basis, Todd Rodriguez has expressed

the expert opinion that:

> In the physician directed clinic setting, no individual physician must
> be designated as the supervising physician. Rather, all services are
> deemed to be under the medical management of all physicians in the
> clinic and, therefore, any physician who is in the suite at the time the
> services are being rendered is presumed to be supervising the services.

(*Rodriguez Report at 1,¶ E*, Ex. 23.)  Mr. Rodriguez goes on to conclude that,

under these circumstances, the supervising physician does not have to know that he

or she is serving as supervising physician:

> Accordingly, a physician of the clinic who is on premises during the
> time that the incident-to services are rendered is deemed to be
> supervising those services even though he or she may not be formally
> designated as or have specific knowledge that he or she is serving as
> the supervising physician for such services.

(*Id.; see also Id. at 3, ¶ C.*)  Mr. Coleman, Relator's expert, does not address, or

even mention, Manual § 60.3.  As a result, as Mr. Rodriguez stated, "Mr.

Coleman's Report addresses the incident-to rules as they are intended to apply in

the solo physician office setting . . . ." (*Rodriguez Report at 1, ¶ D*, Ex. 23.)

Rather, as Mr. Rodriguez notes, a physician directed clinic setting is more

analogous to a hospital setting.  (*Id. at 1-2, ¶ E*, Ex. 23.)  Thus, while Relator

attempts to distinguish the Declaration of Edward P. Gelmann, M.D., Defendants'

expert from Georgetown and Columbia Universities, Dr. Gelmann has stated that

the standard of care in oncology was "not limited to chemotherapy administered in

a hospital." (*Gelmann Suppl. Decl.* ¶ *2*, Ex. 29.)  This same standard would apply

to chemotherapy administered in a free standing clinic where there are several

physicians working on the same floor that the chemotherapy is being

administered."  (*Id.*, Ex. 29.)  Similarly, Relator alleges that Jonathan K. Cho,

M.D. was misled by the HPH Defendants when he executed a declaration in

support of the HPH Defendants' motion for summary judgment.  Specifically,

Relator contends that Dr. Cho was not made aware that KMC was a clinic rather

than a hospital.  (Opp. at 22.)  In Dr. Cho's second Declaration, obtained by

Relator, he refers to criteria applicable to a physician's office, infusion center, free-

standing cancer center, "and any other treatment site *except* a hospital outpatient

department."  (Plaintiff/Relator Lockyer's Memorandum in Opposition ("Lockyer

Opp.") Ex. C, ¶ 8)(emphasis in original).  A departmentalized physician based

clinic is not mentioned, but the rationale differentiating a hospital from the other

treatment sites would put KMC in the hospital category: "A medical oncologist is

not ordinarily present when a trained and qualified oncology nurse administers

chemotherapy to a patient in a hospital-based chemotherapy infusion center, *as*

*physicians are always present and available in the hospital.*"  (*Id.* ¶ 6).  As we have just demonstrated, physicians are always present and available at KMC.

Finally, Mr. Rodriguez disputes Mr. Coleman's conclusion that the Medicare claim form requires the supervising physician to have personal knowledge of each and every claim form on which he or she is identified as the supervising physician.  CMS expressly contemplates a physician signing a one-time certification letter for machine-prepared claims and the entry of a physician's signature, by a secretary or other employee, on paper claims by means of a stamp or computer.  (*Rodriguez Report at 2, ¶ 6*, Ex. 23.)

From the foregoing, the HPH Defendants submit that the oncology billing at KMC was in compliance with applicable regulations and guidance.  Relator characterizes this as "*ex post facto*" and appears to contend that if the HPH Defendants did not announce their legal interpretation in advance, the fact that they complied with the law is irrelevant.  (Lockyer Opp. at 1-2.)  This is nonsense. False claims allegations and cancer treatment are not frivolous matters and, unlike a game of pool, there is no requirement to have "called one's shot" in advance in order for it to count.  The HPH Defendants complied with the law when they billed for chemotherapy.  As a result, KMC could not have committed fraud in connection with such billings.  At the very least, however, there is a difference of opinion about the requirements of the applicable regulations.

It is well established that "a disputed legal issue" is not enough to support a False Claims Act allegation. *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1477 (9th Cir. 1996). "[C]laims are not 'false' under the FCA when reasonable persons can disagree regarding whether the service was properly billed to the Government." *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 10013, 1018 (7th Cir. 1999) ("errors based simply on faulty calculations or flawed reasoning are not false under the FCA…[a]nd imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA"). Therefore, Relator cannot state a cognizable claim against HPH Defendants based on the undisputed material facts in the evidentiary record.

C.   The Evidentiary Record Supports the Undisputed Fact that the KMC Nurses Are Qualified; However, the FCA Should Be Used to Address Quality of Care Arguments

Plaintiff Lockyer argues in his opposition brief that HPH Defendants failed to show the absence of a genuine issue of material fact as to whether the nurses assigned to the KMC Oncology Department were sufficiently qualified to administer chemotherapy without continuous direct supervision. HPH Defendants dispute Plaintiff's assertion that the qualifications of the nurses bear on a determination in this case as to whether HPH Defendants submitted fraudulent claims for purposes of the False Claims Act.

