# Exhibit 23

# REPORT OF EXPERT WITNESS

I, Todd A. Rodriguez, have been retained to provide expert testimony in this case on the interpretation and application of the rules under which the Medicare Program pays for items and services, including drugs and biologicals, furnished by auxiliary personnel incident to a physician's services. This includes providing my expert opinion on the Report of Expert Witness (The "Report"), prepared for relators in this case by Terry S. Coleman, which I have reviewed. The opinions that I will express in this case are as follows:

A.      The Medicare Program will pay for items and services, including drugs and biologicals, that are furnished incident to a physician's services when those items and services are an integral although incidental part of the physician's professional service, are furnished in a clinic, and are furnished by auxiliary personnel under the physician's direct supervision.

B.      For purposes of coverage of services rendered incident to a physician's services, "direct supervision" means a physician must be present in the office suite where the services are being rendered and immediately available to furnish assistance and direction throughout the performance of the services. Direct supervision does not mean that the physician must be present in the room where the services are rendered during the services.

C.      The supervising physician need not be the same physician upon whose professional service the "incident-to" service is based. Rather, in an organized physician clinic setting (i.e., a "physician directed clinic"), any physician in the clinic may serve as the supervising physician at any time for incident-to services rendered in the office suite. To illustrate, a patient may come into a clinic to receive an injection by a nurse. Provided the patient's course of treatment was initiated by a physician, the patient may be seen by a nurse and receive the injection, and the patient need not have a face-to-face encounter with any physician during such visit. The office visit and the injected drug or biological are properly billable to the Medicare program on an "incident-to" basis.

D.      The Medicare incident-to rules as implemented through instructional guidance published by the Centers for Medicare and Medicaid Services ("CMS") contemplate not only the use of auxiliary personnel in a solo practicing physician's office but also in a group practice setting. Although Mr. Coleman's Report addresses the incident-to rules as they are intended to apply in the solo physician office setting, his Report fails to mention the CMS instructions for applying the incident-to rules in the group practice or multi-physician clinic (i.e., the "physician directed clinic") setting as set forth in the CMS instructional manual to its contractors. As discussed below, those instructions contemplate that where not just one but multiple physicians are on hand in an organized clinic, any one or more of those physicians can serve as a supervising physician for purposes of incident-to items and services being provided within the clinic at any given time.

E.      In the physician directed clinic setting, no individual physician must be designated as the supervising physician. Rather, all services are deemed to be under the medical management of all physicians in the clinic and, therefore, any physician who is in the suite at the time that the services are being rendered is presumed to be supervising the services. Accordingly, a physician of the clinic who is on premises during the time that the incident-to services are rendered is deemed to be supervising those services even though he or she may not be formally designated as or have specific knowledge that he or

she is serving as the supervising physician for such services. As in a hospital setting, in the physician directed clinic setting, a physician need not have specific knowledge that he or she will be deemed the supervising physician for purposes of submission of the Medicare claim form for such incident-to services since, in the clinic setting, each physician's supervision of all services rendered in the clinic is implied.

F.    In his Report, Mr. Coleman references the certification statement on the reverse-side of the CMS-1500 claim form which reads as follows:

"I certify that the services shown on this form are medically indicated and necessary for the health of the patient and were personally furnished by me, or were furnished incident to my professional services by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."

This certification statement is not contrary to the physician directed clinic rules in any way. Specifically, the certification statement expressly excepts from the representation regarding "immediate personal supervision", arrangements which are "otherwise expressly permitted by Medicare or CHAMPUS regulations." The incident-to regulations expressly allow for "direct supervision" which is distinct from personal supervision.[1]  Moreover, as noted above, CMS has interpreted the regulatory direct supervision requirement as being conclusively met in the physician directed clinic setting.

G.    Finally, I believe that in his Report, Mr. Coleman incorrectly relies upon the certification statement on the reverse-side of the CMS-1500 claim form to support his argument that in order for a claim for incident-to services to be legitimate, the supervising physician would have to have personal knowledge of each and every claim form on which he or she is identified as the supervising physician. In fact, as Mr. Coleman notes in his Report, the claim form certification does not require that the supervising physician review or personally sign each and every claim form on which he or she is identified as the supervising physician. Instructions issued by CMS for completing the claim form expressly provide that a physician may instead sign a one-time certification letter for machine-prepared claims submitted on other than paper claims or, for paper claims, authorize an employee (e.g., nurse, secretary) to enter the physician's signature on the claim either manually, by stamp-facsimile or block letters, or by computer. It is apparent therefore that CMS rules do not contemplate that the supervising physician will personally review and sign each and every claim submitted by a clinic in which he is employed where that physician has authorized such claim submissions by placing his signature on file with the clinic.

The foregoing opinion is based upon the following:

A.    The Social Security Act and the regulations thereunder provide that the Medicare Program will pay for services and supplies including drugs and biologicals when performed and/or administered by auxiliary personnel incident-to the services of a physician in the office setting. (42 U.S.C. § 1395m, 42 C.F.R. § 410.26) The Medicare "incident-to" regulations expressly require that to be covered by the Medicare Program, incident-to services must be furnished under the direct supervision

---

[1] The regulation at 42 CFR 410.32 defines "personal supervision" to mean a physician must be in attendance in the room during the performance of the procedure.

2

of the physician and that the physician directly supervising the auxiliary personnel need not be the same physician upon whose professional service the incident-to service is based. (42 C.F.R. § 410.26(b)(5))

B.    Medicare regulations at 42 C.F.R. § 410.32 define the term "direct supervision" to mean that "the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure.  It does not mean that the physician must be present in the room when the procedure is performed."

C.    In manual instructions by the Centers for Medicare and Medicaid Services ("CMS") to the CMS contractors charged with administering the Medicare program in local regions[2], CMS expressly states the following with regard to incident-to services rendered in a clinic setting:

> In highly organized clinics, particularly those that are departmentalized, <u>direct physician supervision may be the responsibility of several physicians as opposed to an individual attending physician. In this situation, medical management of all services provided in the clinic is assured</u>. The physician ordering a particular service need not be the physician who is supervising the service. Therefore, services performed by auxiliary personnel and other aides are covered even though they are performed in another department of the clinic. (emphasis added) Medicare Benefit Policy Manual, CH. 15, § 60.3

The manual instruction defines "a physician directed clinic" as a clinic where:

> 1. A physician (or a number of physicians) is present to perform medical (rather than administrative) services at all times the clinic is open;
> 2. Each patient is under the care of a clinic physician; and
> 3. The nonphysician services are under medical supervision. (Id.)

