STARN ● O'TOOLE ● MARCUS & FISHER
A Law Corporation

SHARON V. LOVEJOY        5083-0
STEPHANIE THOMPSON    8399-0
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Telephone No. (808) 537-6100
Facsimile No. (808) 537-5434
slovejoy@starnlaw.com
sthompson@starnlaw.com

Attorneys for Defendant
LEE A. EVSLIN, M.D.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf;<br><br>Plaintiffs,<br><br>vs.<br><br>HAWAII PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.;<br><br>Defendants. | CIVIL NO. CV 04-00596 ACK LEK<br>(Federal and State – Qui Tam)<br><br><br><br>**DECLARATION OF MARY G. PIXLER, M.D.** |

## **DECLARATION OF MARY G. PIXLER, M.D.**

I, MARY G. PIXLER, M.D., do declare that:

1. I am a board certified internal medicine physician licensed to practice medicine in the State of Hawai`i, and am fully competent in all respects to make this Declaration. I have personal knowledge of all facts stated herein, except as otherwise noted.

2. I worked as a physician at Kauai Medical Clinic ("KMC") for ten years: from 1992 to 2002.

3. I served as Department Chair of the Internal Medicine Department from 1996 to 2002, when I left for personal reasons.

4. In accordance with applicable rules and practice, I hired Dr. Lockyer in 1999 to work as an internist in the internal medicine department at KMC. I also hired Dr. Braun. As contract chair, I did the hiring for the department, but did not take part in the contract negotiations and salary compensation models.

5. To the best of my knowledge, Dr. Lockyer completed a standard contract form which provided that his salary would be set at a fixed sum for the first year of employment, but then be subject to the compensation formula, as was the case for all the other clinic-based physicians.

6. On several occasions, I was asked to "cover" the chemo administration room. The term "cover" is a generally understood term in the medical profession meaning that while a physician is unavailable, a "covering" physician would render necessary services on behalf of the unavailable physician.

7. Covering the chemo room was not demanding as the chemo nurses worked under specific protocols, were very good, and highly competent.

8. On occasion, I was asked by one of the chemo nurses to "cover" the chemo room, if the oncologist had to leave the office suite, which included the chemo administration room. I understood that request to mean that I would be immediately available to render necessary medical care should an incident arise in the administration of chemotherapy, which required the attention of a physician.

9. I distinctly remember being asked by Beth Carlozzi, R.N., an oncology nurse, to cover during a lunch period for a blood transfusion. It was commonly the practice, that if a patient was scheduled to receive chemotherapy or blood transfusion during a lunch period or at another time when the oncologist or other covering physician was not available, the chemo

nurses asked a physician ahead of time to be the supervising physician and to "cover."

10.  I also remember being asked to "cover" and in fact covering the chemo room for a period of time in or around May/June 2002, when Dr. Sutherland was off island.

11.  In conjunction with this coverage, I regularly "signed off" on the charts of patients who had received chemotherapy on those days I was asked to cover and supervise.

12.  I understood that by signing off on the charts, I was attesting to my supervisory duties, vis-à-vis that patient. I also knew that my UPIN number would be used in the billing of these "incident to" services which I supervised.

13.  In conjunction with coverage, I organized the internal medicine doctors into three groups or pods. This was done so that when a doctor was unavailable (i.e. off-island or physically away from his/her office), another internist would have "covering" responsibilities—he/she would render the necessary services on behalf of the unavailable physician. These services would include seeing a physician's patients, signing off on charts, reviewing laboratory reports and administering any needed medication for that patient.

14. Dr. Lockyer and Dr. Duvauchelle were in my pod. When I was off-island, or on my afternoons off, my patients would be placed on either Dr. Lockyer's or Dr. Duvauchelle's schedule for that day. Consequently, Dr. Duvauchelle or Dr. Lockyer would sign off on that patient's chart and render the necessary medical care—even though they were my patients and not theirs.

15. This coverage schedule was arranged by me as department chair. I created a memo describing the arrangement and the different groups. Every physician and nurse in the internal medicine department knew of the pod coverage arrangement. I created this mechanism to provide continuity of quality of care for the patient.

16. I have reviewed the records relating to three of my patients, K.K., L.R. and M. I. There were standing orders in their charts for the administration of epogen and/or procrit for their respective medical conditions. It was normal that, should one of these patients appear for his/her shot, and I was unavailable, these patients would be seen by Dr. Lockyer. Dr. Lockyer would then supervise and/or render the necessary medical treatment and then sign off on their charts.

17. This coverage was arranged and occurred on a regular basis without the instigation, input or knowledge (that I am aware) of clinic administration.

18. At any given portion of the day, there would usually be at least five physicians on the same floor and within minutes of the chemo room.

19. As Department Chair, I frequently attended Kauai Medical Clinic Executive Committee meetings wherein issues regarding compensation and quality of care were frequently addressed.

20. I never observed Dr. Evslin dominating or controlling the Executive Committee meeting discussions and agenda to suit his personal needs.

21. I was in attendance at the meeting wherein the Executive Committee voted to terminate the employment of Dr. Lockyer.

22. At that meeting, Dr. Evslin advocated on behalf of Dr. Lockyer and argued for leniency on his behalf. I specifically informed Dr. Lockyer of this fact. Dr. Braun, to the best of my recollection was not at this meeting.

23. Subsequently, at the appeal meeting of the Executive Committee, Dr. Evslin, at the direction of the Executive Committee, presented the rationale of the Committee's vote to terminate Dr. Lockyer's employment.

The internists voted to grant the appeal and not to terminate Dr. Lockyer's employment.

24.    I never felt or perceived, Dr. Evslin to control or dominate the affairs of the clinic so as to personally benefit himself.

DATED:    Kalaheo, Hawaii, _____.


_____
Mary G. Pixler, M.D.