IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER, M.D., STATE OF HAWAII, ex rel. JAMES LOCKYER, M.D. and JAMES LOCKYER, M.D., in his own behalf,<br><br>          Plaintiffs,<br><br>     v.<br><br>HAWAI`I PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D. aka LEE A. EVSLIN, M.D.,<br><br>          Defendants. | CIVIL NO. CV04-00596 ACK KSC (Federal and State - Qui Tam)<br><br>DECLARATION OF HARRY R. SILVER; EXHIBITS 1 AND 2; CERTIFICATE OF SERVICE<br><br>HEARING<br>DATE:    3/27/07<br>TIME:    10:30<br>JUDGE:   Alan C. Kay<br><br>TRIAL: 9/18/07<br>JUDGE: Alan C. Kay |

## DECLARATION OF HARRY R. SILVER

I, Harry R. Silver, declare that

1.    I am a partner with Patton Boggs LLP and one of the attorneys for the corporation defendants in the above captioned case.

2.    I was served with the Supplemental Declaration of Harry Yee on March 20, 2007. Attached as Exhibit A to Mr. Yee's declaration is a copy of an e-mail communication characterized as sent "on behalf of Harry Silver."

3.      The copy of the e-mail communication attached as Exhibit A of Mr.

Yee's supplemental affidavit is incomplete.  Appended hereto as Exhibit 1 is a

copy of the complete e-mail communication as forwarded to me by Paul W. Kim.

The copy submitted by Mr. Yee fails to include an e-mail exchange, dated April

17-18, 2006, between Edwin Rauzi and Terrence Kay in which Mr. Rauzi informs

Mr. Kay that he wished to discuss general policies in connection with a case in

which "the Assistant U.S. Attorney for Hawaii has intervened in a whistleblower

case brought by a former physician-employee of the group medical practice."  The

government's Opposition to Defendants' Motion for Summary Judgment also

failed to include this e-mail exchange.

4.      Mr. Kim previously worked at CMS for Mr. Kay on issues now

handled by Dorothy Shannon.  I had contacted Mr. Kim after Mr. Yee had failed to

articulate the legal basis for his position in this case, either in meetings or in

responses to interrogatories.  My practice is concentrated in the area of health care

fraud defense and has been so for a number of years.  Because I could ascertain no

basis on which the corporate defendants could be accused of committing fraud by

failing to comply with applicable "incident to" billing rules, I sought out Mr. Kim

in an effort to make sure there was nothing I was overlooking.  I had wanted to

retain Mr. Kim as one of our expert witnesses, but because of a long-standing

policy, Mr. Kim's law firm refused to let him serve as an expert witness. Mr. Kim has been retained as a consultant in this case, however.

5.    When I received the Declaration of Terrence L. Kay (appended hereto as Exhibit 2), filed by Mr. Yee in support of his Opposition to Defendants' Motion for Summary Judgment, I contacted Mr. Kim and advised him that Mr. Kay's declaration stated: "I was not told by Mr. Rauzi nor is it disclosed in his e-mail, that he was contacting CMS regarding litigation in which CMS was being represented by the United States Attorney's Office for the District of Hawaii." Because I knew this statement to be incorrect, I forwarded Mr. Kim the April 17-18, 2006 e-mail exchange between Mr. Rauzi and Mr. Kay in which Mr. Rauzi, in fact, disclosed that he was contacting CMS regarding litigation in which CMS was being represented by the United States Attorney's Office for the District of Hawaii. Mr. Kim told me that Mr. Kay gets so many e-mails he probably did not remember the e-mail exchange with Mr. Rauzi. Mr. Kim and I agreed that we would not wish to have Mr. Kay unnecessarily embarrassed. For this reason, we agreed that Mr. Kim would send a copy of the e-mails to Mr. Kay as a courtesy.

