IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES LOCKYER; STATE OF HAWAII, ex rel. JAMES LOCKYER; and JAMES LOCKYER, in his own behalf, | ) ) ) ) ) | Civ. No. 04-00596 ACK-LEK |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| HAWAII PACIFIC HEALTH; KAUAI MEDICAL CLINIC; WILCOX MEMORIAL HOSPITAL; WILCOX HEALTH SYSTEM; and WILLIAM A. EVSLIN, M.D., aka LEE A. EVSLIN, M.D., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' ORIGINAL COMPLAINT COUNTS I-IV

PROCEDURAL BACKGROUND

On October 1, 2004, James Lockyer ("Plaintiff Lockyer")
filed a qui tam Complaint in this Court under seal on behalf of
the United States alleging that Defendants Hawaii Pacific Health,
Kauai Medical Clinic, Wilcox Memorial Hospital, Wilcox Health
Systems, and Lee A. Evslin[1] submitted or caused to be submitted

---

[1]  Defendant Evslin is also referred to as William Evslin.
However, Evslin refers to himself in his filings as Lee Evslin.

1

false or fraudulent claims for payments from federal and state assistance programs. In addition, Plaintiff Lockyer alleged that Defendants improperly retaliated against him for opposing and reporting such improper practices. Plaintiff Lockyer's original Complaint alleges the following claims for relief:

Count I: Violation of federal and state False Claims Acts, 31 U.S.C. § 3729, et seq. and Haw. Rev. Stat. § 661-2.

Count II: Common law claim for retaliation in violation of a State of Hawaii public policy to prohibit the submission of false or fraudulent claims for payment to government assistance programs.

Count III: Violation of federal and state Whistleblower Protection Laws, 31 U.S.C. § 3730(h) and Haw. Rev. Stat. § 378-61, et seq.

Count IV: Claim for punitive damages.

The United States Attorney for the District of Hawaii intervened in the case on behalf of the United States on January 27, 2006. The case was unsealed the same day. The State of Hawaii has not intervened in the case.[2] Defendants Hawaii Pacific Health, Kauai Medical Clinic, Wilcox Memorial Hospital, and Wilcox Health System ("HPH Entities") answered the Complaint on June 20, 2006.  Defendant Evslin filed his Answer on July 6,

---

[2] The state qui tam statute provides, "The State may elect to intervene and proceed with the action within sixty days after it receives both the complaint and the material evidence and information." Haw. Rev. Stat. § 661-25(b) The Court notes that the docket for this case does not show that the State has notified the Court that it either wishes to proceed with the action or declines to intervene within the sixty day period as required by § 661-25(d). Thus, the State is deemed to have declined to intervene in the instant action.

2006.

On December 22, 2006, Defendants HPH Entities filed a Motion for Summary Judgment on Plaintiff Lockyer's Complaint ("HPH Motion") and a Concise Statement of Facts ("HPH CSF"). The same day, Defendant Lee Evslin filed a Motion for Summary Judgment on Plaintiff Lockyer's Second, Third, and Fourth Claims for Relief ("Evslin Motion") and a Concise Statements of Facts ("Evslin CSF"). On December 27, 2006, Defendant Evslin filed a joinder in the HPH Entities' Motion for Summary Judgment. On December 29, 2006, the HPH Entities filed a joinder in Evslin's Motion.

On March 9, 2007, Plaintiff Lockyer filed an Opposition to Defendants HPH Entities' Motion for Summary Judgment ("Lockyer Opp. to HPH Motion") and a Concise Statement of Facts ("Lockyer CSF re. HPH Motion"). Plaintiff Lockyer also filed an Opposition to Defendant Evslin's Motion for Summary Judgment ("Lockyer Opp. to Evslin Motion") and a Concise Statement of Facts ("Lockyer CSF re. Evslin Motion"). The United States joined in both of these Oppositions filed by Plaintiff Lockyer. The same day, the United States filed an Opposition to Defendants HPH Entities' Motion for Summary Judgment ("USA Opp. to HPH Motion"), which was joined by Plaintiff Lockyer.

On March 16, 2007, Defendants HPH Entities filed a Reply to Plaintiff Lockyer's Opposition to the HPH Motion ("HPH

3

Reply to Lockyer Opp.") and a Reply to Plaintiff U.S.A.'s
Opposition to the HPH Motion ("HPH Reply to U.S.A. Opp."), both
of which were joined by Defendant Evslin.  The same day,
Defendant Evslin also filed a Reply to Plaintiff Lockyer's
Opposition to Evlsin's Motion ("Evslin Reply to Lockyer's Opp."),
which was joined by Defendants HPH Entities.

On January 24, 2007, the Parties agreed to mediation
before Mediator Clyde Matsui. However, as of the March 27, 2007
hearing, the parties have not apprised this Court of any effect
of the mediation on the instant Motions.

On February 2, 2007, the Parties stipulated to amend
the Complaint filed on October 1, 2004. The First Amended
Complaint adds two additional claims that Defendants violated the
federal False Claims Act, Counts V and VI, respectively.  On
February 20, 2007, Defendants HPH Entities filed a Motion to
Dismiss the Fifth and Sixth Claims of the First Amended
Complaint. Defendant Evslin joined the Motion to Dismiss on
February 20, 2007. The Motion to Dismiss the Fifth and Sixth
Claims of the First Amended Complaint is not before the Court at
the instant hearing, which is limited to Defendants' Motions for
Summary Judgment of the original complaint.

On March 19, 2007, Defendant Evslin filed a Motion to
Strike Hearsay and Other Improper Testimony from Plaintiff
Lockyer's Opposition to Evslin's Motion, which was joined by

4

Defendants HPH Entities.  At the same time, Defendant Evslin filed a Motion to Shorten Time to Hear the Motion to Strike.  On March 21, 2007, the Court granted Defendant Evslin's Motion to Shorten Time and gave the Plaintiffs until noon on March 23, 2007 to file an Opposition to the Motion to Strike.

A hearing on Defendants HPH Entities' Motion for Summary Judgment (of the original complaint), Defendant Evslin's Motion for Summary Judgment on Plaintiff's Second, Third, and Fourth Claims, and Defendant Evslin's Motion to Strike was held on March 27, 2007 at 10:30 a.m.

### FACTUAL BACKGROUND[3]

Kauai Medical Clinic ("KMC") is an outpatient clinic adjacent to Wilcox Memorial Hospital in Lihue, Kauai. See HPH CSF at ¶ 1, Joseph Decl. at ¶ 2.  KMC employed Plaintiff Lockyer as a physician specializing in internal medicine ("internist") from December 1, 1999 until he resigned on June 30, 2004.  See Evslin Exhs. 9, 8; Complaint ¶ 20. In December of 2001, KMC and Hawaii Pacific Health (HPH) merged. See Lockyer Decl. ¶ 6. HPH is the parent entity to KMC, Wilcox Memorial Hospital, and Wilcox Health System.  See Corporate Disclosure Statements filed by Defendants on June 7, 2006. Defendant Evslin was the President and CEO of

---

[3] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

Kauai Medical Clinic from 1996 through September of 2005 and CEO
of Wilcox Memorial Hospital from January of 2003 through
September 2005. See Evslin CSF, Evslin Decl ¶ 2, Knudsen Decl. ¶
6.

Due to the size of KMC, over the past several years it
has never employed more than one oncologist at a time. See HPH
Exh. 1, Joseph Decl. ¶ 3.  Chemotherapy is administered in a
large room called the "chemo suite" that is located within the
internal medicine suite on the second floor of the Clinic, where
the offices of all the internists are located. Id. at ¶¶ 3, 7.
The chemo suite was usually open from 7:00 a.m. to 4:30 p.m.  See
Lockyer's CSF ¶ 6-a. The internal medicine physicians usually
started seeing patients at 8:30 or 9:00 a.m. The Internal
Medicine Department was closed for lunch from noon to 2:00 p.m.
daily. Id. at ¶ 6-c.

Defendants HPH Entities allege they abided by the
following procedure regarding chemotherapy administration: after
an initial consultation, the oncologist provided a written order
for each chemotherapy patient setting forth required blood tests,
acceptable parameters for blood test results, and types and
amounts of chemotherapy to be provided. See HPH CSF ¶ 3. Nurses
in the chemo suite, whom Defendants allege were duly qualified,
would review the blood test results and administer chemotherapy
if the blood tests were normal and alert a physician if the tests

were abnormal. Id. at ¶¶ 4-7. Defendants state that an oncologist was available 95-98% of the time chemotherapy was being administered, but if he or she was unavailable, another physician from the clinic's internal medicine department would be assigned to cover for the oncologist. See HPH Exh. "25," Dannog Decl. at ¶ 8; HPH CSF at ¶¶ 8-10. The oncology nurses were aware of which physician was covering in advance and would leave the charts of oncology patients for the covering physician to sign. See HPH CSF at ¶ 12. Defendants allege that there was always either an oncologist or covering physician available to respond to emergencies, which were unusual. Id. If blood results were within prescribed parameters and no emergency occurred, the supervising physician would not likely see the patient receiving chemotherapy. Id. at ¶ 15. If no physician was available, the nurses would not administer chemotherapy. Id. at ¶ 16. Defendants also allege that KMC's medical records demonstrate that Dr. Lockyer was the supervising physician for the chemo suite on certain occasions and that he received compensation for covering the chemo suite. Id. at ¶¶ 22-23.