14

On the face of the declarations submitted by the Oncology Department nurses and the chart depicting the nurses' employment and certification prepared by HPH Defendants' Compliance Officer, the nurses are in fact trained and qualified to handle the administration of chemotherapy.[2]  (*Joseph Decl. Ex. A*, Ex. 1A; *Diana Decl.¶¶  1,2* , Ex. 5; *Diana Suppl. Decl.¶ 3*, Ex. 27; *Carlozzi Decl.¶ 1*, Ex. 2; *Carlozzi Suppl. Decl.¶¶ 3,4* , Ex. 26; *Carter Decl. ¶ 1*, Ex. 3; *Carter Suppl. Decl.¶¶ 1-3*, Ex. 28; *Dannog Decl.¶¶ 1-7*, Ex. 25.)  Upon review of the oncology nurses' training and credentials, Dr. Gelmann, a practicing oncologist, determined that the nurses are qualified to perform the duties for which they were responsible at KMC's chemotherapy suite.  (*Gelmann Suppl. Decl. ¶ 5*, Ex. 29.)  Moreover, there are no licensing requirements in Hawaii that are specific to oncology nurses. Nor is national OCN certification a requirement for a nurse to administer chemotherapy as, in order to be eligible to even take the certification test, a nurse must have 1,000 hours of on-the-job experience.  (*Carter Suppl. Decl. ¶ 3*, Ex. 28.)

Relator and his oncology consultant's assertions concerning the nurses' qualifications are rife with error.  Relator and Ms. Bookbinder incorrectly assert that during the period of January 2002 through at least September 2003, HPH

---

[2] Plaintiff merely attempts to thwart summary judgment by claiming he needs "objective proof" of the nurses' qualifications; however, nurses Beth Carter, Beth Carlozzi, Debra Dannog, and Sally Diana, and Compliance Officer Lynne Joseph have all submitted signed declarations upon penalty of perjury.

15

Defendants did not employ nurses in the Oncology Department who possessed any recognized certification.  (Lockyer's Opp. at 11; Bookbinder Decl. ¶ 9b.)  Beth Carlozzi, who received her ONC certification in September 1998 worked in the Oncology Department of KMC through September 12, 2002, with her resignation effective September 13, 2002.  (*Carlozzi Suppl. Decl. ¶ 5*, Ex. 26; *Joseph Decl.*, Ex. 1A.)  Additionally, from October 1999 through September 2005, Debra Dannog worked in the chemotherapy suite.  (*Dannog Decl. ¶ 1*, Ex. 25.)  While she received her ONC certification in October 2003, Ms. Dannog received certificates showing the completion of chemotherapy courses sponsored by the Oncology Nursing Society in both December 2000 and May 2003.  (*Dannog Decl. ¶¶ 3,5*, Ex. 25.)

Ms. Bookbinder contends that Ms. Dannog "was the only nurse allegedly assigned to the Department between October 2003 and September 2005 who could have been certified and mixing and administering chemotherapy."  (Bookbinder Decl. ¶ 9c.)  To the contrary, Beth Carter attended a two-day chemotherapy training course in approximately February 2003, received her ONC certification in April 2004, and remained employed at KMC through November 2005.  (*Joseph Decl. Ex. A*, Ex. 1A; *Carter Suppl. Decl. ¶¶ 2, 3*, Ex. 28.)  Based on the evidentiary record, the nurses possessed the qualifications necessary to perform their duties in

KMC's chemotherapy suite.  Any assertions otherwise are merely attempts to thwart summary judgment by throwing in unfounded and irrelevant contentions.

Even so, Plaintiff's argument concerning the nurses' credentials is really a non-issue.  The question here is whether the claims submitted to Medicare were fraudulent under the FCA.  The FCA should not be used as a vehicle for ensuring regulatory compliance, as the FCA only attaches liability to false claims for payment, not to underlying activity.  *United States ex rel. Swan v. Covenant Care, Inc.*, 279 F. Supp. 2d 1212, 1220-21 (E.D. Cal. 2002).  Nor should the FCA be used as a means to police quality of care.  *United States ex rel Mikes v. Straus*, 274 F.3d 687, 698 (2d Cir. 2001); 42 U.S.C. § 1395 (prohibiting federal interference in the manner in which medical services are provided).  "[C]ourts are not the best forum to resolve medical issues concerning the levels of care.  State, local or private medical agencies, boards or societies are better suited to monitor quality of care."  *Id.* at 700; *see also United States ex rel. Philips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879, 884 (W.D. Tex. 2005) (same); *United States ex. rel. Bailey v. Ector County Hosp.*, 386 F. Supp. 2d 759, (W.D. Tex. 2004) (same).

Courts will not find a cognizable claim under the FCA if the United States and relator simply disagree with a reasonable medical care treatment administered by a defendant.  *Bailey*, 386 F. Supp. 2d at 766; *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000).  In order for the United

17

States and the relator to prove fraudulent billing based on allegations concerning quality of care, they would have to prove that the treatment is so deficient as to be worthless. *Mikes*, 274 F.3d at 703; *NHC Healthcare Corp.*, 115 F. Supp. 2d at 1153; *Bailey*, 386 F. Supp. 2d at 766. Based on the evidentiary record, there is no genuine issue of material fact as to the sufficient qualifications of the nurses. Further, Plaintiffs have not alleged, nor could they allege, that HPH Defendants provided services that were so deficient as to be worthless. *See Swan*, 279 F. Supp. at 1221 (where plaintiff challenged the level of care and amount of services received, and did not allege a failure to provide any services, plaintiff's FCA claim did not fit within the worthless services category). Accordingly, any allegations based on the quality of care do not state a cognizable claim under the FCA.

## II.   CONCLUSION

For all the foregoing reasons and those articulated in the memorandum in support of this Motion for Summary Judgment, the HPH Defendants respectfully request that this Court grant their motion for summary judgment.

DATED:  Honolulu, Hawaii, March 16, 2007.

/s/ Kenneth S. Robbins
KENNETH S. ROBBINS
JOHN-ANDERSON L. MEYER

Attorneys for Defendants
HAWAI`I PACIFIC HEALTH, KAUAI
MEDICAL CLINIC, WILCOX MEMORIAL
HOSPITAL AND WILCOX HEALTH
SYSTEM

18