It is apparent from the foregoing manual provisions that in the physician directed clinic setting, the presence of multiple physicians at any given time assures that the direct supervision requirement is met with regard to incident-to services notwithstanding the fact that any one particular physician may not necessarily be designated to serve as the supervising physician within the clinic.  Specifically, direct supervision by all physicians in the clinic is implied even though individual physicians may come and go from the clinic.  This implied direct supervision in the physician directed clinic setting is akin to the analysis applied by CMS to incident-to services rendered in the hospital setting.  In the hospital setting, the continuous presence of many physicians at any given time is deemed to satisfy the direct supervision requirement.  In prefatory comments to regulations dealing with incident-to services in the hospital setting CMS (then the Healthcare Financing Administration) expressly stated the following:

---

[2] An overview statement on the CMS website regarding the instructional manuals states the following:

*The CMS Online Manual System is used by CMS program components, partners, contractors, and State Survey Agencies to administer CMS programs.  It offers day-to-day operating instructions, policies, and procedures based on statutes and regulations, guidelines, models, and directives.(http://www.cms.hhs.gov/Manuals/01_Overview.asp)*

EX1 150781v1 03/16/07

> For hospital services furnished incident to a physician service to outpatients in a department of a hospital that is located on the campus of the hospital, we assume the direct supervision requirement to be met as we explain in section 3112.4(A) of the Intermediary Manual. (65 FR 18434 at 18525, April 7, 2000)

The contractor manual instructions on this point state the following:

> The services and supplies must be furnished on a physician's order by hospital personnel and under a physician's supervision ... <u>The physician supervision requirement is generally assumed to be met where the services are performed on hospital premises; the hospital medical staff that supervises the services need not be in the same department as the ordering physician.</u> (emphasis added) Medicare Benefit Policy Manual, CH. 6, § 20.4, Medicare Intermediary Manual, Part 3, § 3112.4

Although the foregoing statements relate specifically to incident-to services rendered in the hospital setting, that setting is analogous to the physician directed clinic setting since in a hospital, as in the physician directed clinic setting, multiple physicians are present at any given time and therefore direct supervision is implied.

D.    Technical Medicare billing requirements necessitate that an individual physician's provider identification number be included on any claim form for incident-to services to permit processing of the claim. In the physician directed clinic setting, any physician present during the time that the services were rendered may, for purposes of the claim submission, be deemed by the clinic to be the supervising physician, and his or her provider identification number may be included on the claim. Accordingly, a physician meeting the definition of a supervising physician within a physician directed clinic may have his provider identification number submitted on a claim for incident-to services without his or her specific knowledge that a specific claim has been submitted as such. The claim form need not be signed by the supervising physician where his or her signature is "on file." (Medicare Claims Processing Manual, CH. 1, § 50.1.6 and Ch. 26, § 10.4) By placing his or her signature on file with the clinic, a physician authorizes the clinic to bill for his or her services (including incident-to services) without his having to review and sign each claim.

Copies of the statutory, regulatory and manual guidance in support of my position are attached as exhibits hereto.

<u>**Qualifications**</u>

I am a graduate of Hampden-Sydney College (B.A., *cum laude*) and Washington and Lee University School of Law (J.D.). I am licensed to practice law in the Commonwealth of Pennsylvania. I have been in private practice since January of 1995 during which time I have limited my practice to the representation of physicians and other health care providers in, among other areas, Medicare regulatory and compliance matters.

To the best of my recollection, the following is a list of all presentations and publications that I have participated in and/or authored within the preceding ten years:

4

Author, "Making the Medicare Incident-To Rules Work For You", Physician's News Digest, March 2007

Author, "Returning Moneys to the Federal Government", Physician's News Digest, December 2006

Co-Presenter, "Understanding the Basics of Fraud and Abuse in the Health Care Industry," Pennsylvania Bar Institute, November 2006

Author, "Cleaning Up the Mess: Refunding Money to the Medicare Program", BC Advantage Magazine, November 2006

Presenter, "Avoiding Liability from Medicare, Medicaid and Third Party Payer Audits," Legal Liability Prevention for Physicians: 2006 Conference, Falmouth, MA, August 2006

Presenter, "Stark II and Continuing Medical Education," Pennsylvania Medical Society 2006 Accreditation Conference, Harrisburg, PA, April 2006

Co-editor, Representing Physicians Handbook (American Health Lawyers Association, 2006)

Author, "Thinking of Outsourcing Your Billing Functions", Physician's News Digest, February 2006

Author, "Medicare Inquiries: Proceed with Caution", BC Advantage Magazine, February 2006

Presenter, "Negotiating Your First Physician Employment Agreement," Residents and Fellows Program, DuPont Children's Hospital, Wilmington, DE, December, 2005

Presenter, "The 2006 OIG Work Plan," Greater Philadelphia American Academy of Professional Coders, Doylestown, PA, December, 2005

Author, "Managing Third-Party Payor Relationships," Physician's News Digest, August 2005

Presenter, "Negotiating Your First Physician Employment Agreement," Bryn Mawr Hospital Radiology Residents Program, Bryn Mawr, PA, August 2005

Author, "The 10 Biggest Mistakes Physicians Make When Responding to a Medicare Inquiry," The Biggest Mistakes Physicians Make -- and How to Avoid Them, (SEAK 2005)

Presenter, "News on Physician Owned Physical Therapy and Stark II Developments", 9th Annual Meeting of Bones of PA (a network organization that provides orthopaedic practice information to orthopaedic practice office administrators/managers), Baltimore, MD, October 2004

Author, "Healthcare Providers Must Re-Evaluate Compliance Planning Efforts in Response to Changing Enforcement Initiatives" Metropolitan Corporate Counsel," October 2004.