6.    Mr. Kim forwarded his e-mail, which is attached as Exhibit 1, after it was sent to Mr. Kay and Ms. Shannon. Mr. Kim's e-mail contains nothing about the merits of this litigation or the substance of Ms. Shannon's e-mail communication with Mr. Rauzi. Rather, Mr. Kim simply sent Mr. Kay a copy of

Mr. Kay's own prior e-mail communications. In addition, Mr. Kim clearly identifies his connection with defense counsel in this litigation and makes a point of saying: "if you wish, please let me know whom at CMS/OGC should be contacted instead." That is the last I heard of Mr. Kim's communications with Mr. Kay and Ms. Shannon until receiving Mr. Yee's Supplemental Declaration on March 21, 2007.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: Washington, DC, March 22, 2007

_____

Harry R. Silver

Exhibit 1

## Silver, Harry

| | |
|---|---|
| **From:** | Kim, Paul W. [pwkim@ober.com] |
| **Sent:** | Tuesday, March 13, 2007 12:05 PM |
| **To:** | Silver, Harry |
| **Subject:** | FW: I need your/CMS's help, |
| **Importance:** | High |

Will keep you posted.

The information in this electronic transmission is confidential and intended only for the addressee. Any use or disclosure by any other person is unlawful. This information is protected under attorney-client and attorney work product privileges. If you receive this electronic transmission in error, please notify us immediately by telephone (410-685-1120), and delete this message without making a copy.

-----Original Message-----
**From:** Kim, Paul W.
**Sent:** Tuesday, March 13, 2007 12:05 PM
**To:** 'Dorothy.Shannon@cms.hhs.gov'; 'Terrence.Kay@cms.hhs.gov'
**Subject:** FW: I need your/CMS's help,
**Importance:** High

Terry and Dorothy:

Heard that you folks "lawyered" up! :) Anywho, thought I'd send you a courtesy copy of an email exchange below that I received yesterday from the attorneys who are involved in this case. With the tons of emails that ya'll get every hour, it probably just got forgotten. Please feel free to call or email me if you have any questions. Rather, if you wish, please let me know whom at CMS/OGC should be contacted instead. As I've told Dr. Shannon, my friend Harry Silver of Patton Boggs represents the clinic in this case. He would like to clear up this misunderstanding as soon as possible so that he can focus on the merits of this case.

Thanks,
PK

The information in this electronic transmission is confidential and intended only for the addressee. Any use or disclosure by any other person is unlawful. This information is protected under attorney-client and attorney work product privileges. If you receive this electronic transmission in error, please notify us immediately by telephone (410-685-1120), and delete this message without making a copy.

**From:** Rauzi, Edwin [mailto:edrauzi@dwt.com]
**Sent:** Tuesday, April 18, 2006 7:04 AM
**To:** Kay, Terrence L. (CMS/CMM)
**Subject:** RE: I need your/CMS's help,

Thank you,  I appreciate it very much, and will limit the discussion to matters of policy.

I will call you at 10 a.m. EDT/7 a.m. PDT on Friday.

> -----Original Message-----
> **From:** Kay, Terrence L. (CMS/CMM) [mailto:Terrence.Kay@cms.hhs.gov]
> **Sent:** Tuesday, April 18, 2006 10:01 AM
> **To:** Rauzi, Edwin
> **Subject:** RE: I need your/CMS's help,
>
> I'd be happy to talk about general policies but would not want to discuss the details of a specific case