Regarding administration and billing for chemotherapy, Plaintiff Lockyer alleges that KMC submitted 359 claims to Medicare for administration of chemotherapy by oncology nurses using his provider number. See Lockyer CSF re. Evslin ¶¶ 8-9. Lockyer alleges he never accepted an assignment to cover the

chemo suite.  Id. at ¶ 11.  He further alleges that he and other internists were unaware of or did not understand Evslin's request that they sign off on chemotherapy notes to mean that they were assigned to supervise the administration of chemotherapy.  See Lockyer's CSF re. HPH at ¶ 6-h.  Plaintiff argues there was no chemo suite schedule assigning physicians to supervise nor did anyone notify the physicians that they were assigned to supervise the chemotherapy on a particular day.  Id. at ¶¶ 6-e, 6-f. Lockyer alleges that on three occasions he left the clinic, but KMC billed Medicare as though he was the supervising physician for the chemotherapy patients.  See Lockyer's CSF re. Evslin at ¶ 15.

Defendants counter Lockyer's allegations with declarations by other internists and an oncologist who worked at KMC until 2002 who attest to a coverage policy by internists for the chemo suite when the oncologist was away.  See Hayward Decl. at ¶¶5-7; Pixler Decl. at ¶¶ 6, 8-9. Dr. Pixler states she knew that when she signed the chemotherapy patients' charts she was attesting to her supervisory duties and knew that her provider number would be used in billing the services that she supervised. Id. at ¶ 12.

During the course of his employment, Plaintiff Lockyer and Defendants had a prolonged dispute over his compensation. Defendant Evslin argues that Lockyer's salary was calculated

using KMC's compensation formula, based on several factors including the physician's productivity, and was adjusted periodically.  See Evslin CSF at ¶¶ 5, 11.  Lockyer claims that Evslin dominated the decisions at KMC. See Lockyer CSF at ¶ 3. Salary review and adjustments were conducted by KMC's Salary & Finance and Executive Committees. See Evslin CSF at ¶ 7. Beginning in 2001, the Medical Executive Staff Committee advised the KMC Board regarding physician compensation issues, and the CEO was an ex officio non-voting member of the Board.  Id. at ¶ 9.  The Committees voted to reduce Lockyer's salary from $125,000 to $120,00 in June 2001 and to $115,000 in January 2002. Id. at ¶ 14, Evslin Motion p. 8. Evslin argues that Lockyer's projected salary would have been much lower, but that he advocated on Lockyer's behalf based on Lockyer's commitments to improve.  See Evslin CSF at ¶¶ 15, 17. Defendants argue that the salary reductions were due to Lockyer's failure to meet his target productivity numbers, and that other physicians' salaries were periodically reduced based on the same compensation formula. Id. at ¶¶ 16-17.  In March of 2002, the Committees gave Lockyer ninety days' notice of their intent to terminate his employment due to underperformance and complaints.  Id. at ¶ 19. Lockyer appealed the notice and on May 1, 2002, the Committee rescinded the notice and issued a revised work improvement plan to Lockyer. Id. at ¶¶ 22-23.

The parties disagree as to when Plaintiff Lockyer made his first request to see data regarding his billings. Plaintiff states in his declaration that he suggested a financial audit as early as August 2000 when Evslin denied him access to review his receipts data and that he proposed to his colleagues at a Department meeting in December, 2001 that an audit of the KMC books should take place. See Corrected Decl. of Lockyer ¶¶ 39, 40, 42, 43. Defendants counter that Plaintiff Lockyer's declaration contradicts his deposition testimony in which he stated that he never specifically asked Evslin for a financial audit in his meetings in 2000 and that he first asked to see billing documentation in December of 2001. See Evslin Reply re. Lockyer Opp. p. 9-10, n.6; Lockyer Depo, Exh. "59" at pp. 92-93, 95-96. Defendants argue that Lockyer first requested his compensation documentation in May of 2002 by letter from Lockyer's attorneys. See Evslin CSF Exh. "25."

Lockyer alleges that he had reason to suspect Evslin was engaging in fraud based on the denial of his initial requests for his financial data. See Lockyer CSF re. HPH at ¶ 8-c. Lockyer points to the timing that he began asking for billing records when KMC and HPH were negotiating their merger, and that Evslin received a substantial increase in salary after KMC and HPH merged in December of 2001. See Lockyer CSF at ¶¶ 16-17.

On July 8, 2002, Lockyer demanded arbitration over the

failure of KMC to produce the requested compensation documentation to verify the grounds for his salary reduction. See Evslin CSF Exh. "28." KMC produced the requested compensation records pursuant to arbitration. See Evslin CSF Exh. "46."

The Committees reduced Lockyer's salary under the compensation formula to $90,000 in November, 2002 and to $83,132 in February, 2003. See Evslin CSF at ¶¶ 29-30, Evslin Motion p. 11. Defendants claim that Lockyer received patient complaints, failed to reach his salary targets, and KMC had to reassign Lockyer's long-term care patients during 2003 and 2004. See Evslin CSF at ¶ 32. Lockyer argues that the complaints were unfounded and allegations about poor charting practice, wait time, and unresponsiveness to pages were unfair. See Lockyer CSF ¶¶ 19-23. Lockyer resigned on June 30, 2004. See Evslin CSF at ¶ 8.

Lockyer filed his federal qui tam Complaint under seal on October 1, 2004, in which he alleged, inter alia, that upon his analysis of billing documents obtained during arbitration, he discovered reimbursements from Medicare/Medicaid for administration of chemotherapy he never ordered or provided. See Complaint at ¶¶ 22, 23. Lockyer abandoned arbitration in January of 2005. See Evslin CSF at ¶ 34. Defendants argue that they did not know of Lockyer's belief that they had submitted false claims until they learned of this lawsuit in 2006. Id. at ¶ 36.

11

**STANDARD**

**Motion for Summary Judgment**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation omitted).[4]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S.

---

[4]Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' International Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

574, 587 (1986) (citing <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323; <u>Miller v. Glenn Miller Productions</u>, 454 F.3d 975, 987 (9th Cir. 2006). The moving party may do so with affirmative evidence or by "'showing'--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.[5]

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. <u>See Celotex</u>, 477 U.S. 323; <u>Matsushita Elec.</u>, 475 U.S. at 586; <u>California Architecture Building Products, Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).[6] The nonmoving party must instead

_____

[5]When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. <u>Miller</u>, 454 F.3d at 987 (quoting <u>C.A.R. Transportation Brokerage Co. v. Darden Restaurants, Inc.</u>, 213 F.3d 474, 480 (9th Cir. 2000)). When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party. <u>Miller</u>, 454 F.3d at 987.

[6]Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002);

set forth "significant probative evidence" in support of its

position.  T.W. Electrical Service, Inc. v. Pacific Electrical

Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Summary

judgment will thus be granted against a party who fails to

demonstrate facts sufficient to establish an element essential to

his case when that party will ultimately bear the burden of proof

at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the

court must construe all evidence and reasonable inferences drawn

therefrom in the light most favorable to the nonmoving party.

See T.W. Electrical Service, 809 F.2d at 630-31.[7]  Accordingly,

if "reasonable minds could differ as to the import of the

evidence," summary judgment will be denied.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 250-51 (1986).

**DISCUSSION**

I.    **Count I: Federal and State False Claims Acts**

The federal False Claims Act (FCA) imposes liability

upon any person who:

> (1) knowingly presents, or causes to be presented, to an
> officer or employee of the United States Government . . . a
> false or fraudulent claim for payment or approval

---

see also T.W. Electrical Service, 809 F.2d 626, 630 (9th Cir.
1987).

[7]At the summary judgment stage, the court may not make
credibility assessments or weigh conflicting evidence.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Bator v. State
of Hawai`i, 39 F.3d 1021, 1026 (9th Cir. 1994).

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government;
(3) conspires to defraud the Government by getting a false or fraudulent claim paid.

31 U.S.C. § 3729(a)(1)-(3)(2005); See United States ex rel. Hochman v. Nackman, et al., 145 F.3d 1069, 1073 (9th Cir. 1998). The element of scienter is essential to establishing liability under the FCA. The FCA defines "knowing" as having actual knowledge of the information or acting in deliberate indifference or reckless disregard to the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)-(3). Mere negligence or honest mistakes, however, are not covered by the FCA. Hochman, 145 F.3d at 1073.

The Hawaii False Claims Act was enacted in 2000. Haw. Rev. Stat. §§ 661-21 et seq. The language of Haw. Rev. Stat. § 661-21 is almost identical to the federal FCA's language in Section 3729. The Hawaii's False Claims Act extends liability in situations nearly identical to the federal FCA. See United States ex rel. Rost v. Pfizer, Inc., 446 F. Supp. 2d 6, 12 n.13 (D. Mass. 2006). In addition, the Hawaii FCA extends liability to someone who "is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the claim to the State within a reasonable time after discovery of the false claim." Haw. Rev. Stat. § 661-21(a)(8). Thus, the analysis for liability under the federal FCA will apply in a similar fashion

15

to the state FCA.  There may be additional liability, however,
under the Hawaii FCA in circumstances not covered by the federal
FCA.[8]

### A.  Medicare "Incident to" Rules

The Medicare Program is administered by the Department
of Health and Human Services through the Centers for Medicare and
Medicaid Services (CMS). Medicare Part A covers hospital
insurance for the elderly and disabled.  Medicare Part B covers
doctors' services and outpatient care.  CMS reimburses Medicare
claims through private insurance carriers who administer and pay
claims as fiscal intermediaries.  The carrier in this case is
Noridian Administrative Services.