Author, "Medical Practice Split-Up Considerations" Physician's News Digest, October 2004

5

Presenter, "Prompt Pay Laws: What They Can & Can't Do To Help You Get Paid," 5th Annual Part B News Billing and Reimbursement Conference, Philadelphia, PA, July 2004

Author, "Office-Based Clinical Trial Research: Not for the Faint of Heart," Health Law Handbook (West 2004)

Presenter, "Legal and Compliance Hot Spots," DermResources Spring Practice Management Seminar, Atlanta, GA, May 2004

Presenter, "Negotiating Your First Physician Employment Agreement," Bryn Mawr Hospital Radiology Residents Program, Bryn Mawr, PA, April 2004

Presenter, "HIPAA Privacy Update," Lankenau Hospital Medical Staff, Wynnewood, PA, April 2004

Co-Presenter, "HIPAA and the Pennsylvania Workers' Compensation Act," Annual Pennsylvania Bureau of Workers' Compensation Conference, Lancaster, PA, December 2003

Co-editor, Jost and Davies, The Law of Medicare and Medicaid Fraud and Abuse, (West 2003-04 ed.)

Co-Presenter, "HIPAA Privacy Compliance," American Academy of Physical Medicine and Rehabilitation, Billing and Coding Institute, Philadelphia, PA, July 2003

Presenter, "Medicare Billing Hotspots," American Academy of Professional Coders, Philadelphia Chapter Annual Meeting, Philadelphia, PA, June 2003

Presenter, "HIPAA Privacy Compliance Planning," St. Luke's Hospital Medical Staff, Bethlehem, PA, March 2003

Presenter, "Medicare Regulations Affecting Physician Employment," Pennsylvania Bar Institute, Annual Health Law Institute, Philadelphia, PA, March 2003

Author, "Peer Review Protection Revisited: The Challenge of Transparency with Improvement," Health Law Handbook (West 2003)

Co-author, HIPAA Privacy Compliance Plan Protocol, Published by Alice G. Gosfield and Associates, P.C. (2003)

Presenter, "Peer Review Protection Revisited: The Challenge of Transparency vs. Improvement," Physicians & Physician Organizations Law Institute, American Health Lawyers Association, New Orleans, LA, October 28, 2002

Co-Presenter, "Fall HIPAA Round-Up," Pennsylvania Bar Institute, Philadelphia, PA, October 24, 2002

Author, "Using Advance Beneficiary Notices to Maximize Your Medicare Collections," Family Practice Management, September 2002

Author, "Advance Beneficiary Notice Rules," Physicians News Digest, July 2002

Presenter, "Medicare Advance Beneficiary Notices: Where Part B and Medical Necessity Meet," Pennsylvania Bar Institute, Annual Health Law Institute, April 2002

Author, "Physicians and the Pharmaceutical Industry: Knowing when to Look a Gift Horse in the Mouth," Health Law Handbook (West 2002)

Co-Presenter, "Using ABNs to Increase Practice Revenues," Eli Research Audio Conference, October 2001

Presenter, "New Provisions in Employment Contracts," Physicians & Physician Organizations Law Institute, American Health Lawyers Association/American Medical Association, Chicago, Illinois, April 2001

Author, "Physician Employment Agreements: New Realities for Old Relationships," Health Law Handbook (West 2001)

Co-author, Medicare Fraud and Abuse Compliance Plan Protocol, Published by Alice G. Gosfield and Associates, P.C. (2000)

Author, Model Medical Practice Fraud and Abuse Compliance Plan, Published by The Health Care Group, Inc. (1999)

Co-author, "Do You Have a Practice Compliance Plan?" Ophthalmology Management, (August 1999)

Presenter, "The New Economics of Medical Practice," Fort Lauderdale, Florida, November 1998

Presenter, "Building a Medical Practice Compliance Program," Physician Office Managers of York, York, Pennsylvania, November 1998

Presenter, "The Future of Anesthesia," Pennsylvania Association of Nurse Anesthetists, Hershey, Pennsylvania, March 1997

Presenter, "The Essentials of Physician Employment Contracting," Ophthalmology Residents Program, Case Western University Hospitals, Cleveland, Ohio, May 1996

Contributing author, Physician's Guide to In-Office Dispensing. (Inga Ellzey Practice Group, Inc. and Paramedical Consultants, Inc. 1996)

Contributing author, Forecast, a monthly publication for medical practices. (The Health Care Group, Inc. 1996-99)

7

## Compensation

I am charging my normal hourly rate plus expenses.  My hourly rate in 2007 is $310.

## Other Cases

I have not testified at trial or by deposition in any other cases within the past four (4) years.


Todd A. Rodriguez

8

**EXHIBITS**

42 U.S.C. § 1395m

42 C.F.R. § 410.26

42 C.F.R. § 410.32

Medicare Benefit Policy Manual, CH. 15, §§ 60-60.3

Medicare Benefit Policy Manual, CH. 6, § 20.4

Medicare Intermediary Manual, Part 3, § 3112.4

Medicare Claims Processing Manual, CH. 1, § 50.1.6

Medicare Claims Processing Manual, CH. 26, §§ 10-10.4

9

# Exhibit A

**Medicare Benefit Policy Manual**

**Chapter 15 – Covered Medical and Other Health Services**

**Sections 60 -60.3**

**(http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf)**

in plasma necessary for blood to clot. For purposes of Medicare Part B coverage, hemophilia encompasses the following conditions:

- Factor VIII deficiency (classic hemophilia);
- Factor IX deficiency (also termed plasma thromboplastin component (PTC) or Christmas factor deficiency); and
- Von Willebrand's disease.

Claims for blood clotting factors for hemophilia patients with these diagnoses may be covered if the patient is competent to use such factors without medical supervision.

The amount of clotting factors determined to be necessary to have on hand and thus covered under this provision is based on the historical utilization pattern or profile developed by the contractor for each patient. It is expected that the treating source, e.g., a family physician or comprehensive hemophilia diagnostic and treatment center, have such information. From this data, the contractor is able to anticipate and make reasonable projections concerning the quantity of clotting factors the patient will need over a specific period of time. Unanticipated occurrences involving extraordinary events, such as automobile accidents or inpatient hospital stays, will change this base line data and should be appropriately considered. In addition, changes in a patient's medical needs over a period of time require adjustments in the profile.