---

> **From:** Rauzi, Edwin [mailto:edrauzi@dwt.com]
> **Sent:** Monday, April 17, 2006 4:39 PM
> **To:** Kay, Terrence L. (CMS/CMM)
> **Subject:** RE: I need your/CMS's help,
>
> No, it is much worse.  In the hypothetical situation that I would like to discuss, the Assistant U.S. Attorney for Hawaii has intervened in a whistleblower case brought by a former physician employee of the group medical practice.  The physician employee was supposed to "supervise" or "cover" the chemotherapy suite on a few days when the only oncologist on Kauai was either off-island or the group was between oncologists.  He now wants $5 million dollars for the claims that were submitted using his UPIN as the supervising physician.
>
> I believe the Relator is accurate when he states that (a) the claims were not for his patient; (b) he didn't see the patient; (c) he did not order the CBC to determine whether the white blood count was high enough; (d) he didn't order the chemotherapy, yet claims for chemo drugs, chemo administration/infusion, a CBC and an occasional E&M were ordered using his UPIN.
>
> One of the reasons that I thought to contact you is that the scenario is somewhat similar to one of the scenarios that Alice Gosfield described to you in her letter after the 2002 fee schedule regs were published (i.e., the part about atypical claims being associated with a physician).  I attach a copy in case Ms. Gosfield has written you more than one letter. ;-)
>
> I can understand the policy decision to require the UPIN of the supervising physician to be included on the claim form, but the Relator and the AUSA seem to ascribe a greater level of involvement by and responsibility for the supervising physician than what the rules seem to require.  The AUSA has told us that chemotherapy cannot be provided unless the oncologist is next door and reads the CBC the day of the chemo.  That does not sound like it is appropriate or even possible in a rural setting.
>
> I am telling you this because you have a good reputation and I don't want to create problems for you without disclosing that they may be looming.  Still, I really hope I can find someone to lend whatever assistance is appropriate because the AUSA seems convinced that he's found "Al Capone" and that it is a moral outrage to contemplate that chemotherapy will be provided without an oncologist on site that day.  The Relator even claims that epogen shots given by nurses to non-chemo patients are false claims.  The AUSA is really coming down hard on the Clinic, saying (in essence) that "there can be no defense for such egregious behavior that risked the lives of vulnerable patients." I think that some/much/all of his outrage is based on an interpretation of CMS's rules that are not correct.
>
> May I still call?
>
> > -----Original Message-----
> > **From:** Kay, Terrence L. (CMS/CMM) [mailto:Terrence.Kay@cms.hhs.gov]
> > **Sent:** Monday, April 17, 2006 12:57 PM
> > **To:** Rauzi, Edwin
> > **Subject:** RE: I need your/CMS's help,

would be happy to.  I was out all of last week so am catching up.  I would best be able to focus on this if we talked Friday morning at 10am.  Is that soon enough?

Also, who is making the assertion?  Is there a local carrier policy that allegedly affects this?

---

**From:** Rauzi, Edwin [mailto:edrauzi@dwt.com]
**Sent:** Monday, April 17, 2006 3:23 PM
**To:** Kay, Terrence L. (CMS/CMM)
**Subject:** I need your/CMS's help,

but it's a long story.  Is there a time that I can call?  It involves the assertion that only an oncologist must provide "incident to" supervision of chemotherapy services provided by oncology nurses in a rural group medical practice setting.  It seems contrary to everything that I can find, both in theory and in practice.s

I am just another lawyer, but I have spoken to you once or twice at the Reimbursement Seminar in Baltimore, and I recall that you were helpful in the past.

Is there any chance I can schedule a time to call?  I am not seeking to waste your time on a trivial matter--it is important.

Thanks.

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.

Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex )<br>rel. JAMES LOCKYER, M.D., )<br>STATE OF HAWAII, ex rel. )<br>JAMES LOCKYER, M.D. and JAMES )<br>LOCKYER, M.D., in his own )<br>behalf; )<br>   )<br>         Plaintiffs, ).<br>   vs. )<br>HAWAI'I PACIFIC HEALTH; )<br>KAUAI MEDICAL CLINIC; WILCOX )<br>MEMORIAL HOSPITAL; WILCOX )<br>HEALTH SYSTEM; and WILLIAM )<br>A. EVSLIN, M.D. AKA LEE A. )<br>EVSLIN, M.D., )<br>   )<br>         Defendants. )<br>_____ ) | CIVIL NO. 04 00596 ACK KSC<br>(Federal and State - Qui Tam)<br><br>DECLARATION OF TERRENCE L.<br>KAY; EXHIBIT "A" |

DECLARATION OF TERRENCE L. KAY

I, TERRENCE L. KAY, declare that:

1.   I am the Deputy Director of HAPG/CMM with the Centers for Medicare/Medicaid Services ("CMS") of the United States Department of Health and Human Services.