Both parties agree that KMC's billing practices for the
administration of chemotherapy are governed by the "incident to"
rules under Medicare Part B because KMC operates as an outpatient
clinic.[9]  The "incident to" rules read, in relevant part,
"Medicare Part B pays for services and supplies incident to the
service of a physician (or other practitioner)." 42 C.F.R. §

---

[8]  None of the parties has argued that the provision under
Haw. Rev. Stat. § 661-21(a)(8) specifically applies to the case
at bar.

[9] KMC is owned and operated by parent entity Hawaii Pacific
Health, which also owns and operates Defendants Wilcox Memorial
Hospital and Wilcox Health System.  All parties, however, appear
to agree that KMC is governed by the outpatient Medicare Rules
pursuant to Part B, rather than the hospital rules of Medicare
Part A.

410.26(b).  The "incident to" rules further provide, "Services
and supplies must be furnished under the direct supervision of
the physician (or other practitioner).  The physician (or other
practitioner) directly supervising the auxiliary personnel need
not be the same physician (or other practitioner) upon whose
professional service the incident to service is based." 42 C.F.R.
§ 410.26(b)(5).[10] "Direct supervision" is defined by reference to
42 C.F.R. § 410.32(b)(3)(ii), which states, "Direct supervision
in the office setting means the physician must be present in the
office suite and immediately available to furnish assistance and
direction throughout the performance of the procedure.  It does
not mean that the physician must be present in the room when the
procedure is performed."

    In the comments accompanying the 2001 final rule, CMS
addressed the requests of commenters to clarify whose provider
number should be used when billing for incident to services and
supplies: the physician who orders the services or the physician
who supervises the personnel who perform the services.  In
response, CMS stated:

──────────────

    [10] Defendants point out that the current version of 42
C.F.R. § 410.26 is the product of a revision on November 1, 2001,
effective January 1, 2002. 66 Fed. Reg. 55246 (Nov. 1, 2001). The
revised rule was intended to codify an existing policy set forth
in section 2050 of the Medicare Carriers Manual. 66 Fed. Reg.
55267-8 (Nov. 1, 2001).  Thus, Defendants assert, and Plaintiffs
do not contest, that the current version of the "incident to"
rules was also applicable prior to 2002, during all relevant time
periods in this case.

17

> When a claim is submitted to Medicare under the billing number of a physician (or other practitioner) for an incident to service, the physician is stating that he or she either performed the service or directly supervised the auxiliary personnel performing the service. Accordingly, the Medicare billing number of the ordering physician (or other practitioner) should not be used if that person did not directly supervise the auxiliary personnel. We added language to the supervision requirement set forth in § 410.26(b)(5) to reflect this clarification.

66 Fed. Reg. 55267 (Nov. 1, 2001).

Both parties seem to agree that under the incident to rules, services administered by a non-physician are only eligible for Medicare payment if there is a supervising physician in the same office suite where the services are furnished, and who is immediately available to provide assistance. The supervising physician need not be the same physician who ordered the incident to services or supplies. The supervising physician's provider number, rather than the ordering physician's, should be used when billing Medicare for incident to services.

The parties disagree, however, about whether the applicable rules require the supervising physician to be aware that she is supervising the services that are billed using her number.[11] According to Plaintiff Lockyer's expert, Terry Coleman, the Medicare claim form must be signed by the supervising physician unless her signature is on file. As

_____

[11] The pronoun "she" rather than "he" is used for convenience and to minimize confusion with reference to the parties in this case.

Defendants' expert, Todd Rodriguez, explains, CMS allows a physician to sign a one-time certification letter and authorize the entity to enter the physician's signature on the claims. <u>See</u> HPH Exh. "23," Rodriguez Report at ¶ G.  Defendants have produced evidence that Lockyer signed a form authorizing KMC to bill, claim, and receive fees from Medicare for his services.  <u>See</u> HPH Exh. "30."  Mr. Coleman states that in either case, the submission of the claim form to Medicare constitutes a certification by the supervising physician that the services were furnished under the physician's immediate personal supervision. <u>See</u> Coleman Report at ¶ "c."  Mr. Coleman concludes that an entity submitting claims on behalf of a supervising physician cannot properly certify the claim form if the physician is unaware that she was supervising the services billed.  <u>Id.</u> Furthermore, a physician who was unaware that she was supervising services would not be able to take care to be immediately available in the office suite. <u>Id.</u>

Mr. Rodriguez disagrees with Mr. Coleman's assessment of the certification requirement of the Medicare claim form. Because CMS expressly allows a physician to sign a one-time certification letter or authorize the employer to enter the physician's stamp-facsimile signature on claims, Mr. Rodriguez states that it is apparent that CMS did not contemplate that the supervising physician would personally review each claim

submitted by her clinic using her authorized signature. Id. at ¶
"G." By placing her signature on file, the physician authorized
the clinic to bill for her services, including incident-to
services without her having to review and sign each claim. Id. at
¶ D.

Mr. Rodriguez argues that Mr. Coleman's assessment
applies more to solo practitioner settings than in a "physician
directed clinic." The term "physician directed clinic" is
defined in the Medicare Benefit Policy Manual, Ch. 15, § 60.3, as
a clinic where:

1. A physician (or a number of physicians) is present to
perform medical (rather than administrative) services at all
times the clinic is open;
2. Each patient is under the care of a clinical physician;
and
3. The nonphysician services are under medical supervision.

Medicare Benefit Policy Manual, Ch. 15 § 60.3. Defendants assert,
and Plaintiffs do not argue, that KMC meets the criteria for a
physician directed clinic.[12] Regarding physician directed
clinics, the CMS Medicare Benefit Policy Manual goes on to state,

In highly organized clinics, particularly those that are
departmentalized, direct physician supervision may be the
responsibility of several physicians as opposed to an
individual attending physician. In this situation, medical

_____

[12] Plaintiffs point out that in Defendants' own words, "KMC
is a small outpatient medical clinic adjacent to Wilcox Memorial
Hospital, in Lihue, Kauai." HPH CSF at ¶ 1; Joseph. This
statement does not negate the assertion that KMC may also qualify
as a "physician directed clinic" as defined in the Medicare
Benefit Policy Manual.

management of all services provided in the clinic is
assured.  The physician ordering a particular service need
not be the physician who is supervising the service.
Id.

Thus, Mr. Rodriguez concludes, in a physician directed
clinic, a physician who is on the premises at the time may be
deemed the supervising physician and need not have specific
knowledge that she is the supervising physician for the purposes
of submitting claims for incident to services to Medicare.  See
Rodriguez report ¶ "E."  This interpretation is further supported
by the statement of Dr. Bernard Fong, who served as Medical
Director of Noridian, the applicable Medicare Carrier in this
case.[13]  Dr. Fong states that the supervising physician may be
"any other physician in the group who is immediately available
and to whom such duties have been either assigned or agreed upon
as part of the group practice agreement to qualify as the
'supervising' physician for purposes of the 'incident to' rules."
See HPH Exh. "8," Fong Decl. at ¶ 9.

Mr. Coleman does not directly address whether KMC
qualifies as a physician directed clinic, but states that for
these types of clinics, supervision may be shared by more than
one physician, but a supervising physician must be identified on
the claim form and that physician "must have been present in the

---

[13] According to Dr. Fong, Noridian is the Part B Medicare
Administrative Contractor serving eleven states including Hawaii,
as well as Guam and American Samoa. See Fong Decl. at ¶ 2.

office suit and immediately available to provide assistance during every one of the procedures listed on the claim form." See Coleman Supplemental Decl. at ¶¶ 2-3.

The Court is persuaded by the interpretation of the incident to rules and the Medicare Benefit Policy Manual § 60.3, that in a physician directed clinic setting, any one of multiple physicians who are available in the office suite may be deemed to be supervising the incident to service. Thus, in any given administration of an incident to service, the supervising physician may not and need not be aware that she is supervising a particular incident to service. For billing purposes, a supervising physician's provider number must be identified on the claim form. The certification on the back of the Medicare claim form requires the entity billing for services to attest that it met the requirements of direct supervision for the services billed, that is, that the physician whose provider number is used was present in the office suite and immediately available to furnish assistance.

To the extent that Mr. Coleman disagrees with Mr. Rodriguez's assessment of the incident to rules, this disagreement, if given weight, goes to the scienter element of FCA liability. Where there is dispute among experts about the requirements of the law, a practice which may constitute a technical violation of one expert's assessment but is in

22

compliance with another expert's opinion does not give rise to
fraud. See Haqood v. Sonoma County Water Agency, 81 F.3d 1465,
1477 (9th Cir. 1996)(showing that Defendant took advantage of a
legally disputed question is not enough to establish scienter
under the FCA).

**B.  Whether KMC Submitted False Claims in Violation of the
"Incident To" Rules**

1.  Qualification of Nurses

Plaintiff Lockyer first claims that Defendants violated
the FCA when they submitted claims to Medicare for reimbursement
for the administration of chemotherapy by nurses who were not
qualified to perform chemotherapy administration services.
Plaintiff argues that the incident to rules presume that the
services meet the applicable standard of care and that any non-
physician personnel must be licensed and qualified to carry out
all the services they perform.  Thus, under Plaintiff Lockyer's
reasoning, the Defendants' submission of claims for physician
services that were conducted by unqualified nurses without a
physician present in the same room constituted false claims.

Plaintiffs' argument suggests that the rules require a
two-tiered supervision system where qualified auxiliary personnel
only require direct supervision (doctor present in the office
suite) while unqualified auxiliary personnel require personal
supervision (doctor present in the room). The Court fails to find
such a two-tiered supervision requirement in the plain language

23

of the incident to rules.  The rules simply require the
supervising physician to be present in the office suite and
immediately available to furnish assistance.