## 50.6 – Coverage of Intravenous Immune Globulin for Treatment of Primary Immune Deficiency Diseases in the Home

### (Rev. 6, 01-23-04)

Beginning for dates of service on or after January 1, 2004, The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 provides coverage of intravenous immune globulin (IVIG) for the treatment of primary immune deficiency diseases (ICD-9 diagnosis codes 279.04, 279.05, 279.06, 279.12, and 279.2) in the home. The corresponding HCPCS codes are J1563 and J1564. The Act defines "intravenous immune globulin" as an approved pooled plasma derivative for the treatment of primary immune deficiency disease. It is covered under this benefit when the patient has a diagnosed primary immune deficiency disease, it is administered in the home of a patient with a diagnosed primary immune deficiency disease, and the physician determines that administration of the derivative in the patient's home is medically appropriate. The benefit does not include coverage for items or services related to the administration of the derivative. For coverage of IVIG under this benefit, it is not necessary for the derivative to be administered through a piece of durable medical equipment.

## 60 - Services and Supplies

### (Rev. 1, 10-01-03)

### B3-2050

### A. Noninstitutional Setting

For purposes of this section a noninstitutional setting means all settings other than a hospital or skilled nursing facility

Medicare pays for services and supplies (including drug and biologicals which are not usually self-administered) that are furnished incident to a physician's or other practitioner's services, are commonly included in the physician's or practitioner's bills, and for which payment is not made under a separate benefit category listed in §1861(s) of the Act. Carriers and intermediaries must not apply incident to requirements to services having their own benefit category. Rather, these services should meet the requirements of their own benefit category. For example, diagnostic tests are covered under §1861(s)(3) of the Act and are subject to their own coverage requirements. Depending on the particular tests, the supervision requirement for diagnostic tests or other services may be more or less stringent than supervision requirements for services and supplies furnished incident to physician's or other practitioner's services. Diagnostic tests need not also meet the incident to requirement in this section. Likewise, pneumococcal, influenza, and hepatitis B vaccines are covered under §1861(s)(10) of the Act and need not also meet incident to requirements. (Physician assistants, nurse practitioners, clinical nurse specialists, certified nurse midwives, clinical psychologists, clinical social workers, physical therapists and occupational therapists all have their own benefit categories and may provide services without direct physician supervision and bill directly for these services. When their services are provided as auxiliary personnel (see under direct physician supervision, they may be covered as incident to services, in which case the incident to requirements would apply.

For purposes of this section, physician means physician or other practitioner (physician, physician assistant, nurse practitioner, clinical nurse specialist, nurse midwife, and clinical psychologist) authorized by the Act to receive payment for services incident to his or her own services.

To be covered incident to the services of a physician or other practitioner, services and supplies must be:

- An integral, although incidental, part of the physician's professional service (see §60.1);

- Commonly rendered without charge or included in the physician's bill (see §60.1A);

- Of a type that are commonly furnished in physician's offices or clinics (see §60.1A);

- Furnished by the physician or by auxiliary personnel under the physician's direct supervision (see §60.1B).

## B. Institutional Setting

Hospital services incident to physician's or other practitioner's services rendered to outpatients (including drugs and biologicals which are not usually self-administered by the patient), and partial hospitalization services incident to such services may also be covered.

The hospital's intermediary makes payment for these services under Part B to a hospital.

## 60.1 - Incident to Physician's Professional Services

**(Rev. 1, 10-01-03)**

**B3-2050.1**

Incident to a physician's professional services means that the services or supplies are furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness.

### A.  Commonly Furnished in Physicians' Offices

Services and supplies commonly furnished in physicians' offices are covered under the incident to provision.  Where supplies are clearly of a type a physician is not expected to have on hand in his/her office or where services are of a type not considered medically appropriate to provide in the office setting, they would not be covered under the incident to provision.

Supplies usually furnished by the physician in the course of performing his/her services, e.g., gauze, ointments, bandages, and oxygen, are also covered.  Charges for such services and supplies must be included in the physicians' bills.  (See §50 regarding coverage of drugs and biologicals under this provision.)  To be covered, supplies, including drugs and biologicals, must represent an expense to the physician or legal entity billing fir he services or supplies.  For example, where a patient purchases a drug and the physician administers it, the cost of the drug is not covered.  However, the administration of the drug, regardless of the source, is a service that represents an expense to the physician. Therefore, administration of the drug is payable if the drug would have been covered if the physician purchased it.

### B.  Direct Personal Supervision

Coverage of services and supplies incident to the professional services of a physician in private practice is limited to situations in which there is direct physician supervision of auxiliary personnel.

Auxiliary personnel means any individual who is acting under the supervision of a physician, regardless of whether the individual is an employee, leased employee, or independent contractor of the physician, or of the legal entity that employs or contracts with the physician. Likewise, the supervising physician may be an employee, leased employee or independent contractor of the legal entity billing and receiving payment for the services or supplies.

However, the physician personally furnishing the services or supplies or supervising the auxiliary personnel furnishing the services or supplies must have a relationship with the legal entity billing and receiving payment for the services or supplies that satisfies the requirements for valid reassignment. As with the physician's personal professional services, the patient's financial liability for the incident to services or supplies is to the physician or other legal entity billing and receiving payment for the services or supplies. Therefore, the incident to services or supplies must represent an expense incurred by the physician or legal entity billing for the services or supplies.

Thus, where a physician supervises auxiliary personnel to assist him/her in rendering services to patients and includes the charges for their services in his/her own bills, the

services of such personnel are considered incident to the physician's service if there is a physician's service rendered to which the services of such personnel are an incidental part and there is direct supervision by the physician.

This does not mean, however, that to be considered incident to, each occasion of service by auxiliary personnel (or the furnishing of a supply) need also always be the occasion of the actual rendition of a personal professional service by the physician. Such a service or supply could be considered to be incident to when furnished during a course of treatment where the physician performs an initial service and subsequent services of a frequency which reflect his/her active participation in and management of the course of treatment. (However, the direct supervision requirement must still be met with respect to every nonphysician service.)

Direct supervision in the office setting does not mean that the physician must be present in the same room with his or her aide. However, the physician must be present in the office suite and immediately available to provide assistance and direction throughout the time the aide is performing services.