2.   On April 21, 2006, I received the attached e-mail from Mr. Edwin Rauzi.  In all the communication with Mr. Rauzi, I was not told by Mr. Rauzi nor is it disclosed in his e-mail, that he was contacting CMS regarding litigation in which CMS was being represented by the United States Attorney's Office for the District of Hawaii.  I would not have communicated with him

before obtaining the approval and advice of the Office of the General Counsel of the U.S. Department of Health and Human Services and the United States Attorney's Office for the District of Hawaii.

     3.    On or after April 21, 2006, I assigned Dorothy Shannon to respond to Mr. Rauzi's hypothetical by e-mail. If Mr. Rauzi had informed me that I was not obligated to communicate with him, since I am an employee of a represented opposing party in pending litigation, then I would not have assigned Ms. Shannon to respond to him before consulting with CMS legal counsel and obtaining the consent of the United States Attorney's Office for the District of Hawaii.

     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

     DATED: March _8_ , 2007, at Baltimore, MD.

TERRENCE L. KAY

### Rauzi, Edwin

**From:**    Kay, Terrence L. (CMS/CMM) [Terrence.Kay@cms.hhs.gov]
**Sent:**    Wednesday, May 10, 2006 6:10 AM
**To:**      Rauzi, Edwin
**Subject:**  RE: Request for guidance

I'll ask Dorothy Shannon, on his staff, to reply. Should hear from her today.

---

**From:** Rauzi, Edwin [mailto:edrauzi@dwt.com]
**Sent:** Tuesday, May 09, 2006 12:03 PM
**To:** Kay, Terrence L. (CMS/CMM)
**Subject:** RE: Request for guidance
**Importance:** High

John Warren did not get back to me and is out of the office until May 15th. Unfortunately, that is the date when I need the advice.

Is there anything else that can be done?

> -----Original Message-----
> **From:** Kay, Terrence L. (CMS/CMM) [mailto:Terrence.Kay@cms.hhs.gov]
> **Sent:** Thursday, May 04, 2006 8:52 AM
> **To:** Rauzi, Edwin
> **Subject:** RE: Request for guidance
>
> I spoke with John Warren yesterday. He is the Acting Director of the Division of Practitioner Services. Perhaps you
> have already heard from him but if not, he will be providing a summary of the CMS general policy very soon.

---

**From:** Rauzi, Edwin [mailto:edrauzi@dwt.com]
**Sent:** Monday, May 01, 2006 11:55 AM
**To:** Kay, Terrence L. (CMS/CMM)
**Subject:** RE: Request for guidance

Just thought I would check in to see about the status of the review.

Thanks.

> -----Original Message-----
> **From:** Kay, Terrence L. (CMS/CMM) [mailto:Terrence.Kay@cms.hhs.gov]
> **Sent:** Friday, April 21, 2006 2:48 PM
> **To:** Rauzi, Edwin
> **Subject:** RE: Request for guidance
>
> received your message.

---

> **From:** Rauzi, Edwin [mailto:edrauzi@dwt.com]
> **Sent:** Friday, April 21, 2006 2:39 PM
> **To:** Kay, Terrence L. (CMS/CMM)
> **Subject:** Request for guidance

EXHIBIT "A"

Pursuant to our call today, I seek policy guidance from CMS concerning the "incident to" rules in the context of providing chemotherapy. My request deals with general policies, and not as applied in a particular case.