Plaintiff also appears to argue that submitting a claim
to Medicare for services rendered using sub-standard care is a
false claim in violation of the FCA.  Plaintiff produces the
Declaration of Nancy Bookbinder, an oncology consultant, who
states that a nurse is qualified to administer chemotherapy
incident to a physician's services if the nurse is certified by
the Oncology Nursing Certification Corporation. See Lockyer Reply
to HPH, Bookbinder Decl. at ¶ 8.

Plaintiff's argument is misplaced.  First, Defendants
produce declarations of several nurses attesting to their on the
job training hours, course work, and OCN certifications and a
declaration by Dr. Gelmann, an Oncologist, who states his opinion
that all oncology nurses listed for KMC between 1999 and 2006 are
qualified to perform chemotherapy duties.  See Decl. of Dannog at
¶; Suppl. Decl. of Carlozzi at ¶ 3, Suppl. Decl. Diana at ¶ 3,
Suppl. Decl. of Carter at ¶¶ 2 & 3, and Suppl. Decl. Gelmann at ¶
3. Plaintiff, by contrast, has produced no affirmative evidence
tending to prove that the nurses were not qualified to administer
chemotherapy.

Even if Plaintiff could show that certain nurses were
not adequately qualified, such an allegation by itself does not

24

give rise to a FCA claim.  Plaintiff does not point to a provision of the incident to rules (or any other Medicare rule) that requires oncology nurses to have certain qualifications in order to bill Medicare for their services.  Rather, Plaintiff argues that the rules governing billing for services includes a presumption of meeting a certain standard of care. The Medicare incident to billing requirements do not contain a qualitative standard of care element.  The Court agrees with the reasoning in Mikes v. Straus, 274 F.3d 687, (2d Cir. 2006), which held that billing for medical services that do not meet the standard of care does not give rise to a FCA violation.  The Mikes court reasoned that the False Claims Act is an inappropriate vehicle for policing quality of care, which is better left to local regulation and enforcement.  Id. at 700.  Plaintiff has not demonstrated that the alleged lack of qualifications of the oncology nurses at KMC gives rise to a viable FCA claim.

        Furthermore, Plaintiffs do not and cannot allege under these facts that Defendants' administration of chemotherapy constituted worthless services.  See United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1053 (9th Cir. 2001)(stating that "knowingly billing for worthless services or recklessly doing so with deliberate ignorance may be actionable under [FCA]").

        For these reasons, the Court rejects the Plaintiffs'

argument that the alleged lack of qualification of the oncology nurses at KMC gives rise to a colorable FCA claim for services delivered by those nurses.

### 2. Whether KMC's Billing Practice Violated the Incident to Rules

Plaintiff Lockyer argues that under the FCA, the chemotherapy administration and billing practices violated the "incident to" rules because he was not aware he was supervising the administration.

Neither party contests that during the time in question at KMC, an oncologist made the initial assessment of the patient, established a treatment protocol, and directed the oncology nurse to administer the chemotherapy if the patient's blood levels and other lab results fell within the acceptable range.  Furthermore, it is established that the supervising physician, who could be a non-oncologist, did not have to be in the room, but had to be present in the office suite and immediately available for assistance.  KMC has presented evidence, and Plaintiffs have presented no evidence to the contrary, that KMC meets all the requirments of a physician-directed clinic as defined by the Medicare Benefit Policy Manual.[14]  Applying the incident to rules to a physician directed clinic setting, as long as at least one

---

[14] As stated earlier, Defendants' acknowledgment that KMC is a "small outpatient medical clinic" does not negate the assertion that it is also a physician directed clinic.

physician was present in the office suite available to furnish
assistance at all times that chemotherapy was being administered,
KMC could deem the available physician as supervising physician
for the purposes of billing for the chemotherapy.

Defendants argue that their chemotherapy administration
and billing practices complied with the incident to rules.  Based
on his capacity as Medical Director of Noridian, Dr. Fong states
that he is familiar with the incident rules as applied to
chemotherapy services, and during the time period from 2000-2004,
he "had the opportunity to review KMC's Medicare billings in
general and for chemotherapy in particular.  KMC's Medicare
billings were . . . entirely consistent with applicable CMS
regulations and manuals."  See HPH Exh. 9, Fong Decl. at ¶¶ 5, 8.

Plaintiff Lockyer acknowledges that Defendant Evslin
asked him in 2002 to sign off on chemotherapy notes and labwork.
See Pl. Opp. to HPH at p. 31. Lockyer contends that he declined
this request, and never understood the request to be an order to
supervise the administration of chemotherapy.  Lockyer and two
other internists declare that they were never aware that they
were assigned to supervise the chemo suite.  See Lockyer Decl. at
¶ 21, Braun Decl. ¶ 29-31; Netzer Decl. ¶¶ 16-19.  Lockyer argues
that because he was not aware of his supervisory duties, he did
not take care to remain in the internal medicine suite.  He
claims it was likely he left the second floor for lunch or for

administrative reasons. Lockyer produced evidence that there were
at least three occasions that he left the KMC clinic and KMC
billed Medicare for chemotherapy he was supposed to be
supervising. See Lockyer CSF re. Evslin, Exh. 5.

Defendants counter with evidence of chemotherapy charts
Plaintiff Lockyer signed prior to May 2002 and a medical record
showing Lockyer treated a patient for a side effect of
chemotherapy in June of 2002. See HPH CSF Exhs. 12, 14, 15.
Defendants produce the declarations of three oncology nurses that
state that Lockyer covered the chemo suite. HPH CSF Exh. 3,
Carlozzi Decl. ¶ 7; Exh. 5, Diana Decl. ¶¶ 10-11; Exh. 25, Dannog
Decl. at ¶ 18. Defendants also produce the declarations of three
other internists who state they were asked to cover the chemo
room and understood that to mean they would be available to
render services if necessary. See McKnight Decl. ¶¶ 2-5, and
Pixler Decl. ¶¶ 6-9, Diaz decl. ¶ 4. Lockyer stated in his
deposition that he was available for emergencies and in one
instance helped a nurse in the chemo suite when a patient passed
out due to chemotherapy. See HPH CSF Exh. "5," Lockyer Depo. at
84, 107-108. Defendants also produce two emails that show Lockyer
was scheduled to cover for the oncologists on June 7, 2002, and
an email asking for confirmation that Lockyer received his daily
stipend for covering for the oncologist on June 7. See HPH CSF
Exh. 1-B, 1-C. Furthermore, Defendants produced a letter from

Defendant Evslin to Plaintiff Lockyer dated August 23, 2002, that states that Lockyer "will be receiving payments for time which you have spent helping with the chemo unit while [the oncologists] were not available." See HPH CSF, Exh. 11.

Generally, Defendants have shown that there is no issue of material fact that Plaintiff Lockyer did supervise the chemo suite, even if he disagrees with the use of the terms "cover" or "supervise." The incident to rules simply require the supervising physician to be present in the office suite and immediately available to furnish assistance. Defendants have demonstrated that on certain occasions Lockyer was present in the office suite and was available to render assistance if the need arose in the chemo suite, that he signed chemo patients' charts, and that he received compensation for covering for absent oncologists. This is sufficient evidence to rebut Plaintiff Lockyer's broadest contention that he was never aware that he was ever covering the chemo suite at KMC.

Plaintiffs, however, have raised issues of fact as to whether there were three particular instances in which KMC billed Medicare for chemotherapy services under Lockyer's provider number when he was away from the office. The incident to rules prohibit billing for services under the provider number of a physician who was not present in the office at the time the alleged supervision took place. Plaintiffs present evidence that

on three occasions, he left the office or went home sick and that KMC billed for services under his provider number on those days. See Lockyer CSF re. Evslin Motion, Exh. "5." Plaintiffs have established that there are material issues of fact as to whether on these three occasions, KMC submitted claims in violation of the incident to rules.

The Parties also present conflicting evidence as to whether chemotherapy was ever performed and billed when no supervising physician was available on the suite.

Plaintiffs produce the declaration of Christina Newbold, a medical technician and phlebotomist who worked for Lockyer. Newbold states that cancer patients began receiving chemotherapy by 7:30 or 8:00 a.m., but that the first physicians did not arrive on the second floor after conducting hospital rounds until after 8:30 a.m. See Lockyer CSF re. HPH Motion, Exh. 6, Newbold Decl. ¶¶ 9h-i. Defendants produce declarations of oncology nurses who attest that if no physician was available, no chemotherapy was administered, and that activity in the chemo room before physicians arrived in the office was limited to preparatory activity. See Dannog Decl. at ¶ 19, Diana Decl. at ¶ 1, Carter Suppl. Decl. at ¶¶ 5-6. Defendants produce the declaration of internist Mary Pixler who says she remembers being asked to cover the chemo room at lunch or other times when the oncologist or other covering physician was not available. See

Pixler Decl. at ¶ 9. Defendants also produce the declaration of internist Diaz who states that he knows of no time, including the noon to 2:00 p.m. lunch break, when no internist was on the second floor. See HPH Exh. 23, Diaz Decl. at ¶ 3. Viewing the evidence in a light most favorable to the non-moving party, Plaintiffs have presented evidence that raises issues of fact as to whether KMC submitted claims for chemotherapy when no supervising physician was available in the office suite in violation of the incident to rules.

There are questions of fact as to whether Defendants billed for chemotherapy under Lockyer's provider number when he was not present to supervise and whether the Defendants billed for chemotherapy services when no physician was present to supervise. An affirmative answer to either factual question would constitute a false claim. However, to be liable under the FCA, the Defendants must have had the requisite scienter when it prepared or submitted the claims to Medicare.