If auxiliary personnel perform services outside the office setting, e.g., in a patient's home or in an institution (other than hospital or SNF), their services are covered incident to a physician's service only if there is direct supervision by the physician. For example, if a nurse accompanied the physician on house calls and administered an injection, the nurse's services are covered. If the same nurse made the calls alone and administered the injection, the services are not covered (even when billed by the physician) since the physician is not providing direct supervision. Services provided by auxiliary personnel in an institution (e.g., nursing, or convalescent home) present a special problem in determining whether direct physician supervision exists. The availability of the physician by telephone and the presence of the physician somewhere in the institution does not constitute direct supervision. (See §70.3 of the Medicare National Coverage Determinations Manual for instructions used if a physician maintains an office in an institution.) For hospital patients and for SNF patients who are in a Medicare covered stay, there is no Medicare Part B coverage of the services of physician-employed auxiliary personnel as services incident to physicians' services under §1861(s)(2)(A) of the Act. Such services can be covered only under the hospital or SNF benefit and payment for such services can be made to only the hospital or SNF by a Medicare intermediary. (See §80 concerning physician supervision of technicians performing diagnostic x-ray procedures in a physician's office.)

## 60.2 - Services of Nonphysician Personnel Furnished Incident to Physician's Services

**(Rev. 1, 10-01-03)**

**B3-2050.2**

In addition to coverage being available for the services of such auxiliary personnel as nurses, technicians, and therapists when furnished incident to the professional services of a physician (as discussed in §60.1), a physician may also have the services of certain nonphysician practitioners covered as services incident to a physician's professional services. These nonphysician practitioners, who are being licensed by the States under

various programs to assist or act in the place of the physician, include, for example, certified nurse midwives, clinical psychologists, clinical social workers, physician assistants, nurse practitioners, and clinical nurse specialists. (See §§150 through 200 for coverage instructions for various allied health/nonphysician practitioners' services.)

Services performed by these nonphysician practitioners incident to a physician's professional services include not only services ordinarily rendered by a physician's office staff person (e.g., medical services such as taking blood pressures and temperatures, giving injections, and changing dressings) but also services ordinarily performed by the physician such as minor surgery, setting casts or simple fractures, reading x-rays, and other activities that involve evaluation or treatment of a patient's condition.

Nonetheless, in order for services of a nonphysician practitioner to be covered as incident to the services of a physician, the services must meet all of the requirements for coverage specified in §§60 through 60.1. For example, the services must be an integral, although incidental, part of the physician's personal professional services, and they must be performed under the physician's direct supervision.

A nonphysician practitioner such as a physician assistant or a nurse practitioner may be licensed under State law to perform a specific medical procedure and may be able (see §§190 or 200, respectively) to perform the procedure without physician supervision and have the service separately covered and paid for by Medicare as a physician assistant's or nurse practitioner's service. However, in order to have that same service covered as incident to the services of a physician, it must be performed under the direct supervision of the physician as an integral part of the physician's personal in-office service. As explained in §60.1, this does not mean that each occasion of an incidental service performed by a nonphysician practitioner must always be the occasion of a service actually rendered by the physician. It does mean that there must have been a direct, personal, professional service furnished by the physician to initiate the course of treatment of which the service being performed by the nonphysician practitioner is an incidental part, and there must be subsequent services by the physician of a frequency that reflects the physician's continuing active participation in and management of the course of treatment. In addition, the physician must be physically present in the same office suite and be immediately available to render assistance if that becomes necessary.

Note also that a physician might render a physician's service that can be covered even though another service furnished by a nonphysician practitioner as incident to the physician's service might not be covered. For example, an office visit during which the physician diagnoses a medical problem and establishes a course of treatment could be covered even if, during the same visit, a nonphysician practitioner performs a noncovered service such as acupuncture.

## 60.3 - Incident to Physician's Service in Clinic

**(Rev. 1, 10-01-03)**

**B3-2050.3**

Services and supplies incident to a physician's service in a physician directed clinic or group association are generally the same as those described above.

A physician directed clinic is one where:

1. A physician (or a number of physicians) is present to perform medical (rather than administrative) services at all times the clinic is open;

2. Each patient is under the care of a clinic physician; and

3. The nonphysician services are under medical supervision.

In highly organized clinics, particularly those that are departmentalized, direct physician supervision may be the responsibility of several physicians as opposed to an individual attending physician. In this situation, medical management of all services provided in the clinic is assured. The physician ordering a particular service need not be the physician who is supervising the service. Therefore, services performed by auxiliary personnel and other aides are covered even though they are performed in another department of the clinic.

Supplies provided by the clinic during the course of treatment are also covered. When the auxiliary personnel perform services outside the clinic premises, the services are covered only if performed under the direct supervision of a clinic physician. If the clinic refers a patient for auxiliary services performed by personnel who are not supervised by clinic physicians, such services are not incident to a physician's service.

## 60.4 - Services Incident to a Physician's Service to Homebound Patients Under General Physician Supervision

**(Rev. 1, 10-01-03)**

B3-2051

### A. When Covered

In some medically underserved areas there are only a few physicians available to provide services over broad geographic areas or to a large patient population. The lack of medical personnel (and, in many instances, a home health agency servicing the area) significantly reduces the availability of certain medical services to homebound patients. Some physicians and physician-directed clinics, therefore, call upon nurses and other paramedical personnel to provide these services under general (rather than direct) supervision. In some areas, such practice has tended to become the accepted method of delivery of these services.

The Senate Finance Committee Report accompanying the 1972 Amendments to the Act recommended that the direct supervision requirement of the "incident to" provision be modified to provide coverage for services provided in this manner.

Accordingly, to permit coverage of certain of these services, the direct supervision criterion in §60.2 above is **not** applicable to individual or intermittent services outlined in this section when they are performed by personnel meeting any pertinent State requirements (e.g., a nurse, technician, or physician extender) and where the criteria listed below also are met:

# Exhibit B

**Medicare Benefit Policy Manual**

**Chapter 6 – Hospital Services Covered Under Part B**

**Section 20.4**

**(http://www.cms.hhs.gov/manuals/Downloads/bp102c06.pdf)**

Covered diagnostic services to outpatients include the services of nurses, psychologists, technicians, drugs and biologicals necessary for diagnostic study, and the use of supplies and equipment. When a hospital sends hospital personnel and hospital equipment to a patient's home to furnish a diagnostic service, Medicare covers the service as if the patient had received the service in the hospital outpatient department.