The context in which my questions arise include the following characteristics:

1. A group medical practice (the "Group") provides chemotherapy items and services to oncology patients
2. the Group is in a rural location
3. for the past several years, there has not been more than one oncologist in the Group or the rural location on a full-time basis
4. the one oncologist is occasionally out of the area (e.g., for vacation, continuing medical education, family obligations, etc.)
5. the Group employs nurses who are experienced in providing chemotherapy
6. on a day when the oncologist is out of the area, a chemotherapy patient may have been scheduled to receive chemotherapy
7. the chemotherapy is part of an ongoing regimen (e.g., week 4 of a six week series of treatments)
8. the Group employs physicians
9. the Group either asks an employed general practitioner in internal medicine (who agrees) or assigns/instructs an employed general practitioner to "cover" or "be on call" for the chemotherapy suite on a day when the oncologist is out of the area. The internal medicine practitioner does not protest
10. the internal medicine suite is located adjacent to the chemotherapy suite on the same floor of the group's office
11. on a day when the oncologist is out of the area and the internal medicine physician/employee is "covering" or "on call" for the chemotherapy suite and is physically located in the internal medicine suite next door, the following happens

- the oncology patient comes to the Group's clinic
- the oncology patient is not a patient of the internal medicine physician
- pursuant to either a protocol or an order in the patient's medical record, the nurse orders a complete blood count (CBC) from a diagnostic laboratory. The order includes the UPIN of the oncologist
- the nurse reviews the results of the CBC, which show a white blood count that is high enough for chemotherapy to proceed based on the standards of the chemotherapy suite
- the nurse does not consult the internal medicine physician who is next door
- the nurse proceeds with the chemotherapy regimen prescribed by the oncologist
- the patient finishes the chemotherapy without incident and departs the clinic
- after the patient leaves, the internal medicine physician reviews the oncology nurse's notes describing the chemotherapy, and signs his/her first initial and last name
- for this chemotherapy encounter, there has been no face to face contact between the oncology patient and the internal medicine physician
- for other chemotherapy episodes that were delivered while the oncologist was out of the area and the internal medicine physician was in the adjacent suite, the oncology nurses did consult the internal medicine physician (e.g., the patient complained of a rash and the internal medicine physician directed the oncology nurse to provide the patient with drug samples)

On some later date, the Group submits claims to Medicare for the chemotherapy with the following characteristics–

- the Group uses a CMS-1500 form
- in field 31 of the CMS-1500 form, the Group's billing office inserts the UPIN of the internal medicine physician/employee
- the signature of the physician is indicated to be "on file"
- the form includes claims for chemotherapy drugs (e.g., the J code for rituximab), chemotherapy administration (e.g., CPT 96410) and, occasionally, a CPT 99211 for something "extra" done by the

oncology nurse. For the purpose of our discussion, you should assume that the items and services were delivered and the codes were appropriate

- Medicare pays for the items and services provided to the oncology patient on the day that the oncologist was out of the area
- the payment is made to the Group

Could you please advise me whether there is anything problematic with the scenario described or the claims that were submitted under Medicare's policies? In particular--

- do the items and services provided by the oncology nurses while the internal medicine physician was in the adjacent suite and available to assist in the event of an emergency satisfy the "incident to" rules
- Does Medicare require that the "supervising physician" for chemotherapy services be an oncologist?
- Does Medicare require the supervising physician to review the results of the CBC prior to the oncology nurses initiating chemotherapy?

For the purpose of researching this matter in advance of seeking your guidance, the authorities that appeared to be most on point were sections 2050 and 15400 of the Medicare Carrier's Manual (as it existed prior to the creation of the Internet Only Manuals). If there is other guidance that needs to be considered, I would appreciate it if you could point them out to me.

Thank you in advance for any guidance and assistance that you can provide with respect to this scenario. Your assistance is much appreciated. If there are any ambiguities or variables that I have failed to identify that could affect the outcome (or if you have any additional questions), please let me know.

P.S. Does the answer change if the internal medicine physician goes to lunch in the cafeteria of the adjoining hospital during a chemotherapy session that extends over several hours? Does it help that there is "always" one of the Group's employed physicians in the building where the chemotherapy suite is located?