**C.  Whether Defendants had Requisite Scienter under FCA**

The FCA imposes liability on anyone who knowingly presents a false claim to the government for payment. The False Claims Act defines "knowing" as having actual knowledge of the information, or acting in either deliberate indifference to or reckless disregard for the information's truth or falsity. 31 U.S.C. § 3729(b) (1994). "Congress specifically amended the

False Claims Act to include this definition of scienter, to make 'firm ... its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" <u>Hochman</u>, 145 F.3d at 1073 (quoting S.Rep. No. 99-345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272). The Ninth Circuit further explained that the requisite scienter is "the knowing presentation of what is known to be false," <u>United States ex rel. Hagood v. Sonoma County Water Agency</u>, 929 F.2d 1416, 1421 (9th Cir. 1991).

Here, Defendants argue that the Plaintiffs have not produced any evidence that shows that Defendants knew Plaintiff Lockyer had gone home sick on the three days KMC billed for services under Plaintiff Lockyer's provider number. Nor do the Plaintiffs present any evidence that the Defendants billed Medicare for chemotherapy services when it knew no supervising physician was available. The FCA requires the element of knowledge on the part of the Defendants. It is not enough that Plaintiffs can point to certain claims that may have been technically incorrect. The Defendants are not liable under the FCA even if they negligently submitted these false claims.[15] <u>See</u> <u>Hochman</u>, 145 F.3d at 1073. Plaintiffs cannot survive summary judgment unless they present some evidence to show that Defendant

_____

[15] Defendant Evslin's counsel conceded at the hearing that while KMC's coverage or billing practices might have been sloppy, "sloppy isn't fraud." The Court agrees.

had knowledge of or recklessly disregarded the fact that it billed for services using provider numbers of physicians who were not present in the office suite. Hagood, 929 F.2d at 1421.  At the hearing, Plaintiffs' counsel conceded that the Plaintiffs have no evidence that the Defendants were aware that Lockyer went home sick on the days he alleges they falsely billed for services under his supervision.

Plaintiff Lockyer argues that he did not know he was supervising chemotherapy, and that is sufficient to make out Defendants' FCA violation.  As discussed above, the Court concludes that under the incident to rules, in a physician-directed clinic the supervising physician need not be aware of every instance of service she is deemed to be supervising as long as she was physically present in the office suite and available for immediate assistance.  Furthermore, even if Mr. Coleman's opinion to the contrary is given weight, to the extent that Defendants either did not know that Plaintiff Lockyer was unaware of his supervisory role or to the extent that there is a dispute of law as to whether Lockyer had to be aware of his supervisory role, Plaintiffs have not demonstrated any evidence that Defendants had the requisite scienter to be liable for fraud under the FCA.

The Defendants have met their burden of pointing out an absence of evidence of scienter to support Plaintiffs' FCA claim.

33

Plaintiffs cannot rely on a metaphysical doubt about whether Defendants knowingly made false claims to avoid summary judgment. Due to the lack of any probative evidence of Defendants' scienter, the Court GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' FCA claim.[16]

## II.  **Count II: Termination/Retaliation in Violation of State Public Policy**

In his second claim, Plaintiff Lockyer alleges a common law claim for wrongful termination and retaliation in violation of state public policy.[17]  Defendants' Motion for Summary Judgment as to Lockyer's second claim is granted.

The public policy exception that Plaintiff cites under Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625 (Haw. 1982), does not apply to Plaintiff.  In Parnar, the Hawaii Supreme Court adopted a public policy exception to the at-will doctrine of employment, creating a cause of action in tort where an employer may be held liable for discharging its employee in violation of a clear mandate of public policy.  See Parnar, 65

_____

[16] The Parties have not addressed the extent to which the analysis would differ under the State FCA.  Both parties appear to assume that a conclusion under the federal FCA would apply equally to the state FCA claim.

[17] For Counts II through IV, Plaintiff Lockyer will be referred to as "Plaintiff."  The Court notes, however, that the United States has joined Plaintiff Lockyer's opposition to the motions for summary judgment on all claims, including claims for which only Plaintiff Lockyer has an interest.

Haw. 370, 379-80.  In adopting the public policy exception, the Hawaii Supreme Court emphasized that the exception responded to the strictness of the judicially created at-will doctrine of employment to "correct for inequalities resulting from harsh application of the doctrine." Id., 65 Haw. at 380.  Here, Lockyer's employment was subject to an employment agreement that only allowed for termination for cause.  See Evslin CSF Exh. "9," p. 4.  Thus, Plaintiff was not an at-will employee.

Hawaii courts have generally restricted claims of violation of public policy under Parnar to cases where the employee was an at-will employee.  See, e.g., Shoppe v. Gucci America, Inc., 94 Haw. 368, 382-83, 14 P.3d 1049, 1063-64 (Haw. 2000) (describing the narrow doctrine as an exception to the employment at-will doctrine); Ross v. Stouffer Hotel Co. (Hawaii) Ltd., Inc., 76 Haw. 454, 464, 879 P.2d 1037, 1047 (Haw. 1994) (same); Kinoshita v. Canadian Pacific Airlines, Ltd., 68 Haw. 594, 600, 724 P.2d 110, 115 (Haw. 1986) (same); Takaki v. Allied Machinery Corp., 87 Haw. 57, 62, 951 P.2d 507, 512 (Haw. Ct. App. 1998) (same); see also Shoppe, 94 Haw. at 383 ("The principle that the at-will doctrine prevails absent a collective bargaining agreement, a contractual provision, or a statutorily-conferred right has remained untouched in this jurisdiction since this court's decision in Panar.").  However, the Hawaii Supreme Court has allowed a claim for violation of public policy under Parnar

for a union employee (otherwise covered by a collective
bargaining agreement) in a limited circumstance, where the
collective bargaining agreement did not address or seek to
protect the public policy at issue, and the legislature had
enacted a statutorily-conferred right in the Hawaii
Whistleblowers' Protection Act, which was not restricted to at-
will employees but instead explicitly superseded collective
bargaining agreements that provided inferior rights.[18]  See
Norris v. Hawaiian Airlines, Inc., 74 Haw. 235, 258-65, 842 P.2d
634, 645-47 (Haw. 1992) (reversing dismissal of claim for
violation of public policy brought by terminated airline mechanic
who was allegedly terminated for reporting a safety violation).
Hawaii law recognizes a "public policy exception" to the at-will
employment doctrine, such that an employer may be subject to tort
liability for wrongful termination of employment in violation of
public policy.  Parnar v. Americana Hotels, Inc., 65 Haw. 370,
380, 652 P.2d 625, 631 (Haw. 1982).

        Even if the public policy exception did apply to
Plaintiff Lockyer's employment contract terminable only for
cause, he could not assert a public policy claim under Hawaii law

_____

        [18]  The Court notes that Plaintiff Lockyer does not allege a
violation of the public policy against retaliation for
whistleblowers under the Hawaii Whistleblowers Protection Act.
Haw. Rev. Stat. § 378-61.  Thus, the Court will not address
whether or not a common law Parnar claim could be brought to
enforce the state public policy of whistleblower protection.

because "courts do not recognize <u>Parnar</u> claims where . . . the public policy at issue is contained in a statute, if that statutory scheme provides a remedy for violations of that policy." <u>Batacan v. Reliant Pharmaceuticals</u>, 324 F. Supp. 2d 1144, 1145 (D. Haw. 2004).  The Hawaii Supreme Court reasoned, "Absent a clear expression of legislative intent to the contrary, we think it is both unnecessary and unwise to permit a judicially created cause of action, which is designed to promote a specific public policy in a 'narrow class of cases,' to be maintained where the policy sought to be vindicated is already embodied in a statute providing its own remedy for its violation." <u>Ross</u>, 76 Haw. at 464, 879 P.2d at 1047(internal citations omitted).

Here, Plaintiff Lockyer alleges Defendants retaliated against him for requesting an audit of KMC's finances that would have revealed violations of the state FCA.  Plaintiff cites the State's public policy prohibiting the submission of false and fraudulent claims for payment to government assistance programs and the public policy to guarantee appropriate levels of care to Medicare/Medicaid beneficiaries.  Plaintiff says these policies are embodied in Haw. Rev. Stat. § 661 (providing for qui tam actions and recovery for false claims to the state); Haw. Rev. Stat. § 28-91 (establishing a Medicaid Fraud Unit to investigate and prosecute Medicaid fraud); Haw. Rev. Stat. § 346-14

(describing the duties of the Department of Human Services).[19]
Complaint at ¶ 36.

Plaintiff's cited statutes only address the public
policy prohibiting submission of false claims to the
government.[20]  Defendants argue that Plaintiff may not assert a
Parnar claim based on the public policy prohibiting false claims
because the statutory scheme that embodies this public policy
creates remedies that make a Parnar common law claim unnecessary.
In his opposition, Plaintiff Lockyer does not dispute Defendants'
argument but simply argues that if the Court grants summary
judgment on Defendants' FCA claims, Plaintiff should be allowed
to plead a Parnar claim in the alternative.  Plaintiff

_____

[19]  Plaintiff also cites Title 17 Chapter 1704 of the Hawaii
Administrative Rules, which the Court is unable to identify as an
existing rule in the current Hawaii Administrative Code.
Plaintiff also cites Title 11, Chapter 94 of the Hawaii
Administrative Rules, which appears to govern skilled nursing
facilities/intermediate care facilities, neither of which are at
issue in this case.