Hospital personnel may provide diagnostic services outside the hospital premises without the direct personal supervision of a physician. For example, if a hospital laboratory technician is sent by the hospital to a patient's home to obtain a blood sample for testing in the hospital's laboratory, the technician's services are a covered hospital service even though a physician was not with the technician.

Payment may not be made for outpatient diagnostic services unless the same service would be covered as an inpatient hospital service if furnished to a hospital inpatient.

### 20.3.3 - Outpatient Diagnostic Services Under Arrangements

**(Rev. 1, 10-01-03)**

**A3-3112.3.C, HO-230.3.C**

When the hospital makes arrangements with others for diagnostic services, such services are covered under Part B as diagnostic tests whether furnished in the hospital or in other facilities.

Independent laboratory services furnished to an outpatient under arrangements with the hospital are covered only under the "diagnostic laboratory tests" provisions of Part B (see §10, above), but are to be billed along with other services to outpatients. See the Medicare Benefit Policy Manual, Chapter 1, "Inpatient Hospital Services," §50.3, for: (1) the definition of an independent clinical laboratory; (2) the requirements which such a laboratory must meet; and (3) instructions to the intermediary when it is not approved. The "cost" to the hospital for diagnostic laboratory services for outpatients obtained under arrangements is the reasonable charge by the laboratory.

Laboratory services may also be furnished to a hospital outpatient under arrangements by:

1. The laboratory of another participating hospital; or

2. The laboratory of an emergency hospital or participating skilled nursing facility that meets the hospital conditions of participation relating to laboratory services.

### 20.4 - Outpatient Therapeutic Services

**(Rev. 1, 10-01-03)**

**A3-3112.4, HO-230.4**

## 20.4.1 - Coverage of Outpatient Therapeutic Services

**(Rev. 37, Issued: 08-12-05; Effective/Implementation: 09-12-05)**

Therapeutic services which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients. Such services include clinic services and emergency room services.

To be covered as incident to physicians' services, the services and supplies must be furnished as an integral, although incidental, part of the physician's professional service in the course of diagnosis or treatment of an illness or injury. The services and supplies must be furnished on a physician's order by hospital personnel and under a physician's supervision. This does not mean that each occasion of service by a nonphysician need also be the occasion of the actual rendition of a personal professional service by the physician. However, during any course of treatment rendered by auxiliary personnel, the physician must personally see the patient periodically and sufficiently often to assess the course of treatment and the patient's progress and, where necessary, to change the treatment regimen. A hospital service or supply would not be considered incident to a physician's service if the attending physician merely wrote an order for the services or supplies and referred the patient to the hospital without being involved in the management of that course of treatment. The physician supervision requirement is generally assumed to be met where the services are performed on hospital premises; the hospital medical staff that supervises the services need not be in the same department as the ordering physician. However, if the services are furnished outside the hospital, they must be rendered under the direct personal supervision of a physician who is treating the patient. For example, if a hospital therapist, other than a physical, occupational or speech -language pathologist, goes to a patient's home to give treatment unaccompanied by a physician, the therapist's services would not be covered. See the Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Services," §§220 and 230 for outpatient physical therapy and speech-language pathology coverage conditions.

## 20.5 - Outpatient Observation Services

*(Rev. 42, Issued: 12-16-05, Effective: 01-01-06, Implementation: 01-03-06)*

### A. Outpatient Observation Services Defined

*Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital. Observation status is commonly assigned to patients who present to the emergency department and who then require a significant period of treatment or monitoring before a decision is made concerning their admission or discharge.*

# Exhibit C

**Medicare Intermediary Manual**

**Part 3 – Claims Process**

**Section 3112.4**

3112.4   Outpatient Therapeutic Services.--

A.   Coverage of Outpatient Therapeutic Services.--Therapeutic services which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients. Such services include clinic services and emergency room services.

To be covered as incident to physicians' services, the services and supplies must be furnished as an integral, although incidental, part of the physician's professional service in the course of diagnosis or treatment of an illness or injury. The services and supplies must be furnished on a physician's order by hospital personnel and under a physician's supervision. This does not mean that each occasion of service by a nonphysician need also be the occasion of the actual rendition of a personal professional service by the physician. However, during any course of treatment rendered by auxiliary personnel, the physician must personally see the patient periodically and sufficiently often to assess the course of treatment and the patient's progress and, where necessary, to change the treatment regimen. A hospital service or supply would not be considered incident to a physician's service if the attending physician merely wrote an order for the services or supplies and referred the patient to the hospital without being involved in the management of that course of treatment. The physician supervision requirement is generally assumed to be met where the services are performed on hospital premises; the hospital medical staff that supervises the services need not be in the same department as the ordering physician. However, if the services are furnished outside the hospital, they must be rendered under the direct personal supervision of a physician who is treating the patient. For example, if a hospital therapist, other than a physical or speech therapist, goes to a patient's home to give treatment and no physician accompanies him, the therapist's services would not be covered. See §3147ff. for outpatient physical therapy and speech pathology coverage conditions.

B.   Drugs and Biologicals.--For definitions of drugs and biologicals and combination drugs, see §3101.3. Except for those drugs and biologicals which must be put directly into an item of durable medical equipment or a prosthetic device (see §§3110.4C and 3113.4), drugs and biologicals furnished to outpatients for therapeutic purposes are includable only if they are of a type which cannot be self-administered.

Whether a drug or biological is of a type which cannot be self-administered is based on the usual method of administration of the form of that drug or biological as furnished by the physician. Thus, where a physician gives a patient pills or other oral medication, these are excluded from coverage since the form of the drug given to the patient is usually self-administered. Similarly, if a physician gives a patient an injection which is usually self-injected, this drug is excluded from coverage, except for insulin administered to a patient in a diabetic coma. Where, however, a physician injects a drug which is not usually self-injected, this drug is not subject to the self-administrable drug exclusion (regardless of whether the drug may also be available in oral form) since it is not self-administrable in the form in which it was furnished to the patient. (Of course, such injections could not be reasonable and necessary where injection is not considered an indicated method of administration according to accepted standards of medical practice for the condition for which given.)