[20]  Because Plaintiff does not identify a statutory,
regulatory, or other clearly defined mandate of public policy
"guaranteeing the appropriate level of care to Medicare/Medicaid
beneficiaries," the Court will not apply the public policy
exception to this assertion by Plaintiff. The Parnar court
stated, "In view of the somewhat vague meaning of the term
'public policy,' few courts have been inclined to apply the
public policy exception absent a violation of statute or clearly
defined policy." Parnar, 65 Haw. at 379, 652 P.2d at 630-31.
Furthermore, Plaintiff's own allegations under Count II focus on
the retaliatory acts taken in response to his potential exposure
of false claims and not to the exposure of sub-standard levels of
care. See Complaint ¶¶ 35-48. The Court will not create an
argument for Plaintiff where none has been made.

38

misconstrues the operation of the Parnar doctrine.  A common-law
Parnar claim is not an alternative method to seek a remedy if the
underlying statutory claim fails.  The Batacan court addressed a
similar argument by saying, "If (assuming arguendo) [Plaintiff]
cannot prevail on an [sic] FMLA claim (i.e. if [Defendant] did
not violate the FMLA), then [Defendant] necessarily would not
have violated the public policy embodied in the FMLA."  Batacan,
324 F. Supp. 2d at 1146. Similarly, here, if Plaintiff cannot
prevail on his FCA claim, then no public policy violation of
submitting false claims has occurred that would require remedy
through statutory or common law means.

        The statute clearly lays out a remedy within the
statutory scheme for qui tam plaintiffs in false claims actions.
In Haw. Rev. Stat. § 661-27, the legislature laid out the means
of calculating awards given to successful qui tam plaintiffs both
in the event that the state chooses to proceed with the action
and if the state declines to proceed with the action.  The
existence of a statutory remedy for violation of the prohibition
on submitting false claims under Haw. Rev. Stat. § 661 precludes
a common law Parnar remedy as unnecessary.

        Defendants' Motion for Summary Judgment as to
Plaintiff's common law claim for retaliation in violation of the
public policy prohibiting submission of false and fraudulent
claims for payment to government assistance programs is GRANTED.

III. **Count III: Retaliation in Violation of Federal and State Whistleblower Protection Laws**

Both Defendants HPH Entities and Evslin seek Summary Judgment on Plaintiff's third claim alleging violation of the federal and state whistleblower protection laws.

A. **Federal Whistleblower Protection**

The federal FCA contains a provision that protects "whistleblowers" from retaliation by their employers for actions taken in furtherance of pursuing a FCA claim against the employer. 31 U.S.C. § 3730(h).[21]  The Ninth Circuit delineated three elements the Plaintiff must prove to prevail in a Section 3730(h) claim:

> (1) the employee must have been engaging in conduct protected under the Act;
> (2) the employer must have known that the employee was engaging in such conduct; and

---

[21]  The text of 31 U.S.C. § 3730(h) reads: Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

(3) the employer must have discriminated against the employee because of her protected conduct.

United States of America ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996).

### 1.  Statute of Limitations

This Court has previously held that the applicable statute of limitations for Section 3730(h) claims is determined by looking to the most closely analogous statute of limitations under state law, which is the Hawaii Whistleblower Protection Act ("HWPA")codified at Haw. Rev. Stat. § 378-61. U.S. ex rel. Hinden v. UNC/Lear Services, Inc., 362 F. Supp. 2d 1203, 1209 (D. Haw. 2005).  The limitations period for claims under the HWPA was, until April 26, 2002, ninety-days from the alleged violation of the act.  The limitations period was extended from ninety-days to two-years, effective April 26, 2002. HRS § 378-63 (2003)(amended by L 2002, c 56, § 3).  Plaintiff's Complaint alleges retaliatory acts that took place after April 26, 2002.  Thus, the Court will apply a two year statute of limitations to Plaintiff's claim for retaliatory discharge under 31 U.S.C. § 3730(h). Hinden, 362 F. Supp. 2d at 1209. This Court has also found that the two year statute of limitations runs from the date of the occurrence of the alleged violation.  Lopes v. Kapiolani Medical Center for Women & Children, et al., 410 F. Supp. 2d 939, 952 (D. Haw. 2005).

Applying the two year limitations period, the Court

will only consider the alleged retaliatory acts that occurred within the two years prior to Plaintiff's filing of his Complaint on October 1, 2004.

### 2. Retaliation Claim as to Defendants HPH Entities

a. Element one: Whether Plaintiff engaged in protected activity

The first element of a retaliation claim under Section 3730(h) states that the employee must have been engaging in protected conduct in furtherance of the FCA. See Hopper, 91 F.3d at 1269. While "[s]pecific awareness of the FCA is not required," Plaintiff "must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." Id. An employee engages in protected activity under the FCA where "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing some fraud against the government." Moore v. California Institute of Technology Jet Propulsion Laboratory, 275 F.3d 838, 845 (9th Cir. 2002). The Moore court thus created a test with subjective and objective components for assessing whether activity is protected conduct under the FCA. Id. at n.1.

Plaintiff argues that he engaged in protected activity by investigating the billing practices of KMC which, because of his medical practice, necessarily included claims filed for reimbursement from Medicare. Plaintiff further argues that

Defendants' denials of his requests for data provides the
requisite evidence to show that he engaged in protected activity.
Notably absent from Plaintiff's argument is any affirmative
evidence that Plaintiff had the subjective belief that KMC was
conducting fraud against the government at the time he made his
requests.  In cases where the courts have found that a plaintiff
had established a question of fact as to whether he engaged in
protected activity, there is usually some evidence that the
Plaintiff, at the time of the investigatory activity, expressed
his or her suspicion of fraud. See, e.g., Moore, 275 F.3d at 846
(special agent who took plaintiff's call recalled plaintiff said
he "suspected fraud at JPL," a government contractor).  Plaintiff
cites an unpublished case, Sweeney v. Manorcare Health Services,
Inc., WL 1042015 (W.D. Wash. 2006), from the U.S. District Court
in Washington, to support his assertion that he need not have
used the words "investigate," "fraud," or "whistleblower" to be
able to claim he engaged in protected activity.  Nevertheless, in
Sweeney, the plaintiff "claims to have specifically accused
[Defendants] of 'engaging in illegal conduct in regards to
billing for service not provided.'" Id. at * 7.

        Unlike the plaintiffs in Moore or Sweeney Plaintiff
Lockyer's evidence does not show that at the time he asked for
his compensation data (his alleged "investigatory activity") he
was doing so because he suspected fraud on the government.  In

43

Plaintiff Lockyer's declaration of March 9, 2007, he states that a remark from a KMC claims processing clerk in February of 2002 made him suspicious that Defendants were defrauding patients and HMSA, a private insurer. See Lockyer Corrected Decl. at ¶¶ 51-53. He states that the clerk remarked to him that she had been told to forget about a report she made about claims she made under a physician's provider number no longer employed at KMC and that she been contacted by HMSA questioning $30,000 in claims that appeared to be billed under the wrong provider number. Id. Lockyer says he began searching for legal counsel because he felt a duty to report his suspicions of fraud and ultimately compelled arbitration.[22]  Id. at ¶ 53.

However, Plaintiff's pleadings, deposition, and other evidence contradict Lockyer's assertion that he suspected that KMC was engaging in fraud in 2002 and demonstrate instead that Lockyer demanded arbitration because he suspected his salary was being shorted and he was being underpaid.  For example, Defendants state, and Plaintiffs do not rebut, that Lockyer

---

[22] The Court notes that Lockyer's declaration consisted of self-serving statements made five years after the alleged incident.  Lockyer produces no evidence that he raised his suspicions based on the February 2002 conversation with the unidentified KMC claims processing clerk with the Defendants or anyone else at the time of his request for documentation or at any time until after he resigned. Nor does Lockyer corroborate the statements by the KMC claims processing clerk with a declaration by the clerk or anyone else who may have been aware of the alleged incident.

stated in a Disclosure to Defendants that his investigatory
actions were "to establish whether pay reductions imposed upon
him were accurate and reasonable according to his employment
contract." <u>See</u> Evslin Reply at p. 9; Evslin CSF ¶ 38.    In
Plaintiff's deposition, he stated that the purpose for his
request for documentation of his pay was because he didn't think
his pay was accurate. <u>See</u> Evslin Reply, Exh. "59," Lockyer Depo.
at p. 93.   The May 24, 2002 request for compensation
documentation from Plaintiff Lockyer's attorney stated that the
request's purpose was to "satisfy himself whether KMC has proper
grounds for reducing his salary." <u>See</u> Evslin CSF, Exh. "25."
Indeed, at the time, it seems the core of Plaintiff's concern was
that KMC was under-reimbursing him for payment he was rightly
owed under his employment contract, not that KMC was over-
charging the government for claims that it was not entitled to
bill. Plaintiff cannot create an issue of material fact through a
declaration that contradicts his prior deposition testimony.   <u>See</u>
<u>Hambleton Brothers Lumber Co. v. Balkin Enterprises, Inc.</u>, 397
F.3d 1217, 1225 (9th Cir. 2005); <u>Disc Golf Ass'n, Inc. v.</u>
<u>Champion Discs, Inc.</u>, 158 F.3d 1002, 1008 (9th Cir.1998) ("A
party cannot create a triable issue of fact, and thus survive
summary judgment, merely by contradicting his or her own sworn
deposition testimony with a later declaration"). Plaintiff
Lockyer has not created an issue of fact by contradicting his

45

sworn testimony with a later declaration that he began seeking legal counsel and demanded arbitration because he suspected KMC was engaging in fraud.