1.   Less Than Effective Drugs.--Payment may not be made for a less than effective drug. This is a drug that has been determined by the Food and Drug Administration (FDA) to lack substantial evidence of effectiveness for all labeled indications. Also, a drug that has been the subject of a Notice of an Opportunity for a Hearing (NOOH) published in the Federal Register before being withdrawn from the market, and for which the Secretary has not determined there is a compelling justification for its medical need, is considered less than effective. This will include any other drug product that is identical, similar, or related.

Because the FDA has not yet completed its identification of drug products that are still on the market, existing FDA efficacy decisions must be applied to all similar products once they are identified. The complete FDA listing comprises, for the most part, self-administered drugs. The listing that follows includes only those drugs which cannot be self-administered and which therefore could otherwise be covered under the Medicare program.

### DESI DRUG PRODUCTS AND KNOWN RELATED DRUG PRODUCTS THAT LACK SUBSTANTIAL EVIDENCE OF EFFECTIVENESS AND ARE SUBJECT TO A NOTICE OF OPPORTUNITY FOR HEARING

| TRADE NAME | ACTIVE INGREDIENT | DOSAGE FORM/ROUTE | FIRM |
|------------|-------------------|-------------------|------|
| Vasodilan | Isoxsuprine Hydrochloride | Sol/IM | Mead Johnson |

2.  <u>Hemophilia Clotting Factors</u>.--Blood clotting factors, for hemophilia patients competent to use such factors to control bleeding without medical or other supervision, and items related to the administration of such factors are covered under Part B. Coverage is effective for such items and services purchased on or after July 18, 1984. Prior to the enactment of the Deficit Reduction Act of 1984 (P.L. 98-369), all drugs and biologicals which were of the type that could be self-administered were excluded from coverage. The coverage of blood clotting factors is an exception to the exclusion.

The amount of clotting factors determined to be necessary to have on hand and thus covered under this provision will be based on the historical utilization pattern or profile developed by the contractor <u>for each patient</u>. It is expected that the treating source; e.g., a family physician or Comprehensive Hemophilia Diagnostic and Treatment Center, will have such information. From this data, the contractor should be able to make reasonable projections concerning the quantity of clotting factors anticipated to be needed by the patient over a specific period of time. Unanticipated occurrences involving extraordinary events, such as automobile accidents, inpatient hospital stays, etc., will change this base line data and should be appropriately considered. In addition, changes in a patient's medical needs over a period of time will require adjustments in the profile.

Payment under this provision may be conditioned by the Part B blood deductible, see §3235.2.

3.  <u>Immunosuppressive Drugs</u>.--Until January 1, 1995, immunosuppressive drugs are covered under Part B for a period of 1 year following discharge from a hospital for a Medicare covered organ transplant. CMS interprets the 1-year period after the date of the transplant procedure to mean 365 days from the day on which an inpatient is discharged from the hospital. Beneficiaries are eligible to receive additional Part B coverage <u>within</u> 18 months after the discharge date for drugs furnished in 1995; <u>within</u> 24 months for drugs furnished in 1996; <u>within</u> 30 months for drugs furnished in 1997; and <u>within</u> 36 months for drugs furnished after 1997. Beginning January 1, 2000, §227 of the Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999 extended coverage to eligible beneficiaries whose coverage for drugs used in immunosuppressive therapy expires during the calendar year to receive an additional 8 months of coverage beyond the current 36 month period. This benefit does not extend Medicare entitlement or eligibility to ESRD only Medicare beneficiaries. These beneficiaries will continue to lose their Medicare coverage for immunosuppressive drug therapy 36 months after discharge from a hospital following a covered transplant.

Section 113 of the BIPA 2000 by eliminates the time limit for coverage of immunosuppressive drugs under the Medicare program. Effective with immunosuppressive drugs furnished on or after December 21, 2000, there is no longer any time limit for Medicare benefits. This policy applies to all Medicare entitled beneficiaries who meet all of the other program requirements for coverage

under this benefit. Therefore, for example, currently entitled beneficiaries who had been receiving benefits for immunosuppressive drugs in the past, but whose immunosuppressive drug benefit was terminated solely because of the time limit described above for non-ESRD beneficiaries, would now resume receiving that benefit for immunosuppressive drugs furnished on or after December 21, 2000.

Covered drugs include those immunosuppressive drugs that have been specifically labeled as such and approved for marketing by the FDA, as well as those prescription drugs, such as prednisone, that are used in conjunction with immunosuppressive drugs as part of a therapeutic regimen reflected in FDA approved labeling for immunosuppressive drugs. Therefore, antibiotics, hypertensives, and other drugs that are not directly related to rejection are not covered.

You are expected to keep informed of FDA additions to the list of the immunosuppressive drugs and to share this information with your providers. The FDA has identified and approved for marketing only the following specifically labeled immunosuppressive drugs:

- Sandimmune (cyclosporine), Sandoz Pharmaceutical (oral or parenteral form);

- Imuran (azathioprine), Burroughs-Wellcome (oral);

- Atgam (antithymocyte/globuline), Upjohn (parenteral);

- Orthoclone (OKT3) (muromonab-CD3), Ortho Pharmaceutical (parenteral);

- Prograf (tacrolimus), Fujisawa USA, Inc.; and

- Cellcept (mycophenolate mofetil), Roche Laboratories.

- Daclizumab (Zenapax)

- Cyclophosphamide (Cytoxan)

- Prednisone

- Prednisolone

For coverage of immunizations, etc., see §3157.

    4.   <u>Epoetin Alfa (EPO)</u>.--Epoetin Alfa is a biologically engineered protein which stimulates the bone marrow to make new red blood cells. The FDA approved labeling for EPO states that it is indicated in the treatment of anemia associated with chronic renal failure. Medicare patients with this condition include end stage renal disease (ESRD) patients on dialysis and other beneficiaries who have chronic renal failure, but who are not on dialysis. Chronic renal failure patients with symptomatic anemia considered for EPO therapy should have a hematocrit less than 30%.