Plaintiff has failed to establish genuine issues of material fact as to whether at the time he requested documents he had the requisite subjective belief that KMC was defrauding the government.

> b. Element two: Whether Defendants were aware that Plaintiff engaged in protected activity

Even if Plaintiff has produced evidence sufficient to allow the factfinder to conclude that he engaged in protected activity, to satisfy element two of the prima facie case under Section 3730(h), there must be some evidence that Defendants were aware that Plaintiff Lockyer was investigating fraud. Hopper, 91 F.3d at 1269. The element of employer awareness is necessary to show that the employer possessed the necessary retaliatory intent. Id.

In cases where courts have found an employer had notice that the employee was engaging in protected conduct, the plaintiff had produced evidence that he or she voiced a concern about fraud on the federal government or referenced a qui tam FCA action to the employer. In Moore, the court found that there was a genuine issue of fact as to the employer's notice because the employer's in-house counsel recommended that Plaintiff voice his fraud concerns to the in-house ethics head and told Plaintiff

46

twice that he would be protected against retaliation as a whistleblower. Moore, 275 F.3d at 838.  In United States ex rel. McKenzie v. Bellsouth Tel., the court found the employer had notice where the employee brought the alleged fraud to the attention of her supervisors and showed them a newspaper article describing another company's employee's qui tam action. McKenzie, 123 F.3d 935, 945 (6th Cir. 1997)

By contrast, when an employee voices complaints but does not refer to any allegations of fraudulent conduct against the government, the employer lacks the requisite knowledge to make out a FCA retaliation claim.  In Hopper, the court concluded that the employer lacked the requisite awareness, because "even if [defendant] was intimately familiar with Hopper's complaints, Hopper never gave any indication that she was investigating the School District for defrauding the federal government." Hopper, 91 F.3d at 1270.  In Luckey v. Baxter Healthcare Corp., the court found that the plaintiff's complaints and threats of other types of legal action did not give her employer notice that her actions could lead to a FCA suit. 2 F. Supp. 2d 1034, 1054 (N.D. Ill. 1998).

Plaintiff Lockyer produces no evidence that he ever voiced a concern to KMC that it was engaging in fraud upon the government. Plaintiff merely asks the Court to infer from Defendant Evslin's denial of his request for his bills and

47

receipts that Defendants somehow knew that Lockyer was allegedly contemplating bringing a qui tam FCA claim.  Lockyer also points to Defendant Evslin's request that the internists sign charts of chemotherapy patients as evidence of knowledge that Lockyer was engaging in protected activity under the FCA.  Defendants counter that the internists were asked to sign chemotherapy charts because there was a several-day period when no oncologist was on staff.  Plaintiff's inferences and conclusory statements fall far short of establishing any issue of fact as to whether Defendants' were aware of his protected activity.  Even if Defendants were aware that Plaintiff was unhappy with his compensation and of his request for documentation to substantiate the pay cuts, this does not establish Defendants were aware that Plaintiff was investigating fraud on the government.  Because Plaintiff has failed to establish any issues of material fact as to either elements one or two of his retaliation claim, the Court need not reach element three.

For the foregoing reasons, Defendants' HPH Entities' Motion for Summary Judgment as to Plaintiff's claim for retaliation in violation of 31 U.S.C. § 3730(h) is GRANTED.

### 3.  Retaliation Claim Against Defendant Evslin

The Court grants Defendant Evslin's Motion for Summary Judgment on the same grounds as the Court granted Defendants HPH Entities' Motion.  Furthermore, the whistleblower protection

provision of the FCA prohibits retaliation against an employee by his or her employer.  31 U.S.C. § 3730(h).  Defendant Evslin cannot be liable for retaliation if he was not Lockyer's employer under the FCA.

Although the Ninth Circuit has not addressed the issue of whether an individual supervisor is an "employer" under the FCA, the vast majority of courts that have addressed the issue have answered in the negative.  In holding that the word "employer" does not apply to a supervisor in his individual capacity, the D.C. Circuit reasoned, "Even in cases arising under Title VII, which explicitly defines 'employer' as including 'any agent of such a person . . . we . . . have held that the word 'employer' does not cover a supervisor in his personal capacity." Yesudian v. Howard University, 270 F.3d 969, 972 (D.C. Cir. 2001).  The Yesudian court reasoned, "all the § 3730(h) remedies are phrased in mandatory language (the employee 'shall be entitled,' etc.) and yet include remedies such as reinstatement, which a mere supervisor could not possibly grant in his individual capacity." Id.  The U.S. District Court in Missouri also looked to how employer is defined in a Title VII claim to conclude that an "employer" does not extend to corporate supervisors under § 3730(h). United States ex rel. Lamar v. Burke, 894 F. Supp. 1345, 1348 (D. Mo. 1995).  In the Ninth Circuit, a supervisor cannot be sued as the employer under Title

49

VII.  <u>Miller v. Maxwell's International, Inc.</u>, 991 F.2d 583, 587

(9th Cir. 1993).  The Court sees no reason to depart from this

reasoning to attach employer liability to an individual

supervisor under Section 3730(h).

      Plaintiff argues that the Court should look to the <u>Mruz</u>

case to find that Evslin was his de facto employer.  <u>Mruz v.

Caring, Inc.</u>, 991 F. Supp. 701 (D.N.J. 1998).  In <u>Mruz</u> the U.S.

District Court in New Jersey found that there were issues of fact

as to whether an individual who dominated and dictated the

actions of the Defendant corporations and their boards in a way

that benefitted her personally could be deemed the various

whistleblower plaintiffs' de facto employer. <u>Id</u>. at 710.

      The Court is reluctant to read a 'de facto' doctrine

into the word "employer" used in § 3730(h). The Court notes that

no other case has followed <u>Mruz</u> to apply the de facto employer

doctrine in the context of § 3730(h). Furthermore, Plaintiff has

not alleged sufficient facts to demonstrate the high level of

domination and control that may have persuaded the <u>Mruz</u> court to

reserve the issue for trial. Although Plaintiff produces

committee minutes and declarations of colleagues that attest that

Defendant Evslin set agendas, called meetings, focused debates,

and influenced outcomes, this type of activity is unsurprising

for a CEO of a corporation. <u>See</u> Lockyer Opp. re. Evslin, at p.

14. Defendants also point to the KMC's By-Laws that state the

CEO/President could not make hiring and firing decisions, and that the committees made recommendations regarding physician compensation to be determined by the KMC Board, on which Evslin was a non-voting member. <u>See</u> Evslin CSF Exhs. "1," "2." Even if the evidence is viewed in a light most favorable to Plaintiff, the facts do not convince this court that the level of domination and control alleged justifies invoking the de facto employer doctrine.

For the reasons stated granting Defendants HPH Entities' Motion for Summary Judgment as to the federal whistleblower claim and because the Court concludes that Evslin was not Lockyer's employer, the Court GRANTS Defendant Evslin's Motion for Summary Judgment regarding Plaintiff Lockyer's § 3730(h) retaliation claim as to Defendant Evslin.

**B.  State Whistleblower Protection Claim**

The Hawaii Whistleblower Protection act ("HWPA") states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because: (1) the employee . . . reports or is about to report to the employer or . . . a public body, verbally or in writing, a violation or a suspected violation of a law or rule adopted pursuant to law of this State, a political subdivision of the State, or the United States . . . . .

Haw. Rev. Stat. § 378-62.

The HWPA requires a causal connection to be established

between the alleged retaliation and the whistleblowing.  Crosby
v. State of Hawaii Dep't of Budget & Finance, 76 Haw. 332, 342,
876 P.2d 1300, 1310 (Haw. 1994).  The "employee has the burden of
showing that his or her protected conduct was a 'substantial or
motivating factor' in the decision to terminate the employee."
Id.

A.  Whether Evslin was Lockyer's Employer Under HWPA

The HWPA defines "employer" to mean "a person who has
one or more employees. Employer includes an agent of an employer
or of the State or a political subdivision of the State." Haw.
Rev. Stat. § 378-61.

The instant case involves the Hawaii Whistleblower
Protection Act codified at Section 378-62 instead of the Hawaii
Fair Employment Act ("HFEA") codified at Section 378-2, but the
statutory definition of employer is nearly identical to that
under Section 378-2.[23]

The Court notes Judge Mollway's thoughtful discussion
of the split in this district as to whether a plaintiff may sue
an individual employee in the same manner as an employer under
the Hawaii Fair Employment Act ("HFEA") codified at Haw. Rev.

---

[23]  Haw. Rev. Stat. § 378-1 defines "employer" as "any
person, including the State or any of its political subdivisions
and any agent of such person, having one or more employees, but
shall not include the United States."  Haw. Rev. Stat. § 378-61
defines "employer" as "a person who has one or more employees.
Employer includes an agent of an employer or of the State or a
political subdivision of the State."

52

Stat. § 378-2.  Maizner v. Hawaii Dep't of Education, 405 F.
Supp. 2d 1225, 1233 (D. Haw. 2005).  Courts have identified two
interpretations of this definition. In one interpretation, the
phrase "having one or more employees" restrictively modifies "any
person," thus limiting the breadth of the definition of an
"employer." Maizner, 405 F. Supp. 2d at 1235.  In the other
interpretation, the statute is construed broadly to define an
"employer" to include "any agent" of the employer as long as the
employer has one or more employees.  In Sherez v. Department of
Education, 396 F. Supp. 2d 1138, 1145-48 (D. Haw. 2005), Judge
Seabright concluded that this "plain reading of the statute
strongly suggests that an individual agent can be held liable as
an employer for purposes of § 378-2."  This Court agreed with
Judge Seabright and recently held that an individual may be
liable as an agent of the employer for discrimination or
retaliation under Section 378-2.  Hale v. Hawaii Publications,
Inc., 468 F. Supp. 2d 1210, 1229 (D. Haw. 2006).