EPO is covered for Medicare beneficiaries with chronic renal failure who are not on dialysis when it is administered for the treatment of anemia "incident to" a physician's service.

Section 3644.2 contains instructions for submitting claims for EPO, including the requirements for providing the hematocrit reading and the number of units of EPO administered. It is expected that the outpatient department of a hospital will maintain the following information in each patient's medical record to permit the review of the medical necessity of EPO.

   o   Diagnostic coding;
   o   Most recent creatinine prior to initiation of EPO therapy;

o     Date of most recent creatinine prior to initiation of EPO therapy;
o     Most recent hematocrit (HCT) prior to initiation of EPO therapy;
o     Date of most recent hematocrit (HCT) prior to initiation of EPO therapy;
o     Dosage in units/kg.;
o     Weight in kgs.; and
o     Number of units administered.

    5.    Oral Anti-Cancer Drugs.--Effective January 1, 1994, Medicare Part B coverage is extended to include oral anti-cancer drugs that are prescribed as anti-cancer, chemotherapeutic agents providing they have the same active ingredients and are used for the same indications as anti-cancer, chemotherapeutic agents which would be covered if they were not self-administered and they were furnished incident to a physician's service as drugs and biologicals.

This provision applies only to the coverage of anti-neoplastic, chemotherapeutic agents. It does not generally apply to oral drugs and/or biologicals used to treat toxicity or side effects such as nausea or bone marrow depression. However, effective January 24, 1996, Medicare will cover anti-neoplastic, chemotherapeutic agents, the primary drugs which directly fight the cancer, and self-administered antiemetics which are necessary for the administration and absorption of the anti-neoplastic, chemotherapeutic agents when a high likelihood of vomiting exists. The substitution of an oral form of an anti-neoplastic drug requires that the drug be retained for absorption. The antiemetics drug is covered as a necessary means for administration of the oral drug (similar to a syringe and needle necessary for injectable administration). Oral drugs prescribed for use with the primary drug which enhance the anti-neoplastic effect of the primary drug or permit the patient to tolerate the primary anti-neoplastic drug in higher doses for longer periods are not covered. Self-administered antiemetics to reduce the side effects of nausea and vomiting brought on by the primary drug are not included beyond the administration necessary to achieve drug absorption.

In order to assure uniform coverage policy, you must be apprised of carriers' anti-cancer drug medical review policies which may impact on future medical review policy development. Carrier's current and proposed anti-cancer drug medical review polices should be provided by carrier medical directors or your medical directors, upon request.

For an oral anti-cancer drug to be covered under Part B, it must:

    o    Be prescribed by a physician or other practitioner licensed under State law to prescribe such drugs as anti-cancer, chemotherapeutic agents;

    o    Be a drug or biological that has been approved by the Food and Drug Administration (FDA);

    o    Have the same active ingredients as a non-self-administrable, anti-cancer, chemotherapeutic drug or biological that is covered when furnished incident to a physician's service. The oral anti-cancer drug and the non-self-administrable drug must have the same chemical/generic name as indicated by the FDA's Approved Drug Products (Orange Book), Physician's Desk Reference (PDR), or an authoritative drug compendium;

        -- or, effective January 1, 1999, be a prodrug, which is an oral drug ingested into the body that metabolizes into the same active ingredient that is found in the non-self-administrable form of the drug;

    o    Be used for the same indications, including unlabeled uses, as the non-self-administrable version of the drug; and

    o    Be reasonable and necessary for the individual patient.

3112.4 (Cont.)                    COVERAGE OF SERVICES                              11-01

6.  <u>Oral Anti-Nausea Drugs</u>.--Section 4557 of the Balanced Budget Act of 1997 amends §1861(s)(2) by extending the coverage of oral anti-emetic drugs under the following conditions:

o    Coverage is provided only for oral drugs approved by the FDA for use as anti-emetics;
o    The oral anti-emetic(s) must either be administered by the treating physician or in accordance with a written order from the physician as part of a cancer chemotherapy regimen;

o    Oral anti-emetic drug(s) administered with a particular chemotherapy treatment must be initiated within 2 hours of the administration of the chemotherapeutic agent and may be continued for a period not to exceed 48 hours from that time; and

o    The oral anti-emetic drug(s) provided must be used as a full therapeutic replacement for the intravenous anti-emetic drugs that would have otherwise been administered at the time of the chemotherapy treatment.

Only drugs pursuant to a physician's order at the time of the chemotherapy treatment, qualify for this benefit. The dispensed number of dosage units may not exceed a loading dose administered within 2 hours of that treatment, plus a supply of additional dosage units not to exceed 48 hours of therapy. However, more than one oral anti-emetic drug may be prescribed and will be covered for concurrent usage within these parameters if more than one oral anti-emetic is needed to fully replace the intravenous drugs that would otherwise have been given.

Oral drugs that are not approved by the FDA for use as anti-emetics and which are used by treating physicians adjunctively in a manner incidental to cancer chemotherapy are not covered by this benefit and are not reimbursable within the scope of this benefit.

It is recognized that a limited number of patients will fail on oral anti-emetic drugs. Intravenous anti-emetics may be covered (subject to the rules of medical necessity) when furnished to patients who fail on oral anti-emetic therapy.

This coverage, effective for services on or after January 1, 1998, is subject to regular Medicare Part B coinsurance and deductible provisions.

**NOTE:**  Existing coverage policies authorizing the administration of suppositories to prevent vomiting when oral cancer drugs are used are unchanged by this new coverage.

C.  <u>Other Covered Services and Items</u>.--Covered services and items provided by the hospital in connection with the clinic visit or the physician's treatment of outpatients include the use of the following:

o    Hospital facilities, including the use of the emergency room;

o    Services of nurses, nonphysician anesthetists, psychologists, technicians, therapists, and other aides; and

o    Medical supplies such as gauze, oxygen, ointments and other supplies used by physicians or hospital personnel in the treatment of outpatients.

Additional examples of covered items are surgical dressings; splints, casts, and other devices used for reduction of fractures and dislocations; prosthetic devices; leg, arm, back, and neck braces, trusses, and artificial legs, arms, and eyes. (See §§3110.3 - 3110.5 for details on coverage of these items and §3101.9B for additional coverage rules for occupational therapy.)