        As the Court reasoned in Hale, the plain reading and
the legislative history both suggest that the definition of
"employer" in Section 378-1 should be read broadly to include the
individual employee who is the agent of the employer.[24]  The plain

_____

        [24]  In Hale, the Court examined the legislative history:
The term "employer" was originally defined by Act 44 of the
1964 Hawaii Session Laws, 1964 Haw. Sess. Laws 44 § 2A ("Act
44"), as "any person having one or more persons in his
employment, and includes any person acting as an agent of an

language of the definition of employer in Section 378-61
similarly suggests that the legislature intended "employer" to
include the person or entity who has one or more employees and
the agent of that person or entity.  The Court finds no
persuasive reason to give different interpretations of "employer"
for the purposes of the HWPA versus the HFEA.

Drawing inferences in a light most favorable to
Plaintiff Lockyer, there are material issues of fact as to
whether Defendant Evslin, as an individual employee and
supervisor of Plaintiff Lockyer, may be considered Lockyer's
employer under HWPA.  The Court turns to whether Plaintiff has
demonstrated Defendants Evslin and HPH Entities are liable under
HWPA.

B.  Whether Lockyer's Conduct Was Protected and Causally
Connected to Defendants' Alleged Retaliation

---

employer, directly or indirectly." It is clear from the
original definition that the phrase "having one or more
persons" does not modify or limit the term "agent." Rather,
the term "employer" expansively includes "any person" that
is an agent. When the definition was amended to its current
form in 1981, both the House and Senate Standing Committee
Reports explained that the purpose of the amendment was
solely to extend liability to state and county governments.
There is no mention of an intent to suddenly immunize
individual agents from liability. See Comm. Rep. No. 549,
Reg. Sess. (House Journal 1981); Comm. Rep. No. 653, Reg.
Sess. (Senate Journal 1981). After combing through the
entire legislative history of this statute, the Court finds
no indication that the Hawaii legislature ever intended to
exclude individual agents from the definition of the term
"employer."
Hale, 468 F. Supp. 2d at 1228.

54

The HWPA differs from 31 U.S.C. § 3730(h) in how it defines protected conduct.  The HWPA prohibits retaliatory action when the employee reports or is about to report to the employer or a public body a suspected violation of state or federal law. § 378-62(1)(A).

In their arguments, the parties do not address whether Plaintiff's request for documents was protected conduct for the purposes of the HWPA.  Plaintiff has failed to demonstrate that this activity constitutes protected conduct under the HWPA.  As discussed with regard to Plaintiff's federal whistleblower protection claim, Plaintiff did not present any triable issues of fact that his request for compensation documentation was motivated by anything other than a desire to see whether he was being underpaid by KMC.[25]  Because he has not shown any evidence that he suspected a violation of state or federal law, he could not have engaged in the protected conduct of reporting or preparing to report such suspected violation to the employer or a public body.

Furthermore, even if Plaintiff had engaged in protected conduct under HWPA, he has produced no evidence that tends to show that Defendants knew Plaintiff was about to report a

---

[25]  The evidence establishes that Plaintiff did not indicate to defendant at any time during his employment, including when he requested compensation documentation and when he demanded arbitration, that he was about to report a violation of a state or federal law.

violation of state or federal law. Without such knowledge by Defendants, any alleged plans by Plaintiff to report such a violation could not have constituted a substantial motivating factor in any employment actions taken.  Plaintiff has failed to meet his burden of establishing the essential elements of his HWPA claim.

Plaintiff has failed to establish any issue of material fact as to whether he engaged in protected conduct or whether such conduct was a substantial motivating factor in Defendant's retaliatory actions. Summary judgment as to Plaintiff's claim under HWPA is GRANTED.

## IV.  Count IV: Claim for Punitive Damages

Defendant seeks summary judgment on the "Fourth Claim for Relief - Punitive Damages" count of the Complaint.  To the extent that the Complaint could be read to allege a separate and independent cause of action for punitive damages, Defendant would be entitled to summary judgment on that count because punitive damages are a type of relief sought under the other counts rather than any independent cause of action. A claim for punitive damages is incidental to a separate cause of action and not an independent claim. See, e.g., Ross v. Stouffer Hotel Co., 76 Haw. 454, 466, 879 P.2d 1037, 1049 (Haw. 1994).  Furthermore, Plaintiff has no remaining claims for which he can seek punitive damages.  The Court GRANTS Defendant's Motion for Summary

Judgment with regard to Count IV, Plaintiff's claim for punitive damages.[26]

## V.   Violations of Hawaii Rules of Professional Conduct

Plaintiff United States of America argues that Defendants HPH Entities' counsel violated Hawaii Rules of Professional Conduct 4.2 and 8.4(a),(c) when they communicated with employees at the Centers for Medicare and Medicaid Services about ("CMS"), a represented party in this case, about the subject of this case without approval of counsel.[27]

Rule 4.2 of the Hawaii Rules of Professional Conduct states, "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

Comment 1 to Rule 4.2, states, "Communications

---

[26]   The instant Motions only addressed Counts I through IV of Plaintiffs' Original Complaint. The Court does not address the availability of punitive damages with respect to Counts V and VI of Plaintiffs' First Amended Complaint.

[27]   Rule 8.4 states, "It is professional misconduct for a lawyer to: (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . . (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . ."
The United States argues that the Defendants collectively violated Rule 8.4 when they presented the e-mail communication, gained in violation of 4.2, as evidence in support of their Motion.

authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter." This comment recognizes a government official exception to the general ban on communication with a represented party without the consent of the other lawyer.

Here, Defendants' counsel engaged in email conversations with CMS officials about the incident to rules under Medicare Part B. Defendants present evidence of an email in which they notified the CMS officials that the matter was in litigation with the U.S. government, represented by the Assistant U.S. Attorney. <u>See</u> HPH Reply to U.S. Motion, Exh. "33." In the email reply, the CMS official stated that he would "be happy to talk about the general policies but would not want to discuss the details of a specific case." <u>Id.</u> The United States presented declarations by the CMS official stating he does not recall seeing the disputed email discussion. <u>See</u> U.S. Suppl. Decl. of Terrence L. Kay. The evidence shows that CMS officials only opined as to a general policy, not specific facts, and in any event, the government official exception to Rule 4.2 is clearly implicated. While the better practice would have been for Defendants' counsel to notify opposing counsel prior to their communications with CMS officials, nevertheless, the communication falls within the exception contemplated by Comment 1 to the Rule.

The Court concludes that Defendants did not violate Hawaii Rules of Professional Conduct 4.2 or 8.4.

## VI.  Defendant Evslin's Motion to Strike

Defendant Evslin filed a Motion to Strike Hearsay and Other Improper Testimony from Plaintiff Lockyer's Memorandum in Opposition to Evslin's Motion for Summary Judgment.

The Court declines to rule on Defendant Evslin's Motion to Strike as moot.  The Court either has not relied upon the particular evidence that Defendant Evslin wishes to strike or reaches its decision to grant Defendant Evslin's substantive motion for summary judgment notwithstanding the evidence at issue.

## CONCLUSION

For the foregoing reasons, the Court:

GRANTS Defendants' Motion for Summary Judgment as to Plaintiffs' claim under the federal and state False Claims Acts (Count I).  There are no genuine issues of material fact as to whether KMC knowingly submitted false claims to Medicare under the "incident to" rules.

GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's common claim for retaliation in violation of state public policy (Count II).  The public policy exception set forth in Parnar is not applicable to Plaintiff, who is not an at-will employee.  In any event, there is a sufficient statutory remedy

59

for violations of the state false claims act to preclude a common law <u>Parnar</u> remedy.

GRANTS Defendants' HPH Entities' Motion for Summary Judgment as to Plaintiff's Federal Whistleblower Protection Act claim (Count III). The Plaintiff has not established that any issue of material fact exists as to whether he engaged in protected conduct under the FCA or whether KMC knew about his protected activity.

GRANTS Defendant Evslin's Motion for Summary Judgment of Plaintiff's Federal Whistleblower Protection Act claim (Count III) on the same grounds as HPH's Motion and because, as an individual employee, Evslin was not Lockyer's employer under the federal whistleblower provision of the FCA.

GRANTS Defendants HPH Entities' and Evslin's Motions for Summary Judgment as to Plaintiff's State Whistleblower Protection Act claim (Count III) because Plaintiff's actions of requesting salary documentation or an audit were not protected conduct under the Act and there is no evidence establishing issues of fact as to whether this conduct was a substantial motivating factor in Defendant's alleged retaliatory actions.

GRANTS Defendants' Motion for Summary Judgment as to punitive damages (Count IV) because Plaintiff cannot make an independent claim for punitive damages and because Plaintiff has no surviving claims in the Original Complaint (Counts I -III) for

which he can claim punitive damages.

The only remaining claims in the case are Counts V and VI of Plaintiffs' First Amended Complaint asserting additional violations of the federal False Claims Act, which were not addressed by the instant Motions and Order.

IT IS SO ORDERED.

DATED: HONOLULU, HAWAII, April 16, 2007.



_____
Alan C. Kay
Sr. United States District Judge

UNITED STATES ex rel. LOCKYER v. HAWAII PACIFIC HEALTH, et al., Civ. No. 04-00596 ACK-LEK, ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' ORIGINAL COMPLAINT COUNTS I-IV.